# IN THE UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF INDIANA

## HAMMOND DIVISION

| | | |
|---|---|---|
| **JENNIFER DOCHEE,** | **)** | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | **Case No: 2.21-cv-00275-PPS-JEM** |
| | ) | |
| **METHODIST HOSPITALS, INC.,** | **)** | |
| Defendant | ) | |

## PLAINTIFF COMPLAINT

**Now comes,** Jennifer Dochee, by and through her attorney, alleges and states as follows:

## PRELIMINARY STATEMENT

1. Plaintiff, Dr. Jennifer Dochee, brings this action against Methodist Hospital, (Defendants) for violations of Title VII of the Civil Rights Act of 1964 (Title VII) (42 U.S.C. § 2000e) the Indiana Civil Rights Laws and Regulations Public Policy (IC 22-9-1-2).

2. Defendants hired Dr. Jennifer Dochee on August 19, 2019, as an Interventional Cardiologist. Dr. Dochee is an African American woman who is over forty years of age. During her tenure at Methodist Hospital, Dr. Dochee was qualified to do her job and was doing it satisfactorily. Despite Dr. Dochee's many achievements, the defendants subjected her to racial discrimination, gender discrimination, and retaliation after she exercised her right to report the discriminatory treatment she was receiving.  The Defendants summarily terminated Dr. Jennifer Dochee, claiming, there were concerns about patient care.

## JURISDICTION

3. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331, in that this is a civil action arising under the Civil Rights Act of 1964 Title VII. This court has supplemental jurisdiction over related claims arising under state and local laws pursuant to 28 U.S.C. § 1367(a).

## VENUE

Venue is proper in this district under [42 U.S.C. § 2000e-5(f)(3), in that the unlawful employment practice was committed in Indiana /42 U.S.C. § 2000e-5(f)(3), in that the relevant employment records

are maintained in this district/42 U.S.C. § 2000e-5(f)(3), in that the aggrieved person would have worked in this district but for the alleged unlawful employment practice/42 U.S.C. § 2000e-5(f)(3), in that Methodist Hospital, has its principal office in this district, and there is no other district that has a substantial connection to the claim.

## CONDITIONS PRECEDENT

5. On April 13, 2020, Dr. Dochee timely filed a Charge of discrimination and retaliation with the Equal Employment Opportunity Commission (EEOC) and the Indiana Civil Rights Commission (ICRC).

6. On or about August 1, 2020, Charge was assigned to the Indiana Civil Rights Commission (ICRC). Plaintiff has fully complied with all prerequisites to jurisdiction in this Court under Title VII.

7. Plaintiff has satisfied statutory administrative requirements, thereby satisfying the notice requirements and citation requirements.

## PARTIES

8. Dr. Jennifer Dochee is an African American woman who resides in the City of Frankfort in the State of Illinois and is a citizen of the United States of America.

9. Dr. Dochee was an employee, as defined by Title VII, and the Indiana Code Title 22 Labor and Safety Article 3 § 22-3-6-1 Definitions. As an Interventional Cardiologist, Dr. Dochee works in a very specialized field.

10. Upon information and belief, the defendant is an Indiana corporation with corporate headquarters located in the City of Merrillville in the State of Indiana. Defendant maintains offices and does business in Merrillville and Gary Indiana. Methodist is an employer as defined by Title VII and Indiana Code Title 22 Labor and Safety Article 3 § 22-3-6-1. Definitions. Methodist employees over 3,260 employees.

## FACTS

15. Dr. Jennifer Dochee began working for Defendant[s] on July 3, 2019, as an Interventional Cardiologist in the Cardiology Department at the Gary Indiana Methodist Hospital. Her contract was for 3 years with a salary of $650,000 a year.

16. During Dr. Dochee's tenure, she improved patient care through her skills and training in advanced methods being used to treat patients. She increased the life expectancy of cardiology patients. She also made a presentation to other doctors regarding innovative techniques being used in medicine, all while being discriminated against.

17. From the moment Dr. Dochee was hired, Defendant[s] began to marginalize Dr. Dochee by reassigning her duties to other employees. Defendant failed to notify her about critical changes made to patients assigned to her. She was not included in meetings related to patient care, the re-assignment of her patients, or the changing of patient treatment. This subjected her to a de facto demotion, without notice or investigation by the appropriate authorized body. Dr. Dochee did not observe this happening to her male colleagues.

18. For example, Dr. Dochee, upon being employed by Defendant was told that she must do daily rounds with less experienced doctors that did not have the credentials or the wealth of experience Dr. Dochee holds. She also observed other less experienced male doctors were not being required to do daily rounds like she was told she must do. When she mentioned this to her supervisor, she knew this was discrimination. He did not seem happy that she had pointed this out to him. A week later, the matter was dropped.

19. On or about August 12, 2019, Dr. Dochee met with Chief Executive Officer Matt Doyle. She expressed to him that she was being discriminated against by the male doctors because she is African American and a woman. She told him about the almost daily attempts to usurp her authority, the disparaging treatment, and the hostility she was being subjected to. CEO Doyle told her he would speak with the male doctors.

20. On or about November 2019, Dr. Vincent Sevier called Dr. Dochee into a meeting, stating she was accused by a male doctor, Dr. Milhas Kodenchery, of yelling at him, and he wanted Dr. Dochee reprimanded. An investigation was conducted, and the allegation was deemed "unfounded" after witnesses told the investigator that Dr. Dochee never raised her voice, but the other doctor raised had his voice at her. Dr. Dochee realized that this was an attempt to get her fired.

21. On or about December 4, 2019, after Dr. Dochee arrived at work, Dr. Sevier told her he wanted to speak with her. When she met with him, he mentioned the unfounded incident with Dr. Kodenchery. Two or more people were present at this meeting. Dr. Sevier stated that she appeared to be an "Angry Black Woman" and she should be softer and nicer. He said she needed to lower her voice, in a mocking tone. Dr. Sevier appeared to take pleasure in stating this in from of her colleagues. He had a smirk on his face while speaking. Plaintiff found out that she was routinely called Angry Black women behind her back by male doctors. Dr. Jennifer Dochee was humiliated, embarrassed, and infuriated all at the same time. She had seen male doctors yelling at patients and other staff continuously. Dr. Sevier never brought them into a meeting to tell them to "be softer". The allegations that she raised her voice at a doctor were unfounded. This was done simply to send the message that she was not wanted there because she is an African American woman.

22. January 29, 2020, Dr. Sevier called another meeting with Dr. Dochee and other colleagues, stating that an employee named Reneker alleged that Dr. Dochee became angry at him about a task he was supposed to complete. An investigation was done, and the allegation was deemed "unfounded", again.

23. On several occasions, inappropriate comments were made about Dr. Dochee's race. For example, when she first began working at Methodist, another employee warned her that she should be very careful because the Indian Mafia had decided any did not want a Black woman doctor there and that they would "get some dirt" on Dr. Dochee to make her leave. She reported this to her supervisor, and nothing was done.

24. Plaintiff was routinely accused of wrongdoing and treated with contempt by her colleagues. She was not invited to numerous social events that were work-related but her male counterparts were. She attempted to join in the gatherings, but she was ignored or viewed with disdain by those male doctors that were present.

25. In addition, to Dr. Dochee being marginalized, Methodist treated similarly situated employees more favorably that did not share the same race and gender as Dr. Dochee.
For example, Dr. Dochee's credentials were more highly scrutinized than other doctors. Her duties were diminished while those same duties were given to less experienced male doctors. Her medical decisions were continuously being questioned while other male doctors' decisions were viewed more favorably, the other nonprotected doctors never seemed to be questioned or scrutinized

26. On or about February 22, 2020, Methodist Hospital hosted a Masquerade Party and Plaintiff decided to attend in an effort to get to know and to speak with her colleagues in a more relaxed atmosphere. The hope was that the hostility she was experiencing would dissipate. Dr. Dochee was at the party looking for some of her friends who said they would attend. Suddenly, Dr. Sevier appeared and began hugging her

very tightly. He was rubbing her arms and touching her excessively. She was surprised, appalled, and disgusted all at the same time.  He was smiling, laughing while talking to her. It was at best very bizarre. Dr. Dochee knew that at no point with her employment at Methodist Hospital had she ever indicated to Dr. Sevier that she wanted a hug from him or that he was welcome to touch her in that manner.  She attempted to move again away from him, but he seemed to continue to follow her until she met up with the friends she had been looking for. She left the party shortly after that because her friends had seen what happened. The next day at the hospital, people began saying that she was having an affair with Dr. Sevier even though that was far from the truth. Once again, her reputation had been tarnished because of Methodist Hospital.  She became the joke of the hospital as the rumors spread.  She felt violated and disrespected.

26.  On or about March 13, 2020, Dr. Dochee received a message to meet with CEO Matt Doyle. She figured the meeting was about her discrimination complaints. When she arrived, the CEO was not there. Dr. Sevier had organized the meeting. Dr. Dochee became concerned immediately.  Dr. Sevier was one of the main doctors that she complained about that was discriminating against her.  She was told that her contract was being terminated due to low productivity. Dr. Dochee stated that Dr. Sevier had been systemically moving her patients to other doctors so how productive could she be if he was doing that. He did not answer her but went on to say this is your 90-day notice and if you don't sign the resignation immediately, she would not receive 3 months' severance pay. Dr. Dochee had no other choice.  She knew this was just another way to get rid of her. She was ordered to turn over her keys and identification badge. She was informed that she no longer has access to her hospital emails.  Dr. Dochee stated that several of her patients are still receiving treatment and they communicate with her via email. She was told she could not access the information in the emails. She simply walked out of the hospital, feeling that she was at the lowest point in her life.

27.  On or about July 9, 2020, Dr. Dochee received a letter from Methodist Hospital stating for the remaining 90 days of her contract she would be placed on Focused Professional Practice Evaluation (FPPE)., signed by Dr. Kumar Venkat, Chief of Division of Medicine and who was also one of the people named as a person who discriminated against Dr. Dochee. The letter stated there were some "concerns/issues around the standard of care related to a patient". It went on to state a new protocol she would be placed on, which included Dr. Dochee being proctored by an independent person who Dr. Dochee would have to pay for.

The letter listed the number of procedures she must perform and the time she was required to complete them. Additionally, she was required to submit proof that she had performed several procedures, which her credentials and certifications showed she had completed. Moreover, the letter used inflammatory language that was simply untrue. The sentences stated:
 *"The Medical Staff Quality Committee has submitted a case summary of concerns/issues around standard of care which was leveled with death or loss of function, issue with physician clinical judgment or decision-making and issue with physician diagnostic or treatment planning standard of care not met, reasonably expected complication, not managed in an appropriate manner."*

This was simply not true. None of the patients assigned to Dr. Dochee experienced any of these things. Under the bylaws of Methodist Hospital, the Division of Medicine did not have the authority to make such a decision.  Dr. Dochee knew that this was directly related to her complaint of discrimination and that this was retaliation. She knew she had to hire an attorney.

28.  On or about July 17, 2020.  Attorney Michael Brohman submitted a 4-page letter on behalf of Dr. Jennifer Dochee specifically addressing the fact that the committee submitting the letter was not authorized to require her to be proctored or submit to their demands. This committee was in violation of not only the hospital bylaws when the letter was sent, but it was also in violation of the hospital policies. Dr. Dochee's privileges were reinstated that day.

29.  On August 1, 2020, Dr. Jennifer Dochee filed a Charge of discrimination against Methodist Hospitals.

30.  Dr. Dochee began searching for employment elsewhere. On or about October 2, 2020, Dr. Dochee was informed by Pinnacle Hospital that Methodist had given her an unfavorable review and that was the reason they could not hire her. Dr. Dochee told the administrator what happened. They went on to state if she could clear the matter up, they would hire. She met the same fate with all the local hospitals she applied to. Methodist purposely caused her to miss out on employment elsewhere by telling unsubstantiated lies about her. In the medical profession, your reputation is very important. Barnes-Jewish/Christian Health Care (BJC) did not say that Methodist gave a negative review, but Methodist has worked closely with BJC, so the rejection she received was not a surprise. Methodist ruined her reputation as part of the ongoing scheme to retaliate against her. Dr. Dochee was unable to obtain a job, even though she applied to numerous hospitals for more than 365 days, she remained unemployed.

31. As a result of the continuing retaliation, Dr. Dochee filed a complaint with the ICRC on November 3, 2020.  Plaintiff amended the Charge to include discriminatory treatment and retaliation. Specifically, she stated that she experienced continuous harassment related to discrimination based on being an African American woman and she was retaliated against because of her ongoing Charge filed with the ICRC.

32. On or about November 12, 2020, a Demand Letter was sent to Methodist Hospital's Corporate Counsel stating the information included here. (included in Exhibit A).  Defendant stated to Plaintiff's Counsel that his client was unwilling to settle.

33  On November 13, 2020, a Fact-Finding Conference was held where it was stated by Dr. Sevier that Dr. Dochee's employment had been terminated due to COVID19. Defendant refused to negotiate a settlement.

34.  On or about May 10, 2021, the Gary Human Rights Commission (GHRC) made a determination of **PROBABLE CAUSE** stating that they believe that an illegal act of discrimination had occurred.

35.  On or about May 17, 2021, Respondent sent a conciliation request to the agency. Plaintiff agreed to meet. Respondent made a nuisance monetary offer, but no offer was made to give Dr. Dochee her job back.  The conciliation was not successful, and Plaintiff elected to have a public hearing. The hearing was scheduled for September 22, 2021.

36.  On September 9, 2021, Plaintiff was notified that Respondent had elected to move the case to Federal District Court.

37.  Attached you will find Exhibit A, which is the case file created by the GHRC. Plaintiff reserves the right to add additional documents as allowed by the Court.

**COUNT ONE**
**Race Discrimination in violation of Title VII of the Civil Rights Act**
**(42 U.S.C. §§ 2000e et al.)**

38.  Dr. Dochee repeats and realleges paragraphs 1 through 35 hereof, as fully set forth herein.

39..  Dr. Dochee is an African American and a woman. She is a member of two protected classes. She was well qualified as a Cardiologist when Defendant[s] fired her.

40.  Defendant[s] regularly made discriminatory comments to other personnel and her co-workers regarding her being an angry Black woman. For example, Dr. Sevier used the derogatory phrase in a meeting at Dr. Dochee in front of other personnel.

41.  In addition, Dr. Sevier and Dr. Kuvat marginalized Dr. Dochee while treating similarly situated employees more favorably. Specifically, allowing male doctors with less experience not to do daily rounds but telling her she was required to do them. Another example includes removing duties she was hired to do but giving those same duties to other less experienced doctors. Requiring her to re-submit credentials two times but only requiring male doctors to do it only once.

42. Dr. Dochee suffered damages as a result of Defendant['s/s'] unlawful discriminatory actions, including emotional distress, past and future lost wages and benefits, and the costs of bringing this action. She attempted

43.. Methodist intentionally violated Dr. Dochee's rights under Title VII, with malice or reckless indifference, and, as a result, they are liable for punitive damages.

## COUNT TWO

### Retaliation in Violation of Title VII of the Civil Rights Act of 1964
### (42 U.S.C. §§ 2000e et al.)

44.  Dr. Dochee repeats and realleges paragraphs 1 through 34 hereof, as if fully set forth herein.

45.  On or about August 19, 2019, Dr. Dochee engaged in protected activity by complaining to Chief Executive Officer Matt Doyle about Dr. Sevier and other male doctors' discriminatory treatment based on Dr. Dochee's gender and race. Specifically, how Dr. Sevier was interfering with the treatment of her patients and how her male colleagues had been questioning how she became a Cardiologist because she is Black and a woman. There were numerous incidents se relayed to Mr. Doyle from doctors refusing to speak to her to being yelled at publicly by male doctors and then her being accused of doing it. CEO Doyle responded that he would talk to the other male doctors and tell them to stop.

46. There were only 206 days after Dr. Dochee complained of race and gender discrimination to CEO Doyle and when she was summarily fired by Methodist. The reason given in the letter was low productivity. This was a pretext because she was never told what the productivity standard was and, on another occasion, Dr. Sevier stated it was due to COVID 19.

47. Defendant's alleged reason for terminating Dr. Dochee's employment is pretextual and baseless. Defendant[s] fired Dr. Dochee because she complained of race and gender discrimination to CEO Matt Doyle and the ICRC.

48.  Dr. Dochee suffered damages as a result of Defendants' unlawful retaliatory actions, including emotional distress, past and future lost wages and benefits, and the costs of bringing this action. Dr. Dochee attempts to gain employment because of false information given to prospective employers by Methodist Hospital.  Her business failed because the false information caused other hospitals not to refer patients to her.

49. Methodist intentionally violated Dr. Jennifer Dochee's rights under Title VII, with malice or reckless indifference, and, as a result, is liable for punitive damages.

## COUNT THREE

50.  Dr. Dochee repeats and realleges paragraphs 1 through 35 hereof, as if fully set forth herein.

51.  Dr. Dochee is a member of two protected classes. She is African American and female.

52.  Dr. Dochee, in all respects, was performing her job in a manner that was consistent with her contracted duties as a Cardiologist at Methodist Hospital.

53.  Methodist discriminated against Dr. Dochee as described above, including but not limited to harassment and being subjected to a hostile work environment

54. Methodist retaliated against Dr. Dochee as described above.

55. Methodist's actions were taken with willful and wanton disregard of Dr. Dochee's rights under Title VII 42 U.S.C. § 2000e) the Indiana Civil Rights Laws and Regulations Public Policy (IC 22-9-1-2).

56. As a direct and proximate result of such unlawful employment practices of Methodist Hospital and in disregard of Dr. Dochee's rights, she suffered humiliation, degradation, emotional distress, a loss of her good reputation, employment, lost wages, and other consequential damages.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff, Jennifer Dochee respectfully requests judgment as follows:
A. Accept jurisdiction over this matter;
B. Award Plaintiff for her past and future loss of wages and benefits, plus interest;
C. Award to Plaintiff liquidated damages incurred in connection with this action, equal to the sum amount of back pay and interest;
D. Award to Plaintiff all costs and reasonable attorneys' fees incurred in connection with this action;
E. Award to Plaintiff compensatory damages;
F. Award to Plaintiff punitive damages; and
G . Grant Plaintiff such additional or alternative relief as the Court deems just and proper.

## JURY DEMAND
Plaintiff demands a trial by jury on all claims properly triable by a jury.

March 18, 2022

Respectfully submitted,

s/ Jennifer Witherspoon_____
Jennifer Witherspoon
J. Witherspoon Law Firm
32 N. West St. Suite 100
Waukegan, IL. 60085
(847) 672-7819
Attorney for Jennifer Dochee

<u>Certificate of Service</u>

I hereby certify that on March 18, 2022, I electronically filed the foregoing with the Clerk of Court using CM/ECF system which sent notification of such filing to the following:


Steven Scott
sscott@hodgesdavis.com                                                        Jennifer Witherspoon

# Exhibit A





**Gary Human Relations Commission**
Haneefah Khaaliq, Executive Director

September 9, 2021

Attorney Steven J. Scott
8700 Broadway
Merrillville, IN 46410

RE: Charge Numbers:    470-2020-03359 & 0920ReSR091
Charging Party:       Jennifer Dochee, M.D.

Dear Mr. Scott:

This letter is with reference to the above captioned charge filed by a representative of my staff on behalf of your client Dr. Jennifer Dochee.

This is to notify you that since your firm has respectfully requested the removal of the above referenced charge to federal court. We have administratively closed the case without prejudice to either party.

Thank you for your cooperation in the subject inquiry.

Sincerely,
GARY HUMAN RELATIONS COMMISSION

Haneefah Khaaliq
Executive Director

Certified Number: **7020 0640 0001 4986 3929**

CC: Dr. Jennifer Dochee
8631 Stone Creek Blvd
Frankfort, IL 60423

FAX: (219) 882-0373      Contact: (219) 883-4151 / (219) 805-7977      Address: 455 Massachusetts, Gary IN 46402

  

**Gary Human Relations Commission**
Haneefah Khaaliq, Executive Director

September 9, 2021

Attorney Jennifer Witherspoon
32 N. West St. Suite 100
Waukegan, IL 60085

Charge Numbers: 470-2020-03359 & 470-2020-03359
Respondent: The Methodist Hospitals, Inc.

Dear Ms. Witherspoon:

This is to notify you that since, the above referenced Respondent has respectfully
requested the removal of the above referenced charge to federal court. We have
administratively closed the case without prejudice to either party.

Thank you for your cooperation in the subject inquiry.

Sincerely,

Haneefah Khaaliq
Executive Director
GARY HUMAN RELATIONS COMMISSION

Certified Number: **7020 0640 0001 4986 7163**






Re-imagine



**Gary Human Relations Commission**
Haneefah Khaaliq, Executive Director



August 24, 2021

ATT: Attorney Jennifer Witherspoon
32 N. West St. Suite 100
Waukegan, IL 60085

RE: PUBLIC HEARING NOTICE
Case Name: Dochee vs. The Methodist Hospitals, Inc.
FEPA: 0920ReSR091 EEOC: 470-2020-03359

On August 1, 2020, Dr. Jennifer Dochee filed a charge of discrimination against
Methodist Hospitals, resulting in an agency PROBABLE CAUSE DETERMINATION.
We believe that an illegal act of discrimination did occur.

On May 10, 2021, the Respondent was sent correspondence regarding this determination.
On May 17, 2020, the Respondent sent a conciliation request to the agency. The
conciliation attempts were unsuccessful. Therefore, and in accordance with our local
ordinance, rules and regulations, the matter will now proceed to a public hearing where
the details of the case will be examined before the Gary Human Relations Commission,
its members, and any interested members of the public. Each party should be prepared to
provide both opening and closing statements, generally present their argument, and call
witnesses. The opportunity to question opposing counsel will also be given.

**The public hearing date has been scheduled for September, 22, 2021, at 10:00 a.m.
via Zoom.** This meeting will be recorded. No pre-hearing conference has been scheduled
for this matter. The information regarding how to access this virtual hearing will be
provided to you at a later date. It is your responsibility to ensure you are able to receive
communication from this office.

The information contained in this correspondence includes information regarding an
agency public hearing. Please read all the documents enclosed and contact the agency
should you have any questions or concerns.

Sincerely,
Haneefah Khaaliq, Esq.
Executive Director

**Certified #:**

FAX: (219) 882-0373        Contact: (219) 883-4151 / (219) 881-5225        Address: 455 Massachusetts, Gary IN 46402

Enclosed: Acknowledgment and Order, Supplemental Acknowledgment and Order, FAQ

CC: e-mail: witherspoonlegal@gmail.com

CC: Dr. Jennifer Dochee
8631 Stone Creek Blvd.
Frankford, IL 60423

The City of Gary Human Relations Commission

## ACKNOWLEDGMENT AND ORDER

This acknowledges receipt of your request for a conciliation conference. Although conciliation attempts failed, the agency has determined that this issue may proceed to a public hearing. 29 C.F.R. §1614.109 shall govern the conduct of hearings.

The Presiding Officer whose name appears below has been assigned to preside over this complaint. Failure to follow the orders of the Presiding Officer or to comply with the Commission's regulations may result in sanctions or a suit. See 29 C.F.R. §1614.109 (f) (3). When a conflict between the parties arises, the parties should attempt to resolve the conflict themselves before bringing it to the attention of the Presiding Officer.

**Presiding Officer: Haneefah Khaaliq, Esq., Executive Director**

I. Correspondence and Motions

Each party may provide the opposing party with a copy of all correspondence that he/she sends to the Presiding Officer. The attachment of a certificate of service may demonstrate that the opposing party was provided a copy. Failure to provide a copy of submissions to the opposing party may result in return of such submissions without consideration. The parties are reminded of their ongoing obligation to keep this office informed of their current mailing address. Other than to clarify a procedural issue or during alternative dispute resolution, it is inappropriate for the parties to engage in ex parte (one-sided) communication with the Presiding Officer from the date the public hearing has been set.

Extensions of filing dates and postponements will not be granted absent a prompt request in writing and a showing of good cause. Failure by Complainant or Respondent to obtain representation, or failure of the Agency to assign this matter to a representative, will not be grounds for postponement.

II. Designation of Representative

The parties are entitled to be represented. However, the complainant is not required to be represented. The agency does not provide representatives for either party. Even if Complainant has previously designated a representative for counseling and agency investigation of the complainant, he/she must renew that designation for the purpose of the local agency's processing of this complaint. The parties must inform this office of the name, address and telephone number of their respective representative. If that representative changes, or if a currently unrepresented complainant obtains representation in the future, the party shall notify the Presiding Officer and the other party immediately.

III. Partial Dismissals

The parties have fifteen (30) calendar days from receipt of this Order to identify any claims the Agency has dismissed from the complaint during the Agency investigative process pursuant to 29 C.F.R. § 1614.107 (a) and to comment on the appropriateness of each dismissal. Once the opportunity for identification and comment has passed, the Presiding Officer will determine pursuant to 29 C.F.R. § 1614.107 (b) the appropriateness of the Agency's decision to dismiss each claim. If the Complainant fails to oppose in writing the dismissal of a claim within the 30-day comment period, the opportunity to have the dismissal reviewed by the Presiding Officer shall be deemed waived.

IV. Settlement

Within 10 calendar days of receipt of this Order, the parties are directed to contact each other to define the issue(s) presented, to develop stipulations (i.e., agreements between the parties that certain facts are true for purposes of adjudicating this complaint) and to discuss settlement. The parties must discuss specific settlement proposals. The Agency may designate an individual with settlement authority to attend settlement discussions convened by the Presiding Officer. The Presiding Officer has settlement authority.

V. Discovery

The parties are hereby notified of their right to seek discovery prior to the hearing in accordance with 29 C.F.R. Section 1614.109(d). The parties must cooperate with each other in honoring discovery requests. The parties are expected to initiate and complete needed discovery with a minimum of intervention by the Presiding Officer. Except as indicated below, copies of interrogatories, requests for production of documents, requests for admissions, deposition notices and transcripts, and responses to such should not be sent to the Presiding Officer.

Discovery shall be completed within twenty-five (25) calendar days from the date of receipt of this Order unless otherwise directed by the Presiding Officer. If the parties agree between themselves to extend discovery deadlines that would, in turn, extend the 25 day deadline, the parties must seek the Presiding Officer's prior approval.
The method and scope of discovery shall be subject to the following:
Interrogatories shall be limited to one set. The set of interrogatories shall contain no more than ten (10) questions including subparts.
Requests for production of documents must be specific and identify the documents or types of documents requested. Requests for production of documents shall contain no more than ten (10) requests including sub-parts.
Requests for admissions shall not exceed ten (10) in number including sub-parts.
The Agency must make employees available for deposition. Absent prior approval from the Presiding Officer, a party must initiate discovery within fifteen (15) calendar days of receipt of this Order. If a party does not submit a timely discovery request, the Presiding Officer may determine that the party has waived the right to pursue discovery.

A party must respond to a request for discovery within five (5) calendar days from receipt of the request. Requests for discovery and objections to such requests must be specific. A

notice of deposition does not require a written response; however, any objection to a notice of deposition must be served promptly on the moving party. A deposition may be noticed and taken at any time during the discovery period.

Discovery motions, including motions to compel, must be filed within five (5) calendar days after receipt of a deficient response or after the response to the discovery is due, whichever occurs first. Motions to compel and other discovery motions must be accompanied by the discovery requests and responses and a declaration stating that the moving party has made a good faith effort to resolve the discovery dispute. The declaration shall indicate the efforts made to resolve the dispute and identify which items remain in dispute. Statements in opposition to discovery motions must be filed within ten (10) calendar days of receipt of the motion. Rulings will be made based upon the written submissions. The failure to timely file objections to discovery may result in the objections being deemed waived.

VI. Sanctions or Suit for Failure to Follow Orders

Failure to follow this Order or other orders of the Presiding Officer may result in sanctions and/or suit pursuant to 29 C.F.R. §1614.109(f) (3). The Presiding Officer may, where appropriate:

Draw an adverse inference that the requested information, or the testimony of the requested witness, would have reflected unfavorably on the party refusing to provide the requested information;
Consider the matters to which the requested information or testimony pertains to be established in favor of the opposing party;
Exclude other evidence offered by the party failing to produce the requested information or witness;
Issue a decision fully or partially in favor of the opposing party; or
Take such other actions as appropriate.

VII. Decision Without a Hearing

Pursuant to 29 C.F.R. §1614.109(g)(1), a party may file a motion for summary judgment if that party believes that some or all material facts are not in genuine dispute and there is no genuine issue as to credibility. A motion for summary judgment must include a statement of the undisputed material facts. Unless otherwise ordered by the Presiding Officer, a motion for summary judgment must be filed not later than fifteen (15) days after the close of discovery. The opposing party will then have five (5) days from receipt of the motion in which to file a response. The moving party will then have five (5) days from receipt of the response to file a reply. Motions for summary judgment and responses to such motions shall contain specific citations to reference evidence (e.g., cite the specific pages of the report of investigation, or other submitted evidence in support of an argument).

The Presiding Officer may also issue summary judgment on his/her own initiative, pursuant to 29 C.F.R. §1614.109 (g) (3).

The Presiding Officer may also dismiss a complaint pursuant to 29 C.F.R. §1614.109 (b) for any of the reasons set forth in 29 C.F.R. §1614.107 (a). The Presiding Officer may dismiss complaints on his/her own initiative, or upon the Agency's motion to dismiss a complaint.

VII. Amendment and Consolidation of Complainants

Pursuant to 29 C.F.R. §1614.106(d), the Complainant may move to amend his/her complaint to add claims that are like or related to the original complaint. In order to amend the complaint, the Complainant shall submit a motion as early as possible to the Presiding Officer stating the new claim, the date(s) when it occurred, and why it is like or related to the original complaint. The Presiding Officer may amend the original complaint to include the new claim(s) if he/she finds the new claim is like or related to the original complaint. Motions to amend filed late in the process may be denied.

The Presiding Officer also has discretion to consolidate complaints pursuant to 29 C.F.R. §1614.606. The parties shall advise the Presiding Officer in writing of any other complaint(s) pending at any stage of processing and should include all case number(s) or other information identifying such complaint(s).

HANEEFAH KHAALIQ, ESQ.
Presiding Officer
Gary Human Relations Commission

The City of Gary Human Relations Commission

**Supplemental Acknowledgment and Order**

This order supplements the Acknowledgment and Order (or Consolidated Acknowledgment and Order) previously issued in this case. This order has been adopted to further standardize practice and procedure in cases before the Presiding Officer of the Gary Human Relations Commission.

Service and Receipt of Orders

1. Service of any order issued by the Presiding Officer on the parties is complete upon mailing. The order will be presumed to have been received by the parties not later than 5 calendar days after mailing.

**Correspondence and Motions**

2. Faxed submissions are authorized. Do not submit the original via U.S. Mail or other delivery means if the item has been previously faxed. Unless expressly authorized by the Presiding Officer, any submission faxed to any fax number other than (219) 882-0373, or any submission that exceeds 20 pages in length, will be automatically rejected. Parties may not circumvent the restriction on number of pages faxed by "batching" submissions.

3. Any request or motion of a party requiring action by the Presiding Officer will prominently indicate whether the matter is opposed by the other party. All correspondence, requests and motions will be dated (month/day/year). Communication with the Presiding Officer via e-mail is authorized.

4. Parties and their representatives may not assume that a motion or request filed with the Presiding Officer, even if unopposed by the other party, will be approved. The mere act of filing a motion or request will not operate to extend a deadline or setting.

**Citations To Legal Authorities**

5. When citing to legal authorities in briefs and other pleadings, parties are advised to focus on applicable statutes and U.S. Supreme Court case law and on Commission case law, regulations, directives and instructions. The case law of federal circuit courts of appeal and district courts, while perhaps persuasive, is not necessarily the dispositive law of the case.

**Designation of Representative**

6. If represented, the parties will act through their respective designated representatives in regard to all matters involving the case. Pleadings filed in the case will be signed by the representative, whose signature block will include the representative's mailing address,

telephone number and fax number (if any) and indicate the party on whose behalf the representative is acting (e.g., Complainant's Representative).

**Settlement**

7. Settlement of cases without the necessity for a hearing or issuance of a decision by the Presiding Officer is highly encouraged. During the course of settlement discussions, the parties are expected to discuss and consider specific ideas, methods and means of resolving all matters in controversy, recognizing that compromises by both parties may be required in order to reach a settlement. Discussions that merely restate and reinforce the parties' respective positions are unlikely to resolve the complaint and are discouraged. Alternative methods or means of dispute resolution ("ADR"), for example, mediation, affords parties the opportunity to craft creative settlement solutions that bi-lateral negotiations between the parties oftentimes do not. Use of ADR, therefore, is encouraged. Ideally, ADR should be undertaken after discovery is completed and well in advance of the scheduled hearing. In addition to contacting each other during the first 10-days after receipt of the Acknowledgment and Order, if no settlement is reached, the parties are directed to again contact each other during the week preceding the scheduled pre-hearing conference and to jointly assess prospects for settlement. During the pre-hearing conference the parties are expected to brief the Presiding Officer concerning all prior settlement efforts. Neither party, however, is obligated to settle. If no settlement is forthcoming, a decision by the Presiding Officer will be issued in due course, with or without a hearing, as appropriate.

8. In the event a settlement is reached, the parties will execute a written settlement agreement (or memorandum of agreement) and promptly deliver a copy to the Presiding Officer or, upon request, the hearing record may be opened and the settlement terms read into the record. Any previously scheduled pre-hearing conference or hearing will not be cancelled until the foregoing is accomplished. If a hearing has been scheduled, the parties may not release the witnesses or the recorder unless authorized by the Presiding Officer.

**Discovery**

9. Discovery that is timely and properly conducted facilitates expeditious adjudication of complaints. Non-compliance or untimely compliance with parties' legitimate discovery requests, or hyper-technical responses or objections to discovery requests, defeat this purpose and are discouraged, and may subject the parties or the parties' representatives to sanctions.

10. Parties are encouraged to enter into discovery agreements tailored for the particular case, failing which, the provisions and deadlines contained in the Acknowledgment and Order will be strictly followed and enforced. Requests for extensions of discovery deadlines delay orderly processing of the case and are discouraged. Extensions will be granted only upon a showing of good cause.

11. Parties will not send copies of discovery requests or discovery responses to the Presiding Officer unless they are exhibits to a pending discovery motion (e.g., a motion to compel).

12. Parties are requested to give the Presiding Officer written notice of the date discovery is commenced or if discovery is waived.

**Witnesses**

13. The parties may request approval of witnesses to testify at the hearing. The request must be made to the Presiding Officer in writing and a copy provided to the opposing party. The request will include the name, position, and location of each witness. The request also will number each witness and will include a synopsis of the expected testimony of the witness in relation to the issue(s) to be decided in the case. Only witnesses whose testimonies are relevant and material to the issue(s) to be decided, and which are not repetitive of other witness testimony, will be approved. Absent a showing of good cause, submission of a witness list after the specified deadline may result in disapproval of some or all of the requested witnesses.

14. Attendance of any approved witness who is not currently a federal employee is the responsibility of the party requesting the witness.

15. It is assumed that the Complainant intends to testify at the hearing and, therefore, is automatically approved as a witness.

**Hearing Exhibits**

16. Documents comprising the Report of Investigation constitute a portion of the record of this case, are deemed admitted into evidence and need not be re-offered into evidence by either party. Copies of documents not already part of the Report of Investigation, which either party intends to offer into evidence at the hearing will be pre-marked for identification and delivered to the Presiding Officer at the pre-hearing conference, and to the opposing party (or his/her representative). Parties will pre-mark exhibits, individually, using the designations, "C-1, C-2, C-3", et seq. The Agency will use the designations, "A-1, A-2, A-3", et seq. Unless authorized by the Presiding Officer, exhibits comprising more than 20 pages may not be faxed to the Presiding Officer.

17. The Recorder is the official exhibit custodian. Exhibits admitted into evidence at the pre-hearing will be provided to the Recorder and made part of the hearing record. Parties should provide the Recorder, by and through the Presiding Officer, a complete set of exhibits at the pre-hearing conference and, if there are more than 5 exhibits, will also prepare a list or index of the proposed exhibits.

**Pre-hearing Conference**

18. At an initial pre-hearing conference which can be scheduled in this case at your request, the parties will be prepared to discuss the following matters:

Identification and simplification of all issues comprising the complaint;
Possibility of obtaining stipulations of fact;
Status of discovery;
Disposition of pending motions and resolution of objections;
Settlement of the case;
Resolution of the complaint using mediation or another ADR method or procedure.
Scheduling the case for a hearing on the merits (have calendars available); and
Any other matter likely to facilitate orderly and timely disposition of the case.
Duration of Hearings, Rest Breaks, Etc.

19. Hearing proceedings generally will be limited to 4 hours per day. If the hearing is scheduled for a single-day hearing, proceedings generally will continue until completed. The parties should prepare and limit their hearing presentations to the available time. Generally, parties will be afforded 10-minute rest breaks mid-morning and mid-afternoon each hearing day. As meal times approach, the Presiding Officer, after consulting with the parties and their representatives, will decide whether to break for a meal and, if so, for how long. Hearing participants may ask the Presiding Officer for additional rest breaks, as necessary.

**Re-Scheduling**

20. Excepting cases involving bona fide emergencies, a party seeking to re-schedule a pre-hearing conference, hearing or other proceeding set by the Presiding Officer, must file a written request that has been sworn to before a notary public or verified via an unsworn statement. If the requested delay is for medical reasons, suitable medical documentation must be provided. Continuances will be granted only upon a showing of good cause.

**Professional Responsibility**

21. A representative who enters an appearance in a Commission proceeding becomes subject to disciplinary action by the Presiding Officer or the Commission for any improper conduct engaged in by the representative at any stage of the proceeding. A representative cannot avoid the Commission's jurisdiction in disciplinary matters by withdrawing from representation, withdrawing the complaint or request for hearing, or by removing the complaint to federal court. Any attorney representative who engages in flagrant improper conduct may be referred to the disciplinary committee of the appropriate bar association. See 29 C.F.R. §1614.109 (e).

Sanctions For Failure To Follow Orders

22. Failure of a party or a party's representative to comply with this or any other order issued by the Presiding Officer, following notice to show cause, is subject to appropriate

sanctions, including the drawing of adverse inferences, exclusion of witnesses or evidence, issuance of decisions or rulings adverse to the non-complying party, or dismissal of all or a portion of the complaint.


HANEEFAH KHAALIQ, ESQ.
Presiding Officer
Gary Human Relations Commission

**FREQUENTLY ASKED QUESTIONS**

**What is an agency public hearing?**

An agency public hearing is similar to an administrative hearing pursuant to 29 C.F.R. §1614.109, that is similar to a trial before a judge at the courthouse. As the presiding official, the Presiding Officer acts as both the judge and jury. Proceedings, for the most part, are informal. Parties generally are permitted to make opening and closing statements, offer into evidence witness testimony and documents, examine and cross-examine witnesses and raise objections and obtain rulings on objections from the PRESIDING OFFICER.

**Do I need an attorney or may I represent myself?**

You are not required to retain an attorney or have another person represent you, but you are strongly advised to have one. You may represent yourself (pro se). If you choose to represent yourself (proceed pro se,) you are expected to be familiar with the administrative rules of practice and procedure and be prepared at the hearing. At the hearing, you are required to proceed first with presentation of evidence that supports your allegations of discrimination. At all times you carry the ultimate burden of proving your case with relevant and material evidence. Given the importance of the hearing, it may be advantageous for you to retain an attorney or designate a knowledgeable co-worker, union official or other individual to represent you in the case. If you designate someone to represent you, you are expected to act through your representative. You are ineligible to receive reasonable attorneys' fees as part of any award in the case unless you are represented by an attorney.

**Can I resolve my complaint without a hearing?**

Yes. Settlement of your case without the necessity for a hearing or issuance of a decision by the PRESIDING OFFICER is highly encouraged. Settlement discussions are permissible at any stage of proceedings. During settlement discussions, you and the agency representative are expected to discuss and consider specific ideas, methods and means of resolving the dispute. It is important you understand that both parties may be required to compromise for there to be any real prospect for a settlement. Discussions that merely restate and reinforce each party's position are unlikely to resolve the complaint and, therefore, are discouraged. Alternative methods or means of dispute resolution ("ADR") afford you and the agency opportunities to craft creative settlement solutions. Ideally, you should undertake ADR after discovery is completed and well in advance of the scheduled hearing. In addition to contacting the agency representative during the first 10-days after receipt of the Acknowledgment and Order, if no settlement is reached, the PRESIDING OFFICER may direct you and the agency representative to again contact each other before the hearing to jointly assess prospects for settlement. Neither party, however, is obligated to settle. If the parties are unable to settle the dispute, the PRESIDING OFFICER will decide the case.

If you and the agency are able to reach a settlement, you are required to execute a written settlement agreement (or memorandum of agreement) and promptly deliver a copy to the PRESIDING OFFICER. The PRESIDING OFFICER also can allow the parties to go on the record and state the settlement terms. Any previously scheduled pre-hearing conference or hearing will not be cancelled until the settlement is finalized. Additionally, if a hearing is scheduled, the parties may not release witnesses or the recorder unless the PRESIDING OFFICER expressly authorizes you to do so.





**Gary Human Relations Commission**
**Haneefah Khaaliq, Executive Director**

August 24, 2021

ATT: Attorney Steven J. Scott
8700 Broadway
Merrillville, IN 46410

RE: PUBLIC HEARING NOTICE
Case Name: Dochee vs. The Methodist Hospitals, Inc.
FEPA: 0920ReSR091 EEOC: 470-2020-03359

On August 1, 2020, Dr. Jennifer Dochee filed a charge of discrimination against
Methodist Hospitals, resulting in an agency PROBABLE CAUSE DETERMINATION.
We believe that an illegal act of discrimination did occur.

On May 10, 2021, the Respondent was sent correspondence regarding this determination.
On May 17, 2020, the Respondent sent a conciliation request to the agency. The
conciliation attempts were unsuccessful. Therefore, and in accordance with our local
ordinance, rules and regulations, the matter will now proceed to a public hearing where
the details of the case will be examined before the Gary Human Relations Commission,
its members, and any interested members of the public. Each party should be prepared to
provide both opening and closing statements, generally present their argument, and call
witnesses. The opportunity to question opposing counsel will also be given.

**The public hearing date has been scheduled for September, 22, 2021, at 10:00 a.m.
via Zoom.** This meeting will be recorded. No pre-hearing conference has been scheduled
for this matter. The information regarding how to access this virtual hearing will be
provided to you at a later date. It is your responsibility to ensure you are able to receive
communication from this office.

The information contained in this correspondence includes information regarding an
agency public hearing. Please read all the documents enclosed and contact the agency
should you have any questions or concerns.

Sincerely,
Haneefah Khaaliq, Esq.
Executive Director

**Certified #:**

Enclosed: Acknowledgment and Order, Supplemental Acknowledgment and Order, FAQ

CC: sscott@hodgesdavis.com

CC: Methodist Hospitals
600 Grant Street
Gary, IN 46402

The City of Gary Human Relations Commission

**ACKNOWLEDGMENT AND ORDER**

This acknowledges receipt of your request for a conciliation conference. Although conciliation attempts failed, the agency has determined that this issue may proceed to a public hearing. 29 C.F.R. §1614.109 shall govern the conduct of hearings.

The Presiding Officer whose name appears below has been assigned to preside over this complaint. Failure to follow the orders of the Presiding Officer or to comply with the Commission's regulations may result in sanctions or a suit. See 29 C.F.R. §1614.109 (f) (3). When a conflict between the parties arises, the parties should attempt to resolve the conflict themselves before bringing it to the attention of the Presiding Officer.

**Presiding Officer: Haneefah Khaaliq, Esq., Executive Director**

I. Correspondence and Motions

Each party may provide the opposing party with a copy of all correspondence that he/she sends to the Presiding Officer. The attachment of a certificate of service may demonstrate that the opposing party was provided a copy. Failure to provide a copy of submissions to the opposing party may result in return of such submissions without consideration. The parties are reminded of their ongoing obligation to keep this office informed of their current mailing address. Other than to clarify a procedural issue or during alternative dispute resolution, it is inappropriate for the parties to engage in ex parte (one-sided) communication with the Presiding Officer from the date the public hearing has been set.

Extensions of filing dates and postponements will not be granted absent a prompt request in writing and a showing of good cause. Failure by Complainant or Respondent to obtain representation, or failure of the Agency to assign this matter to a representative, will not be grounds for postponement.

II. Designation of Representative

The parties are entitled to be represented. However, the complainant is not required to be represented. The agency does not provide representatives for either party. Even if Complainant has previously designated a representative for counseling and agency investigation of the complainant, he/she must renew that designation for the purpose of the local agency's processing of this complaint. The parties must inform this office of the name, address and telephone number of their respective representative. If that representative changes, or if a currently unrepresented complainant obtains representation in the future, the party shall notify the Presiding Officer and the other party immediately.

III. Partial Dismissals

The parties have fifteen (30) calendar days from receipt of this Order to identify any claims the Agency has dismissed from the complaint during the Agency investigative process pursuant to 29 C.F.R. § 1614.107 (a) and to comment on the appropriateness of each dismissal. Once the opportunity for identification and comment has passed, the Presiding Officer will determine pursuant to 29 C.F.R. § 1614.107 (b) the appropriateness of the Agency's decision to dismiss each claim. If the Complainant fails to oppose in writing the dismissal of a claim within the 30-day comment period, the opportunity to have the dismissal reviewed by the Presiding Officer shall be deemed waived.

IV. Settlement

Within 10 calendar days of receipt of this Order, the parties are directed to contact each other to define the issue(s) presented, to develop stipulations (i.e., agreements between the parties that certain facts are true for purposes of adjudicating this complaint) and to discuss settlement. The parties must discuss specific settlement proposals. The Agency may designate an individual with settlement authority to attend settlement discussions convened by the Presiding Officer. The Presiding Officer has settlement authority.

V. Discovery

The parties are hereby notified of their right to seek discovery prior to the hearing in accordance with 29 C.F.R. Section 1614.109(d). The parties must cooperate with each other in honoring discovery requests. The parties are expected to initiate and complete needed discovery with a minimum of intervention by the Presiding Officer. Except as indicated below, copies of interrogatories, requests for production of documents, requests for admissions, deposition notices and transcripts, and responses to such should not be sent to the Presiding Officer.

Discovery shall be completed within twenty-five (25) calendar days from the date of receipt of this Order unless otherwise directed by the Presiding Officer. If the parties agree between themselves to extend discovery deadlines that would, in turn, extend the 25 day deadline, the parties must seek the Presiding Officer's prior approval.
The method and scope of discovery shall be subject to the following:
Interrogatories shall be limited to one set. The set of interrogatories shall contain no more than ten (10) questions including subparts.
Requests for production of documents must be specific and identify the documents or types of documents requested. Requests for production of documents shall contain no more than ten (10) requests including sub-parts.
Requests for admissions shall not exceed ten (10) in number including sub-parts.
The Agency must make employees available for deposition. Absent prior approval from the Presiding Officer, a party must initiate discovery within fifteen (15) calendar days of receipt of this Order. If a party does not submit a timely discovery request, the Presiding Officer may determine that the party has waived the right to pursue discovery.

A party must respond to a request for discovery within five (5) calendar days from receipt of the request. Requests for discovery and objections to such requests must be specific. A

notice of deposition does not require a written response; however, any objection to a notice of deposition must be served promptly on the moving party. A deposition may be noticed and taken at any time during the discovery period.

Discovery motions, including motions to compel, must be filed within five (5) calendar days after receipt of a deficient response or after the response to the discovery is due, whichever occurs first. Motions to compel and other discovery motions must be accompanied by the discovery requests and responses and a declaration stating that the moving party has made a good faith effort to resolve the discovery dispute. The declaration shall indicate the efforts made to resolve the dispute and identify which items remain in dispute. Statements in opposition to discovery motions must be filed within ten (10) calendar days of receipt of the motion. Rulings will be made based upon the written submissions. The failure to timely file objections to discovery may result in the objections being deemed waived.

VI. Sanctions or Suit for Failure to Follow Orders

Failure to follow this Order or other orders of the Presiding Officer may result in sanctions and/or suit pursuant to 29 C.F.R. §1614.109(f) (3). The Presiding Officer may, where appropriate:

Draw an adverse inference that the requested information, or the testimony of the requested witness, would have reflected unfavorably on the party refusing to provide the requested information;
Consider the matters to which the requested information or testimony pertains to be established in favor of the opposing party;
Exclude other evidence offered by the party failing to produce the requested information or witness;
Issue a decision fully or partially in favor of the opposing party; or
Take such other actions as appropriate.

VII. Decision Without a Hearing

Pursuant to 29 C.F.R. §1614.109(g)(1), a party may file a motion for summary judgment if that party believes that some or all material facts are not in genuine dispute and there is no genuine issue as to credibility. A motion for summary judgment must include a statement of the undisputed material facts. Unless otherwise ordered by the Presiding Officer, a motion for summary judgment must be filed not later than fifteen (15) days after the close of discovery. The opposing party will then have five (5) days from receipt of the motion in which to file a response. The moving party will then have five (5) days from receipt of the response to file a reply. Motions for summary judgment and responses to such motions shall contain specific citations to reference evidence (e.g., cite the specific pages of the report of investigation, or other submitted evidence in support of an argument).

The Presiding Officer may also issue summary judgment on his/her own initiative, pursuant to 29 C.F.R. §1614.109 (g) (3).

The Presiding Officer may also dismiss a complaint pursuant to 29 C.F.R. §1614.109 (b) for any of the reasons set forth in 29 C.F.R. §1614.107 (a). The Presiding Officer may dismiss complaints on his/her own initiative, or upon the Agency's motion to dismiss a complaint.

VII. Amendment and Consolidation of Complainants

Pursuant to 29 C.F.R. §1614.106(d), the Complainant may move to amend his/her complaint to add claims that are like or related to the original complaint. In order to amend the complaint, the Complainant shall submit a motion as early as possible to the Presiding Officer stating the new claim, the date(s) when it occurred, and why it is like or related to the original complaint. The Presiding Officer may amend the original complaint to include the new claim(s) if he/she finds the new claim is like or related to the original complaint. Motions to amend filed late in the process may be denied.

The Presiding Officer also has discretion to consolidate complaints pursuant to 29 C.F.R. §1614.606. The parties shall advise the Presiding Officer in writing of any other complaint(s) pending at any stage of processing and should include all case number(s) or other information identifying such complaint(s).

HANEEFAH KHAALIQ, ESQ.
Presiding Officer
Gary Human Relations Commission

The City of Gary Human Relations Commission

**Supplemental Acknowledgment and Order**

This order supplements the Acknowledgment and Order (or Consolidated Acknowledgment and Order) previously issued in this case. This order has been adopted to further standardize practice and procedure in cases before the Presiding Officer of the Gary Human Relations Commission.

Service and Receipt of Orders

1. Service of any order issued by the Presiding Officer on the parties is complete upon mailing. The order will be presumed to have been received by the parties not later than 5 calendar days after mailing.

**Correspondence and Motions**

2. Faxed submissions are authorized. Do not submit the original via U.S. Mail or other delivery means if the item has been previously faxed. Unless expressly authorized by the Presiding Officer, any submission faxed to any fax number other than (219) 882-0373, or any submission that exceeds 20 pages in length, will be automatically rejected. Parties may not circumvent the restriction on number of pages faxed by "batching" submissions.

3. Any request or motion of a party requiring action by the Presiding Officer will prominently indicate whether the matter is opposed by the other party. All correspondence, requests and motions will be dated (month/day/year). Communication with the Presiding Officer via e-mail is authorized.

4. Parties and their representatives may not assume that a motion or request filed with the Presiding Officer, even if unopposed by the other party, will be approved. The mere act of filing a motion or request will not operate to extend a deadline or setting.

**Citations To Legal Authorities**

5. When citing to legal authorities in briefs and other pleadings, parties are advised to focus on applicable statutes and U.S. Supreme Court case law and on Commission case law, regulations, directives and instructions. The case law of federal circuit courts of appeal and district courts, while perhaps persuasive, is not necessarily the dispositive law of the case.

**Designation of Representative**

6. If represented, the parties will act through their respective designated representatives in regard to all matters involving the case. Pleadings filed in the case will be signed by the representative, whose signature block will include the representative's mailing address,

telephone number and fax number (if any) and indicate the party on whose behalf the representative is acting (e.g., Complainant's Representative).

**Settlement**

7. Settlement of cases without the necessity for a hearing or issuance of a decision by the Presiding Officer is highly encouraged. During the course of settlement discussions, the parties are expected to discuss and consider specific ideas, methods and means of resolving all matters in controversy, recognizing that compromises by both parties may be required in order to reach a settlement. Discussions that merely restate and reinforce the parties' respective positions are unlikely to resolve the complaint and are discouraged. Alternative methods or means of dispute resolution ("ADR"), for example, mediation, affords parties the opportunity to craft creative settlement solutions that bi-lateral negotiations between the parties oftentimes do not. Use of ADR, therefore, is encouraged. Ideally, ADR should be undertaken after discovery is completed and well in advance of the scheduled hearing. In addition to contacting each other during the first 10-days after receipt of the Acknowledgment and Order, if no settlement is reached, the parties are directed to again contact each other during the week preceding the scheduled pre-hearing conference and to jointly assess prospects for settlement. During the pre-hearing conference the parties are expected to brief the Presiding Officer concerning all prior settlement efforts. Neither party, however, is obligated to settle. If no settlement is forthcoming, a decision by the Presiding Officer will be issued in due course, with or without a hearing, as appropriate.

8. In the event a settlement is reached, the parties will execute a written settlement agreement (or memorandum of agreement) and promptly deliver a copy to the Presiding Officer or, upon request, the hearing record may be opened and the settlement terms read into the record. Any previously scheduled pre-hearing conference or hearing will not be cancelled until the foregoing is accomplished. If a hearing has been scheduled, the parties may not release the witnesses or the recorder unless authorized by the Presiding Officer.

**Discovery**

9. Discovery that is timely and properly conducted facilitates expeditious adjudication of complaints. Non-compliance or untimely compliance with parties' legitimate discovery requests, or hyper-technical responses or objections to discovery requests, defeat this purpose and are discouraged, and may subject the parties or the parties' representatives to sanctions.

10. Parties are encouraged to enter into discovery agreements tailored for the particular case, failing which, the provisions and deadlines contained in the Acknowledgment and Order will be strictly followed and enforced. Requests for extensions of discovery deadlines delay orderly processing of the case and are discouraged. Extensions will be granted only upon a showing of good cause.

11. Parties will not send copies of discovery requests or discovery responses to the Presiding Officer unless they are exhibits to a pending discovery motion (e.g., a motion to compel).

12. Parties are requested to give the Presiding Officer written notice of the date discovery is commenced or if discovery is waived.

**Witnesses**

13. The parties may request approval of witnesses to testify at the hearing. The request must be made to the Presiding Officer in writing and a copy provided to the opposing party. The request will include the name, position, and location of each witness. The request also will number each witness and will include a synopsis of the expected testimony of the witness in relation to the issue(s) to be decided in the case. Only witnesses whose testimonies are relevant and material to the issue(s) to be decided, and which are not repetitive of other witness testimony, will be approved. Absent a showing of good cause, submission of a witness list after the specified deadline may result in disapproval of some or all of the requested witnesses.

14. Attendance of any approved witness who is not currently a federal employee is the responsibility of the party requesting the witness.

15. It is assumed that the Complainant intends to testify at the hearing and, therefore, is automatically approved as a witness.

**Hearing Exhibits**

16. Documents comprising the Report of Investigation constitute a portion of the record of this case, are deemed admitted into evidence and need not be re-offered into evidence by either party. Copies of documents not already part of the Report of Investigation, which either party intends to offer into evidence at the hearing will be pre-marked for identification and delivered to the Presiding Officer at the pre-hearing conference, and to the opposing party (or his/her representative). Parties will pre-mark exhibits, individually, using the designations, "C-1, C-2, C-3", et seq. The Agency will use the designations, "A-1, A-2, A-3", et seq. Unless authorized by the Presiding Officer, exhibits comprising more than 20 pages may not be faxed to the Presiding Officer.

17. The Recorder is the official exhibit custodian. Exhibits admitted into evidence at the pre-hearing will be provided to the Recorder and made part of the hearing record. Parties should provide the Recorder, by and through the Presiding Officer, a complete set of exhibits at the pre-hearing conference and, if there are more than 5 exhibits, will also prepare a list or index of the proposed exhibits.

**Pre-hearing Conference**

18. At an initial pre-hearing conference which can be scheduled in this case at your request, the parties will be prepared to discuss the following matters:

Identification and simplification of all issues comprising the complaint;
Possibility of obtaining stipulations of fact;
Status of discovery;
Disposition of pending motions and resolution of objections;
Settlement of the case;
Resolution of the complaint using mediation or another ADR method or procedure.
Scheduling the case for a hearing on the merits (have calendars available); and
Any other matter likely to facilitate orderly and timely disposition of the case.
Duration of Hearings, Rest Breaks, Etc.

19. Hearing proceedings generally will be limited to 4 hours per day. If the hearing is scheduled for a single-day hearing, proceedings generally will continue until completed. The parties should prepare and limit their hearing presentations to the available time. Generally, parties will be afforded 10-minute rest breaks mid-morning and mid-afternoon each hearing day. As meal times approach, the Presiding Officer, after consulting with the parties and their representatives, will decide whether to break for a meal and, if so, for how long. Hearing participants may ask the Presiding Officer for additional rest breaks, as necessary.

**Re-Scheduling**

20. Excepting cases involving bona fide emergencies, a party seeking to re-schedule a pre-hearing conference, hearing or other proceeding set by the Presiding Officer, must file a written request that has been sworn to before a notary public or verified via an unsworn statement. If the requested delay is for medical reasons, suitable medical documentation must be provided. Continuances will be granted only upon a showing of good cause.

**Professional Responsibility**

21. A representative who enters an appearance in a Commission proceeding becomes subject to disciplinary action by the Presiding Officer or the Commission for any improper conduct engaged in by the representative at any stage of the proceeding. A representative cannot avoid the Commission's jurisdiction in disciplinary matters by withdrawing from representation, withdrawing the complaint or request for hearing, or by removing the complaint to federal court. Any attorney representative who engages in flagrant improper conduct may be referred to the disciplinary committee of the appropriate bar association. See 29 C.F.R. §1614.109 (e).

Sanctions For Failure To Follow Orders

22. Failure of a party or a party's representative to comply with this or any other order issued by the Presiding Officer, following notice to show cause, is subject to appropriate

sanctions, including the drawing of adverse inferences, exclusion of witnesses or evidence, issuance of decisions or rulings adverse to the non-complying party, or dismissal of all or a portion of the complaint.


HANEEFAH KHAALIQ, ESQ.
Presiding Officer
Gary Human Relations Commission

**FREQUENTLY ASKED QUESTIONS**

**What is an agency public hearing?**

An agency public hearing is similar to an administrative hearing pursuant to 29 C.F.R. §1614.109, that is similar to a trial before a judge at the courthouse. As the presiding official, the Presiding Officer acts as both the judge and jury. Proceedings, for the most part, are informal. Parties generally are permitted to make opening and closing statements, offer into evidence witness testimony and documents, examine and cross-examine witnesses and raise objections and obtain rulings on objections from the PRESIDING OFFICER.

**Do I need an attorney or may I represent myself?**

You are not required to retain an attorney or have another person represent you, but you are strongly advised to have one. You may represent yourself (pro se). If you choose to represent yourself (proceed pro se,) you are expected to be familiar with the administrative rules of practice and procedure and be prepared at the hearing. At the hearing, you are required to proceed first with presentation of evidence that supports your allegations of discrimination. At all times you carry the ultimate burden of proving your case with relevant and material evidence. Given the importance of the hearing, it may be advantageous for you to retain an attorney or designate a knowledgeable co-worker, union official or other individual to represent you in the case. If you designate someone to represent you, you are expected to act through your representative. You are ineligible to receive reasonable attorneys' fees as part of any award in the case unless you are represented by an attorney.

**Can I resolve my complaint without a hearing?**

Yes. Settlement of your case without the necessity for a hearing or issuance of a decision by the PRESIDING OFFICER is highly encouraged. Settlement discussions are permissible at any stage of proceedings. During settlement discussions, you and the agency representative are expected to discuss and consider specific ideas, methods and means of resolving the dispute. It is important you understand that both parties may be required to compromise for there to be any real prospect for a settlement. Discussions that merely restate and reinforce each party's position are unlikely to resolve the complaint and, therefore, are discouraged. Alternative methods or means of dispute resolution ("ADR") afford you and the agency opportunities to craft creative settlement solutions. Ideally, you should undertake ADR after discovery is completed and well in advance of the scheduled hearing. In addition to contacting the agency representative during the first 10-days after receipt of the Acknowledgment and Order, if no settlement is reached, the PRESIDING OFFICER may direct you and the agency representative to again contact each other before the hearing to jointly assess prospects for settlement. Neither party, however, is obligated to settle. If the parties are unable to settle the dispute, the PRESIDING OFFICER will decide the case.

If you and the agency are able to reach a settlement, you are required to execute a written settlement agreement (or memorandum of agreement) and promptly deliver a copy to the PRESIDING OFFICER. The PRESIDING OFFICER also can allow the parties to go on the record and state the settlement terms. Any previously scheduled pre-hearing conference or hearing will not be cancelled until the settlement is finalized. Additionally, if a hearing is scheduled, the parties may not release witnesses or the recorder unless the PRESIDING OFFICER expressly authorizes you to do so.



**·HODGES·**
AND **DAVIS** P.C.
· · · · · · · · · · · · · ·
EST 1906

September 3, 2021

EARLE F. HITES
R. LAWRENCE STEELE
GREGORY A. SOBKOWSKI
BONNIE C. COLEMAN
LAURA B. FROST
BENJAMIN T. BALLOU
STEVEN J. SCOTT
SHAWN D. COX
EMILIE E.D. HUNT
CARL J. HALL

OF COUNSEL:
CLYDE D. COMPTON
EDWARD J. HUSSEY

JASPER COUNTY OFFICE:
EDWARD P. DUMAS

**LAKE COUNTY**
8700 BROADWAY
MERRILLVILLE, IN 46410
**P** (219) 641.8700
**F** (219) 641.8710

**PORTER COUNTY**
P.O. BOX 476
PORTAGE, IN 46368
**P** (219) 762.9129

**JASPER COUNTY**
119 W. HARRISON STREET
RENSSELAER, IN 47978
**P** (219) 866.4158
**F** (219) 866.2274

HODGESDAVIS.COM

**VIA EMAIL AND FIRST CLASS MAIL**
Ms. Haneefah Khaaliq
Gary Human Relations Commission
455 Massachusetts Street
Gary, IN 46402

Re:    Charging Party: Jennifer Dochee, M.D.
       Respondent: The Methodist Hospitals, Inc.
       Case No. 470-2020-03359
       Our File No. 6367-2520-1

Dear Ms. Khaaliq:

I have enclosed the Notice of Removal of the above-referenced matter
filed with the Federal Court.   Please contact me if you have any
questions.

Very truly yours,

HODGES AND DAVIS, P.C.

By:

    Steven J. Scott

SJS:sk:557369.1

Enclosure

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF INDIANA
## HAMMOND DIVISION

JENNIFER DOCHEE,          )
                              )
          Plaintiff,        )
                              )
vs.                         )
                              )  Cause No.
THE METHODIST HOSPITALS, INC.,  )
                              )
          Defendant.     )

## NOTICE OF REMOVAL

The Defendant, Methodist Hospitals, Inc. ("Methodist"), by counsel and pursuant to 28 U.S.C. § § 1331, 1441 and 1446, hereby provide Notice of Removal of this administrative action to the United States District Court for the Northern District of Indiana. The grounds for removal are:

1.      On October 28, 2020, Jennifer Dochee ("Dochee"), filed a Charge of Discrimination with the Gary Human Relations Commission (the "GHRC") and Equal Employment Opportunity Commission ("EEOC"). A true and accurate copy of the Charge of Discrimination is attached hereto as **"Exhibit A"** and is incorporated herein by reference.

2.      Although the case was dual filed, the GHRC as a Fair Employment Practices Agency ("FEPA") for the EEOC, was tasked with investigating and administratively adjudicating the Charge of Discrimination.

USDC IN/ND case 2:21-cv-00275 document 17 filed 09/03/21 page 48 of 48

3.      Pursuant to Rule 13, Section 13.1, of the Rules and Regulations of the Gary Human Relations Commission, "[a]ny Party or Person aggrieved by a final order or determination made by the Commission shall be entitled to judicial review . . .". A true and accurate copy of the Rule 13, Section 13.1 of the Rules and Regulations of the Gary Human Relations Commission is attached hereto as **"Exhibit B"** and incorporated herein by reference.

4.      On May 10, 2021, the GHRC made a probable cause determination and the parties attempted conciliation. A true and accurate copy of the Probable Cause Determination is attached hereto as **"Exhibit C"** and incorporated herein by reference.

5.      Following the Probable Cause Determination, the parties attempted to resolve the matter through the conciliation process, however, the parties were unable to settle the matter through the conciliation process.

6.      This Court has original jurisdiction pursuant to 28 U.S.C. § 1331 because this matter involves a federal question in that Dochee alleges a violation of the Title VII of the Civil Rights Act of 1964, a federal law.

7.      Contemporaneous with the filing of this Notice of Removal, Methodist will provide written notice to all attorneys of record and to the GHRC of the filing of this Notice of Removal.

8.      Contemporaneous with the filing of this Notice of Removal, the Defendants have submitted the filing fee to the Clerk of the United States

2

USDC IN/ND case 2:21-cv-00275 document 1 filed 09/03/21 page 3 of 4

District Court for the Northern District of Indiana in the amount of Four Hundred Two ($402.00) Dollars.

WHEREFORE, Defendant, The Methodist Hospitals, Inc., respectfully requests that the above action now pending against it with the Gary Human Relations Commission, be removed to this Court.

Respectfully submitted,

By: /s/ Steven J. Scott
Steven J. Scott (#22763-45)
HODGES & DAVIS, P.C.
8700 Broadway
Merrillville, IN 46410
(219) 641-8700
*Attorneys for Defendant,*
*The Methodist Hospitals, Inc.*

3

## CERTIFICATE OF SERVICE

I hereby certify that on September 3, 2021 I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which sent notification of such filing to the following:

> Jennifer Witherspoon
> witherspoonlegal@gmail.com
>
> Haneefah Khaaliq
> hkhaaliq@gary.gov

I also hereby certify that on the 3rd day of September, 2021, a copy of the Notice of Removal was served on the Plaintiff herein and the Gary Human Relations Commission by depositing the same in the United States Mail, first class postage prepaid, and addressed as follows:

> Haneefah Khaaliq, Esq
> Gary Human Relations Commission
> 455 Massachusetts
> Gary, IN 46402
> (219) 883-4151
>
> Jennifer Dochee c/o
> Jennifer Witherspoon
> J. Witherspoon Legal & Mediation Services
> 32 N. West St. Suite 100
> Waukegan, IL 60085
> (847) 672-7819

/s/ Steven J. Scott
Steven J. Scott

556726.1
6367-2520-1

4

From:                                    11/06/2020 14:07   #069 P.002/002

C Form 5 (5/01)

| CHARGE OF DISCRIMINATION | Charge Presented To: | Agency(is) Charge No(s): |
|---|---|---|
| This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form. | [X] FEPA | 0920ReSR091 |
| | [X] EEOC | 470-2020-03359 |

| Gary Human Relations Commission | And EEOC |
|---|---|
| State or local Agency, If any | |

| Name (indicate Mr., Ms., Mrs.) | Home Phone (Incl. Area Code) | Date of Birth |
|---|---|---|
| DR. JENNIFER DOCHEE | (708) 516-0099 | 1975 |

| Street Address | City, State and ZIP Code |
|---|---|
| 8631 Stone Creek Blvd | FRANKFORT, IL 60423 |

Named is the Employer, Labor Organization, Employment Agency, Apprenticeship Committee, or State or Local Government Agency That I Believe Discriminated Against Me or Others. (If more than two, list under PARTICULARS below.)

| Name | No. Employees, Members | Phone No. (Include Area Code) |
|---|---|---|
| METHODIST HOSPITALS | 15-100 | (219) 886-4000 |

| Street Address | City, State and ZIP Code |
|---|---|
| 600 GRANT STREET | GARY, INDIANA 46402 |

| Name | No. Employees, Members | Phone No. (Include Area Code) |
|---|---|---|
| | | |

| Street Address | City, State and ZIP Code |
|---|---|
| | |

| DISCRIMINATION BASED ON (Check appropriate box(es).) | DATE(S) DISCRIMINATION TOOK PLACE |
|---|---|
| | Earliest          Latest |
| [X] RACE  [X] COLOR  [X] SEX  [ ] RELIGION  [ ] NATIONAL ORIGIN | 04/13/2020     04/13/2020 |
| [X] RETALIATION  [ ] AGE  [ ] DISABILITY  [ ] OTHER (Specify below.) | [X] CONTINUING ACTION |

THE PARTICULARS ARE (If additional paper is needed, attach extra sheet(s)):

AMENDED

I am an African American Female hired by the Respondent on or about August 15, 2019. My position Title was Interventional Cardiologist.  During my employment, I became a recipient of continuous harassment by several male Cardiologist.  The main decision maker is Indian. I complained and reported to the Respondents chairman and Chief Executive Officer and nothing was done.  On April 13, 2020 I was disciplined and discharged in retaliation for my reporting the harassment.  I was also threatened by the respondent that I would be reported to the National Practitioner Databank. On October 2, 2020 I was informed a negative reference was given on me discrediting my credentials and blocking me from getting hired at another hospital.

I believe I have been discriminated and retaliated against based on my race African American/ Sex Female in violation of Title VII of the Civil Rights Act of 1964 as amended.

| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies If I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY When necessary for State and Local Agency Requirements |
|---|---|
| I declare under penalty of perjury that the above is true and correct. | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief. SIGNATURE OF COMPLAINANT |

| 11/3/2020 | | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE (month, day, year) |
|---|---|---|
| Date | Charging Party S | October 28, 2020 |

EXHIBIT

A

USDC IN/ND case 2:21-cv-00275-JEM    document 1-2   filed 09/18/22   page 56 of 389

RULES AND REGULATIONS
OF THE GARY HUMAN RELATIONS COMMISSION

RULE 1      DEFINITIONS:

When used in these rules and regulations, unless the contest clearly requires otherwise.

(A)   The term "Affirmative Action" shall mean those acts, which the Commission deems necessary to assure compliance with the Gary Civil Rights Ordinance.

(B)   "Aggrieved Person" includes any person who claims to have been injured by a discriminatory housing practice, believes that such person will be injured by a discriminatory housing practice that is about to occur.

(C)   The term "Commission" means the Human Relations Commission of the City of Gary, Indiana, hereinafter created.

(D)   The term "Commission Attorney" shall mean such assistants of the Corporation Counsel as may be assigned to the Commission, or such other attorneys as may be engaged by the Commission.

(E)   The term "Commissioners" means any duly appointed member of the Human Relations Commission.

(F)   The term "Complainant" means any individual charging on his own behalf to have been personally aggrieved by an unlawful discriminatory practice, or the director, deputy director, charging that an unlawful discriminatory practice was committed against a person or class of persons other than himself, in order to vindicate the public policy of the City of Gary, Indiana as referred in Article II of this Ordinance.

(G)   The term "Complaint" means any written grievance filed by a Complainant with the Commission. The original shall be signed and verified before a notary public or other persons duly authorized by law to administer oaths and take acknowledgements. Notarial service shall be furnished by the Commission without charge. To be acceptable by the Commission, a complaint shall be sufficiently complete so as to reflect properly the full name and address of the Complainant; the name and address of the respondent against whom the complaint is made; the alleged discriminatory practice and a statement of particulars thereof; the dates and places of the alleged discriminatory practice is of a continuing nature, the dates between which said continuing acts of discrimination are alleged to have occurred; and a statement as to any other action, civil or criminal, instituted in any other forms based upon the same grievance as is alleged in the complaint, together with a statement as to the status of disposition of such other action. No complaint shall be valid unless filed within ninety (90) days from the date of the occurrence of the alleged discriminatory practice, or from the date of the termination of a published and meaningful grievance procedure provided by a Respondent employer, or labor union. A complaint may be amended to cure technical defects or omission. including the failure to verify the charge, or to clarify and amplify allegations made therein. Such amendments and amendments alleging additional acts with constitute unlawful discriminatory practices related to or growing out of the

EXHIBIT

B

1

Section 12.4    INJUNCTIONS

(A)    Director Determination

Where a charge has been filed with the Commission, the Director may determine that irreparable harm will be suffered by the Charging Party if the alleged discriminatory practices are allowed to continue.  This determination may be made only after the Director has consulted the Staff Attorney.

(B)    Petition to Chairperson for Order to File in Court

When the Director has determined that irreparable harm will be suffered by the Charging Party if the alleged discriminatory practices are allowed to continue, the Director by the Staff Attorney shall petition the Chairperson for a preliminary order authorizing the Director to file a request in circuit or superior court for a temporary restraining order, preliminary injunction, or permanent injunction.  The Chairperson shall issue such a preliminary order if he/she finds:

(i)    That the Commission has jurisdiction over the parties and over the subject matter;

(ii)    That the Charging Party is suffering, and will continue to suffer, irreparable harm if a temporary emergency order of the Court is not obtained; and

(iii)    That the Charging Party is likely to succeed on the merits of his/her complaint filed with the Commission.

The Chairperson's preliminary order under this section shall issue only after such preliminary order has been approved by the Department of Law.  The preliminary order shall be in writing and it shall become a part of the permanent record of the Commission's proceedings relating to the charge..

(C)    The Department of Law shall file suit on behalf of the Commission in superior or circuit court, for the issuance of a temporary restraining order, preliminary injunction, or permanent injunction following satisfaction of the procedural steps set out in these rules and the issuance of a preliminary order to so proceed by the Chairperson.

RULE 13    JUDICIAL REVIEW

Section 13.1    METHOD OF FILING FOR REVIEW

(A)    Who May Seek Review

Any Party or Person aggrieved by a final order or determination made by the Commission shall be entitled to judicial review, pursuant to Indiana Code 4-22.

(B)    Record Of Hearing

For purposes of judicial review, the record of the Public Hearing shall consist of a transcript of the oral testimony, the exhibits admitted into evidence, and all notices; pleadings. exceptions, motions, requests and other papers filed with the Commission with



the exception of briefs or arguments of law. The cost of producing such record for judicial review shall be borne by the Party making the appeal. The Commission may require the deposit of reasonable security for the payment of such cost before producing such record.

## RULE 14    REVOCATION OR SUSPENSION OF LICENSES

### Section 14.1    NOTICE TO LICENSEE AND LICENSING AGENCY

(A)    Procedure

Any licensee of the City of Gary who is found to have committed a discriminatory practice shall be put on notice by the order of the Commission that failure to comply with its final order will subject said licensee to the possible suspension or revocation of such license. The licensing agency shall be given notice of the Commission's determination, and upon failure of the licensee to comply with the Commission's final order, the Commission shall request the licensing agency to conduct a hearing on the matter of whether or not such licensee shall continue to be licensed.

## RULE 15    CONSTRUCTION OF THESE REGULATIONS

### Section 15.1    HOW CONSTRUED

(A)    Broad Construction

These regulations shall be broadly construed to accomplish the purposes of the Law and the Policies of the Commission.

(B)    Partial Invalidity

If any provision of these rules or the application of a provision to any person or circumstances shall be held invalid, the remainder of these rules or the application of a rule to persons or circumstances other than those as to which it is held invalid, shall not be affected thereby

Revised 07/27/05

ADOPTED BY THE HUMAN RELATIONS COMMISSION OF THE CITY OF GARY THIS _____ DAY OF _____



**Gary Human Relations Commission**
Haneefah Khaaliq, Executive Director



August 24, 2021

ATT: Attorney Steven J. Scott
8700 Broadway
Merrillville, IN 46410

RE: PUBLIC HEARING NOTICE
Case Name: Dochee vs. The Methodist Hospitals, Inc.
FEPA: 0920ReSR091 EEOC: 470-2020-03359

On August 1, 2020, Dr. Jennifer Dochee filed a charge of discrimination against
Methodist Hospitals, resulting in an agency PROBABLE CAUSE DETERMINATION.
We believe that an illegal act of discrimination did occur.

On May 10, 2021, the Respondent was sent correspondence regarding this determination.
On May 17, 2020, the Respondent sent a conciliation request to the agency. The
conciliation attempts were unsuccessful. Therefore, and in accordance with our local
ordinance, rules and regulations, the matter will now proceed to a public hearing where
the details of the case will be examined before the Gary Human Relations Commission,
its members, and any interested members of the public. Each party should be prepared to
provide both opening and closing statements, generally present their argument, and call
witnesses. The opportunity to question opposing counsel will also be given.

**The public hearing date has been scheduled for September, 22, 2021, at 10:00 a.m.
via Zoom.** This meeting will be recorded. No pre-hearing conference has been scheduled
for this matter. The information regarding how to access this virtual hearing will be
provided to you at a later date. It is your responsibility to ensure you are able to receive
communication from this office.

The information contained in this correspondence includes information regarding an
agency public hearing. Please read all the documents enclosed and contact the agency
should you have any questions or concerns.

Sincerely,
Haneefah Khaaliq, Esq.
Executive Director

**Certified #: This number will be provided on the document mailed to you.**

EXHIBIT

C

FAX: (219) 882-0373          Contact: (219) 883-415          ddress: 455 Massachusetts, Gary IN 46402

USDC IN/ND case 2:21-cv-00275 document 17 filed 09/03/21 page 1 of 2

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
### HAMMOND DIVISION


JENNIFER DOCHEE,

     Plaintiff,

v.                                Case No.

THE METHODIST HOSPITALS, INC.,

     Defendant.

## APPEARANCE OF COUNSEL

To:   The Clerk of the Court and all parties of record

I, the below-signed, state that I have read the Standards for Professional Conduct within the Seventh Federal Judicial Circuit pursuant to N.D. Ind. L.R. 83.5(g) and appendix B-65-B-70 of this Court and will faithfully adhere to them. I declare under penalty of perjury that the foregoing is true and correct.

I am counsel for   The Methodist Hospitals, Inc.


September 3, 2021

                      s/Steven J. Scott
                      HODGES AND DAVIS, P.C.
                      STEVEN J. SCOTT
                      *Print Name*
                      22763-45
                      *Indiana Attorney Registration Number*
                      8700 Broadway
                      *Address*
                      Merrillville, IN 46410
                      *City*         *State*       *Zip*
                      (219) 641-8700
                      *Phone Number*
                      (219) 641-8710
                      *Fax Number*
                      sscott@hodgesdavis.com

557046.1
6367-2520-1

## CERTIFICATE OF SERVICE

I hereby certify that on September 3, 2021 I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which sent notification of such filing to the following:

> Jennifer Witherspoon
> witherspoonlegal@gmail.com

> Haneefah Khaaliq
> hkhaaliq@gary.gov

I also hereby certify that on the 3rd day of September, 2021, a copy of the Appearance by Counsel was served on the Plaintiff herein and the Gary Human Relations Commission by depositing the same in the United States Mail, first class postage prepaid, and addressed as follows:

> Haneefah Khaaliq, Esq
> Gary Human Relations Commission
> 455 Massachusetts
> Gary, IN 46402
> (219) 883-4151

> Jennifer Dochee c/o
> Jennifer Witherspoon
> J. Witherspoon Legal & Mediation Services
> 32 N. West St. Suite 100
> Waukegan, IL 60085
> (847) 672-7819

/s/ Steven J. Scott
Steven J. Scott

2

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION

Jennifer Dochee )
 )
   Plaintiff, )
 )
vs. )
 ) Cause No.
The Methodist Hospitals, Inc., )
 )
   Defendants. )

## NOTICE OF REMOVAL TO FEDERAL COURT

To Plaintiff, Jennifer Dochee and her attorneys of record, please take notice that a Notice of Removal of this action was filed in the United States District Court for the Northern District of Indiana Hammond Division on September 3, 2021.

A copy of said Notice of Removal is attached hereto, and is served and filed herewith.

Respectfully submitted,

By: /s/ Steven J. Scott
   Steven J. Scott (#22763-45)
   HODGES & DAVIS, P.C.
   8700 Broadway
   Merrillville, IN 46410
   (219) 641-8700
   *Attorneys for Defendant, The*
   *Methodist Hospitals, Inc.*

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on September 3, 2021 I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which sent notification of such filing to the following:

      Jennifer Witherspoon
      witherspoonlegal@gmail.com

      Haneefah Khaaliq
      hkhaaliq@gary.gov


I also hereby certify that on the 3rd day of September, 2021, a copy of the Notice of Removal was served on the Plaintiff herein and the Gary Human Relations Commission by depositing the same in the United States Mail, first class postage prepaid, and addressed as follows:

      Haneefah Khaaliq, Esq
      Gary Human Relations Commission
      455 Massachusetts
      Gary, IN 46402
      (219) 883-4151

      Jennifer Dochee c/o
      Jennifer Witherspoon
      J. Witherspoon Legal & Mediation Services
      32 N. West St. Suite 100
      Waukegan, IL 60085
      (847) 672-7819


                        /s/ Steven J. Scott
                        Steven J. Scott


556730.1
6367-2520-1

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF INDIANA
## HAMMOND DIVISION

| | | |
|---|---|---|
| JENNIFER DOCHEE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | . |
| | ) | Cause No. |
| THE METHODIST HOSPITALS, INC., | ) | |
| | ) | |
| Defendant. | ) | |

## NOTICE OF REMOVAL

The Defendant, Methodist Hospitals, Inc. ("Methodist"), by counsel and pursuant to 28 U.S.C. § § 1331, 1441 and 1446, hereby provide Notice of Removal of this administrative action to the United States District Court for the Northern District of Indiana. The grounds for removal are:

1.      On October 28, 2020, Jennifer Dochee ("Dochee"), filed a Charge of Discrimination with the Gary Human Relations Commission (the "GHRC") and Equal Employment Opportunity Commission ("EEOC"). A true and accurate copy of the Charge of Discrimination is attached hereto as **"Exhibit A"** and is incorporated herein by reference.

2.      Although the case was dual filed, the GHRC as a Fair Employment Practices Agency ("FEPA") for the EEOC, was tasked with investigating and administratively adjudicating the Charge of Discrimination.

3.     Pursuant to Rule 13, Section 13.1, of the Rules and Regulations of the Gary Human Relations Commission, "[a]ny Party or Person aggrieved by a final order or determination made by the Commission shall be entitled to judicial review . . .". A true and accurate copy of the Rule 13, Section 13.1 of the Rules and Regulations of the Gary Human Relations Commission is attached hereto as **"Exhibit B"** and incorporated herein by reference.

4.     On May 10, 2021, the GHRC made a probable cause determination and the parties attempted conciliation. A true and accurate copy of the Probable Cause Determination is attached hereto as **"Exhibit C"** and incorporated herein by reference.

5.     Following the Probable Cause Determination, the parties attempted to resolve the matter through the conciliation process, however, the parties were unable to settle the matter through the conciliation process.

6.     This Court has original jurisdiction pursuant to 28 U.S.C. § 1331 because this matter involves a federal question in that Dochee alleges a violation of the Title VII of the Civil Rights Act of 1964, a federal law.

7.     Contemporaneous with the filing of this Notice of Removal, Methodist will provide written notice to all attorneys of record and to the GHRC of the filing of this Notice of Removal.

8.     Contemporaneous with the filing of this Notice of Removal, the Defendants have submitted the filing fee to the Clerk of the United States

District Court for the Northern District of Indiana in the amount of Four
Hundred Two ($402.00) Dollars.

WHEREFORE, Defendant, The Methodist Hospitals, Inc., respectfully
requests that the above action now pending against it with the Gary Human
Relations Commission, be removed to this Court.

Respectfully submitted,

By:    /s/ Steven J. Scott

Steven J. Scott (#22763-45)
HODGES & DAVIS, P.C.
8700 Broadway
Merrillville, IN 46410
(219) 641-8700
*Attorneys for Defendant,*
*The Methodist Hospitals, Inc.*

3

## CERTIFICATE OF SERVICE

I hereby certify that on September 3, 2021 I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which sent notification of such filing to the following:

>Jennifer Witherspoon
>witherspoonlegal@gmail.com
>
>Haneefah Khaaliq
>hkhaaliq@gary.gov

I also hereby certify that on the 3rd day of September, 2021, a copy of the Notice of Removal was served on the Plaintiff herein and the Gary Human Relations Commission by depositing the same in the United States Mail, first class postage prepaid, and addressed as follows:

>Haneefah Khaaliq, Esq
>Gary Human Relations Commission
>455 Massachusetts
>Gary, IN 46402
>(219) 883-4151
>
>Jennifer Dochee c/o
>Jennifer Witherspoon
>J. Witherspoon Legal & Mediation Services
>32 N. West St. Suite 100
>Waukegan, IL 60085
>(847) 672-7819

>/s/ Steven J. Scott
>Steven J. Scott

556726.1
6367-2520-1

4

From:                                        11/06/2020 14:07    #069 P.002/002

C Form 5 (5/01)

| CHARGE OF DISCRIMINATION | Charge Presented To: | Agency(is) Charge No(s): |
|---|---|---|
| This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form. | [X] FEPA | 0920ReSR091 |
| | [X] EEOC | 470-2020-03359 |

| Gary Human Relations Commission | | And EEOC |
|---|---|---|
| State or local Agency, If any | | |

| Name (indicate Mr., Ms., Mrs.) | Home Phone (Incl. Area Code) | Date of Birth |
|---|---|---|
| DR. JENNIFER DOCHEE | (708) 516-0099 | 1975 |

| Street Address | City, State and ZIP Code |
|---|---|
| 8631 Stone Creek Blvd | FRANKFORT, IL 60423 |

Named is the Employer, Labor Organization, Employment Agency, Apprenticeship Committee, or State or Local Government Agency That I Believe Discriminated Against Me or Others. (If more than two, list under PARTICULARS below.)

| Name | No. Employees, Members | Phone No. (Include Area Code) |
|---|---|---|
| METHODIST HOSPITALS | 15-100 | (219) 886-4000 |

| Street Address | City, State and ZIP Code |
|---|---|
| 600 GRANT STREET | GARY, INDIANA 46402 |

| Name | No. Employees, Members | Phone No. (Include Area Code) |
|---|---|---|
| | | |

| Street Address | City, State and ZIP Code |
|---|---|
| | |

**DISCRIMINATION BASED ON** (Check appropriate box(es).)

[X] RACE   [ ] COLOR   [X] SEX   [ ] RELIGION   [ ] NATIONAL ORIGIN
[X] RETALIATION   [ ] AGE   [ ] DISABILITY   [ ] OTHER (Specify below.)

| DATE(S) DISCRIMINATION TOOK PLACE | |
|---|---|
| Earliest | Latest |
| 04/13/2020 | 04/13/2020 |

[X] CONTINUING ACTION

THE PARTICULARS ARE (If additional paper is needed, attach extra sheet(s).)

AMENDED

I am an African American Female hired by the Respondent on or about August 15, 2019. My position Title was Interventional Cardiologist.   During my employment, I became a recipient of continuous harassment by several male Cardiologist. The main decision maker is Indian. I complained and reported to the Respondents chairman and Chief Executive Officer and nothing was done.   On April 13, 2020 I was disciplined and discharged in retaliation for my reporting the harassment.   I was also threatened by the respondent that I would be reported to the National Practitioner Databank. On October 2, 2020 I was informed a negative reference was given on me discrediting my credentials and blocking me from getting hired at another hospital.

I believe I have been discriminated and retaliated against based on my race African American/ Sex Female in violation of Title VII of the Civil Rights Act of 1964 as amended.

| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY When necessary for State and Local Agency Requirements |
|---|---|
| I declare under penalty of perjury that the above is true and correct. | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief. SIGNATURE OF COMPLAINANT |

11/3/2020
Date        Charging Party Signature

SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE (month, day, year)

October 28, 2020

**EXHIBIT**

A

RULES AND REGULATIONS
OF THE GARY HUMAN RELATIONS COMMISSION

RULE 1    DEFINITIONS:

When used in these rules and regulations, unless the contest clearly requires otherwise.

(A)    The term "Affirmative Action" shall mean those acts, which the Commission deems necessary to assure compliance with the Gary Civil Rights Ordinance.

(B)    "Aggrieved Person" includes any person who claims to have been injured by a discriminatory housing practice, believes that such person will be injured by a discriminatory housing practice that is about to occur.

(C)    The term "Commission" means the Human Relations Commission of the City of Gary, Indiana, hereinafter created.

(D)    The term "Commission Attorney" shall mean such assistants of the Corporation Counsel as may be assigned to the Commission, or such other attorneys as may be engaged by the Commission.

(E)    The term "Commissioners" means any duly appointed member of the Human Relations Commission.

(F)    The term "Complainant" means any individual charging on his own behalf to have been personally aggrieved by an unlawful discriminatory practice, or the director, deputy director, charging that an unlawful discriminatory practice was committed against a person or class of persons other than himself, in order to vindicate the public policy of the City of Gary, Indiana as referred in Article II of this Ordinance.

(G)    The term "Complaint" means any written grievance filed by a Complainant with the Commission. The original shall be signed and verified before a notary public or other persons duly authorized by law to administer oaths and take acknowledgements.  Notarial service shall be furnished by the Commission without charge.  To be acceptable by the Commission, a complaint shall be sufficiently complete so as to reflect properly the full name and address of the Complainant; the name and address of the respondent against whom the complaint is made; the alleged discriminatory practice and a statement of particulars thereof; the dates and places of the alleged discriminatory practice is of a continuing nature, the dates between which said continuing acts of discrimination are alleged to have occurred; and a statement as to any other action, civil or criminal, instituted in any other forms based upon the same grievance as is alleged in the complaint, together with a statement as to the status of disposition of such other action.  No complaint shall be valid unless filed within ninety (90) days from the date of the occurrence of the alleged discriminatory practice, or from the date of the termination of a published and meaningful grievance procedure provided by a Respondent employer, or labor union.  A complaint may be amended to cure technical defects or omission, including the failure to verify the charge, or to clarify and amplify allegations made therein. Such amendments and amendments alleging additional acts with constitute unlawful discriminatory practices related to or growing out of the

EXHIBIT

B

1

Section 12.4   INJUNCTIONS

(A)   Director Determination

Where a charge has been filed with the Commission, the Director may determine that irreparable harm will be suffered by the Charging Party if the alleged discriminatory practices are allowed to continue.   This determination may be made only after the Director has consulted the Staff Attorney.

(B)   Petition to Chairperson for Order to File in Court

When the Director has determined that irreparable harm will be suffered by the Charging Party if the alleged discriminatory practices are allowed to continue, the Director by the Staff Attorney shall petition the Chairperson for a preliminary order authorizing the Director to file a request in circuit or superior court for a temporary restraining order, preliminary injunction, or permanent injunction.   The Chairperson shall issue such a preliminary order if he/she finds:

   (i)   That the Commission has jurisdiction over the parties and over the subject matter;

   (ii)   That the Charging Party is suffering, and will continue to suffer, irreparable harm if a temporary emergency order of the Court is not obtained; and

   (iii)   That the Charging Party is likely to succeed on the merits of his/her complaint filed with the Commission.

The Chairperson's preliminary order under this section shall issue only after such preliminary order has been approved by the Department of Law.   The preliminary order shall be in writing and it shall become a part of the permanent record of the Commission's proceedings relating to the charge.

(C)   The Department of Law shall file suit on behalf of the Commission in superior or circuit court, for the issuance of a temporary restraining order, preliminary injunction, or permanent injunction following satisfaction of the procedural steps set out in these rules and the issuance of a preliminary order to so proceed by the Chairperson.

RULE 13   JUDICIAL REVIEW

Section 13.1   METHOD OF FILING FOR REVIEW

(A)   Who May Seek Review

Any Party or Person aggrieved by a final order or determination made by the Commission shall be entitled to judicial review, pursuant to Indiana Code 4-22.

(B)   Record Of Hearing

For purposes of judicial review, the record of the Public Hearing shall consist of a transcript of the oral testimony, the exhibits admitted into evidence, and all notices; pleadings, exceptions, motions, requests and other papers filed with the Commission with

28



the exception of briefs or arguments of law. The cost of producing such record for judicial review shall be borne by the Party making the appeal. The Commission may require the deposit of reasonable security for the payment of such cost before producing such record.

## RULE 14    REVOCATION OR SUSPENSION OF LICENSES

### Section 14.1    NOTICE TO LICENSEE AND LICENSING AGENCY

(A)    Procedure

Any licensee of the City of Gary who is found to have committed a discriminatory practice shall be put on notice by the order of the Commission that failure to comply with its final order will subject said licensee to the possible suspension or revocation of such license. The licensing agency shall be given notice of the Commission's determination, and upon failure of the licensee to comply with the Commission's final order, the Commission shall request the licensing agency to conduct a hearing on the matter of whether or not such licensee shall continue to be licensed.

## RULE 15    CONSTRUCTION OF THESE REGULATIONS

### Section 15.1    HOW CONSTRUED

(A)    Broad Construction

These regulations shall be broadly construed to accomplish the purposes of the Law and the Policies of the Commission.

(B)    Partial Invalidity

If any provision of these rules or the application of a provision to any person or circumstances shall be held invalid, the remainder of these rules or the application of a rule to persons or circumstances other than those as to which it is held invalid, shall not be affected thereby

Revised 07/27/05

ADOPTED BY THE HUMAN RELATIONS COMMISSION OF THE CITY OF GARY THIS _____ DAY OF _____ _____





## Gary Human Relations Commission
### Haneefah Khaaliq, Executive Director

Re-imagine

August 24, 2021

ATT: Attorney Steven J. Scott
8700 Broadway
Merrillville, IN 46410

RE: PUBLIC HEARING NOTICE
Case Name: Dochee vs. The Methodist Hospitals, Inc.
FEPA: 0920ReSR091 EEOC: 470-2020-03359

On August 1, 2020, Dr. Jennifer Dochee filed a charge of discrimination against
Methodist Hospitals, resulting in an agency PROBABLE CAUSE DETERMINATION.
We believe that an illegal act of discrimination did occur.

On May 10, 2021, the Respondent was sent correspondence regarding this determination.
On May 17, 2020, the Respondent sent a conciliation request to the agency. The
conciliation attempts were unsuccessful. Therefore, and in accordance with our local
ordinance, rules and regulations, the matter will now proceed to a public hearing where
the details of the case will be examined before the Gary Human Relations Commission,
its members, and any interested members of the public. Each party should be prepared to
provide both opening and closing statements, generally present their argument, and call
witnesses. The opportunity to question opposing counsel will also be given.

**The public hearing date has been scheduled for September, 22, 2021, at 10:00 a.m.
via Zoom.** This meeting will be recorded. No pre-hearing conference has been scheduled
for this matter. The information regarding how to access this virtual hearing will be
provided to you at a later date. It is your responsibility to ensure you are able to receive
communication from this office.

The information contained in this correspondence includes information regarding an
agency public hearing. Please read all the documents enclosed and contact the agency
should you have any questions or concerns.

Sincerely,
Haneefah Khaaliq, Esq.
Executive Director

**Certified #:** This number will be provided on the document mailed to you.

EXHIBIT
_C_

FAX: (219) 882-0373        Contact: (219) 883-415        ddress: 455 Massachusetts, Gary IN 46402

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION

| | | |
|---|---|---|
| Jennifer Dochee | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | Cause No. |
| The Methodist Hospitals, Inc., | ) | |
| | ) | |
| Defendants. | ) | |

## NOTICE OF REMOVAL TO FEDERAL COURT

To, Gary Human Relations Commission, please take notice that a Notice of Removal of this action was filed in the United States District Court for the Northern District of Indiana Hammond Division on September 3, 2021.

A copy of said Notice of Removal is attached hereto, and is served and filed herewith.

Respectfully submitted,


By:   /s/ Steven J. Scott
      Steven J. Scott (#22763-45)
      HODGES & DAVIS, P.C.
      8700 Broadway
      Merrillville, IN 46410
      (219) 641-8700
      *Attorneys for Defendant,*
      *The Methodist Hospitals, Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that on September 3, 2021 I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which sent notification of such filing to the following:

> Jennifer Witherspoon
> witherspoonlegal@gmail.com
>
> Haneefah Khaaliq
> hkhaaliq@gary.gov

I also hereby certify that on the 3rd day of September, 2021, a copy of the Notice of Removal was served on the Plaintiff herein and the Gary Human Relations Commission by depositing the same in the United States Mail, first class postage prepaid, and addressed as follows:

> Haneefah Khaaliq, Esq
> Gary Human Relations Commission
> 455 Massachusetts
> Gary, IN 46402
> (219) 883-4151
>
> Jennifer Dochee c/o
> Jennifer Witherspoon
> J. Witherspoon Legal & Mediation Services
> 32 N. West St. Suite 100
> Waukegan, IL 60085
> (847) 672-7819

/s/ Steven J. Scott
Steven J. Scott

556731.1
6367-2520-1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION

JENNIFER DOCHEE,               )
                               )
              Plaintiff,       )
                               )
vs.                            )    .
                               )    Cause No.
THE METHODIST HOSPITALS, INC., )
                               )
              Defendant.       )

## NOTICE OF REMOVAL

The Defendant, Methodist Hospitals, Inc. ("Methodist"), by counsel and pursuant to 28 U.S.C. § § 1331, 1441 and 1446, hereby provide Notice of Removal of this administrative action to the United States District Court for the Northern District of Indiana. The grounds for removal are:

1.     On October 28, 2020, Jennifer Dochee ("Dochee"), filed a Charge of Discrimination with the Gary Human Relations Commission (the "GHRC") and Equal Employment Opportunity Commission ("EEOC"). A true and accurate copy of the Charge of Discrimination is attached hereto as **"Exhibit A"** and is incorporated herein by reference.

2.     Although the case was dual filed, the GHRC as a Fair Employment Practices Agency ("FEPA") for the EEOC, was tasked with investigating and administratively adjudicating the Charge of Discrimination.

3.     Pursuant to Rule 13, Section 13.1, of the Rules and Regulations of the Gary Human Relations Commission, "[a]ny Party or Person aggrieved by a final order or determination made by the Commission shall be entitled to judicial review . . .". A true and accurate copy of the Rule 13, Section 13.1 of the Rules and Regulations of the Gary Human Relations Commission is attached hereto as **"Exhibit B"** and incorporated herein by reference.

4.     On May 10, 2021, the GHRC made a probable cause determination and the parties attempted conciliation.   A true and accurate copy of the Probable Cause Determination is attached hereto as **"Exhibit C"** and incorporated herein by reference.

5.     Following the Probable Cause Determination, the parties attempted to resolve the matter through the conciliation process, however, the parties were unable to settle the matter through the conciliation process.

6.     This Court has original jurisdiction pursuant to 28 U.S.C. § 1331 because this matter involves a federal question in that Dochee alleges a violation of the Title VII of the Civil Rights Act of 1964, a federal law.

7.     Contemporaneous with the filing of this Notice of Removal, Methodist will provide written notice to all attorneys of record and to the GHRC of the filing of this Notice of Removal.

8.     Contemporaneous with the filing of this Notice of Removal, the Defendants have submitted the filing fee to the Clerk of the United States

2

District Court for the Northern District of Indiana in the amount of Four Hundred Two ($402.00) Dollars.

WHEREFORE, Defendant, The Methodist Hospitals, Inc., respectfully requests that the above action now pending against it with the Gary Human Relations Commission, be removed to this Court.

Respectfully submitted,

By: /s/ Steven J. Scott
Steven J. Scott (#22763-45)
HODGES & DAVIS, P.C.
8700 Broadway
Merrillville, IN 46410
(219) 641-8700
*Attorneys for Defendant,*
*The Methodist Hospitals, Inc.*

3

## CERTIFICATE OF SERVICE

I hereby certify that on September 3, 2021 I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which sent notification of such filing to the following:

> Jennifer Witherspoon
> witherspoonlegal@gmail.com
>
> Haneefah Khaaliq
> hkhaaliq@gary.gov

I also hereby certify that on the 3rd day of September, 2021, a copy of the Notice of Removal was served on the Plaintiff herein and the Gary Human Relations Commission by depositing the same in the United States Mail, first class postage prepaid, and addressed as follows:

> Haneefah Khaaliq, Esq
> Gary Human Relations Commission
> 455 Massachusetts
> Gary, IN 46402
> (219) 883-4151
>
> Jennifer Dochee c/o
> Jennifer Witherspoon
> J. Witherspoon Legal & Mediation Services
> 32 N. West St. Suite 100
> Waukegan, IL 60085
> (847) 672-7819

/s/ Steven J. Scott
Steven J. Scott

556726.1
6367-2520-1

4

11/06/2020 14:07  #069 P.002/002

From:

C Form 5 (5/01)

## CHARGE OF DISCRIMINATION

This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form.

| Charge Presented To: | Agency(is) Charge No(s): |
|---|---|
| X FEPA | 0920ReSR091 |
| X EEOC | 470-2020-03359 |

Gary Human Relations Commission And EEOC

*State or local Agency, If any*

| Name *(indicate Mr., Ms., Mrs.)* | Home Phone *(Incl. Area Code)* | Date of Birth |
|---|---|---|
| DR. JENNIFER DOCHEE | (708) 516-0099 | 1975 |

| Street Address | City, State and ZIP Code |
|---|---|
| 8631 Stone Creek Blvd | FRANKFORT, IL 60423 |

Named is the Employer, Labor Organization, Employment Agency, Apprenticeship Committee, or State or Local Government Agency That I Believe Discriminated Against Me or Others. *(If more than two, list under PARTICULARS below.)*

| Name | No. Employees, Members | Phone No. (Include Area Code) |
|---|---|---|
| METHODIST HOSPITALS | 15-100 | (219) 886-4000 |

| Street Address | City, State and ZIP Code |
|---|---|
| 600 GRANT STREET | GARY, INDIANA 46402 |

| Name | No. Employees, Members | Phone No. (Include Area Code) |
|---|---|---|
| | | |

| Street Address | City, State and ZIP Code |
|---|---|
| | |

DISCRIMINATION BASED ON *(Check appropriate box(es).)*

| [X] RACE | [X] COLOR | [X] SEX | [ ] RELIGION | [ ] NATIONAL ORIGIN |
|---|---|---|---|---|
| [X] RETALIATION | [ ] AGE | [ ] DISABILITY | [ ] OTHER *(Specify below.)* | |

DATE(S) DISCRIMINATION TOOK PLACE
Earliest 04/13/2020   Latest 04/13/2020

[X] CONTINUING ACTION

THE PARTICULARS ARE *(If additional paper is needed, attach extra sheet(s)):*

### AMENDED

I am an African American Female hired by the Respondent on or about August 15, 2019. My position Title was Interventional Cardiologist. During my employment, I became a recipient of continuous harassment by several male Cardiologist. The main decision maker is Indian. I complained and reported to the Respondents chairman and Chief Executive Officer and nothing was done. On April 13, 2020 I was disciplined and discharged in retaliation for my reporting the harassment. I was also threatened by the respondent that I would be reported to the National Practitioner Databank. On October 2, 2020 I was informed a negative reference was given on me discrediting my credentials and blocking me from getting hired at another hospital.

I believe I have been discriminated and retaliated against based on my race African American/ Sex Female in violation of Title VII of the Civil Rights Act of 1964 as amended.

| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY *When necessary for State and Local Agency Requirements* |
|---|---|
| I declare under penalty of perjury that the above is true and correct. | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief. SIGNATURE OF COMPLAINANT |

11/3/2020
Date            Charging Party Signature

SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE *(month, day, year)*
October 28, 2020

EXHIBIT
A

RULES AND REGULATIONS
OF THE GARY HUMAN RELATIONS COMMISSION

RULE 1    DEFINITIONS:

When used in these rules and regulations, unless the contest clearly requires otherwise.

(A)    The term "Affirmative Action" shall mean those acts, which the Commission deems necessary to assure compliance with the Gary Civil Rights Ordinance.

(B)    "Aggrieved Person" includes any person who claims to have been injured by a discriminatory housing practice, believes that such person will be injured by a discriminatory housing practice that is about to occur.

(C)    The term "Commission" means the Human Relations Commission of the City of Gary, Indiana, hereinafter created.

(D)    The term "Commission Attorney" shall mean such assistants of the Corporation Counsel as may be assigned to the Commission, or such other attorneys as may be engaged by the Commission.

(E)    The term "Commissioners" means any duly appointed member of the Human Relations Commission.

(F)    The term "Complainant" means any individual charging on his own behalf to have been personally aggrieved by an unlawful discriminatory practice, or the director, deputy director, charging that an unlawful discriminatory practice was committed against a person or class of persons other than himself, in order to vindicate the public policy of the City of Gary, Indiana as referred in Article II of this Ordinance.

(G)    The term "Complaint" means any written grievance filed by a Complainant with the Commission. The original shall be signed and verified before a notary public or other persons duly authorized by law to administer oaths and take acknowledgements. Notarial service shall be furnished by the Commission without charge. To be acceptable by the Commission, a complaint shall be sufficiently complete so as to reflect properly the full name and address of the Complainant; the name and address of the respondent against whom of complaint is made; the alleged discriminatory practice and a statement of particulars thereof; the dates and places of the alleged discriminatory practice is of a continuing nature, the dates between which said continuing acts of discrimination are alleged to have occurred; and a statement as to any other action, civil or criminal, instituted in any other forms based upon the same grievance as is alleged in the complaint, together with a statement as to the status of disposition of such other action. No complaint shall be valid unless filed within ninety (90) days from the date of the occurrence of the alleged discriminatory practice, or from the date of the termination of a published and meaningful grievance procedure provided by a Respondent employer, or labor union. A complaint may be amended to cure technical defects or omission, including the failure to verify the charge, or to clarify and amplify allegations made therein. Such amendments and amendments alleging additional acts with constitute unlawful discriminatory practices related to or growing out of the

EXHIBIT

B

Section 12.4    **INJUNCTIONS**

(A)    Director Determination

Where a charge has been filed with the Commission, the Director may determine that irreparable harm will be suffered by the Charging Party if the alleged discriminatory practices are allowed to continue. This determination may be made only after the Director has consulted the Staff Attorney.

(B)    Petition to Chairperson for Order to File in Court

When the Director has determined that irreparable harm will be suffered by the Charging Party if the alleged discriminatory practices are allowed to continue, the Director by the Staff Attorney shall petition the Chairperson for a preliminary order authorizing the Director to file a request in circuit or superior court for a temporary restraining order, preliminary injunction, or permanent injunction. The Chairperson shall issue such a preliminary order if he/she finds:

(i)    That the Commission has jurisdiction over the parties and over the subject matter;

(ii)    That the Charging Party is suffering, and will continue to suffer, irreparable harm if a temporary emergency order of the Court is not obtained; and

(iii)    That the Charging Party is likely to succeed on the merits of his/her complaint filed with the Commission.

The Chairperson's preliminary order under this section shall issue only after such preliminary order has been approved by the Department of Law. The preliminary order shall be in writing and it shall become a part of the permanent record of the Commission's proceedings relating to the charge.

(C)    The Department of Law shall file suit on behalf of the Commission in superior or circuit court, for the issuance of a temporary restraining order, preliminary injunction, or permanent injunction following satisfaction of the procedural steps set out in these rules and the issuance of a preliminary order to so proceed by the Chairperson.

RULE 13    **JUDICIAL REVIEW**

Section 13.1    **METHOD OF FILING FOR REVIEW**

(A)    Who May Seek Review

Any Party or Person aggrieved by a final order or determination made by the Commission shall be entitled to judicial review, pursuant to Indiana Code 4-22.

(B)    Record Of Hearing

For purposes of judicial review, the record of the Public Hearing shall consist of a transcript of the oral testimony, the exhibits admitted into evidence, and all notices; pleadings, exceptions, motions, requests and other papers filed with the Commission with

the exception of briefs or arguments of law. The cost of producing such record for judicial review shall be borne by the Party making the appeal. The Commission may require the deposit of reasonable security for the payment of such cost before producing such record.

## RULE 14   REVOCATION OR SUSPENSION OF LICENSES

### Section 14.1   NOTICE TO LICENSEE AND LICENSING AGENCY

(A)   Procedure

Any licensee of the City of Gary who is found to have committed a discriminatory practice shall be put on notice by the order of the Commission that failure to comply with its final order will subject said licensee to the possible suspension or revocation of such license. The licensing agency shall be given notice of the Commission's determination, and upon failure of the licensee to comply with the Commission's final order, the Commission shall request the licensing agency to conduct a hearing on the matter of whether or not such licensee shall continue to be licensed.

## RULE 15   CONSTRUCTION OF THESE REGULATIONS

### Section 15.1   HOW CONSTRUED

(A)   Broad Construction

These regulations shall be broadly construed to accomplish the purposes of the Law and the Policies of the Commission.

(B)   Partial Invalidity

If any provision of these rules or the application of a provision to any person or circumstances shall be held invalid, the remainder of these rules or the application of a rule to persons or circumstances other than those as to which it is held invalid, shall not be affected thereby.

Revised 07/27/05

ADOPTED BY THE HUMAN RELATIONS COMMISSION OF THE CITY OF GARY THIS _____ DAY OF _____





Re-imagine

**Gary Human Relations Commission**
Haneefah Khaaliq, Executive Director

August 24, 2021

ATT: Attorney Steven J. Scott
8700 Broadway
Merrillville, IN 46410

RE: PUBLIC HEARING NOTICE
Case Name: Dochee vs. The Methodist Hospitals, Inc.
FEPA: 0920ReSR091 EEOC: 470-2020-03359

On August 1, 2020, Dr. Jennifer Dochee filed a charge of discrimination against
Methodist Hospitals, resulting in an agency PROBABLE CAUSE DETERMINATION.
We believe that an illegal act of discrimination did occur.

On May 10, 2021, the Respondent was sent correspondence regarding this determination.
On May 17, 2020, the Respondent sent a conciliation request to the agency. The
conciliation attempts were unsuccessful. Therefore, and in accordance with our local
ordinance, rules and regulations, the matter will now proceed to a public hearing where
the details of the case will be examined before the Gary Human Relations Commission,
its members, and any interested members of the public. Each party should be prepared to
provide both opening and closing statements, generally present their argument, and call
witnesses. The opportunity to question opposing counsel will also be given.

**The public hearing date has been scheduled for September, 22, 2021, at 10:00 a.m.
via Zoom.** This meeting will be recorded. No pre-hearing conference has been scheduled
for this matter. The information regarding how to access this virtual hearing will be
provided to you at a later date. It is your responsibility to ensure you are able to receive
communication from this office.

The information contained in this correspondence includes information regarding an
agency public hearing. Please read all the documents enclosed and contact the agency
should you have any questions or concerns.

Sincerely,
Haneefah Khaaliq, Esq.
Executive Director

**Certified #: This number will be provided on the document mailed to you.**

EXHIBIT
_C_

FAX: (219) 882-0373          Contact: (219) 883-415          ddress: 455 Massachusetts, Gary IN 46402









May 17, 2021

EARLE F. HITES
R. LAWRENCE STEELE
GREGORY A. SOBKOWSKI
BONNIE C. COLEMAN
LAURA B. FROST
BENJAMIN T. BALLOU
STEVEN J. SCOTT
SHAWN D. COX
EMILIE E.D. HUNT
CARL J. HALL

OF COUNSEL:
CLYDE D. COMPTON
EDWARD J. HUSSEY

JASPER COUNTY OFFICE:
EDWARD P. DUMAS

**LAKE COUNTY**
8700 BROADWAY
MERRILLVILLE, IN 46410
**P** (219) 641.8700
**F** (219) 641.8710

**PORTER COUNTY**
P.O. BOX 476
PORTAGE, IN 46368
**P** (219) 762.9129

**JASPER COUNTY**
119 W. HARRISON STREET
RENSSELAER, IN 47978
**P** (219) 866.4158
**F** (219) 866.2274

**HODGESDAVIS.COM**

**VIA FACSIMILE AND FIRST CLASS MAIL**
Ms. Haneefah Khaaliq
Gary Human Relations Commission
455 Massachusetts Street
Gary, IN 46402

Re:  Charging Party: Jennifer Dochee, M.D.
     Respondent: The Methodist Hospitals, Inc.
     Case No. 470-2020-03359
     Our File No. 6367-2520-1

Dear Ms. Khaaliq:

This is in response to the Probable Cause finding that we recently received as counsel for Methodist Hospital in the above-referenced matter. Per said letter, which provided for conciliation efforts to resolve this matter, Methodist agrees to engage in conciliation efforts in an attempt to resolve this matter. Please confirm that you received this letter that Methodist agrees to engage in conciliation efforts. Thank you.

Very truly yours,

HODGES AND DAVIS, P.C.

By:

Steven J. Scott

SJS:sk:539978.1

SUBSTANTIAL WEIGHT SUBMISSION
Gary Human Relations Commission
839 Broadway – Suite S107
Gary, Indiana 46402

Jennifer Dochee
8631 Stone Creek Blvd
Frankfort, IL 60423

EEOC CNTRL NO: 470-2020-03359
FEPA CNTRL NO:    0920ReSR091

Vs.

TD NO: 8

Methodist Hospitals
600 Grant Street
Gary, IN 46402

FINDING:  PC

## I. SUMMARY OF COMPLAINT                                    **Tab A-1**

The Complainant alleged the Respondent engaged in discriminatory employment practices in violation of the Gary Civil Rights Ordinance and Title VII of the Civil Rights Act of 1964 as amended for the following reason:

### Amended Charge

I am an African American Female hired by the Respondent on or about August 15, 2019. My position Title was Interventional Cardiologist.    During my employment, I became a recipient of continuous harassment by several male Cardiologist. The main decision maker is Indian. I complained and reported to the Respondents chairman and Chief Executive Officer and nothing was done. On April 13, 2020 I was disciplined and discharged in retaliation for my reporting the harassment. I was also threatened by the respondent that I would be reported to the National Practitioner Databank. On October 2, 2020 I was informed a negative reference was given on me discrediting my credentials and blocking me from getting hired at another  hospital.

I believe I have been discriminated and retaliated against based on my race African American/ Sex Female in violation of Title VII of the Civil Rights Act of 1964 as amended.

**Respondent's Position Statement:**                          **Tab B-6**

There is no evidence of any discrimination toward Dr. Dochee on April 13. 2020 or during her employment at Methodist.
.
**.II. SUMMARY OF CHARGE:**

08/01/20    Charge Filed with ICRC

| | |
|---|---|
| 08/20/2020 | Charge sent from EEOC for GHRC to investigate |
| 09/21/2020 | Charge assigned to investigator |
| 09/25/2020 | Case Reassignment FFC notification mailed out |
| 11/03/2020 | Charge was amended to include race |
| 11/13/2020 | FFC Held |

**Undisputed Facts:**                                                    **Tab C-2**

I am an African American Female hired by the Respondent on or about August 15, 2019. My position Title was Interventional Cardiologist.

**Disputed Facts:**

During my employment, I became a recipient of continuous harassment by several male Cardiologist. The main decision maker is Indian. I complained and reported to the Respondents chairman and Chief Executive Officer and nothing was done.

On April 13, 2020 I was disciplined and discharged in retaliation for my reporting the harassment. I was also threatened by the respondent that I would be reported to the National Practitioner Databank.

On October 2, 2020 I was informed a negative reference was given on me discrediting my credentials and blocking me from getting hired at another hospital.

I believe I have been discriminated and retaliated against based on my race African American/ Sex Female in violation of Title VII of the Civil Rights Act of 1964 as amended.

**Charging Party's Position:**                                           **Tab A-4**
**Written Statement**

**Charging Party's Attorney Wrote This**

This office has been retained by Dr. Jennifer Dochee with respect to the improper and completely unauthorized action of the Methodist Hospitals ("Hospital"), acting through its Medical Staff Quality Committee ("MSQC"), in restricting the staff and clinical privileges that Dr. Dochee has with the Hospital and requiring her to submit to unlimited proctoring. These actions are outlined in a July 9, 2020 letter authored by Dr. Kumar Venkat, the Chief of the Hospitals Division of Medicine. In taking such action, the MSQC exceeded its authority and the Hospital/MSQC completely disregarded the substantive and procedural rights granted to Dr. Dochee under the Bylaws of the Hospital Medical Staff (Bylaws") and the Hospital's Rules and Regulations ("Rules"). Moreover, the timing the action is suspect and suggests that the entire purpose of the action was simply to avoid the economic competition between Dr. Dochee, now an independent cardiologist with staff privileges, with the cardiologists employed by Dr. Dochee's former employer, the Methodist

2

Hospitals, Inc. ("MHI"). In this regard, it is of no coincidence that the letter was sent at approximately the same time that Dr. Dochee was set to begin her independent practice after the July 12, 2020 effective date of the no-cause termination of Dr. Dochee's employment with MHI. Among the many improper and unauthorized acts taken by the Hospital/MSQC are:

**Charging Party's Verbal Position**                                   **Tab C-3**
**Fact Finding Conference**

**Charging Party is speaking:**

Dr. Gady was hired in on August 30, 2020 and wrote very derogatory things about me in the charts. I felt harassed because on April 13, 2020 I was called into a meeting and terminated. My clients were being seen by other doctors. I was told in the meeting not to fight the termination or I would not be paid for the ninety days.

**Respondent's Position:**                                             **Tab B-5**
**Written Statement**

I represent the Respondent. The Methodist Hospitals, Inc. ("Methodist"). In connection with the above-referenced Charge of Discrimination ("Complaint t ') filed by Jennifer Dochee. This letter presents Methodist's Position Statement with respect to the Complaint and is based upon an Investigation of the allegations and records available as of the date of this letter. There is no evidence of any discrimination toward Dochee on April 13. 2020 or during her employment at Methodist.

THE CHARGE OF DISCRIMINATION

1. General Considerations.

Methodist is a general care hospital with its Northlake Campus located in Gary, Indiana, and the Southlake. Campus located in Merrillville, Indiana. The hospital has approximately (350 beds. equally divided between the two campuses, has several off site facilities and employs approximately 2,100 people. The campuses are located approximately 10 miles apart. As an institution, Methodist is committed to non-discriminatory practices and actively supports equal opportunity programs and efforts for its employees.

2. Nondiscrimination Policies.

Methodist is committed to fair and equitable treatment for all hospital employees. It is the policy of Methodist to "[Ë]mploy individuals and offer promotional opportunities on the basis of their qualifications, and seniority with the assurance of equal opportunity and fair treatment regardless of race, color, religion, sex, age, national origin. Sexual orientation, ancestry, or any disabling condition that does not inhibit job performance." See Methodist Employee Relations Code, (I-IR-POL

3

07). Methodist is in compliance with all applicable local, state and federal laws governing nondiscrimination in employment. Id.

Methodist. Has established procedures to follow in the event an employee, believes he or she has been unlawfully discriminated against by a co-worker, supervisor, physician, manager or agent of Methodist Id. If discrimination occurs in any form, Methodist encourages its employees to immediately report any discriminatory acts so that. They can be properly investigated and corrective action taken. Id. The fact .sshould be reported, and the names of individuals involved should be disclosed so that proper act ions can be taken. 161. Methodist would take necessary corrective action. Including disciplinary action, up to and including termination if unlawful discrimination was determined. Methodist's non-discrimination policies support the diversity of its employees and its two campus hospitals.

FACTS

On or about July 3. 2019, Claimant and Respondent entered into a written Professional Services Employment. Agreement ("Agreement") whereby Respondent ·would employ Claimant as an interventional cardiologist. The Agreement. Provided that Claimant was to be paid an annual salary of Six Hundred Fifty Thousand (650,000.00) Dollars. In addition, pursuant to Paragraph 12.4 of the Agreement. Either Claimant or Respondent could terminate the Agreement. Without cause by providing 90-day written notice to the other party. On or about April 13, 2020, respondent properly notified claimant that pursuant to the clear terms of the agreement, respondent was terminating the agreement without cause.

In accordance with the agreement, respondent notified claimant that the termination was effective in 90 days or on July 9, 2020. Claimant and consider the terms of the agreement was simply terminated from her position pursuant to the terms of the agreement she signed. Claimant was not coerced or forced to sign the agreement. Claimant was given the opportunity to review, negotiated
And consider the terms of the agreement prior to the effective date of termination of the agreement. Further while no longer employed by respondent. Claimant continues to have medical staff privileges at the hospital as an independent medical provider.

CONCLUSION
Claimant and Respondent entered into an employment agreement and respondent terminated the agreement in accordance to the clear terms of the agreement agreed to by the claimant

**Tab B-6**

Professional Services Employment Agreement dated July 3, 2019 (Employment Agreement)
This is Dr. Dochee' Termination Notice:
This letter serves as formal notice that the Methodist Hospitals, Inc. has elected to terminate your employment without cause. Under paragraph 12.4 of your Employment

4

Agreement, the termination is effective ninety (90) days from your receipt of this letter, on July 12, 2020 (the "Termination date").

You will be considered to be on paid leave status until the Termination Date. The Hospital will continue to pay your base salary in accordance with normal payroll procedures and will maintain your benefits and malpractice insurance in place through the Termination Date; however, you will not be permitted to see patients at professional office(s) of the Hospital or on Hospital premises, nor will you be permitted to provide services to patients on behalf of the Hospital during this time. Final payment of any remaining base salary will be paid to you on or before the next regular payroll date following the Termination Date. Bonus compensation which may be owing to you under the terms of the Employment Agreement, if any, will be calculated and paid to you within thirty (30) days of the Termination Date. All such amounts paid to you will be subject to withholdings as required by applicable law.

Your participation in any of the Hospital's employee benefit plans will continue through the last day of the month in which the Termination Date occurs. If you are entitled and choose to elect COBRA continuation coverage, you will be responsible for payment of all COBRA premiums associated with such continuation coverage. "COBRA" means the Consolidated Omnibus Budget Reconciliation Act of 1985, as amended, through which certain qualified beneficiaries are provided continuation coverage in affected group health plans.

The Hospital will maintain your malpractice insurance in effect through the Termination Date. On the Termination Date, the malpractice policy will terminate and appropriate "Tail Coverage" will be issued to provide protection to you and the Hospital for any incidents that occurred while you provided services as an employee of and on behalf of the Hospital. The Hospital will arrange and pay for the "tail coverage" policy covering the period of your employment by the Hospital as provided in paragraph 5.1 of your employment agreement. You will be responsible for securing your own malpractice insurance following the Termination Date.

Please note that the malpractice insurance policy provided by the Hospital will not cover you for services you provide on behalf of a new employer or in the event that you open your own medical practice. Accordingly, if you begin employment with a new employer or choose to open your own practice prior to the Termination Date, you must notify the Hospital, as this may result in termination of the malpractice insurance provided by the Hospital, prior to the Termination Date.

In such event, the "tail coverage" required under paragraph 5.1 will commence at the time the malpractice insurance policy terminates. Please keep in mind that the provisions of paragraph 2.2 of your Employment Agreement remain in effect through the Termination Date.

The Hospital will make arrangements for continuity of care of patients from the date of this letter through the Termination Date. During this time, scheduled patients will be advised that you are on leave and given the option to see another physician in the Methodist Physician Group. After the Termination Date, patients will be notified that

you are no longer employed by the Hospital. Of course, at all times, patient choice of provider will be honored.

All of your patient records must be up to date and complete. If you need to arrange a time to complete all your notes and sign-offs, please contact Dawn Smith, Director of Medical Records, at 738-3441 (Southlake) or 881-2481 (Northlake) to schedule a time to do so within the next seven (7) days.

As you know, all patient records are the property of the Hospital. As such, they will be maintained by the Hospital through and following the Termination Date in accordance with Hospital policies and as required by applicable law. You will be provided with access to such records in accordance with the terms of paragraph 2.5 of your Employment Agreement. As always, patients request for copies and /or releases of records will be honored in compliance with applicable Federal and State laws, including without limitation HIPPA. Further, please note that the confidentiality obligations under Section 8 of your Employment Agreement remain in effect notwithstanding the termination of your employment.

Finally, you received a signing bonus at the commencement of your employment which is subject to repayment under the provisions of paragraph 7.3 of your Employment Agreement. The Hospital has determined that no repayment of the signing bonus is owed under paragraph 7.3
The letter was signed by/Matthew Doyle, Acting CEO

Fact Finding Conference
Respondents Verbal Position

Dr. Vincent Sevier is speaking: We brought her on board in August. She was the only female cardiologist. We have many females employed by Methodist. Nurse Practioners nurses I do believe. We thought she could bring in additional things to the group new things for the growth of the group. Her time here it was cares that came up some staff would bring things it's a part of see something say something. She was not retaliated against for brining things fourth. In the spring of 2020 Covid brought in state restrictions, changing relationships because of covid. Mid to late march we had to restructure because of gaps in revenue we had to make changes on physician's side. Her program was costly. We received something for reference for only community hospital nothing from Barns Jewish or Pinnacle to give her a negative reference we would not do.

**Respondent submitted Additional Information:**

| | |
|---|---|
| Attorney Appearance | Tab B-3 |
| Policy and Procedure | Tab B-5 |
| Termination Employment Agreement | Tab B-6 |
| Professional Services Employment Agreement | Tab B-7 |
| Duties of Physician | Tab B-8 |
| Relationship between the Parties | Tab B-9 |

6

Benefits/Compensation                          Tab B-10
Termination                                     Tab B-11
Sanctioned Person                               Tab B-12
Internal medicine Core Privileges               Tab B-13
Internal medicine non-core Privileges           Tab B-14
Cardiology Core Privileges                      Tab B-15
Electrophysiology core privileges               Tab B-16
Clinical Privileges                             Tab B-17
Clinical Area Medicine                          Tab B-18

## III. INVESTIGATIVE ANALYSIS

Charging Party is an African American Female hired by the Respondent on or about August 15, 2019.   Her position Title was Interventional Cardiologist. During her employment Charging Party alleged she had been a recipient of continuous harassment by several male Cardiologist. The main decision maker was Indian. Charging Party alleged she complained and reported to the Respondents chairman and Chief Executive Officer and nothing was done. On April 13, 2020 charging Party alleged she was disciplined and discharged in retaliation for her reporting the harassment. She alleged she was also threatened by the respondent that she would be reported to the National Practitioner Databank. On October 2, 2020 she was informed a negative reference was given on her discrediting her credentials and blocking her from getting hired at another hospital.   Charging party was discharged without cause.

Charging party believe she has been discriminated and retaliated against based on my race African American/ that she alleges that was not the factor, rather her Sex Female was in violation of Title VII of the Civil Rights Act of 1964 as amended.

April 15, 2019Charging party was hired by the Respondent.   Her position was an Interventional Cardiologist.   The primary responsibility was to treat coronary artery disease heart valve disorders congenital heart disease. They are highly skilled in prevention of heart disease and the compilations of heart failure. They are trained to perform specific catheter based treatments for heart diseases they do nonsurgical procedures for treating coronary artery disease.
During her time with the Respondent after about three months of being there.  On July 3, 2019 respondent and charging party entered into a written professional service employment agreement, in the agreement either party could have terminated the agreement without cause. By providing a 90 day written notice party without cause, so on April 13, 20 20 Respondent terminated the agreement without cause. It was to be effective on July 12, 2020.  As part of respondents policy employees are encouraged to report any unlawful discriminatory acts against them. So they can be properly investigated a corrective action would be taken.   Respondent has not provided any documentation to support if any investigation had been done into the Charging party's allegations.

7

Respondent gave no reason for the termination. Although the contact did state without cause, which implies there was no reason given, or did the respondent want to submit a reason. That contract gave many reasons for termination. If certain criteria was not met. Like Duties of the physician. None were broken Relationships between the parties charging party was not in violation of professional standards. Charging party was discharged for no other reason except because the respondent wanted to sever a relationship that was not wanted. She was the only female cardiologist. The male doctors simply did not want a female on board. Respondent has not articulated a nondiscriminatory reason for not wanting charging party on staff at the hospital. Respondent may employ female nurses and practitioners she was still the only female cardiologist.

## IV. CONCLUSION/RATIONAL/RECOMMENDATION

1.  Investigation revealed charging party was hired by the Respondent on April 15, 2019. Her position was an Interventional Cardiologist.

2.  Investigation revealed the primary responsibility of a Interventional cardiologist Was to treat coronary artery disease, heart valve disorders. Congenital Heart Disease.

3.  Investigation revealed they are skilled in prevention of heart disease and the Compilations of heart failure. They are trained to perform specific catheter based Treatments for heart diseases they do nonsurgical procedures for treating coronary Artery disease.

4.  Investigation revealed on July 3, 2019 respondent and charging party entered into a written professional service employment agreement, in the agreement either party or respondent could have terminated the agreement without cause.by providing a 90 day written notice.

5.  Investigation revealed on April 13, 2020 Respondent terminated the agreement without cause. It was to become effective on July 12, 2020.

6.  Investigation revealed as part of respondents policy employees are encouraged to Report any unlawful discriminatory acts against them. So they can be properly investigated and corrective action would be taken.

7.  Investigation revealed Respondent has not provided any documentation to support if any investigation had been done into the Charging party's allegations. Respondent gave no reason for the termination.

8.  Investigation revealed the contact did state without cause, which implies there was no reason given, or did the respondent want to submit a reason. That contract gave many reasons for termination. If certain criteria was not met. Like Duties of the physician.

8

9. Investigation revealed Respondent did not state whether without cause was connected to other terminal issues. And if so charging Party was not made aware of any prior to her discharge of without cause.

10. Investigation revealed charging party was not in violation of any professional standards that caused her discharge. Charging party was discharged for no other reason except because the respondent wanted to sever a relationship that was not wanted any more.

11. Investigation revealed   she was the only female cardiologist. The male doctors simply did not want a female on board.

12. Investigation revealed Respondent has not articulated a legitimate nondiscriminatory reason for not wanting charging party on staff at the hospital.

13. Investigation revealed Respondents may employ female nurses and practitioners she was still the only female cardiologist.

The Respondent has not articulated a legitimate non-discriminatory business decision for its employment decision. The burden of proof rests with the Respondent to show that the stated reason for the termination of the Charging party was nondiscriminatory. Staff Recommends Probable Cause.

Staff Recommendation is Probable Cause.

IV.    **FINDING:  Probable Cause**

_Nara Robbs_                                    **5/6/2021**
_____          _____
**Commissioner Signature**                          **Date**


_[signature]_                                    **Date**
_____
**Commissioner Signature**

_[signature]_                                    **5/6/2021**
_____          _____
**Executive Director's Signature**                   **Date**


**Loretta Houston/Investigator**

9





**Gary Human Relations Commission**
Haneefah Khaaliq, Executive Director

## Dr. Jennifer Dochee   Vs.  Methodist Hospitals

| | |
|---|---|
| **GHRC Numbers:** | **0920ReS091** |
| **EEOC Numbers:** | **470-2020-03359** |
| **Date Filed:** | **09/21/2020** |
| **Date Assigned:** | 9/24/20 |
| **Investigator:** | Loretta Huston |

| | |
|---|---|
| **Date Closed:** | |
| **Closed As:** | |

FAX: (219) 882-0373          Contact: (219) 883-4151 / (219) 881-5225          Address: 455 Massachusetts, Gary IN 46402





**Gary Human Relations Commission**
Haneefah Khaaliq, Executive Director

May 10, 2021

Mr. Steve Scott
Hodges & Davis P.C.
8700 Broadway
Merrillville, Indiana 46410

Charging Party:    Jennifer Dochee
Respondent:        Methodist Hospital Northlake
Charge Numbers:    470-2020-03359 & 0920ReSR091

**RE:  NOTICE OF FINDING OF PROBABLE CAUSE**

Dear Mr. Scott:

The above case has been presented to the case review committee for action resulting in their finding of Probable Cause to believe that an illegal act of discrimination did occur. This decision was made for the following reason (s):

Please find attached a copy of our rules and regulations that explains your right to request that a conciliation conference be scheduled in order to resolve the problems involved in a remedial and equitable manner.

1. Investigation revealed charging party was hired by the Respondent on April 15, 2019. Her position was an Interventional Cardiologist.

2. Investigation revealed the primary responsibility of a Interventional cardiologist Was to treat coronary artery disease, heart valve disorders. Congenital Heart Disease.

3. Investigation revealed they are skilled in prevention of heart disease and the compilations of heart failure. They are trained to perform specific catheter based treatments for heart diseases they do nonsurgical procedures for treating coronary artery disease.

4. Investigation revealed. On July 3, 2019 respondent and charging party entered into a written professional service employment agreement, in the agreement either party

---

FAX: (219) 882-0373          Contact: (219) 883-4151 / (219) 881-5225          Address: 455 Massachusetts, Gary IN 46402

or respondent could have terminated the agreement without cause.by providing a 90 day written notice.

5. Investigation revealed on April 13, 2020 Respondent terminated the agreement without cause. It was to become effective on July 12, 2020.

6. Investigation revealed as part of respondents policy employees are encouraged to report any unlawful discriminatory acts against them. So they can be properly investigated a corrective action would be taken.

7. Investigation revealed Respondent has not provided any documentation to support if any investigation had been done into the Charging party's allegations. Respondent gave no reason for the termination.

8. Investigation revealed the contact did state without cause, which implies there was no reason given, or did the respondent want to submit a reason. That contract gave many reasons for termination. If certain criteria was not met. Like Duties of the physician.

9. Investigation revealed Respondent did not state whether without cause was connected to other terminal issues. And if so charging Party was not made aware of any prior to her discharge of without cause.

10. Investigation revealed charging party was not in violation of any professional standards that caused her discharge. Charging party was discharged for no other reason except because the respondent wanted to sever a relationship that was not wanted any more.

11. Investigation revealed she was the only female cardiologist. The male doctors simply did not want a female on board.

12. Investigation revealed Respondent has not articulated a legitimate nondiscriminatory reason for not wanting charging party on staff at the hospital.

13. Investigation revealed Respondents may employ female nurses and practitioners she was still the only female cardiologist.

The Respondent has not articulated a legitimate non-discriminatory business decision for its employment decision. The burden of proof rests with the Respondent to show that the stated reason for the termination of the Charging party was nondiscriminatory. Staff Recommends Probable Cause.

Staff Recommendation is Probable Cause.

If we do not hear from you in writing within (5) days after your receipt of this notice, we shall assume you do not desire to seek to conciliate this case. Our ordinance mandates that if conciliation efforts fail and or the Respondent ignores or is uncooperative in

conciliation efforts, the Director shall cause a Public Hearing to be set as the next step in processing a case where there is a finding of Probable Cause.

**If you have any questions please feel free to contact the agency.**

Sincerely,
Gary Human Relations Commission


Haneefah Khaaliq

CERTIFIED MAIL:  7019 0700 0001 2144 3137
Regular Mail

cc: Jamie Serrano
Manager Employment & Labor Relations

# SECTION 3.2 INVESTIGATION AND FINDING

(a)    **Investigation of Complaint**

If the Respondent chooses to defend against the complaint, the Director shall initiate a
full investigation of the complaint.  Based on the status of the investigation, the
Director and a minimum of two (2) Commissioners appointed by the Chair shall
determine whether Probable Cause exists to believe that an illegal act of
Discrimination did occur in violation of the Gary Civil Rights Ordinance, Municipal
Code of Gary, Sections 7-101-7-110.

(b)    **Finding of Probable Cause**

If the Director and a minimum of two (2) Commissioners appointed by the Chair find
Probable Cause to believe that an illegal act of discrimination did occur, or if Probable
Cause should be found by the Commission pursuant to an appeal under Section 3.2 (c.i.),
the Director shall have served on the Respondent a Probable Cause Notice.  Upon receipt
of the Probable Cause Notice sent to the Respondent by Certified or Registered mail, the
Respondent may request within five (5) days that a Conciliation Conference be
scheduled.
The Respondent May ignore all conciliation efforts.  In this case the Director shall cause
a Public Hearing date to be set at the Commission's earliest convenience.

(c)    **Ruling on Pre-Hearing Motions and Petitions**

When the Complainant or the Respondent files a pre-hearing motion or petition, the
Chairperson or Vice-Chairperson of the Commission or if both are unavailable, and
Commissioner shall rule on the motion or petition or if a Presiding Officer has been
appointed pursuant to Section 3.5, the Presiding Officer shall rule on the motion or
petition.

## Section 3.3 CONCILIATION CONFERENCE
### Assignment of Conciliator

When the Director receives notice pursuant to Section 3.2(b)(ii) that the Respondent has requested a Conciliation Conference, the Director shall conduct the Conference him/herself along with the Commission Attorney and any staff and agents and Director appoints to help him/her represent the interest of the Complainant and the Commission.

### (a)    Conduct of Conciliation Conference

At the Conciliation Conference, the Commission shall attempt to negotiate all differences and arrive at a Consent Agreement. The Respondent may represent him/herself or be represented by his/her attorney. All discussion in a Conciliation Conference shall be confidential. No admissions made against interest during the Conciliation Conference may be introduced as evidence at a Public Hearing held by the Commission or any other Legal proceeding, unless waived in written consent of both Respondent and Complainant.

## Section 3.4    CONSENT AGREEMENTS
### (a)    Unsuccessful Conciliation

If the Respondent does not agree to the terms of a Consent Agreement the Director shall send the complaint for Public Hearing at the Commission's earliest convenience.

### (b)    Successful Conciliation

If the terms, which are reached at the Conciliation Conference, are approved by the Complainant and the Respondent, the Complainant and the Respondent shall sign the Consent Agreement. Such Consent Agreement shall not become effective until executed by the Commission as provided in Section 3.4(c).

2

U.S. Postal Service
**CERTIFIED MAIL® RECEIPT**
*Domestic Mail Only*

For delivery information, visit our website at *www.usps.com®*.

OFFICIAL USE

Certified Mail Fee

$

Extra Services & Fees *(check box, add fee as appropriate)*
☐ Return Receipt (hardcopy)        $ _____
☐ Return Receipt (electronic)      $ _____
☐ Certified Mail Restricted Delivery $ _____
☐ Adult Signature Required         $ _____
☐ Adult Signature Restricted Delivery $ _____

Postage

$

05/10/2021

Postmark
Here

Mr. Steve Scott
Hodges & Davis P.C.
8700 Broadway
Merrillville, Indiana 46410

7019 0700 0001 2144 3137

PS Form 3800, April 2015 PSN 7530-02-000-9047    See Reverse for Instructions

# BASIC CHARGE DATA (1)

| Receiving Office: 24O | | Region: |
|---|---|---|
| Accountable Office:24E | Intake Officer: **Loretta Houston** | District |

Charge No. **091**

Lead Charge No. **0920ReS091**

EEOC: 470-2020-03359

DATES CONTINUING    YES ☒    NO ☐

Alleged Violation Date: **04/13/2020**          Received This Office: _____

Initial Received
Inquiry: **08/01/2020**          Received This Office: _____

## CHARGING PARTY INFORMATION

Mrs. ☐    Ms. ☒    Mr. ☐

First Name: **Dr. Jennifer** _____          Title: **Interventional Cardiologist**

Last Name: **Dochee**          Cell#: **(708) 516-0099**

Address: **8631 Stone Creek Blvd**          Email: jddochee@gmail.com

City: **Frankfort**          State: **IL**    Zip Code: **60423**

## CONTACT PERSON

Name: _____          Address: _____

City: _____    State & Zip _____          Phone: _____

## RESPONDENT INFORMATION

Name: **Methodist Hospitals**

Address: **600 Grant Street**          Phone#: **(219) 886-4000**

City: **Gary**          State: **IN**    Zip Code: **46402**

Address 2:          City & State: _____    Zip Code: _____
Phone

| CHARGING PARTY INFORMATION | RESPONDENT INFORMATION |
|---|---|

Date of Birth: **06/21/1975**

Sex: ☐ Male    ☒ Female

Race: ☒ B – Black    ☐ O – Other

☐ W – White    ☐ A – Asian/Pacific Islanders

☐ I – American Indian/Alaskan Native

National Origin: ☐ M – Mexican    ☐ H – Hispanic

☐ E – East Indian    ☐ O – Other

Household Size **01**    Income: $ _____

Country: **089**    SMSA: **2960**    SIC: _____

**Respondent Type:**

| | |
|---|---|
| ☒ | E – Private Employer |
| | U – Union |
| | J – Joint Apprentice Commission |
| | G – State and Local Government |
| | F – Federal Government |
| | S – State/Local Employment Agency |
| | P – Private Employment Agency |
| | K – Public Elementary/Secondary School |
| | M – Private Elementary /Secondary School |
| | N – Private College University |
| | I – Public College University |
| | O - Other |

# BASIC CHARGE DATA (2)

**CP NAME:**                 **CHARGE NO:**

**Source of Complaint:**
A – Aggrieved Party
B – Third Party
C – Commissioner
O – Other

**Statute:**
Title VII
ADEA
EPA
Rehab. Act

**Process Type:**
A – Class Complaint
C – Commission's Charge
D – Directed ADEA
E – Directed EPA
F – Federal Class
H – Hearing (Procedural)
I – Special Processing
L – Limited Scope Comm.
M – Hearing (Merits)
N – Citizenship
P – Proposed Federal Class
Q – Confidential Complaint
R – ADEA Rights Restored
O – Other

**Federal Referral/Transfer:**
A – Transferred Charge
B – Referred (Indev.) EEOC Process
C – Referred Agency to Process
D – Referred (Class) EEOC to Process

Federal Agency:_____

## BASIS AND ISSUES

**Basis:**
RB - Black
RW - White
RA - Asian/Pacific Island
RO - Other
RI - American Indian/Alaskan Native

**Religion:**
AA - Seventh Day Adventist
AC - Catholic
AJ - Jewish
AM - Muslim
AO - Other
AP - Protestant

| **National Origin:** | **Sex:** | **Equal Pay:** | **Other:** |
|---|---|---|---|
| NE - East Indian | GF - Female | PF - Female | OA - Age |
| NH - Hispanic | GM - Male | PM - Male | C - Color |
| NM - Mexican | | | OH - Handicap |
| OH - Handicap | | | OO - Other |
| | | | OR - Retaliation |

**Issues:**

| | | | | |
|---|---|---|---|---|
| A1 | - | Advertising | Q1 - Qualifications |
| A2 | - | Apprenticeship | R1 - Recall |
| B1 | - | Benefits | R2 - Reference Unfavorable |
| D1 | - | Demotion | R3 - Referral |
| D2 | - | Discharge | R4 - Reinstatement |
| D3 | - | Discipline | R5 - Retirement-Inventory |
| E1 | - | Exclusion | S1 - Segregate Facilities |
| H1 | - | Harassment | S2 - Segregate Local |
| H2 | - | Hiring | S3 - Seniority |
| I1 | - | Intimidation | S4 - Sexual Harassment |
| J1 | - | Job Classification | S5 - Suspension |
| L1 | - | Layoff | T1 - Tenure |
| M1 | - | Maternity | T2 - Terms/Condition of Employment |
| O1 | - | Other | T3 - Testing |
| P1 | - | Paternity | T4 - Training |
| P2 | - | Pay Comparability | U1 - Union Representative |
| P3 | - | Pension | |

# CHARGE ASSIGNMENT

| | | | |
|---|---|---|---|
| **Name** | Dr. Jennifer Dochee | **VS.** | Methodist Hospitals |
| **Address** | 8631 Stone Creek Blvd | | 600 Grant Street |
| **City & State** | Frankfort, IL 60423 | | Gary, IN 46402 |
| **Phone #** | (708) 516-0099 | | (219) 886-4000 |

| | Date Received Initial After Date | Date Completed Initial After Date |
|---|---|---|
| **Complaint Intake** | 09/21/2020 | |
| **Deferral to EEOC** | | |
| **To Case Supervisor** | | |
| **Assigned to Investigator** | | |
| **Assigned to:** | 9/24/20 | |

| Charging Party's Contact Person(s) | Respondent's Contact Person(s) |
|---|---|
| | |
| | |

**Equal Opportunity Specialist Assigned to Case:**

| | | | |
|---|---|---|---|
| **Case HRC No:** | 0920ReS091 | **EEOC No:** | 470-2020-03359 |
| **Issue(s):** | Retaliation | **Basis:** | Sex |
| **DATE:** | | **ACTION:** | |

**Charge Typed By:**

## CHARGE ACTIVITY SHEET

| | |
|---|---|
| **CHARGING PARTY:** | **Dr. Jennifer Dochee** |
| **RESPONDENT:** | **Methodist Hospitals** |
| **GHRC NUMBERS:** | **0920ReS091** |
| **EEOC NUMBERS:** | **470-2020-03359** |

| DATES | ACTIVITIES |
|---|---|
| 09/21/2020 | Initial Inquiry with GHRC Office |
| | Charge Formalized |
| | Assigned to Investigator |
| | CP Given Charge |
| | Investigative Plan |

10/27/20 CP asked for Conference to be he ~~reschedu~~ rescheduled because she wanted her attorney to be present. She was informed to have her attorney submit an apperance with dates of their availabilty. CP asked for Amended Charge to include Race.

10/27/20 Respondent was Contacted & Told FFC was Canceled from Oct 28, 2020 until further notice

11/13/20 Held FFC CP wants 3.5 million as a settlement R unwilling to pay.

**Charge Closed As:** _____    **Date:** _____

# BASIC CHARGE DATA (1)

| Receiving Office: 24O | | Region: |
|---|---|---|
| Accountable Office:24E | Intake Officer: **Loretta Houston** | District 0920 Re.5091 |

Charge No. **091**　　　　　　　　　　　Lead Charge No. **0920-091**

EEOC: 470-2020-03359

DATES CONTINUING　　YES ☒　　NO ☐

| Alleged Violation Date: | **04/13/2020** | Received This Office: | _____ |
|---|---|---|---|
| Initial Received Inquiry: | **08/01/2020** | Received This Office: | _____ |

## CHARGING PARTY INFORMATION

Mrs. ☐　　Ms. ☒　　Mr. ☐

| First Name: | **Dr. Jennifer** | Title: | **Interventional Cardiologist** |
|---|---|---|---|
| Last Name: | **Dochee** | Cell#: | **(708) 516-0099** |
| Address: | **8631 Stone Creek Blvd** | Email: | |
| City: | **Frankfort** | State: **IL** | Zip Code: **60423** |

## CONTACT PERSON

| Name: | | Address: | |
|---|---|---|---|
| City: | State & Zip | Phone: | |

## RESPONDENT INFORMATION

| Name: | **Methodist Hospitals** | | |
|---|---|---|---|
| Address: | **600 Grant Street** | Phone#: | **(219) 886-4000** |
| City: | **Gary** | State: **IN** | Zip Code: **46402** |
| Address 2: Phone | | City & State: | Zip Code: |

## CHARGING PARTY INFORMATION　　RESPONDENT INFORMATION

Date of Birth: _____

Sex: ☐ Male　☒ Female

Race: ☐ B – Black　☐ O – Other
　　　☐ W – White　☐ A – Asian/Pacific Islanders
　　　☐ I – American Indian/Alaskan Native

National Origin: ☐ M – Mexican　☐ H – Hispanic
　　　　　　　☐ E – East Indian　☐ O – Other

Household Size _____　Income: $ _____

Country: **089**　SMSA: **2960**　SIC: _____

**Respondent Type:**

| X | E – Private Employer |
|---|---|
| | U – Union |
| | J – Joint Apprentice Commission |
| | G – State and Local Government |
| | F – Federal Government |
| | S – State/Local Employment Agency |
| | P – Private Employment Agency |
| | K – Public Elementary/Secondary School |
| | M – Private Elementary /Secondary School |
| | N – Private College University |
| | I – Public College University |
| | O - Other |

# BASIC CHARGE DATA (2)

**CP NAME:**                                                    **CHARGE NO:**

**Source of Complaint:**
A  –   Aggrieved Party
B  –   Third Party
C  –   Commissioner
O  –   Other

**Statute:**
Title VII
ADEA
EPA
Rehab. Act

**Process Type:**
A  –   Class Complaint
C  –   Commission's Charge
D  –   Directed ADEA
E  –   Directed EPA
F  –   Federal Class
H  –   Hearing (Procedural)
I  –   Special Processing
L  –   Limited Scope Comm.
M  –   Hearing (Merits)
N  –   Citizenship
P  –   Proposed Federal Class
Q  –   Confidential Complaint
R  –   ADEA Rights Restored
O  –   Other

**Federal Referral/Transfer:**
A  –   Transferred Charge
B  –   Referred (Indev.) EEOC Process
C  –   Referred Agency to Process
D  –   Referred (Class) EEOC to Process

Federal Agency: _____

## BASIS AND ISSUES

**Basis:**
RB  -  Black
RW  -  White
RA  -  Asian/Pacific Island
RO  -  Other
RI  -  American Indian/Alaskan Native

**Religion:**
AA  -  Seventh Day Adventist
AC  -  Catholic
AJ  -  Jewish
AM  -  Muslim
AO  -  Other
AP  -  Protestant

**National Origin:**
NE  -  East Indian
NH  -  Hispanic
NM  -  Mexican
OH  -  Handicap

**Sex:**
GF  -  Female
GM  -  Male

**Equal Pay:**
PF  -  Female
PM  -  Male

**Other:**
OA  -  Age
C  -  Color
OH  -  Handicap
OO  -  Other
OR  -  Retaliation

**Issues:**

| | | | | |
|---|---|---|---|---|
| A1  -  Advertising | | Q1  -  Qualifications | | |
| A2  -  Apprenticeship | | R1  -  Recall | | |
| B1  -  Benefits | | R2  -  Reference Unfavorable | | |
| D1  -  Demotion | | R3  -  Referral | | |
| D2  -  Discharge | | R4  -  Reinstatement | | |
| D3  -  Discipline | | R5  -  Retirement-Inventory | | |
| E1  -  Exclusion | | S1  -  Segregate Facilities | | |
| H1  -  Harassment | | S2  -  Segregate Local | | |
| H2  -  Hiring | | S3  -  Seniority | | |
| I1  -  Intimidation | | S4  -  Sexual Harassment | | |
| J1  -  Job Classification | | S5  -  Suspension | | |
| L1  -  Layoff | | T1  -  Tenure | | |
| M1  -  Maternity | | T2  -  Terms/Condition of Employment | | |
| O1  -  Other | | T3  -  Testing | | |
| P1  -  Paternity | | T4  -  Training | | |
| P2  -  Pay Comparability | | U1  -  Union Representative | | |
| P3  -  Pension | | | | |





**Gary Human Relations Commission**
**Haneefah Khaaliq, Executive Director**

September 25, 2020

Dr. Jennifer Dochee
8631 Stone Creek Blvd
Frankfort, IL 60423

**SUBJECT:  Case Reassignment**

**Respondent:**        **Methodist Hospitals**
**Charge Numbers:**    **EEOC: 470-2020-03359 -GHRC:  0920ReS091**

Dear Dr. Dochee:

This letter is to serve as notification that the above referenced charge of discrimination initially assigned to **EEOC Indianapolis District Office** for investigation has been reassigned to the **Gary Human Relations Commission** for continuation of the investigation.  The Commission recently took over the investigation of this case and I, Loretta Houston have been assigned as the investigator.  After a thorough review of this case file I notice the file did include a response from the Respondent. I will be reviewing the written response to determine if further information is needed.

You are hereby requested to appear and participate in a Fact Finding Conference scheduled for **October 28, 2020 10:00 a.m.** in the Gary Human Relations Commission Office, 455 Massachusetts Street 1st floor, Gary Indiana 46402.  However due to Corvid -19 restrictions and building not open to public yet this conference may be via – conference call in. You will be notified prior to the conference date as to which method will be utilized.

Any further correspondence on this matter, please use the charge numbers shown on the foregoing page.   Inquiries should be directed to: Loretta Houston

If you have any questions regarding this correspondence please **"CALL"** the telephone number listed in  the letterhead between the hours of 9:00 a.m. and 5:00 p.m. Monday through Friday.

Sincerely,
Loretta Houston/Equal Opportunity Specialist

A-2

**FAX: (219) 882-0373**          **Contact: (219) 883-4151 / (219) 881-5225**          **Address: 455 Massachusetts, Gary IN 46402**

EEOC Form 5 (11/09)

| CHARGE OF DISCRIMINATION | Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|---|
| This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form. | ☐ FEPA  <br> ☒ EEOC | **470-2020-03359** |

|  |  |  |
|---|---|---|
| **INDIANA CIVIL RIGHTS COMMISSION** | | and EEOC |
| *State or local Agency, if any* | | |

| Name *(indicate Mr., Ms., Mrs.)* | Home Phone | Year of Birth |
|---|---|---|
| **DR. JENNIFER  DOCHEE** | **(708) 516-0099** | |

| Street Address | City, State and ZIP Code |
|---|---|
| **8631 STONE CREEK BLVD,  FRANKFORT, IL 60423** | |

Named is the Employer, Labor Organization, Employment Agency, Apprenticeship Committee, or State or Local Government Agency That I Believe Discriminated Against Me or Others. (*If more than two, list under PARTICULARS below.*)

| Name | No. Employees, Members | Phone No. |
|---|---|---|
| **METHODIST HOSPITALS** | **15 - 100** | |

| Street Address | City, State and ZIP Code |
|---|---|
| **600 GRANT STREET,  GARY,  IN 46402** | |

| Name | No. Employees, Members | Phone No. |
|---|---|---|
| | | |

| Street Address | City, State and ZIP Code |
|---|---|
| | |

DISCRIMINATION BASED ON *(Check appropriate box(es).)*

☐ RACE  ☐ COLOR  ☒ SEX  ☐ RELIGION  ☐ NATIONAL ORIGIN
☒ RETALIATION  ☐ AGE  ☐ DISABILITY  ☐ GENETIC INFORMATION
☐ OTHER *(Specify)*

DATE(S) DISCRIMINATION TOOK PLACE
Earliest **04-13-2020**  Latest **04-13-2020**

☒ CONTINUING ACTION

THE PARTICULARS ARE *(If additional paper is needed, attach extra sheet(s)):*

I was hired by Respondent on or about August 15, 2019.  My last position was Interventional Cardiologist. During my employment, I was harassed.  I complained to Respondent.  Subsequently, I was disciplined, discharged, and Respondent has threatened to report me to the National Practitioner Databank.

I believe I have been discriminated against because of my sex, and in retaliation for engaging in protected activity, in violation of Title VII of the Civil Rights Act of 1964, as amended.

| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY – *When necessary for State and Local Agency Requirements* |
|---|---|
| I declare under penalty of perjury that the above is true and correct. | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief. SIGNATURE OF COMPLAINANT |
| **Digitally signed by Jennifer Dochee on 08-01-2020 12:58 AM EDT** | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE *(month, day, year)* |

*A-1*

# CHARGE OF DISCRIMINATION

This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form.

| Charge Presented To: | Agency(is) Charge No(s): |
|---|---|
| [X] FEPA | 0920ReSR091 |
| [X] EEOC | 470-2020-03359 |

| **Gary Human Relations Commission** | And EEOC |
|---|---|

State or local Agency, if any

| Name (indicate Mr., Ms., Mrs.) | Home Phone (Incl. Area Code) | Date of Birth |
|---|---|---|
| **DR. JENNIFER DOCHEE** | **(708) 516-0099** | **1975** |

| Street Address | City, State and ZIP Code |
|---|---|
| **8631 Stone Creek Blvd** | **FRANKFORT, IL 60423** |

Named is the Employer, Labor Organization, Employment Agency, Apprenticeship Committee, or State or Local Government Agency That I Believe Discriminated Against Me or Others. (If more than two, list under PARTICULARS below.)

| Name | No. Employees, Members | Phone No. (Include Area Code) |
|---|---|---|
| **METHODIST HOSPITALS** | **15-100** | **(219) 886-4000** |

| Street Address | City, State and ZIP Code |
|---|---|
| **600 GRANT STREET** | **GARY, INDIANA 46402** |

| Name | No. Employees, Members | Phone No. (Include Area Code) |
|---|---|---|
| | | |

| Street Address | City, State and ZIP Code |
|---|---|
| | |

DISCRIMINATION BASED ON (Check appropriate box(es).)

[X] RACE  [X] COLOR  [X] SEX  [ ] RELIGION  [ ] NATIONAL ORIGIN
[X] RETALIATION  [ ] AGE  [ ] DISABILITY  [ ] OTHER (Specify below.)

DATE(S) DISCRIMINATION TOOK PLACE
Earliest **04/13/2020**   Latest **04/13/2020**

[X] CONTINUING ACTION

THE PARTICULARS ARE (If additional paper is needed, attach extra sheet(s)):

## AMENDED

I am an African American Female hired by the Respondent on or about August 15, 2019. My position Title was Interventional Cardiologist. During my employment, I became a recipient of continuous harassment by several male Cardiologist. The main decision maker is Indian. I complained and reported to the Respondents chairman and Chief Executive Officer and nothing was done. On April 13, 2020 I was disciplined and discharged in retaliation for my reporting the harassment. I was also threatened by the respondent that I would be reported to the National Practitioner Databank. On October 2, 2020 I was informed a negative reference was given on me discrediting my credentials and blocking me from getting hired at another hospital.

I believe I have been discriminated and retaliated against based on my race African American/ Sex Female in violation of Title VII of the Civil Rights Act of 1964 as amended.

| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY When necessary for State and Local Agency Requirements |
|---|---|
| I declare under penalty of perjury that the above is true and correct. | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief. SIGNATURE OF COMPLAINANT |

11/3/2020
Date          Charging Party Signature

SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE (month, day, year)

A-3

# U.S. Equal Employment Opportunity Commission

## Notification & Acknowledgement
## of Dual-Filed Charge

### (This Notice replaces EEOC FORM 212-A)

## DIGITAL CHARGE SYSTEM

09/01/2020
EEOC Number: 470-2020-03359C
FEPA Number:

This is notice that a charge of employment discrimination, Jennifer Dochee v. METHODIST HOSPITALS was initially received by Indianapolis District Office on 08/03/2020, and will be dual-filed with Indiana Civil Rights Commission.

Pursuant to the work sharing agreement, the Indianapolis District Office will Investigate Charge.

The Indiana Civil Rights Commission acknowledges receipt of the referenced charge, Jennifer Dochee v. METHODIST HOSPITALS, and intends to Defer Investigation.

| Issued by: | Date: |
|---|---|
| Andrea M Dayharsh, I5 Indianapolis District Office | 09/01/2020 |

| Acknowledged by: | Date: |
|---|---|
| Crystal L Warner, I4 Indiana Civil Rights Commission | 09/01/2020 |

A-2



30 N. LaSalle Street, Suite 2800
Chicago, IL 60602
Direct Dial 312.582.1682
PHONE 312.580.1200 FAX 312.580.1201
mbrohman@ralaw.com

WWW.RALAW.COM

July 17, 2020

**VIA EMAIL & U.S. MAIL**

mdoyle@methodisthospitals.org
Matthew Doyle
Chief Executive Officer
Methodist Hospitals
c/o Northlake Campus
600 Grant Street
Gary, IN 46409

Falzeidan@methodisthospitals.org
Fadi Alzeidan, M.D.
President of the Medical Staff
Methodist Hospitals
c/o Northlake Campus
600 Grant Street
Gary, IN 46409

woniah@methodisthospitals.org
Winfred Oniah, M.D.
Chair, DSQC
Methodist Hospitals
c/o Northlake Campus
600 Grant Street
Gary, IN 46409

kvenkat@methodisthospitals.org
Kumar Venkat, M.D.
Chief, Division of Medicine
Methodist Hospitals
c/o Northlake Campus
600 Grant Street
Gary, IN 46409

Re: Dr. Jennifer Dochee

Dear Methodist Hospitals Administrators:

This office has been retained by Dr. Jennifer Dochee with respect to the improper and completely unauthorized action of the Methodist Hospitals ("Hospital"), acting through its Medical Staff Quality Committee ("MSQC"), in restricting the staff and clinical privileges that Dr. Dochee has with the Hospital and requiring her to submit to unlimited proctoring. These actions are outlined in a July 9, 2020 letter authored by Dr. Kumar Venkat, the Chief of the Hospital's Division of Medicine. In taking such action, the MSQC exceeded its authority and the Hospital/MSQC completely disregarded the substantive and procedural rights granted to Dr. Dochee under the Bylaws of the Hospital Medical Staff ("Bylaws") and the Hospital's Rules and Regulations ("Rules"). Moreover, the timing the action is suspect and suggests that the entire purpose of the action was simply to avoid the economic competition between Dr. Dochee, now an independent cardiologist with staff privileges, with the cardiologists employed by Dr. Dochee's former employer, The Methodist Hospitals, Inc. ("MHI"). In this regard, it is of no coincidence that the letter was sent at approximately the same time that Dr. Dochee was set to



Methodist Hospitals Administrators
July 17, 2020
Page 2

begin her independent practice after the July 12, 2020 effective date of the no-cause termination of Dr. Dochee's employment with MHI.

Among the many improper and unauthorized acts taken by the Hospital/MSQC are:

1.     Through the MSQC's letter, the Hospital/MSQC is taking away Dr. Dochee's unlimited Interventional Cardiology privileges, Cardiovascular Magnetic Resonance privileges, CT Coronary Angiography and Cardiac CT privileges, Abdominal Femoral Angiography with interpretation privileges, Peripheral Vascular Interpretation privileges, Balloon Stent Arthrectomy and Thrombectomy privileges, Carotid and Central Angiography (not for aneurysm or tumor) privileges, and arrhythmia interpretation, diagnoses and treatment privileges. All of these privileges were granted to Dr. Dochee by the Hospital's Credentials Committee, which is the only Hospital Committee authorized to grant or deny practitioner requests for staff and clinical privileges. Moreover, staff and clinical privileges may only be limited or taken away by the Hospital's Medical Council and Board of Directors, and only then after a practitioner has been afforded the due process, hearing and appeal rights set forth in the Bylaws and Rules. Dr. Dochee was afforded none of these rights prior to the unauthorized and improper acts of the MSQC.

2.     Through the MSQC's letter, the Hospital/MSQC tried to couch its action as a Focused Professional Practice Evaluation ("FFPE") action. However, FFPEs are meant to be short-term, educational actions designed to help improve a practitioner's skills. They are not meant to be punitive actions that result in reports to the National Practitioner Data Bank ("NPBD"). Here, there can be no serious dispute that the Hospital/MSQC's action against Dr. Dochee is strictly punitive and, thus, not a permissible FFPE action. As noted, through the unauthorized action, the Hospital/MSQC is removing clinical privileges that have been granted to Dr. Dochee. Moreover, the Hospital/MSQC is requiring unlimited proctoring of Dr. Dochee's procedures. Both of these acts of punishment imposed by the Hospital/MSQC are reportable to the NPBD. Indeed, in its letter to Dr. Dochee, the MSQC even acknowledged that the proctoring aspect of the punishment will be reported to the NPBD.

3.     While trying to hide under the FFPE umbrella, the Hospital/MSQC failed to follow the FFPE requirements set forth in the Hospital's own Bylaws. For instance, the Bylaws specifically provide that "when issues are identified, communication to the provider must be clear and specific regarding what is wrong with the performance and what improvements are expected." The MSQC's letter to Dr. Dochee contained no such specificity. All it referenced was some unidentified "case summary" which allegedly identified unspecified issues with Dr. Dochee's clinical judgment or decision-making. No meetings were held between representatives of the MSQC and Dr. Dochee.

4.     Consistent with the informal, educational purpose of FFPEs, the Hospital Bylaws note that to resolve performance issues, there should be a documented discussion between the practitioner and the Division Chief, a letter to the provider noting areas of improvement or recommendations for training. Dr. Dochee vehemently denies that the procedures she has performed require FFPE review. However, to the extent they have required such review, neither the Division Chief nor any member of the MSQC have discussed those procedures with her,

Methodist Hospitals Administrators
July 17, 2020
Page 3

noted areas of needed improvement, or offered recommendations for training. Hence, again the Hospital/MSQC failed to follow its own Bylaws with respect to the punitive action taken against Dr. Dochee.

5.     Moreover, according to the FFPE section in the Hospital's Bylaws, external review is required when there are an insufficient number of non-conflicted specialists available to do an internal review of the practitioner's work. The MSQC's letter failed to identify the individuals who allegedly reviewed Dr. Dochee's work. However, on information and belief, those reviewers (likely including MHI employees Dr. Harish Shah and Dr. Andre Artis) were competitors of Dr. Dochee who had conflicts of interest. Since there is no reference to any external review of Dr. Dochee's work, any conclusions of the MSQC are a complete sham and must be disregarded. This would be true even if the FFPE of the MSQC were legitimate, which, as set forth in items 2, 3 and 4 above, it is not.

6.     As noted above, through the MSQC's letter, many of Dr. Dochee's unlimited clinical privileges have been removed and she has been required to submit to unlimited proctoring. However, the MSQC has no authority to impose such punishment against Dr. Dochee. Instead, such punishment clearly constitutes corrective action. Article VI of the Bylaws identify the procedures that the Hospital must follow and the rights that must be given to a practitioner when corrective action is at issue. None of these procedures were followed by the MSQC, nor was Dr. Dochee provided with any of her required rights. For instance:

a.     Pursuant to Section 2(A) of Article VI, when there is a complaint about the performance or competence of a practitioner, the practitioner involved must be provided with a copy of the Bylaws and a copy of the complaint. No one from the MSQC or any other branch of the Hospital has provided Dr. Dochee with a copy of any complaint regarding her performance or competence.

b.     Pursuant to Section 2(B) of Article VI, the Division Chief is required to appoint a qualified preceptor to do a detailed review of the practitioner's work and to submit a report of that review, or to have the Chair of the Medical Council appoint a peer review committee to do a focused review of the practitioner's work. By all accounts, the MSQC did not have a preceptor review Dr. Dochee's work, nor did it have the Chair of the Medical Council appoint a peer review committee.

c.     Pursuant to Section 2(C) of Article VI, if either the preceptor or the peer review committee initiates an investigation into the practitioner's work, the practitioner is to be "notified that an investigation is being conducted" and is to be "given an opportunity to provide information" pertaining to the investigation. In violation of the Bylaws, Dr. Dochee has never been notified of any investigation pertaining to the items raised in the MSQC's letter, nor was Dr. Dochee ever given any opportunity to provide information in response to that "investigation."

d.     Pursuant to Section 2(D) of Article VI, external review should be utilized to promote "impartiality in peer review." By all accounts, any complaints pertaining to Dr. Dochee's performance were likely provided by or reviewed by her direct competitors. Thus, to

Methodist Hospitals Administrators
July 17, 2020
Page 4

the extent any review needed to have been conducted of her procedures, an external reviewer should have been utilized. There is no indication in the MSQC's letter that external review was utilized.

      e.     Pursuant to Section 3 of Article VI, among many other things, it is the exclusive and specific function of the Hospital's Medical Council to recommend "reduction, modification, suspension or revocation of clinical privileges" or to impose "requirements of co-admissions, mandatory consultation, or monitoring." By all indications in the MSQC's letter, it was the MSQC, and not the Hospital's Medical Council, that took away Dr. Dochee's unlimited clinical privileges and is requiring her to have a proctor for an unlimited period of time. In doing so, the MSQC not only improperly performed the functions of the Medical Council, it directly violated Dr. Dochee's substantive and procedural rights.

      f.     Where, as here, Hospital action results in corrective action against a practitioner, Article VII provides the practitioner with hearing and appeal rights. Dr. Dochee has improperly been denied any hearing and appeal rights with respect to the Hospital's/MSQC's removal of clinical privileged and order for unlimited proctoring.

As you are no doubt aware, the Bylaws require a practitioner to exhaust the remedies afforded by the Bylaws before resorting to legal action. Here, however, there are no remedies for Dr. Dochee to exhaust because the Hospital/MSQC utterly and completely disregarded its own Bylaws in taking the action outlined in the MSQC's July 9, 2020 letter. Accordingly, Dr. Dochee hereby demands that the Hospital/MSQC rescind and void the items set forth in that letter and immediately restore Dr. Dochee's full staff and clinical privileges, without restriction or limitation. If such action is not taken by the close of business on July 24, 2020, Dr. Dochee will have no choice but to initiate legal proceedings against the Hospital, the MSQC and all individuals who participated in the clear violation of Dr. Dochee's rights under the Bylaws and Rules. Of course, if she is required to initiate such proceedings, Dr. Dochee will seek all legal and equitable remedies available to her, including punitive damages and legal fees.

If you have any questions about this matter, please do not hesitate to contact me.

Very truly yours,

ROETZEL & ANDRESS, LPA

Michael B. Brohman

MBB
cc:    Jennifer Dochee, M.D. (via e-mail at jddochee@gmail.com)

4



July 9, 2020

Jennifer Dochee, M.D.
24460 Potomac Court
Crete, IL 60047

Dr. Dochee:

The Medical Staff Quality Committee has submitted a case summary of concerns/issues around standard of care which were leveled with death or major loss of function, issue with physician clinical judgment or decision-making and issue with physician diagnostic or treatment planning, standard of care not met, reasonably expected complication, and not managed in an appropriate manner.

As a result of this, effective immediately, you will be placed on FPPE (Focused Professional Practice Evaluation) and the following will be implemented immediately:

1).    You must have a Proctor for all cases as outlined on your current privilege list (see attached).  You must be the primary operator, and the Proctor must be scrubbed in with you, on site beside you and observe you throughout the procedure.  When scheduling a procedure, it will be your responsibility to inform the scheduler who your Proctor will be.

The Proctor must be privileged to do the procedures that he/she is observing.

The Proctor will be responsible for completing the required Proctor forms for each case, and submitting them to the Medical Staff Office within 72 hours of the procedure, and these will be reviewed by the appropriate Medical Director.

You will be responsible for compensation to said Proctor.

2)    25 coronary angiograms are to be reviewed by the Medical Director within a one year period

3)    6 month period of monitoring for all non-coronary procedures are to be reviewed by the Medical Director.

A-5

4)  In order to perform the following procedures, and prior to performing these procedures, you will need to submit documentation of training, current competency and procedure lists for the following procedures:

--Interventional cardiology
--Cardiovascular Magnetic Resonance (this is a contracted service)
--CT Coronary Angiography and Cardiac CT (this is a contracted service)
--Abdominal Femoral Angiography with interpretation
--Peripheral Vascular Interpretation
--Balloon Stent Arthrectomy and Thrombectomy
--Carotid and Central Angiography (not for aneurysm or tumor)
--Interpretation of results of non-invasive testing relevant to arrhythmia diagnoses and treatment.

For your information the NPDB Guidelines states the following.

*"If, as a result of a professional review action related to professional competence or conduct, a proctor is required in order for a physician or dentist to proceed in freely exercising clinical privileges, and the period lasts longer than 30 days, the action must be reported to the NPDB. In other words, if, for a period lasting more than 30 days, the physician or dentist cannot perform certain procedures without proctor approval or without the proctor being present and watching the physician or dentist, the action constitutes a restriction of clinical privileges and must be reported. However, if the proctor is not required to be present for or approve the procedures (for example, if the proctoring consists of the proctor reviewing the physician's or dentist's records or procedures after they occur), the action is not considered a restriction of clinical privileges and should not be reported to the NPDB.*

If you have any questions or concerns, please do not hesitate to contact me.

Sincerely,

Kumar Venkat, M.D., Chief
Division of Medicine

VK/tlm

Cc:    Fadi Alzeidan, M.D., President of the Medical Staff
       Winfred Oniah, M.D., Chair, MSQC
       Harish Shah, M.D., Medical Director, Cath Lab
       Andre Artis, M.D., Medical Director of Heart & Vascular Institute
       Vincent Sevier, M.D., Chief Quality Officer
       Roxanne Wicklund, Director of Heart and Vascular Institute
       Quality File

7/31/2020
JZ1 intake
470-2020-03359
TC with CP Dr. Jennifer Dochee
Told CP EEOC is a neutral party, and she can file regardless of what I say.
R is Methodist Hospital.  Both locations in Indiana.

Started August 15, 2019.
Last day July 12, 2020.
Last position was Interventional Cardiologist.
Immediate supervisor was Mr. Grady, CEO, then Matt Doyle, CEO around Feb 2020.
CP says she it is because of her sex, not race.
End of Oct, beginning of Nov – Mihas Kordenchery, male doctor, wrote a statement in a patient chart that alleged CP made the patient bleed, referred to CP as she.  Cp says Dr. Mihas didn't want CP to be hired in the first place.  He was hostile toward CP during her interview, questioning her about her work ethic.
CP says Dr. Mihas made a comment to CP that he will put the Indian mafia to investigate CP.
CP also says Dr. Amickway said that Mihas made a comment that he didn't want CP hired because CP's black female and she will take all the patients.

CP says she's the only female Interventional Cardiologist.

Other male doctors:
- Dr. Amickway
- Dr. Dobbay
- Dr. Gallopody
- Dr. Shah
- Dr. Union
- Dr. Artist

Cp says during her employment she complained to Dr. Rice, that Mihas was defaming her character and discriminating her because of her sex.  CP says she has emails.

After complaint CP says she was disciplined.
April 13, 2020 laid off for no reason.
CP was paid 90 days and cannot see patients.
R found CP came back as a private doctor, and is now restricting her privileges which is usually something that happens to doctors who malpractice.  Doctor national practitioner databank.

CP wants to file under sex and retaliation.  Told CP most likely her case will be transferred to Indy office for further review.

A-6



November 5, 2020


Ms. Houston,

This document is noticed that I, Attorney Jennifer Witherspoon have been retained by Dr. Jennifer Dochee to represent her in Charge number 470-2020-03359.

Thank you
Jennifer Witherspoon
ARC 6291079



Steve Scott-Corporate Counsel
Methodist Hospital

November 12, 2020

Counsel,

My name is Attorney Jennifer Witherspoon and I have been retained by Methodist Hospital's former employee, Dr. Jennifer Dochee. Dr. Dochee has filed a Charge with the Equal Employment Opportunity Commission (EEOC) related to discrimination she was subjected to while employed by Methodist Hospital located in Gary, Indiana.  Dr. Dochee faced racial discrimination, discrimination based on being a woman along with retaliation and wrongful termination.  My client is willing to settle this matter without litigation for the sum of $2.5 million. In exchange, my client is willing to dismiss her current case with the EEOC and sign a confidentiality agreement. If we are forced to litigate, the following facts will be presented to the Court.

### Background

Dr. Jennifer Dochee was hired by Methodist Hospital in August 2019.  Jennifer Dochee graduated from Wayne State with Superior Status and Honors. She was hired as a Structural Interventional Cardiologist, for the Methodist Physician Group Network.  A Structural and Interventional Cardiology is a unique field of medicine, offering a comprehensive program which includes integrative treatment approaches for patients with atherosclerosis, congenital and structural heart disease and heart valve disease.  It is a specialized field that requires an intimate knowledge of the human heart. Dr. Dochee was well qualified for the position and Methodist Hospital boasted about her being added to their staff. The reputation of Dr. Dochee was outstanding and well known and respected within the medical community.

### Discrimination

The Equal Employment Opportunity Commission (EEOC) was created by Congress in 1964, after the passage of the Civil Rights Act of 1964.  Title VII of the Civil Rights Act of 1964 was enacted to prohibit discrimination in employment based on color, national origin, race, religion, and sex.

Dr. Dochee experienced discrimination from the moment she accepted the position. The first incident that she remembers is when she overheard a few doctors, who were of Indian descent, state that they would get the "Indian Mafia" to dig up dirt on the new "Black female doctor". Shortly after that incident Dr. Dochee was informed that she had to begin to do rounds with the new, inexperienced doctors on a daily basis.  Dr. Dochee was astounded that she was asked to do rounds.  Historically, a new doctor without any experience would be required to make rounds, however with her credentials and real life experience, it was an insult to be told that she had to do rounds daily.  She quickly explained this to her supervisor and reiterated her experience and the matter was dropped. She also noticed that other doctors that were Caucasian and had the same amount of experience as she, were never asked to do rounds.  In the meantime she was faced with an extraordinary amount of review related to her work.  She was asked to make a presentation by Dr. Linton about a procedure she would be doing.  She assumed that she was asked to make the presentation because very few people were familiar with it. Dr. Dochee did the presentation and received a standing ovation from her colleagues.  However, before she began her presentation, expressions on the faces of her male colleagues

A-7



displayed skepticism about her knowledge and skill. The positive response to her presentation infuriated the male doctors who were attempting to "dig up dirt" on Dr. Dochee.

There was a battle going on daily with other male physicians attempting to usurp her authority. This included Dr. Vincent Sevier, Chief Quality Officer. Dr. Sevier began altering her recommendations she made for patients, moving patients off Dr. Dochee's caseload without informing her beforehand and continuously double checking her work. On March 15, 2019, Dr. Sevier ordered a life vest for one of Dr. Dochee's patients. That same patient was ordered to be discharged by Dr. Sevier after previously being deemed unstable by Dr. Dochee. Additionally, her patients were removed from her caseload and transferred to other doctors. She found out that her patients were told not to communicate to her. This left Dr. Dochee feeling invalidated, humiliated, intimidated and disrespected. She had spoken to many other doctors at Methodist who were not part of a protected class and they stated they had never been treated the way she was being treated. It was at that moment it became undeniably clear that she was being discriminated against because she was a woman and African American. Jennifer Dochee decided she needed to speak with someone about what was going on. After attempting to locate the hospital's policies regarding discrimination, she was unable to determine exactly who she was to speak with about the matter.

On August 12, 2019, Dr. Dochee reached out to and met with CEO Matt Doyle. She informed him of the discriminatory incidents she was experiencing. Mr. Doyle assured her she would not experience that type of treatment anymore. He agreed she was being defamed and that was unacceptable. Mr. Doyle told her he would speak with all of the other doctors to let them know that the harassment, discrimination and hostility toward Dr. Dochee was unacceptable and must end immediately. After speaking with Mr. Doyle, Jennifer felt hopeful for the first time in a long time, however that did not last long.

When Dr. Dochee arrived to work on December 4, 2020, Dr. Sevier told her he would like to meet with her. Dr. Sevier informed her he called the meeting because he wanted her to speak with her about an incident involving Dr. Mihas Kodenchery. Dr. Dochee said it felt more like an interrogation. He said that she appeared to be an "Angry Black Woman" when she spoke to others. Dr. Dochee was appalled and devastated. She had never been called an "Angry Black Woman" in her entire life and resented the stereotypical implication. He told her she should lower her voice and to be more soft spoken. Jennifer stated that she had not raised her voice to anyone. Dr. Dochee informed Dr. Sevier that several other individuals were present and witnessed the exchange. It appeared that Dr. Sevier was taking pleasure in accusing her in front of her peers.

On January 29, 2020, Dr. Sevier called her to another meeting stating that another employee Jim Wince, alleged that she raised her voice at him. At this point Dr. Dochee was sure that the discrimination was being done to get her to resign. The allegation made against her was investigated and deemed unfounded.

February 22, 2020 Methodist Hospital hosted a Masquerade Party. Jennifer decided to go because she wanted to put all the stress and hostility she was experiencing behind her for a day. When she arrived, she began looking for some friends that were meeting her there. Suddenly, Dr. Sevier appeared and gave her a hug. He was smiling, laughing and talking to her



Dr. Dochee hired Attorney Michael Brohman.  On July 17th Attorney Brohman sent a letter to Methodist Hospital which listed improper use of hospital policies and the illegal methods they used to terminate Dr. Dochee,demanding that her privileges be reinstated or she would file a lawsuit with the Court.  Methodist reinstated the doctor's privileges.

### Conclusion

Dr. Jennifer Dochee spent almost two decades learning and perfecting her skill within the field of medicine. It took Methodist Hospital less than two years to demolish it. Dr. Dochee has lost her exceptional reputation among her peers within the medical field.  She has lost at least $2,000,000 in salary. She is currently still unemployed as a result of these actions. She may have to change her career.  She may have to leave the state. Her future remains uncertain.  All this came about because she is simply an African American woman.

My client wishes to move beyond this nightmare and piece together her career. Dr. Dochee is willing to forego litigation and will sign a confidentiality agreement and dismiss the EEOC Charge for the settlement amount of $2.5 million.

If you have any questions or would like to discuss the matter, I can be reached at 847.672.7819. My cellphone number is 224.303.4144.

Respectfully,

J. Witherspoon, Esq.



as if they were close intimate friends. He kept following her and touching her arm.  Dr. Dochee felt very uncomfortable. She decided to leave because people seemed to be watching them.

Shortly after the party, rumors began circulating that she was having an affair with Dr. Sevier. She was once again humiliated and her reputation tarnished. Dr. Dochee knew that her career depended on her reputation.  At this point she had to manage her patients,discrimination and her crumbling reputation due to baseless allegations.

### Retaliation

On March 13, 2020, Dr. Dochee was called to a meeting with the CEO, except the CEO was not there but Dr. Sevier was.  She knew that, once again, Dr. Sevier would use the meeting to demean and humiliate her, as he has done so in the past with meetings involving Dr. Dochee. After she had spoken to the CEO about the discrimination, the harassment and the hostility, Jennifer felt that the goal of Dr. Sevier and the doctors who referenced the"Indian Mafia", was to terminate Dr. Dochee's employment with Methodist. In that meeting, Dr. Dochee was informed that she was being terminated because of "low productivity". Dr. Dochee thought it was ironic that the fact that she was being terminated for low productivity yet her patients were systematically being removed from her caseload by Dr. Sevier. She was asked to turn over her badge and if she tries to fight the termination, she would not receive 3 months of severance pay. Dr. Dochee felt she had no other choice and accepted the termination. On March 15, she received an email stating that all her hospital privileges were being revoked in 90 days. Jennifer knew the reason for her termination was simply that she had dared to speak out about the way she was being discriminated against. This was retaliation. She had never been accused of injuring a patient.  She was never accused of misdiagnosing or malpractice. The stress of her termination along with the jeopardization of her reputation caused her to experience insomnia, stress, high blood pressure and loss of appetite. Other doctors had begun to doubt and question her abilities because of the false rumors being circulating by the administration at Methodist.

On July 9, Dr. Dochee received a letter stating that she would be placed on Focused Professional Practice Evaluation (FPPE) which would require her to be proctored and she would have to pay, out of pocket,for the proctor to monitor her cases if she wanted to practice medicine at Methodist Hospital.  Dr. Jennifer Dochee had enough.  It was time for her to fight for her life and her career.

Jennifer created a business plan to open up her own practice.  Her previous salary was $650,000 a year for 3 years.  Her business plan estimated that she had the potential to earn $798,000 a year with the correct balance of patients.  She was excited by the prospect of owning her own business.  When she started speaking with other cardiologists, they were familiar with her experience at Methodist Hospital. Dr. Dochee found that Methodist Hospital had tarnished and diminished her reputation in which she had worked so diligently all these years to establish and maintain.

Jennifer began reaching out to other hospitals to see if they would hire her.  She was told, off the record, that Methodist Hospital was not speaking favorably about her. One hospital, Pinnacle, spoke frankly about what happened at Methodist Hospital. They offered her a chance to tell her side of the story. Dr. Dochee was prohibited from working as a cardiologist in any hospitals within her area until her privileges were restored at Methodist Hospital.





**Gary Human Relations Commission**
**Haneefah Khaaliq, Executive Director**

September 25, 2020

Mr. Steven J. Scot/Attorney
Hodges and Davis, P.C.
8700 Broadway
Merrillville Indianan 46410

**SUBJECT:  Case Reassignment**

**Charging Party:**    **Dr. Jennifer Dochee**
**Charge Numbers:**    **EEOC: 470-2020-03359 -GHRC:  0920ReS091**

Dear Attorney Scott:

This letter is to serve as notification that the above referenced charge of discrimination initially assigned to **EEOC Indianapolis District Office** for investigation has been reassigned to the **Gary Human Relations Commission** for continuation of the investigation.  The Commission recently took over the investigation of this case and I, Loretta Houston have been assigned as the investigator.  After a thorough review of this case file I notice the file did include a response from the Respondent. I will be reviewing the written response to determine if further information is needed.

You are hereby requested to appear and participate in a Fact Finding Conference scheduled for **October 28, 2020 10:00 a.m.** in the Gary Human Relations Commission Office, 455 Massachusetts Street 1st floor, Gary Indiana 46402.   However due to Corvid -19 restrictions and building not open to public yet this conference may be via –conference call in. You will be notified prior to the conference date as to which method will be utilized.   Inquiries should be directed to: Loretta Houston.

If you have any questions regarding this correspondence please **"CALL"** the telephone number listed in  the letterhead between the hours of 9:00 a.m. and 5:00 p.m. Monday through Friday.

Sincerely,

Loretta Houston/Equal Opportunity Specialist
Gary Human Relations Commission
Certified:  Certified:  7019 2280 0001 1182 8260



**FAX: (219) 882-0373        Contact: (219) 883-4151 / (219) 881-5225        Address: 455 Massachusetts, Gary IN 46402**



**U.S. Postal Service**™
**CERTIFIED MAIL® RECEIPT**
*Domestic Mail Only*

For delivery information, visit our website at *www.usps.com®*.

OFFICIAL USE

Certified Mail Fee

09/28/20

Extra Services & Fees (check box, add fee as appropriate)
☐ Return Receipt (hardcopy)          $ _____
☐ Return Receipt (electronic)        $ _____
☐ Certified Mail Restricted Delivery $ _____
☐ Adult Signature Required           $ _____
☐ Adult Signature Restricted Delivery $ _____

Postmark
Here

Postage
$

Mr. Steven J. Scot/Attorney
Hodges And Davis, P.C.
8700 Broadway
Merrillville Indianan 46410

PS Form 3800, April 2015 PSN 7530-02-000-9047    See Reverse for Instructions

7019 2280 0001 1182 8260

B-2



**·HODGES·**
**AND DAVIS P.C.**
**EST 1906**

August 31, 2020

EARLE F. HITES
R. LAWRENCE STEELE
GREGORY A. SOBKOWSKI
BONNIE C. COLEMAN
LAURA B. PROST
BENJAMIN T. BALLOU
STEVEN J. SCOTT
SHAWN D. COX
EMILIE E.D. HUNT
CARL J. HALL

OF COUNSEL:
CLYDE D. COMPTON
EDWARD J. HUSSEY

JASPER COUNTY OFFICE:
EDWARD P. DUMAS

LAKE COUNTY
8700 BROADWAY
MERRILLVILLE, IN 46410
P (219) 641.8700
F (219) 641.8710

PORTER COUNTY
P.O. BOX 476
PORTAGE, IN 46368
P (219) 762.9128

JASPER COUNTY
119 W. HARRISON STREET
RENSSELAER, IN 47978
P (219) 866.4158
F (219) 866.2274

HODGESDAVIS.COM

**VIA RESPONDENT PORTAL**
U.S. Equal Employment Opportunity Commission
Indianapolis District Office
101 W. Ohio St., Suite 1900
Indianapolis, IN 46204

Re:   Charging Party: Jennifer Dochee, M.D.
      Respondent: The Methodist Hospitals, Inc.
      Case No. 470-2020-03359
      Our File No. 6367-2520-1

Dear Sir or Madam:

Please enter my appearance from the law firm of Hodges and Davis,
P.C. for the Respondent, The Methodist Hospitals, Inc. in the above-
referenced matter.  We request that all future correspondence and
notices concerning this matter be forwarded to our office.

Very truly yours,

HODGES AND DAVIS, P.C.

By:

Steven J. Scott

SJS:sk:495390.1

B-3



·HODGES·
AND DAVIS P.C.
· · · · · · · · · · · · · ·
EST 1906

September 5, 2020

**VIA RESPONDENT PORTAL**
U.S. Equal Employment Opportunity Commission
Indianapolis District Office
101 W. Ohio St., Suite 1900
Indianapolis, IN 46204

EARLE F. HITES
R LAWRENCE STEELE
GREGORY A. SOBKOWSKI
BONNIE C. COLEMAN
LAURA B FROST
BENJAMIN T BALLOU
STEVEN J. SCOTT
SHAWN D. COX
EMILIE E.D. HUNT
CARL J. HALL

OF COUNSEL:
CLYDE D. COMPTON
EDWARD J. HUSSEY

JASPER COUNTY OFFICE:
EDWARD P DUMAS

**LAKE COUNTY**
8700 BROADWAY
MERRILLVILLE, IN 46410
P (219) 641.8700
F (219) 641.8710

**PORTER COUNTY**
P.O. BOX 476
PORTAGE, IN 46368
P (219) 762.9129

**JASPER COUNTY**
119 W. HARRISON STREET
RENSSELAER, IN 47978
P (219) 866.4159
F (219) 866.2274

HODGESDAVIS.COM

Re:    **POSITION STATEMENT**
       Charging Party: Jennifer Dochee, M.D.
       Respondent: The Methodist Hospitals, Inc.
       Case No. 470-2020-03359
       Our File No. 6367-2520-1

Dear Sir or Madam:

I represent the Respondent, The Methodist Hospitals, Inc. ("Methodist"), in connection with the above-referenced Charge of Discrimination ("Complaint") filed by Jennifer Dochee, M.D. ("Dochee"). This letter presents Methodist's Position Statement with respect to the Complaint and is based upon an investigation of the allegations and records available as of the date of this letter. There is no evidence of any discrimination toward Dochee on April 13, 2020 or during her employment at Methodist.

**THE CHARGE OF DISCRIMINATION**

Claimant has made a Charge of Discrimination claiming discrimination based on sex and retaliation. While Claimant made those claims, the lack of any specifics in Claimant's Charge of Discrimination make it difficult to offer a response. However, Respondent will attempt to do so.

B-4

U.S. Equal Employment Opportunity Commission
September 4, 2020
Page 2

## THE METHODIST HOSPITALS, INC.

**1.    General Considerations.**

Methodist is a general care hospital with its Northlake Campus located in Gary, Indiana, and the Southlake Campus located in Merrillville, Indiana. The hospital has approximately 650 beds, equally divided between the two campuses, has several off site facilities and employs approximately 2,100 people.   The campuses are located approximately 10 miles apart.  As an institution, Methodist is committed to nondiscriminatory practices and actively supports equal opportunity programs and efforts for its employees.

**2.    Nondiscrimination Policies.**

Methodist is committed to fair and equitable treatment for all hospital employees. It is the policy of Methodist to "[E]mploy individuals and offer promotional opportunities on the basis of their qualifications, and seniority with the assurance of equal opportunity and fair treatment regardless of race, color, religion, sex, age, national origin, sexual orientation, ancestry, or any disabling condition that does not inhibit job performance." *See Methodist Employee Relations Code, (HR-POL_01).* Methodist is in compliance with all applicable local, state and federal laws governing nondiscrimination in employment. *Id.*

Methodist has established procedures to follow in the event an employee believes he or she has been unlawfully discriminated against by a co-worker, supervisor, physician, manager or agent of Methodist. *Id.* If discrimination occurs in any form, Methodist encourages its employees to immediately report any discriminatory acts so that they can be properly investigated and corrective action taken. *Id.* The facts should be reported, and the names of individuals involved should be disclosed so that proper actions can be taken. *Id.* Methodist would take necessary corrective action, including disciplinary action, up to and including termination if unlawful discrimination was determined.   Methodist's non-discrimination policies support the diversity of its employees and its two campus hospital.

## FACTS

On or about July 3, 2019, Claimant and Respondent entered into a written Professional Services Employment Agreement ("Agreement") whereby Respondent would employ Claimant as an interventional cardiologist.  (See Agreement attached hereto.)  The Agreement provided that Claimant was to be paid an annual salary of Six Hundred Fifty Thousand and 00/100 ($650,000.00) Dollars.   In addition, pursuant to Paragraph 12.4 of the Agreement, either Claimant or Respondent could terminate the Agreement without cause by providing 90-day written notice to the



## METHODIST
#### H O S P I T A L S

| POLICY AND PROCEDURE | POLICY NO.: |
|---|---|
| **Subject:**<br><br>Employee Relations Code | HR-POL_01 |

| ORIGINAL DATE:<br><br>07/01/1981 | LAST REVIEW / REVISION:<br><br>05/2020 | PAGE:<br><br>1 of 4 |
|---|---|---|

Key Words: Behavior, Sexual Harassment, Incident
Applies to: Inpatient: ___ Outpatient: ___ Provider: ___ All: _X_ Video: ___.

## I. POLICY:

### EMPLOYEE RELATIONS CODE

Methodist Hospitals are committed to fair and equitable treatment for all hospital employees. To this end, the hospital has established an Employee Relations Code.

It is the policy of Methodist Hospital to:

A. Employ individuals and offer promotional opportunities on the basis of their qualifications, and seniority with the assurance of equal opportunity and fair treatment regardless of race, color, religion, sex, age, national origin, sexual orientation, ancestry, or any disabling condition that does not inhibit job performance.

B. Maintain in writing policies and procedures which set forth the benefits, privileges, and responsibilities of hospital employees.

C. Require and assure that all levels of management will apply all such policies and procedures fairly and equitably.

D. Pay salaries in accordance with a plan that is fair and competitive.

E. Make available a competitive employee benefit program.

F. Establish standards of work performance and behavior on the job which are expected from employees, inform the individual employee what the standards are, assist in attaining the standards and advise periodically about performance.

G. Inform and explain to employees the meaning of and reasons for, those administrative decisions which affect their work assignments, duties, or their interests as employees.

H. Permit and encourage an employee, who believes that any policy or procedure is not being fairly applied, to present without fear of recrimination, the problem, complaint, or grievance to the manager for settlement. To assure that the complaint, if not settled to the employee's satisfaction at that level, will be dealt with at successively higher levels of administration in accordance with the established grievance procedure.

I. Comply with all applicable employment and labor laws.

J. Provide an atmosphere to allow employees to obtain satisfaction from their work and achieve a true level of recognition from work performed.

K. Encourage and be responsive to employees' comments, complaints, and suggestions.

L. Prohibit employment of relatives in cases where relatives would interact on the job; i.e., being assigned to same service unit, work area or where a management relationship would exist. Further, relatives of personnel in confidential areas such as Accounting or Human Resources may not work at Methodist Hospital.

### EXPECTATION FOR EMPLOYEES

1

B-5

U.S. Equal Employment Opportunity Commission
September 4, 2020
Page 3

other party. (See attached). On or about April 13, 2020, Respondent properly notified Claimant that pursuant to the clear terms of the Agreement, Respondent was terminating the Agreement without cause. (See Respondent's letter to Claimant dated April 13, 2020).

In accordance with the Agreement, Respondent notified Claimant that the termination was effective in 90 days or on July 9, 2020. Claimant was not disciplined, harassed, or threatened during her employment. She was simply terminated from her position pursuant to the terms of the Agreement she signed. Claimant was not coerced or forced to sign the Agreement. Claimant was given the opportunity to review, negotiate and consider the terms of the Agreement prior to signing the Agreement. Claimant received her full compensation prior to the effective date of termination of the Agreement. Further, while no longer employed by Respondent, Claimant continues to have medical staff privileges at the hospital as an independent medical provider.

## CONCLUSION

Claimant has provided no specifics, facts or evidence that in any way support the claims made in this Charge of Discrimination. Claimant and Respondent entered into an employment agreement and Respondent terminated the Agreement in accordance to the clear terms of the Agreement agreed to by Claimant (as Claimant could have done as well per the Agreement). The facts demonstrate that Methodist has not taken any action that is discriminatory towards Claimant.

If there are any questions concerning Methodist's Position Statement, please do not hesitate to contact me.

Very truly yours,

HODGES AND DAVIS, P.C.

By:
Steven J. Scott

SJS:sk:494225.1

Attachments

cc (via e-mail w/o att.): Ms. Tracey L. Crandall

(b) submission to or rejection of such conduct by an individual is used as the basis for employment decisions affecting that individual; or,

(c) such conduct has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, or offensive work environment.

## III. PROCEDURE:

| *Responsible person* | *Action* |
|---|---|
| Any Person | Reporting an Incident |

Any incident of perceived sexual harassment should be reported as quickly as possible, in confidence, to the Vice President of Human Resources or designee so that an immediate investigation may be conducted.

If that should prove uncomfortable for some reason, any employee who believes that he or she has been the subject of sexual harassment may directly contact any member of management.

Questions

Employees are encouraged to raise any questions they may have regarding this policy with the Vice President of Human Resources or designee.

Any Management    Reporting an Incident

Managers so notified by an employee, must immediately bring the matter to the attention of the Vice President of Human Resources or designee.

Human Resources    Reporting an Incident

Every effort will be made to promptly investigate any allegation of sexual harassment in as confidential a manner as possible/practical to the extent permitted by applicable law, and appropriate action will be taken where warranted.

Any employee who is determined, after an investigation, to have engaged in sexual harassment in violation of this policy will be subject to corrective action as outlined in Human Resources Policy #6, Group III Violations.

## IV. REFERENCE:

None

## V. DOCUMENT INFORMATION:

### A. Prepared by

**Dept. & Title**

Human Resources Department

### B. Review and Renewal Requirements

There are essentially two components of an employee's performance and behavioral expectations.
- A. Effectively and efficiently perform the essential functions of the job description.
- B. Perform the above in such a manner that customers (patients, employees, co-workers, vendors, contractors and physicians) have a high degree of satisfaction with their experience at The Methodist Hospitals.
- C. The following behaviors are expected at all times:
    1. When accepting employment at The Methodist Hospitals, Inc. you must agree to work for the corporation, and may therefore be assigned as needed at the Northlake or Southlake Campus or any of the other hospital facilities.
    2. Participate in all required educational programs and in-services.
    3. Maintain competency in job performance as required by your service unit.
    4. Maintain a safe work environment.
    5. Adhere to all regulatory agency guidelines (JCAHO, HIPAA, ISDOH, Corporate Compliance, etc.).
    6. Adhere to policies and procedures, and read all required service unit manuals and follow the guidelines set forth in these manuals.
    7. Attend staff meetings as required by your service unit.
    8. Fulfill the annual Health Service requirement within the prescribed timeframe.
    9. Maintain current certifications/licensures and basic life support certification as required.
    10. Protects hospital trade secrets and proprietary information by not disclosing any information that generates economic value for the hospital which may include a variety of valuable confidential information such as, but not limited to:
        i. Vendor List
        ii. Physician preference cards and other information
        iii. Marketing strategies
        iv. New service performances
        v. Training materials
        vi. Pricing information and strategies
        vii. Generic hospital documents
    11. Exhibits the Model of Care and Conduct.

PROHIBITING SEXUAL HARASSMENT

All employees must be allowed to work in an environment free from any type of discrimination, including freedom from sexual overtones and intimidation. The hospital will not tolerate or condone sexual harassment of its employees in any form whether committed by supervisory, non-supervisory personnel or by non-employees.

**Prohibited Conduct**

No employee shall directly or indirectly: (a) threaten or insinuate that another employee's refusal to submit to sexual advances will adversely affect that employee's relationship with the hospital, work status evaluation, wages, advancement, assigned duties, or any other condition of employment; (b) promise, imply or grant preferential treatment in connection with another employee engaging in sexual conduct; or, (c) abuse the dignity of another employee through insulting or degrading sexual remarks or conduct.

In addition, the hospital will fully investigate and make every effort to correct such behavior committed by non-employees.

## II. DEFINITIONS:

**Sexual harassment**: includes unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature when:

(a) submission to such conduct is made either explicitly or implicitly a term or condition of an individual's employment;

This policy will be reviewed annually and as required by change of law, practice or standard.

C. **Review / Revision History**

    Reviewed on: 07/2009, 11/2011, 07/2013, 10/2014, 12/2015, 04/2017, 08/2018, 11/2019, 05/2020

    Revised on: 01/1992, 10/1995, 02/2001, 12/2002, 12/2005, 02/2006.

D. **Approvals**

    1. **This Policy & Procedure has been reviewed and approved by the Department Director & Vice President(s) of the Service Group(s):**

| Department Director(s) | Date |
|---|---|
| | |
| **Vice President(s)** | **Date** |
| Human Resources, T. Crandall | 5/2020 |

    2. **This Policy & Procedure has been reviewed and/or approved by the following committee(s):**

| Committee(s) | Date |
|---|---|
| Executive Team | 5/2020 |

*Hand Delivered and*
*U.S. Certified Mail – Return Receipt Requested*

April 13, 2020

Jennifer Dochee, M.D.
24460 Potomac Court
Crete, IL 60417

Re:    Professional Services Employment Agreement dated July 3, 2019
       ("Employment Agreement")

Dear Dr. Dochee:

This letter serves as formal notice that The Methodist Hospitals, Inc. has elected to terminate your employment without cause. Under paragraph 12.4 of your Employment Agreement, the termination is effective ninety (90) days from your receipt of this letter, on July 12, 2020 (the "Termination Date").

You will be considered to be on paid leave status until the Termination Date. The Hospital will continue to pay your base salary in accordance with normal payroll procedures and will maintain your benefits and malpractice insurance in place through the Termination Date; however, you will not be permitted to see patients at professional office(s) of the Hospital or on Hospital premises, nor will you be permitted to provide services to patients on behalf of the Hospital during this time. Final payment of any remaining base salary will be paid to you on or before the next regular payroll date following the Termination Date. Bonus compensation which may be owing to you under the terms of the Employment Agreement, if any, will be calculated and paid to you within thirty (30) days of the Termination Date. All such amounts paid to you will be subject to withholdings as required by applicable law.

Your participation in any of the Hospital's employee benefit plans will continue through the last day of the month in which the Termination Date occurs. If you are entitled and choose to elect COBRA continuation coverage, you will be responsible for payment of all COBRA premiums associated with such continuation coverage. "COBRA" means the Consolidated Omnibus Budget Reconciliation Act of 1985, as amended, through which certain qualified beneficiaries are provided continuation coverage in affected group health plans.

The Hospital will maintain your malpractice insurance in effect through the Termination Date. On the Termination Date, the malpractice policy will terminate and appropriate "tail coverage" will be issued to provide protection to you and the Hospital for any incidents that occurred while you provided services as an employee of and on behalf of the Hospital. The Hospital will arrange and pay for the "tail coverage" policy covering the period of your employment by the Hospital as provided in paragraph 5.1 of



METHODIST
H O S P I T A L S

Northlake Campus
600 Grant Street
Gary, Indiana 46402

Midlake Campus
2269 West 25th Avenue
Gary, Indiana 46407

Southlake Campus
8701 Broadway Avenue
Merrillville, Indiana 46410

B-6

Jennifer Dochee, M.D.
April 13, 2020
Page 2 of 2

your Employment Agreement. You will be responsible for securing your own malpractice insurance coverage following the Termination Date.

Please note that the malpractice insurance policy provided by the Hospital will not cover you for services you provide on behalf of a new employer or in the event that you open your own medical practice. Accordingly, if you begin employment with a new employer or choose to open your own practice prior to the Termination Date, you must notify the Hospital, as this may result in termination of the malpractice insurance provided by the Hospital prior to the Termination Date. In such event, the "tail coverage" required under paragraph 5.1 will commence at the time the malpractice insurance policy terminates. Please keep in mind that the provisions of paragraph 2.2 of your Employment Agreement remain in effect through the Termination Date.

The Hospital will make arrangements for continuity of care of patients from the date of this letter through the Termination Date. During this time, scheduled patients will be advised that you are on leave and given the option to see another physician in the Methodist Physician Group. After the Termination Date, patients will be notified that you are no longer employed by the Hospital. Of course, at all times, patient choice of provider will be honored.

All of your patient records must be up to date and complete. If you need to arrange a time to complete all your notes and sign-offs, please contact Dawn Smith, Director of Medical Records, at 738-3441 (Southlake) or 881-2481 (Northlake) to schedule a time to do so within the next seven (7) days.

As you know, all patient records are the property of the Hospital. As such, they will be maintained by the Hospital through and following the Termination Date in accordance with Hospital policies and as required by applicable law. You will be provided with access to such records in accordance with the terms of paragraph 2.5 of your Employment Agreement. As always, patient requests for copies and/or releases of records will be honored in compliance with applicable Federal and State laws, including without limitation HIPAA. Further, please note that the confidentiality obligations under Section 8 of your Employment Agreement remain in effect notwithstanding the termination of your employment.

Finally, you received a signing bonus at the commencement of your employment which is subject to repayment under the provisions of paragraph 7.3 of your Employment Agreement. The Hospital has determined that no repayment of the signing bonus is owed under paragraph 7.3.

We thank you for your service to the Hospital.

Very truly yours,

Matthew Doyle, Acting CEO

478119.4
6367-1990-275 (agrmts)

7-1-19

## PROFESSIONAL SERVICES
## EMPLOYMENT AGREEMENT

THIS PROFESSIONAL SERVICES EMPLOYMENT AGREEMENT ("Agreement") is made and entered into this 3rd day of July, 2019, by and between THE METHODIST HOSPITALS, INC., an Indiana nonprofit corporation ("Hospital"), and JENNIFER DOCHEE, M.D., a physician licensed to practice medicine under the laws of the State of Indiana ("Physician").

### W I T N E S S E T H:

**WHEREAS,** Hospital owns and operates acute care hospital facilities located in Gary, Indiana ("Northlake Campus"), and in Merrillville, Indiana ("Southlake Campus"), and an outpatient/medical facility in Gary, Indiana ("Midlake Campus"); and,

**WHEREAS,** Hospital is organized under the Indiana Nonprofit Corporation Act for purposes of providing treatment of sick, wounded, deformed and injured persons and maternity patients; and,

**WHEREAS,** part of Hospital's mission is to serve as a community hospital for the citizens of the surrounding communities ("Service Area") and to strive to plan and implement programs that are responsive to the health care needs of such constituent population and to strive to provide a full range of services covering the broadest array of levels of care and further to strive to be a compassionate provider of health care services to the people in need; and,

**WHEREAS,** Hospital has determined that there is a community need for interventional cardiology physician services in its Service Area; and,

**WHEREAS,** Hospital desires to employ Physician to provide medical services pursuant to the terms of this Agreement;

NOW, THEREFORE, IN CONSIDERATION OF THE MUTUAL COVENANTS AND PROVISIONS OF THIS AGREEMENT, IT IS UNDERSTOOD AND AGREED BETWEEN THE PARTIES AS FOLLOWS:

1.    **PHYSICIAN.**

1.1 Physician shall at all times maintain a currently valid and unlimited License to Practice Medicine in the State of Indiana, and: (a) provide professional medical services in a manner consistent with all applicable federal, state, and local laws and regulations; (b) obtain and maintain membership on the Hospital's Associate/Active Medical Staff with all rights, privileges, and obligations as defined in the current By-Laws of the Medical Staff of the Hospital; (c) maintain eligibility to participate as a provider in the Medicare and Medicaid Programs; (d) maintain valid and unrestricted federal and state registrations to prescribe, dispense, and

B-7

administer controlled substances; (e) be or become board certified in interventional cardiology in compliance with the requirements of the By-Laws of the Medical Staff of the Hospital; and (f) assume and discharge the duties described in Paragraph 2 of this Agreement.

## 2.    DUTIES OF PHYSICIAN.

2.1    Physician shall provide professional medical services within physician's specialty on a full time basis at the practice site as described in "Schedule 1" attached hereto.

2.2    Other than as specified herein, Physician shall not accept an engagement to provide medical, clinical, professional, administrative and/or consulting services (including but not limited to "moonlighting", marketing, retention as an expert witness, etc.), whether as an employee, partner, associate, shareholder, independent contractor, or in any other capacity, indirectly or directly; nor shall Physician have medical staff privileges with any other hospital, clinic or health care organization.

2.3    In addition to the Regular Hours, Physician shall provide call coverage consistent with his/her obligations under Hospital's Medical Staff By-Laws to ensure that Hospital's patients receive appropriate care.  Compensation for call coverage (regardless of whether imposed by this Agreement or Hospital's Medical Staff By-Laws) is included in the compensation due Physician pursuant to this Agreement.

2.4    Physician shall report to and be under the direction of the Hospital's Chief Executive Officer or his/her designee.

2.5    Physician shall comply with medical record chart completion requirements of the Medical Staff Rules and Regulations and provide necessary information to code services rendered. While this Agreement is in effect, and following termination of this Agreement for whatever reason, all medical records, charts, reports and other such materials shall remain the exclusive property of and remain in the custody of Hospital.

Physician may access, remove or copy such records with the prior written consent of Hospital and as allowed by law. In addition, Physician shall comply with all applicable laws and regulations concerning the confidentiality of medical records and patient information.

2.6    Physician shall participate in all payor contracts entered into by Hospital. All provider contracts, whether executed under Hospital's group agreement or executed individually on behalf of Hospital by Physician, shall remain the property of Hospital and shall not be assigned to Physician upon termination, expiration or non-renewal of this Agreement.

2

B-8

2.7    Physician hereby consents to Hospital's release of information regarding Physician as requested by third-party payors under managed-care agreements entered into by Hospital, which information must be provided pursuant to the terms and conditions of such managed care agreements.  Physician will complete and keep the CAQH database updated with access by the Hospital through the administrative mode.

2.8    Physician shall provide specialty related care to patients, which shall include private-pay patients, managed-care patients, Medicare, Medicaid and other federal health care program patients and such other individuals as may present themselves from time to time for treatment and who are accepted as a patient of Hospital. Physician shall not decline to treat any patient of Hospital due to race, creed, color, religion, age, national origin, sex, disability, inability to pay or insurance carrier/provider; however, Physician shall not be required to provide specialty related care to any person if, in Physician's professional opinion, Physician does not possess the requisite skills to diagnose and/or treat the patient.

2.9    Physician agrees that Hospital shall have the sole right to bill patients or responsible third-party payors, including Medicare and Medicaid, for professional services rendered by Physician in accordance with this Agreement, and that all fees collected for such services shall be the exclusive property of Hospital, and that Physician shall have no right, title or interest in such fees. Physician shall endorse and assign to Hospital any payments that he/she may receive, both while this Agreement is in effect and following its termination, for services rendered by Physician while this Agreement was in effect. Physician shall execute in a timely manner any and all forms necessary to permit Hospital to bill and receive payments for services rendered by Physician while this Agreement was in effect. Physician shall cooperate with Hospital's billing personnel in providing the information necessary for identification of services and procedures performed by Physician, to facilitate prompt and accurate billing for services rendered by Physician.

2.10    Pursuant to 42 C.F.R. § 495.10(f), Physician hereby assigns to Hospital all right, title and interest of Physician in and to any incentive payment(s) payable pursuant to the Health Information Technology for Economic and Clinical Health Act (the "HITECH Act"), which relate to Physician's meaningful use of certified electronic health record ("EHR") technology as defined by the HITECH Act and regulations promulgated thereunder while this Agreement remains in effect. Physician shall cooperate with Hospital, including without limitation by taking such actions, executing such documents and providing such information, as shall be necessary to establish and demonstrate qualification for any such incentive payments.

2.11    Hospital is committed to developing a Structural Heart Program at Hospital, and Physician agrees to assist and work with Hospital in the development of a Structural Heart Program over the first year of this Agreement.

3

3.    **RELATIONSHIP BETWEEN THE PARTIES.**

3.1    The relationship between Hospital and Physician shall be that of an employer and an employee. Physician shall be considered, under the provisions of this Agreement, as having an employee status and being entitled to receive those benefits set forth in Paragraph 6 hereof. Nothing herein contained shall be construed to give Physician any interest in the physical assets or the accounts receivable of the Hospital solely by reason of this Agreement.

3.2    Hospital shall neither have nor exercise any control or direction over the methods by which Physician engages in the practice of medicine. It is the sole interest and responsibility of Hospital to ensure that the programs and services covered by this Agreement shall be performed and rendered in a competent, efficient and satisfactory manner.

3.3    Hospital shall have the sole authority to establish from time to time, operating policies and procedures for Hospital and Hospital patients, and Physician shall comply with all employment policies, rules and regulations of the Hospital.

4.    **PROFESSIONAL STANDARDS.**

4.1    Physician agrees that the work, duties and obligations devolving upon him/her under this Agreement shall be performed and rendered in a competent, efficient and satisfactory manner. All applicable provisions of law and other rules and regulations of any and all governmental authorities relating to licensure and regulation of physicians and hospitals shall be fully complied with by all parties hereto. In addition, the parties shall also operate in accordance with the standards and recommendations of the Hospital's relevant accrediting body, the Indiana State Board of Health, the By-Laws of the Hospital, and the By-Laws and rules and regulations of the Medical Staff as may be in effect from time to time.

4.2    Physician will assist and participate in Hospital's overall quality assessment and improvement program, including without limitation establishing procedures to assure the consistency and quality of all professional services provided hereunder, and shall additionally participate in Hospital's Medical Staff quality assessment and improvement program. Further, Physician will assist and participate in risk management programs, cost effectiveness studies and utilization management initiatives performed by or on behalf of Hospital, including without limitation attending risk management seminars.

5.    **MALPRACTICE INSURANCE.**

5.1    Hospital shall secure and maintain during Physician's employment under this Agreement a policy or policies of professional liability insurance or self-insurance sufficient for Physician to qualify as a provider under the Indiana Medical Malpractice Act, covering all incidents relating to the practice of medicine occurring during the Physician's employment with Hospital, and shall pay for any

4

retroactive premium adjustments as well as deferred premium liability assessed ("tail coverage") against Physician that relates to the period of Physician's employment by Hospital. Physician shall be solely responsible for any retroactive premium adjustments or deferred premium liability assessed for the period preceding or following Physician's employment by Hospital, even if such assessment is made during the period of Physician's employment by Hospital. Physician shall give Hospital written notice not more than five (5) business days following the receipt of notice of any claim and shall assist and cooperate with Hospital in the conduct of the litigation and the enforcement of any right of contribution to which Physician may be entitled from any person or entity.

6.    BENEFITS.

6.1.    As a full-time employee of Hospital, Physician shall be entitled to receive such employment related benefits as Hospital may provide or establish from time to time for physician employees of the Hospital, subject to the rules and terms of such benefits as they may be in effect from time to time during the term of this Agreement. Such employment related benefits may include, without limitation, the following: paid time off (e.g., for vacation, sick leave, and CME); professional liability insurance; expense reimbursement (e.g., for phone/pager, license renewal, professional dues, and CME); and other fringe benefits (e.g., health, dental, vision, life or disability insurance, and retirement and/or savings plans). All such benefits provided to Physician by the Hospital shall cease as of the date of the Physician's termination of employment unless otherwise agreed in writing or unless otherwise required by law; provided, however, that Physician, at his/her sole expense, shall have all rights, if any, provided under applicable law to continue any health insurance and/or any other benefit after the date of termination of employment.

6.2    Physician acknowledges and agrees that the Hospital shall have the right to amend, modify or terminate any benefit program that may be provided to Physician from time to time as set forth in Section 6.1 above if such amendment, modification or termination occurs with respect to all employees similarly situated to Physician with respect to a given benefit or as may be required by law.

7.    COMPENSATION.

7.1    As compensation for the provision of professional services personally provided by Physician under this Agreement, Hospital shall pay Physician a base salary of Six Hundred Fifty Thousand and 00/100ths Dollars ($650,000.00) annually, payable in bi-weekly installments of Twenty-Five Thousand and 00/100ths Dollars ($25,000.00) beginning on the first pay period after the commencement of this Agreement and each two (2) weeks thereafter, subject, however, to withholding for Federal and State Income Taxes, FICA and any other withholdings as required by law or as requested by Physician. Notwithstanding the foregoing, the Hospital's obligation to pay the foregoing base salary is conditioned on Physician maintaining 12,500 work Relative Value Units ("RVUs") annually (the



"Productivity Minimum"). The Productivity Minimum will be reviewed at the end of the initial Term of this Agreement and adjustments may be made at that time.

7.2    In addition to the base salary, Physician shall be eligible to receive an annual productivity bonus of Fifty-Four and 00/100 Dollars ($54.00) for each Relative Value Unit ("RVU") of production physician performs in excess of 12,500 RVUs (the "Productivity Bonus Threshold") in any year. The determination and payment of any bonus earned will be evaluated and paid on a quarterly basis, subject to an annual reconciliation for purposes of Paragraph 7.1. Bonuses will be subject to all required Federal, State, FICA and other withholdings as required by law or as requested by Physician.

7.3    In addition to the base salary, the Hospital shall pay the Physician a signing bonus in the amount of Twenty-Five Thousand and 00/100ths Dollars ($25,000.00), which shall be payable within ten (10) days after the commencement of employment. In the event that the Physician terminates this Agreement without cause under Section 12.4 at any time during the first twelve (12) months (the "Commitment Year") of the initial term of the Agreement, then the Physician shall be obligated to repay this signing bonus to the Hospital on a pro rata basis based on the number of months or partial months remaining during the Commitment Year after the date of termination. For example, if the Physician terminates the Agreement effective the 6th month after commencement, the Physician shall repay the sum of Twelve Thousand Five Hundred and 00/100 Dollars ($12,500.00), to reflect that services will not be provided in 6 full or partial months of the 12 months of the Commitment Year.

7.4    The Hospital shall reimburse Physician for Physician's actual packing and moving expenses for relocating to Northwest Indiana, subject to a cap of Ten Thousand and 00/100ths Dollars ($10,000.00). The reimbursement shall be made to Physician within thirty (30) days of Physician's submission of documentation of such expenses, according to the Hospital's reimbursement procedures.

7.5    In no event shall Physician's total annual compensation including any bonus exceed a reasonable amount as determined by Methodist Hospital, based on the findings of an independent compensation consultant selected by Methodist.

8.    CONFIDENTIALITY OF INFORMATION.

8.1    Physician and Hospital acknowledge and agree to maintain the confidentiality of all patient medical records and information in compliance with applicable Federal and State laws.

8.2    As required by the Administrative Simplification Section of the Health Insurance Portability and Accountability Act of 1996 ("HIPAA") (Pub. L. No. 104-101, 100 Stats. 1936; August 21, 1996) and the regulations promulgated thereunder, Physician hereby assures the Hospital that he/she will

information concerning the processes, systems or methods, patient charges or financial information utilized by the Hospital or any patient information or other secret and confidential information of the Hospital. Upon the termination of this Agreement, Physician agrees to deliver to Hospital the original and all copies of all notebooks, manuals or other data relating to the operation of the Hospital or otherwise containing secret and confidential information. Physician further agrees that in the event Hospital seeks legal relief to enforce this provision of the Agreement, Hospital shall be entitled to injunctive relief without the necessity of posting a bond, cash or otherwise.

## 9.    FACILITIES.

9.1    Hospital shall provide and maintain facilities and equipment as necessary for the provision of services pursuant to this Agreement. Hospital shall purchase all necessary equipment and supplies utilized to perform services pursuant to this Agreement.   If applicable, at Hospital's option, and subject to assignability, Hospital may assume the existing lease for the office space occupied by Physician prior to commencement of this Agreement, and Physician will cooperate as reasonably necessary to effectuate assignment of such lease to Hospital.

## 10.    NON-PHYSICIAN PERSONNEL.

10.1    All non-physician personnel reasonably required for providing medical services pursuant to this Agreement shall be employed, contracted for or assigned by Hospital. Salaries, benefits and personnel policies applicable to such persons shall be determined by Hospital or the entity that furnishes contracted services to the Hospital.

## 11.    TERM.

11.1    The term of this Agreement shall commence on the 15th day of August, 2019 and shall expire thirty-six (36) months thereafter.   This Agreement may be extended by mutual written Agreement of the parties.

## 12.    TERMINATION.

12.1    This Agreement may be terminated by the Hospital immediately upon written notice to the Physician, upon the occurrence of any of the following events:

a.    The Physician's license to practice medicine in Indiana, or any other state, or federal DEA registration, is suspended, revoked, or otherwise restricted or terminated ("restricted");

b.    The Physician is: (i) convicted of any crime, other than a minor traffic offense; or (ii) suspended from or otherwise not permitted to continue

8



appropriately safeguard Protected Health Information ("PHI"), as defined by the Rule, which is made available to or obtained by Physician pursuant to this Agreement. Without limiting the obligations of Physician otherwise set forth in this Agreement or imposed by applicable law, Physician agrees to comply with applicable requirements of law relating to PHI and with respect to any task or other activity Physician performs on behalf of the Hospital, Physician shall do the following:

      a.    Not use or further disclose such PHI other than as permitted or required by this Agreement or as required by law;

      b.    Use appropriate safeguards to prevent use or disclosure of such PHI other than as provided for by this Agreement;

      c.    Report to the Hospital any use or disclosure of such PHI not provided for by this Agreement of which Physician becomes aware;

      d.    Make available such PHI in accordance with applicable law;

      e.    Make Physician's internal practices, books and records relating to the use and disclosure of such PHI received from the Hospital available to the Secretary of the United States Health and Human Services for purposes of determining the Hospital's compliance with applicable law (in all events, Physician shall immediately notify the Hospital upon receipt by Physician of any such request, and shall provide the Hospital with copies of such materials);

      f.    Maintain and make available the information required to provide an accounting of disclosures of such PHI pursuant to applicable law; and,

      g.    At the termination of this Agreement, return or destroy all such PHI that Physician still maintains in any form and retain no copies of such PHI.

The parties further agree to negotiate in good faith and execute any necessary amendments, addenda, or other documents related thereto in order to comply with the requirements of HIPAA and the regulations promulgated thereunder.

8.3    Physician acknowledges that during the course of the performance of this Agreement, Physician will gain knowledge of the processes, systems and methods, patient charges or financial information utilized by Hospital in conducting its hospital business and that Physician will likewise learn information concerning the patients treated at the Hospital. In order to guard the legitimate interests of the Hospital in such information, it is necessary for the Hospital to protect such information by holding it secret and confidential. Therefore, Physician agrees not to divulge to anyone, either during or after the termination of this Agreement any

HOSPITAL:                                    PHYSICIAN:
The Methodist Hospitals, Inc.                Jennifer Dochee, M.D.
Attention: President                         24460 Potomac Court
600 Grant Street                             Crete, Illinois 60417
Gary, IN 46402

COPY TO:
The Methodist Hospitals, Inc.
Attention: Legal Services
600 Grant Street
Gary, IN 46402

16.2   Assignment of this Agreement or the rights or obligations hereunder shall be invalid without the specific prior written consent of the other party herein, except that this Agreement may be assigned by Hospital without the prior written approval of Physician to an affiliated organization.

16.3   The waiver by either party of a breach or violation of any provision of this Agreement shall not operate as, nor be construed to be, a waiver of any subsequent breach hereof.

16.4   The parties shall execute and deliver any and all further instruments and documents reasonably necessary to carry out the purpose of this Agreement.

16.5   In the event it becomes necessary to initiate any action for purposes of the interpretation or enforcement of the terms and conditions of this Agreement, the prevailing party shall be entitled to receive costs and attorney's fees.

16.6   This Agreement shall be construed and governed by the laws of the State of Indiana.

16.7   In the event that any provision hereof is found invalid or unenforceable pursuant to judicial decree or decision, the remainder of this Agreement shall remain valid and enforceable according to its terms.

16.8   This Agreement constitutes the entire understanding and agreement of the parties, and there are no other prior or contemporaneous oral or written agreements between the parties regarding the subject matter hereof. This Agreement may be amended only by an instrument in writing signed by the parties hereto.

16.9   Physician hereby warrants and represents that there is no prohibition or limitation, arising out of law or contract, on his/her ability to enter into this Agreement or render performance hereunder, and Physician shall indemnify and hold harmless Hospital for any claims or actions which are based on or claim such a prohibition or limitation.

12

14.3 Physician acknowledges that he/she is familiar with restrictive agreements such as this, has concluded that his/her obligations and Hospital's rights hereunder (including without limitation Hospital's right to equitable relief as provided herein) are reasonable, and that Physician is fully aware of the duties, responsibilities, obligations, and liabilities imposed upon him/her by this Agreement.

14.4 If a court of competent jurisdiction should declare any part of this Section unenforceable or unreasonable because of any restriction of duration and/or geographical area, or for any other reason, such restriction shall be severed therefrom and a lesser restriction, as may be reasonably necessary to protect Hospital's interests, shall be enforced in its place, and the remaining restrictions contained herein shall be enforceable independently of each other. In the event of a breach of the restrictive covenant, Hospital shall be entitled to injunctive relief, in addition to such other remedies as may be available to Hospital, it being agreed by the parties that there would be no adequate remedy at law available to Hospital. If the Physician breaches the terms of this covenant not to compete, then the duration of such restriction shall be extended for an additional period of time equal to the period of time during which such breach or breaches occurred, including the duration of any litigation with respect thereto, including all appeals.

## 15. CHANGES IN THE LAW.

15.1 In the event there are any subsequent changes or clarifications of statutes, regulations, or rules relating to the manner in which this arrangement has been structured which either party determines in good faith must be complied with to ensure compliance with applicable statutes, regulations, or rules or to receive proper reimbursement from third parties, such party shall notify the other of any actions it deems reasonably necessary to comply with such changes; and the parties agree to take reasonable steps to restructure their relationship to ensure compliance with such change or clarification. In the event that there are substantial changes or clarifications of statutes, regulations, or rules which otherwise materially affect either party's rights under this Agreement, such party may, by notice to the other party, propose a new basis for documenting the parties' intent as expressed herein.

## 16. GENERAL PROVISIONS.

16.1 Any notice required to be given hereunder shall be in writing and delivered by personal delivery, or by Certified Mail, or by an express mail service with receipt verification, as follows, or to any updated address as shall be designated:

11

as a provider in the Medicare and Medicaid programs, or is rendered a "Sanctioned Person" as defined in **"Schedule 2"** attached hereto;

    c.    The Physician's medical staff membership or clinical privileges at Hospital are reduced or restricted for reasons relating to clinical competency or conduct, or the Physician surrenders clinical privileges voluntarily or under threat of disciplinary action relating to clinical competency or conduct, and such privileges have not been fully reinstated within any applicable appeal period;

    d.    The continuing disability of Physician preventing him/her from performing the essential duties of his/her specialty pursuant to this Agreement for a period of more than ninety (90) days of any three hundred sixty (360) consecutive day period;

    e.    The Physician becomes ineligible for malpractice insurance underwritten by an insurance carrier in the preferred market;

    f.    The Physician violates any material provision of this Agreement, provided the Physician has not remedied the violation to the reasonable satisfaction of the Hospital within thirty (30) days of receipt of written notice of the violation from the Hospital, which notice states with reasonable particularity the alleged material violation;

    g.    The Hospital is terminated as a participating provider pursuant to the provisions of the Social Security Act;

    h.    The Hospital's accreditation is terminated by its accrediting agency.

12.2   As an alternative to termination, the Hospital may suspend the Physician, without compensation, for an agreed period of time for any of the reasons set forth in Section 12.1 of this Agreement.

12.3   The Physician may terminate this Agreement immediately upon written notice to the Hospital if the Hospital violates any material provision of this Agreement, provided that the Hospital has not remedied the violation to the reasonable satisfaction of the Physician within thirty (30) days of receipt of written notice of the violation from the Physician, which notice states with reasonable particularity the alleged material violation.

12.4   Recognizing that this is a contract for professional services and that by its nature cannot be carried out without the full cooperation of both the Hospital and the Physician, either party may terminate this Agreement, without cause, by providing advance written notice to the other party by Certified Mail, personal service, or an express mail service with receipt verification, and the Agreement shall terminate ninety (90) days after service of said notice.

9

12.5   In the event that the 501(c)(3) status of Hospital or Hospital or Physician's ability to participate as a provider pursuant to the provisions of the Social Security Act are jeopardized by operation of this Agreement, then Hospital or Physician may terminate this Agreement.

12.6   Upon termination of this Agreement as hereinabove provided, neither party shall have any further obligation hereunder, except for (i) obligations accruing prior to the date of termination, and (ii) obligations, promises or covenants contained herein which are expressly made to extend beyond the term of this Agreement including, without limitation, confidentiality of information, indemnities and releases.

12.7   Upon termination of this Agreement, the provisions of Section 8 and Section 14 shall continue to be given effect in accordance with their terms.

### 13.   COMPLIANCE.

13.1   Physician shall comply in every respect with Hospitals' Compliance Program adopted by the Board of Directors, which is hereby incorporated herein by reference. Physician certifies that the professional and clinical services provided under this Agreement shall be in accordance with all applicable federal, state and local laws and regulations, including but not limited to Medicare and Medicaid laws and regulations. In the event, Physician discovers that the services he/she provided may have violated any of the above authorities, he/she shall immediately call the Hospital's Compliance Hotline at (800) 227-1731.

### 14.   COVENANT NOT TO COMPETE.

14.1   While this Agreement is in effect, and for a period of two (2) years after the termination date, Physician shall not, directly or indirectly, engage in the practice of medicine or have an ownership interest in any medical provider in Lake and Porter Counties in Indiana, without the prior written authorization of Hospital, which may be withheld in its sole discretion.

14.2   The non-compete provisions of Section 14 shall have no effect in the event Physician terminates this Agreement for cause, nor shall the non-compete provisions be given effect upon termination of this Agreement by Hospital without cause; provided, however, the natural expiration of this Agreement at the end of the initial term or any renewal term shall not be interpreted for purposes of Section 14 as termination of this Agreement by Hospital without cause. Physician may receive a waiver of this covenant not to compete by agreeing to (i) maintain his/her practice in the Hospital's primary service area for a period of two (2) years after termination; (ii) refrain from selling the practice or becoming employed by another healthcare provider in the Hospital's service area for the two (2) year time period after termination; and, (iii) Give Methodist the right of first refusal on the sale of the practice for an additional three (3) years.

10

**IN WITNESS WHEREOF,** the parties have hereunto set their hands and seals on the day and the year first above written.

HOSPITAL:                    THE METHODIST HOSPITALS, INC.

                             By: _____
                                 Raymond Grady, President and CEO

PHYSICIAN:                   By: _____
                                 Jennifer Bechee, M.D.        7|2| 2019

484401.2

13

## SCHEDULE 1

### Duties of Physician

Physician shall:

1. Provide interventional cardiology services to current and new patients at a location or locations as determined by the Chief Executive Officer or his designee.

2. Admit patients of the practice needing inpatient care to the Hospital and utilize the outpatient and ancillary services of the Hospital.

3. Provide medical care and supervision to hospitalized patients of his/her practice, as well as other practices within Methodist Physician Group, while *responsible for call*.

4. Collaborate with Advance Practice Nurses ("APNs") within the practice, including without limitation Nurse Practitioners and Nurse Midwives, as applicable, when such services are deemed necessary by the Hospital. Decisions related to APNs will be made collaboratively between practice management and Physician.

5. Participate in on-call coverage for all patients regardless of third party payor. "On-Call Coverage" shall be on a 24 hours per day, 7 days per week basis as scheduled and shall include:

    a.    carrying a beeper or cell phone;

    b.    being reasonably available by telephone; and,

    c.    providing timely inpatient and outpatient consultations.

    On-call coverage shall be pursuant to a written call schedule as determined by the Chief Executive Officer or his designee. Any changes to the on-call schedule shall only be approved by the Chief Executive Officer or his designee.

6. Assist Group in developing a clinical program which improves and maintains Group's reputation including the provision of high quality services, ensuring fiscal efficiency, participating in recruitment, and developing a marketing strategy; and

7. Perform any other professional, administrative or operational duties as assigned by the Chief Executive Officer or his designee.

SCHEDULE 2

DEFINITION OF SANCTIONED PERSON

A "Sanctioned Person" means a person or entity who:

(A)  is currently the subject of prosecution for, or has been convicted of: (1) any offense relating to the delivery of an item or service under any Federal Health Care Program as defined in Section 1128B(f) of the Social Security Act (the Maternal and Child Health Services Program or the Block Grants to States for Social Services Program, respectively), (2) a criminal offense relating to neglect or abuse of patients in connection with the delivery of a health care item or services, (3) fraud, theft, embezzlement, or other financial misconduct in connection with the delivery of a health care item or service, (4) obstructing an investigation of any crime referred to in (1) through (3) above, or (5) unlawful manufacture, distribution, prescription, or dispensing of a controlled substance;

(B)  has been required to pay any civil monetary penalty under 42 U.S.C. §1320a-7b, regarding false, fraudulent, or impermissible claims under, or payments to induce a reduction or limitation of health care services to beneficiaries of, any state or federal health care program, or is currently the subject of any proceeding which may result in such payment; or

(C)  has been excluded from participation in any Federal Health Care Program as defined in Section 1128B(f) of the Social Security Act.

B 12

# 1 METHODIST HOSPITALS

### PRIVILEGES IN *MEDICINE/CARDIOLOGY  APPROVED 2009

7/9/2020

Name: **Dochee, Jennifer D.,MD**                    Effective from  <u>10/10/2020</u>  to  <u>10/10/2021</u>

---

**R = Requested  G = Recommended As Requested   C = Recommended with Conditions   N = Not Recommended**

| Current Status | R | G | C | N | Internal Medicine Core Privileges |
|---|---|---|---|---|---|
| GRANTED | ☑ | ☐ | ☐ | ☐ | Admit, evaluate, diagnose, treat, and provide consultation to adolescent patients 12 years of age and older with common and complex illnesses, afflictions, diseases, and functional disorders of the circulatory, respiratory, digestive, endocrine, metabolic, musculoskeletal, hematopoietic, gastroenteric, and genitourinary systems of the human body. May provide care to patients in the intensive care setting in conformance with unit policies. Assess, stabilize, and determine the disposition of patients with emergent conditions consistent with medical staff policy regarding emergency and consultative call services.The core privileges in this specialty include the procedures on the following procedure list and such other procedures that are extensions of the same techniques and skills. |

-Performance of history and physical
-Abdominal paracentesis
-Arthrocentesis and joint injections
-Drawing of arterial blood
-I & D abscess
-I & D hemorrhoids
-Insertion and management of central venous catheters and arterial lines
-Biopsy of superficial lymph nodes
-Breast cyst aspiration
-Burns, superficial and partial thickness
-Excision of skin and subcutaneous lesions
-Excision of cutaneous and subcutaneous tumors and nodules
-Local anesthetic techniques
-Nasogastric tube placement
-Placement of anterior and posterior nasal hemostatic packing
-Perform simple skin biopsy or excision
-Preliminary interpretation of electrocardiograms, own patient
-Remove non-penetrating corneal foreign body, nasal foreign body or ear
-Suprapubic bladder aspiration
-Venous cutdown
-Thoracentesis

| Current Status | R | G | C | N | Internal Medicine Non Core Privileges |
|---|---|---|---|---|---|
| | ☐ | ☐ | ☐ | ☐ | Arterial Line - Board eligible or certified in Specialty or Subspecialty and documentation of twenty-five (25) hands-on cases performed during training program |
| | ☐ | ☐ | ☐ | ☐ | CVP Line - Documentation of fifteen (15) hands-on cases performed during training program |
| | ☐ | ☐ | ☐ | ☐ | EKG - Contractual |

B-13

| Current Status | R | G | C | N | Internal Medicine Non Core Privileges |
|---|---|---|---|---|---|
| | ☐ | ☐ | ☐ | ☐ | Flexible Sigmoidoscopy - Documentation of ten (10) hands-on cases performed during training program |
| | ☐ | ☐ | ☐ | ☐ | Insertion and Management of Pulmonary artery catheters |
| | ☐ | ☐ | ☐ | ☐ | Lumbar Puncture - Documentation of twenty (20) hands-on cases performed during training program |
| | ☐ | ☐ | ☐ | ☐ | Moderate Sedation |

Criteria: NEW APPLICANTS--Provide documentation of competency, documentation of pre-existing privileges to administer adult moderate sedation and ACLS certification. A copy of Practice Guidelines for Sedation and Analgesia by Non-Anesthesiologists will be provided. Complete and pass (minimum score of 75%) the Competency Test for Moderate Sedation and submit with the request for privileges and documentation of competency. The new applicant must sign the hospital's Attestation Form and submit with application.

REAPPOINTMENT: Effective 1/1/00, Medical Staff who are currently approved for adult moderate sedation will be provided with Practice Guidelines for Sedation and Analgesia by Non-Anesthesiologists, must sign the hospital attestation form, complete and pass (minimum score of 75%) the Competency Test for Adult Moderate Sedation which is to be submitted with the reappointment application, and ACLS certification.

NEW REQUEST: Medical Staff requesting additional privileges approval for adult moderate sedation must be approved to perform Moderate Sedation. The applicant must provide documentation of competency, documentation of pre-existing privileges to administer adult moderate sedation, be ACLS certified, sign the hospital Attestation form, and complete and pass (minimum socre of 75%) the Competency Test for Adult Moderate Sedation.

| Current Status | R | G | C | N | |
|---|---|---|---|---|---|
| | ☐ | ☐ | ☐ | ☐ | Ventilator Management - Physicians who are board eligible or certified in their respective subspecialties and who have a minimum of twelve (12) months documented training in critical and/or pulmonary care and documentation of twenty-five (25) hands-on cases |

| Current Status | R | G | C | N | Cardiology Core Privileges |
|---|---|---|---|---|---|
| GRANTED | ☑ | ☐ | ☐ | ☐ | Admit, evaluate, diagnose, treat, and provide consultation to patients of all ages except as specifically excluded from practice presenting with diseases of the heart, lungs, and blood vessels and manage complex cardiac conditions such as heart attacks, and life-threatening, abnormal heartbeat rhythms and care of patients in the cardiac care units, emergency department or other intensive care units. The core privileges in the specialty include the procedures on the procedure list and such other procedures that are extensions of the same techniques and skills. |

B-14

R = Requested  C = Recommended  A = Requested  C = Recommended with Conditions  N = Not Recommended

| Current Status | R | G | C | N | Cardiology Core Privileges |
|---|---|---|---|---|---|
| GRANTED | ☑ | ☐ | ☐ | ☐ | NON INVASIVE CARDIOLOGY |

-Arterial line placement
-2D echocardiography, Doppler and color flow
-Cardioversion, electrical, elective
-EKG and rhythm interpretation
-Holter scanning monitor interpretation
-Inferior Vena Cava Filters
-Infusion and management of Gp IIb/IIa agents and thrombolytic agents
-Insertion and management of central venous catheters
-Insertion and management of pulmonary artery catheters
Non-invasive hemodynamic monitoring
-Pericardiocentesis
-Signal Average ECG
-Stress echocardiography (exercise and pharmacologic stress)
-Tilt table testing
-Transcutaneous external pacemaker placement
-Use of thrombolytic and antithrombolytic agents
-Pacemaker Programming/Reprogramming & Interrogation

| Current Status | R | G | C | N | |
|---|---|---|---|---|---|
| GRANTED | ☑ | ☐ | ☐ | ☐ | INVASIVE CARDIOLOGY |

-Central line placement and venous angiography
-Coronary arteriography
-Diagnostic right and left heart cardiac catheterization
-Hemodynamic monitoring with balloon floatation devices
-Temporary pacemaker, transvenous, placement
-Insertion of intraortic balloon counter pulsation device
-Use of Vascular Closure Devices

| Current Status | R | G | C | N | |
|---|---|---|---|---|---|
| GRANTED | ☑ | ☐ | ☐ | ☐ | INTERVENTIONAL CARDIOLOGY |

*i) Requires Proctor*
*) Submit documentation of training*
*Submit current competency + procedure logs.*

-EKOS mediated mechanical and pharmacological thrombolysis for arterial, venous and pulmonary thrombosis
-Endomyocardial biopsy
-Endovascular venous radiofrequency ablation for venus reflux
-Femoral, brachial or radial, axillary cannulation for diagnostic angiography or percutaneous coronary intervention
-Impella
-Interpretation of coronary arteriograms, ventriculography and hemodynamic
-Intracoronary foreign body retrival
-Intracoronary infusion of pharmacological agents including thrombolytics
-Intracoronary mechnical thrombectomy
-Intracoronary stents
-Intravascular Ultrasound (IVUS) of coronaries
-Management of mechnical complications of percutaneous intervention
-Performance of balloon angioplasty, stents, and other commonly used interventional devices
-Use of Intracoronary Doppler and flow wire
-Use of vasoactive agents for epicardial and microvascular spasm

| Current Status | R | G | C | N | Cardiology Non Core Privileges |
|---|---|---|---|---|---|
| GRANTED | ☑ | ☐ | ☐ | ☐ | Use of Laser   *i) Required Proctor* |

B-15

R = Requested   G = Recommended   C = Recommended with Conditions   N = Not Recommended

| Current Status | R | G | C | N | Cardiology Non Core Privileges |
|---|---|---|---|---|---|
| GRANTED | ☑ | ☐ | ☐ | ☐ | Cardiovascular Magnetic Resonance — *Contracted.* **Need current competency & doc of training** |
| GRANTED | ☐ | ☐ | ☐ | ☐ | Adult Transesophageal Echocardiography (TEE) - A minimum of two (2) years of subspecialty training (fellowship) in Cardiology, qualified and credentialed in reading M-Mode, 2-dimensional Echocargiogram, Dopplre continuosu pulse and color, after privileges have been granted, the first five (5) cases performed must be proctored with submission of competence report to perform procedure independently |
| GRANTED | ☑ | ☐ | ☐ | ☐ | Nuclear Scan Interpretation: Successful completion of six month structured Nuclear Cardiology program or six month Radiology training program in nuclear medicine.

And

Met the number of required hours by Nuclear Regulatory Commission (N.R.C.) and successfully pass the physics exam or has met the number of required hours by the American College of Radioloy (A.C.R.)

*In order for a cardiologist to be credentialed in Nuclear Cardiology they must have completed a formal training program of two hundred hours consisting of:
-Direct Nuclear Cardiology exposure to make one eligible for Nuclear Cardiology boards so that the individual may become board certified. |
| GRANTED | ☑ | ☐ | ☐ | ☐ | CT Coronary Angiography and Cardiac CT - Must be M.D. or D.O., must demonstrate successful completion of an ACGME or AOA approved residency or fellowship in Radiology or Cardiology, documentation of completion of 19 hours CME didactic course program to include participation in the interpretation, reporting and/or supervised review of at least 50 Coronary CT examinations OR documentation of participation, with interpretation, in a combination of at least 50 Coronary CT examination from a Program Director of a training program or Department Chair of a hospital where the physician actively participates *Contracted - submit docum. & current competency* |
| GRANTED | ☑ | ☐ | ☐ | ☐ | Abdominal Femoral Angiography with interpretation |
| GRANTED | ☑ | ☐ | ☐ | ☐ | Peripheral Vascular Interpretation |
| GRANTED | ☑ | ☐ | ☐ | ☐ | Balloon Stent Arthrectomy and Thrombectomy |
| GRANTED | ☑ | ☐ | ☐ | ☐ | Carotid and Central Angiography (not for aneurysm or tumor) *1) Requires Proctor 2) Docum of current competency & Procedure list* |
| | ☐ | ☐ | ☐ | ☐ | Carotid Stent |
| | ☐ | ☐ | ☐ | ☐ | Implatation of new permanent pacemaker, including single/dual chamber and biventricular - Must meet cridentialing criteria |
| GRANTED | ☑ | ☐ | ☐ | ☐ | Interpretation of results of noninvasive testing relevant to arrhythmia diagnoses and treatment |
| | ☐ | ☐ | ☐ | ☐ | Implantation of Automatic Implatable Cardioverter & Defibrillator including single/dual chamber and biventricular. Must meet credentialing criteria. |

R = Requested  G = Recommended As Requested  C = Recommended With Conditions  N = Not Recommended

| Current Status | R | G | C | N | Electrophysiology Core Privileges |
|---|---|---|---|---|---|
| | ☐ | ☐ | ☐ | ☐ | Cinical cardiac electrophysiology |

-Insertion and management of CIEDs, including ICDs, pacemakers (including single/dual chamber and biventricular, CRTs, implantable loop recorders, and impalntable cardiovascular monitors
-Interpretation of activation sequence mapping recordings and invasive intracardiac electrophysiologic studies, including endocardial electrogram recording and imaging studies
-Interpretation of results of noninvasive testing relevant to arrhytmia diagnoses and treatment
-Pacemaker programming/reprogramming and interrogation
-Performance of therapeutic catheter ablation procedures
-Transvenous lead extraction
-Insertion and implantation of automatic implantable new defibrillators

| Current Status | R | G | C | N | Peripheral Vascular Interventions |
|---|---|---|---|---|---|
| | ☐ | ☐ | ☐ | ☐ | Peripheral Vascular Interventions (arterial, venous, grafts and fistulas) |
| | ☐ | ☐ | ☐ | ☐ | Abdominal Femoral Angiography with Interpretation |
| | ☐ | ☐ | ☐ | ☐ | Peripheral Vascular Intervention (Balloon Stent Arthrectomy and Thrombectomy) |
| | ☐ | ☐ | ☐ | ☐ | Carotid and Central Angiography (not for aneurysm or tumor) |
| | ☐ | ☐ | ☐ | ☐ | Carotid Stent |

| Current Status | R | G | C | N | Pediatric Cardiology Core Privileges |
|---|---|---|---|---|---|
| | ☐ | ☐ | ☐ | ☐ | Admit, evaluate, diagnose, provide consultation to, and provide comprehensive care to newborns, infants, children and adolescents presenting with congenital or acquired cardiovascular disease and disorders of the heart and blood vessels. Privileges include but are not limited to |

-electrocardiography and echocardiography interpretation
-cardiversion
-diagnostic cardiac catheterization
-selective angiocardiography
-electrophysiologic testing
-therapeutic catheterization
-pericardiocentesis
-thoracentesis
-mechanical ventilation

Practitioner Signature:_____    Date:_____/_____/_____

B-16

R = Requested  G = Recommended As Requested  C = Recommended with Conditions  N = Not Recommended

| Current Status | | | | Cardiology Non Core Privileges |
|---|---|---|---|---|
| **R** | **G** | **C** | **N** | |
| ☐ | ☐ | ☐ | ☐ | Endovascular AAA |

The repair of Endovascular Abdominal Aortic Aneurysms requires a team of specialists with special training. Applicant must be a physician with a required specialty in Division of Surgery, Medicine or Radiology and must be in good standing with the medical staff. Applicant must be Board Certified or qualified to pursue Board Certification. If applicant trained in fellowship, a certificate of formal training and competence from the program director will be required.

A Vascular surgeon qualified to repair and treat the segment of vessel to be approached in an open manner. He/she should be able to demonstrate an ongoing annual experience of three (3) cases a year as primary surgeon. He/she must have taken a course of training and be approved by the manufacturer of the graft.

An Interventional Cardiologist or Radiologist qualified to perform and who is credentialed for peripheral interventions. He/she must have taken a course of training and be approved/certified by the manufacturer of the graft. He/she must demonstrate an ongoing experience of three (3) cases per year participating on the team.

Procedure must be done in conjunction with an endovascular specialist and surgeon, unless the physician has privileges to perform both. Applicant must first request probationary credentials for Endovascular Abdominal Aortic Aneurysm (AAA). All physicians must complete three (3) cases under proctorship by a physician experienced in Endovascular AAA. The Proctor will observe all aspects of the AAA procedure and will complete the required competency report on each applicant at the end of three (3) cases. If there is no further need for proctoring after three (3) cases, applicant will be approved to conduct Endovascular AAA procedures without restrictions.

At the time of re-appointment, if the physician has not met the number of required procedures/cases, the physician may continue to perform the procedure, with the understanding that all procedures will be focus reviewed (FPPE) by the Medical Direction of Cardiac Cath Lab/Cardiology.

| | | | | |
|---|---|---|---|---|
| ☐ | ☐ | ☐ | ☐ | Pacemaker programming/reprogramming and interrogation |
| ☐ | ☐ | ☐ | ☐ | IVC Filter Placement |
| ☐ | ☐ | ☐ | ☐ | Pericardicentesis - documentation of five (5) hands-on cases performed during training program |
| ☐ | ☐ | ☐ | ☐ | Therapeutic Hypothermia-Criteria: Must be ACLS certified; Must have privileges to put in Central and Arterial lines; and Must successfully complete and pass Competency Test. |

# 1 METHODIST HOSPITALS

### GARY, IN 46402

### CLINICAL PRIVILEGES IN *MEDICINE/CARDIOLOGY  APPROVED 2009

Name  Dochee, Jennifer D.,MD

**Qualifications:**

To be eligible to apply for core privileges in cardiology, the applicant must meet the following criteria:

Current certification or active participation in the examination process leading to certification in internal medicine and successful completion of an Accreditation Council for Graduate Medical Education (ACGME) or American Osteopathic Association (AOA) accredited post-graduate training program in cardiovascular disease, or active particiaption in the examination process leading to subspecialty certification in cardiovascular disease by the American Board of Internal Medicine or the American Osteopathic Board of Internal Medicine with Special Qualifications in Cardiology.

Or

Successful completion of an Accreditation Council for Graduate Medical Education (ACGME) or American Osteopathic Association (AOA) accredited post-graduate training program in cardiovascular disease.

Applicants for initial appointment must be able to demonstrate active cardiology practice (50 patients in the past 12 months) in an accredited hospital or healthcare facility or demonstrate successful completion of a hospital-affliated accredited residency, special clinical fellowship or research.

Applicants for initial appointment may be requested to provide documentation of the number and types of hospital cases during the past 24 months.  Applicants have the burden of producing information deemed adequate by the hospital for a proper evaluation of current competence and other qualifications and for resolving any doubts.

**Reappointment Requirements:**

To be eligible to renew core privileges in cardiology, the applicant must meet the following Maintenance of Privilege criteria:

Current demonstrated competence and an adequate volume of experience with acceptable results in the privileges requested for the past 24 months based on results of quality assessment/improvement activities and outcomes. Evidence of current ability to perform privileges requested is required of all applicants for renewal of privileges.

B-17

# I METHODIST HOSPITALS

## CLINICAL AREA *MEDICINE/CARDIOLOGY APPROVED 2009

**Name** Dochee, Jennifer D.,MD

**Acknowledgement of Practitioner**

I have requested only those privileges for which by education, training, current experience, and demonstrated performance I am qualified to perform and for which I wish to exercise at The Methodist Hospitals, Inc., and I understand that:

a. In exercising any clinical privileges granted, I am constrained by hospital and medical staff policies and rules applicable generally and any applicable to the particular situation.

b. Any restriction on the clinical privileges granted to me is waived in an emergency situation, and in such situation my actions are governed by the applicable section of the medical staff bylaws or related documents.

Practitioner Signature:_____    Date:_____/_____/_____

### ***Recommendations***

I have reviewed the request for clinical privileges and supporting documentation and

☐ **Recommend As Requested**    ☐ **Recommend with Exceptions**    ☐ **Do Not Recommend**

the privileges requested above.

### EXCEPTIONS

| Exception to Privilege: | Conditions/Modifications |
|---|---|
|  |  |
|  |  |
|  |  |
|  |  |

Explanation:

| | | |
|---|---|---|
| Chief/Vice Chief | | _____/_____/_____ |
| Title | Signature | Date |
| | | _____/_____/_____ |
| Title | Signature | Date |





**Gary Human Relations Commission**
**Haneefah Khaaliq, Executive Director**

# FACT FINDING CONFERENCE
# SIGN-IN SHEET

## Jennifer Dochee vs. Methodist Hospitals

| | |
|---|---|
| DATE: | November 13,2020 |
| GHRC NUMBER: | 0920ReS091 |
| TIME: | 1:00 p.m. |
| INVESTIGATOR: | Loretta Houston |
| NOTE TAKER: | |

| NAME | TITLE | DAYTIME NUMBER |
|---|---|---|
| Steve Scalt | Defendents Attorney | |
| Erin Lansky HR Manager | HR Manager | |
| Dr Vincent Sevier - | Doctor | |
| Jennifer Witherspoon C | CP's attorney | |
| Jennifer Dochee | CP | |
| Abby Lampart | Risk Management Manager | |
| | | |
| | | |
| | | |
| | | |
| | | |

C-1

# RESPONSE TO CHARGE

## CP vs. RESPONDENT

## Case Numbers:

| | Charge Statement | Response | |
|---|---|---|---|
| | | Charging Party | Respondent |
| 1 | I am an African American female hired by the Respondent on or about August 15, 2019.  My position title was Interventional Cardiologist. | Yes | Yes |
| | I became a recipient of  continuous harassment by several male cardiologist. | Yes | No |
| | The main decision maker is Indian I complained and reported to the respondents chairman and chief executive officer and nothing was done.  On april 13, 2020 | Yes | No |
| | I was disciplined and discharged in retaliation for my reporting harassment. | Yes | No |
| | I was also threatened by the Respondent that I would be reported to the National Practitioner databank. | Yes | No |
| | On October 2, 2020 I was informed a negative reference  was given on me discrediting my credentials an blocking me from getting hired. I believe I have been discriminated and retaliated against based on my race African American/sex/female in violation of Title Vii of the Civil right Act of 1964 as amended. ~~sdl9harassment th~~ | Yes | No |
| | I | | |
| 2 | | | |
| 3 | | | |

C-2

| | | | |
|---|---|---|---|
| 4 | | | |
| 5 | | | |
| 6 | | | |
| 7 | | | |
| 8 | | | |
| 9 | | | |
| 10 | | | |
| 11 | | | |
| 12 | | | |
| 13 | | | |
| 14 | | | |
| 15 | | | |
| | | | |

**Notes:**

CP is African American female hired by the Respondent on Aug 15, 2019, was not so much her role but sex.

My position title was Interventional Cardiologist.

During her employment she became the recipient of Continuous harassment by several male Cardiologists

The main decision maker is Indian

CP alleges she complained & reported to the Respondents Chairman.
Name - date -

CP reported to the Chief Executive Officer name date:

What was done?

On April 13, 2020 U was disciplined & discharged, in retaliation for reporting harassment.

Reason for Discharge. Decision Maker for Discharge.

CP alleges being threatened by who? that she was going to be Reported to the National Practitioner Data bank?

Oct 2, negative reference) who let? CP.

On or about July 3, 2019 C P & R, entered into a written professional Service Employment Agreement.

According to the contract or Agreement 12.4 Either C P or R Could terminate the agreement without Cause by providing 90 day written notice to the other party.

April 13, 2020 R terminated the Agreement without Cause effective with the 90 days according to Agreement would be July 9, 2020,

While she was no longer employed She continued to have medical Privileges at the Hospital as an independent medical provider.

Questions for C P

Names of individuals that harassed you? Dates
What was done? Dr. Savaga

Name of the individual who threatened you.
(Dr. to report me to the board

Who gave a negative Reference on you? Did the employer
tell you that was the reason you were not hired?
    This was not established that any negative reference
was given.

Attorney witherspoon figures any litigation 2.5 million
dollars. Loss income Physical Changes.

"No we don't believe that Methodist discriminated
against Dr. Dechee. The demand just made.
Juts it out with Methodist. No Counter
offers.

(90 days paid) —

"CP is Speaking"

Mr. Grady - hired in Aug 30, 2020 never very deplacerity. Dr Artist, a board member Dr Catrina Wright. Dr he big clutim guy, doctor.

Sep - 22, 2020 People started saying I was a Cardiologist

Nov 7, 2020 I was asked to do a presentation. No other doctor was asked to do a presentation.

Derogatory remarks still writing in charts about me. Dr Savage - made me

Jan 29, 2020 - some I felt harassed. Both parties I said I was not unprofessional. The proper chanels were not followed

Feb 22, 2020 we had a Mask Part he walked up to March hug me, i did

Why my patients were beening seen by other doctors.

April 13, 2020 meeting called. Dr Savaa tracie in the meeting they told me they were termination my practice without cause Dr Savaai took my badge E said if I fight this I would not be paid for 90 days.

April 14, 2020 text message June 15, 2020 Dr Artist asked to attend the meeting. Contact

July 10, 2020 received email my privi lagles were denied. I hired an attorney. July 19, 2020 denying all Privigales. No one responded

Aug 8, 2020 Jewish Chrystian Hospial said I had a bad reference. They sent a Angie Head - "No body else had to relate.

C -3

What is the normal procedure for Doctors reporting they feel they are being harassment.

The committee denied my credentials. Matt Dole. I came back as a private position. No they make me as asked to do the things I was.

Oct 27, Mary Dow -

Did she give the name of the person she talked to.

Signed the form Dr Ben cafe. I am unemployed.

---

Dr. Vincent Savaga - Chief Medical Officer - Methodist Physician Group. There were many things communicated. List of various instances. We brought her on board in Aug. She was the only female. Many females employed by Methodist. Nurse Practitionary I don't believe. African American chairman of board. We brought her on board, additional think to the group we thought she could bring in new things to the group for growth. her time here, there were cases that came up. Some matters staff brings thing it's a part of see something, say something. they are not retaliated against for being in thing for growth. Spring of 2020 Covid State restrictions. Changing relationships because of Covid. Mid to late March. fall rosters to re-structure, because of Gaps in revenue. Make changes on Physicians side. her program was costley. D. Dachowske was with Dr Artis, Dr Co in cherry. largest most successful practice there. Dr Artist practice would be given to her.

C - 4

after seeing complaints at what point do you
allow them corrective actions?

R= transfers Dr. Dockee Out of Cardiogroup.
April 13, 2020, Melling CEO - Chairs
The meeting did not go well she was leaving
Only up here she told us she did not want to
meet with us. It was a separation letter
without cause. We communicated to her
she would be paid for 3 months. She could
return back to Methodist. She did not
want to go on with the meeting so we
asked for ID. She left before we could
tell her She would be welcome here to work.
Separation for Covid, Nurse DO Check in
with New employee. Cu & Dr Co in Chevy
had Conflict over a case. Should wanted
her to Seweeds. Yes I asked questions
to Dr. She said I acted like she was an
angry black woman D 1 Wright is on our
board, she female. I wanted her to have a
inventor she is B female. Nurses will be
& Dr Co in Chevy she did not thin
She request a leave of absence LOA.
don't tak LOA when you have cases.
it has to be communicated to ND ata Bank
it was not to report her. it was a process.

U held her LOA, July 12, 2020 her 90 days up she'd
be back. "Medical Staff qualey overview Committee"
This both place after. She goes into blood vessels
in the heart. Proctor & precept. proprocta — put
Someone else in room with Preceptor — your reviewing
Cases for safety Concerns. not for reporting
any body. FPPE focus on professional practice
review Cases looking for red flags. Can walk in
Today and dy a Cab-lab position.
Dr. Shaw cab lab Dr. Artist —
. Barns Jewish — Pinnacle — We received came from
Community ( nothing from Barns Jewish or Pinnacle.
her separation came because of Covid.
attorney with apron — Business decision. We separated without
Cause & she was paid for 90 days, all that was put
forwith in the separation.

no not aware of any formal complaints — take to HR.
they would investigate.

(at point to McLady (Acting CEO) — he resolved this issue)
(1 opened up Gentle Hearts) — ( Program for Education) —
It is a Protocol —

C-6

Q: ... Chief complaint her race is AA She was hired August 15, 2019.

Rachel Case

Potution She hired in as a Interventional Cardiologist treat coronary atery disease, heart valus disorders Congental heart des eas they are highly skilled in plevenlun of heart disease & the complicatum Such as heart failure. they are trained to perform specific catheter - based treatments, for heart diseas they do nonsurguical Procedure for treating Coronary artery disease.

by Providing a 90 day written
notice to either party. So R terminated
without cause.

April 15, 2019 hired

July 3, 2019 CP & R entered into a written
Professional Service employment agreement.

April 13, 2020 discharged in the agreement either party
would take effect on July 13, 2020. could surrender the
agreement without cause

Oct 20, 2020 alleged to have negative reference
Given on her -

"Medical Staff quality committee (MSQC)

As Part of Methodist Respondents policy employees are
encouraged to report any discrimination unlawful acts against
them. So they can be properly investigated
& corrective action will be taken.

R has not provided any documentation after CP's
reporting.

On July 3, 2019

July 3, 2019



11/6/2020                          Mail - Loretta Houston - Outlook

**Notice of Appearance**                                          📎 1 ∨

WL    Witherspoon Legal <witherspoonlegal@gmail.com>
      Thu 11/5/2020 3:57 PM
      To: Loretta Houston
      Cc: Jennifer Dochee <jddochee@gmail.co

      [📄] Appearance_JDochee.pdf
           122 KB

Ms. Houston,

Please see the attached Notice of Appearance for Attorney Jennifer Witherspoon on behalf of Dr. Jennifer Dochee.
Also, Attorney Witherspoon has the following dates and times available: Friday November 13 at 1pm, Monday November 16 at 10am and Tuesday November 17 at 11am.

Please let me know if you need any additional information or documents.

Thank you,

Megan Moore
Director of Operations

--
We are a different type of law firm.

847.672.7819
32 N. West St. Suite 100
Waukegan, IL 60085
Witherspoonlegal@gmail.com
www.jwitherspoonlaw.com

Reply    Reply all    Forward

SUBSTANTIAL WEIGHT SUBMISSION
Gary Human Relations Commission
839 Broadway – Suite S107
Gary, Indiana 46402

Jennifer Dochee                          EEOC CNTRL NO: 470-2020-03359
8631 Stone Creek Blvd                    FEPA CNTRL NO:   0920ReSR091
Frankford, IL 60423

Vs.                                      TD NO: 8

Methodist Hospitals                      FINDING: PC
600 Grant Street
Gary, IN 46402

## I. SUMMARY OF COMPLAINT                                    Tab A-1

The Complainant alleged the Respondent engaged in discriminatory employment
practices in violation of the Gary Civil Rights Ordinance and Title VII of the Civil Rights
Act of 1964 as amended for the following reason:

### Amended Charge

I am an African American Female hired by the Respondent on or about August
15, 2019. My position Title was Interventional Cardiologist.    During my
employment, I became a recipient of continuous harassment by several male
Cardiologist. The main decision maker                    ported to
the Respondents chairman and Chief Ex                    vas done.
On April 13, 2020 I was disciplined and                  my
reporting the harassment. I was also thr                 t I would be
reported to the National Practitioner Da                 was
informed a negative reference was give                   ntials and
blocking me from getting hired at anoth

I believe I have been discriminated and retaliated against based on my race
African American/ Sex Female in violation of Title VII of the Civil Rights Act of
1964 as amended.

**Respondent's Position Statement**:                          **Tab B-6**

There is no evidence of any discrimination toward Dr. Dochee on April 13. 2020 or
during her employment at Methodist.

## .II. SUMMARY OF CHARGE:

08/01/20    Charge Filed with ICRC

1

| 08/20/2020 | Charge sent from EEOC for GHRC to investigate |
| 09/21/2020 | Charge assigned to investigator |
| 09/25/2020 | Case Reassignment FFC notification mailed out |
| 11/03/2020 | Charge was amended to include race |
| 11/13/2020 | FFC Held |

**Undisputed Facts:**                                              **Tab C-2**

I am an African American Female hired by the Respondent on or about August 15, 2019. My position Title was Interventional Cardiologist.

**Disputed Facts:**

During my employment, I became a recipient of continuous harassment by several male Cardiologist. The main decision maker is Indian. I complained and reported to the Respondents chairman and Chief Executive Officer and nothing was done.

On April 13, 2020 I was disciplined and discharged in retaliation for my reporting the harassment. I was also threatened by the respondent that I would be reported to the National Practitioner Databank.

On October 2, 2020 I was informed a negative reference was given on me discrediting my credentials and blocking me from getting hired at another hospital.

I believe I have been discriminated and retaliated against based on my race African American/ Sex Female in violation of Title VII of the Civil Rights Act of 1964 as amended.

**Charging Party's Position:**                                     **Tab A-4**
**Written Statement**

**Charging Party's Attorney Wrote This**

This office has been retained by Dr. Jennifer Dochee with respect to the improper and completely unauthorized action of the Methodist Hospitals ("Hospital"), acting through its Medical Staff Quality Committee ("MSQC"), in restricting the staff and clinical privileges that Dr. Dochee has with the Hospital and requiring her to submit to unlimited proctoring. These actions are outlined in a July 9, 2020 letter authored by Dr. Kumar Venkat, the Chief of the Hospitals Division of Medicine. In taking such action, the MSQC exceeded its authority and the Hospital/MSQC completely disregarded the substantive and procedural rights granted to Dr. Dochee under the Bylaws of the Hospital Medical Staff (Bylaws") and the Hospital's Rules and Regulations ("Rules"). Moreover, the timing the action is suspect and suggests that the entire purpose of the action was simply to avoid the economic competition between Dr. Dochee, now an independent cardiologist with staff privileges, with the cardiologists employed by Dr. Dochee's former employer, the Methodist

2

Hospitals, Inc. ("MHI"). In this regard, it is of no coincidence that the letter was sent at approximately the same time that Dr. Dochee was set to begin her independent practice after the July 12, 2020 effective date of the no-cause termination of Dr. Dochee's employment with MHI. Among the many improper and unauthorized acts taken by the Hospital/MSQC are:

**Charging Party's Verbal Position**                                    **Tab C-3**
**Fact Finding Conference**

**Charging Party is speaking:**

Dr. Gady was hired in on August 30, 2020 and wrote very degotary things about me in the charts. I felt harassed because on April 13, 2020 I was called into a meeting and terminated. My clients were being seen by other doctors. I was told in the meeting not to fight the termination or I would not be paid for the ninety days.

**Respondent's Position:**                                              **Tab B-5**
**Written Statement**

I represent the Respondent. The Methodist Hospitals, Inc. ("Methodist"). In connection with the above-referenced Charge of Discrimination ("Complaint t ') filed by Jennifer Dochee. This letter presents Methodist's Position Statement with respect to the Complaint and is based upon an Investigation of the allegations and records available as of the date of this letter. There is no evidence of any discrimination toward Dochee on April 13. 2020 or during her employment at Methodist.

THE CHARGE OF DISCRIMINATION

1. General Considerations.

Methodist is a general care hospital with its Northlake Campus located in Gary, Indiana, and the Southlake. Campus located in Merrillville, Indiana. The hospital has approximately (350 beds. equally divided between the two campuses, has several off site facilities and employs approximately 2,100 people. The campuses are located approximately 10 miles apart. As an institution, Methodist is committed to non-discriminatory practices and actively supports equal opportunity programs and efforts for its employees.

2. Nondiscrimination Policies.

Methodist is committed to fair and equitable treatment for all hospital employees. It is the policy of Methodist to "[Ë]mploy individuals and offer promotional opportunities on the basis of their qualifications, and seniority with the assurance of equal opportunity and fair treatment regardless of race, color, religion, sex, age, national origin. Sexual orientation, ancestry, or any disabling condition that does not inhibit job performance." See Methodist Employee Relations Code, (I-IR-POL

3

07). Methodist is in compliance with all applicable local, state and federal laws governing nondiscrimination in employment. Id.

Methodist. Has established procedures to follow in the event an employee, believes he or she has been unlawfully discriminated against by a co-worker, supervisor, physician, manager or agent of Methodist Id. If discrimination occurs in any form, Methodist encourages its employees to immediately report any discriminatory act s so that. They can be properly investigated and corrective action taken. Id. The fact sshould be reported, and the names of individuals involved should be disclosed so that proper act ions can be taken. 161. Methodist would take necessary corrective action. Including disciplinary action, up to and including termination if unlawful discrimination was determined. Methodist's non-discrimination policies support the diversity of its employees and its two campus hospitals.

FACTS

On or about July 3. 2019, Claimant and Respondent entered into a written Professional Services Employment. Agreement ("Agreement") whereby Respondent would employ Claimant as an interventional cardiologist. The Agreement. Provided that Claimant was to be paid an annual salary of Six Hundred Fifty Thousand (650,000.00) Dollars. In addition, pursuant to Paragraph 12.4 of the Agreement. Either Claimant or Respondent could terminate the Agreement. Without cause by providing 90-day written notice to the other party. On or about April 13, 2020, respondent properly notified claimant that pursuant to the clear terms of the agreement, respondent was terminating the agreement without cause.

In accordance with the agreement, respondent notified claimant that the termination was effective in 90 days or on July 9, 2020. Claimant and consider the terms of the agreement was simply terminated from her position pursuant to the terms of the agreement she signed. Claimant was not coerced or forced to sign the agreement. Claimant was given the opportunity to review, negotiated
And consider the terms of the agreement prior to the effective date of termination of the agreement. Further while no longer employed by respondent. Claimant continues to have medical staff privileges at the hospital as an independent medical provider.

CONCLUSION
Claimant and Respondent entered into an employment agreement and respondent terminated the agreement in accordance to the clear terms of the agreement agreed to by the claimant

**Tab B-6**

Professional Services Employment Agreement dated July 3, 2019 (Employment Agreement)
This is Dr. Dochee' Termination Notice:
This letter serves as formal notice that the Methodist Hospitals, Inc. has elected to terminate your employment without cause. Under paragraph 12.4 of your Employment

4

Agreement, the termination is effective ninety (90) days from your receipt of this letter, on July 12, 2020 (the "Termination date").

You will be considered to be on paid leave status until the Termination Date. The Hospital will continue to pay your base salary in accordance with normal payroll procedures and will maintain your benefits and malpractice insurance in place through the Termination Date; however, you will not be permitted to see patients at professional office(s) of the Hospital or on Hospital premises, nor will you be permitted to provide services to patients on behalf of the Hospital during this time. Final payment of any remaining base salary will be paid to you on or before the next regular payroll date following the Termination Date. Bonus compensation which may be owing to you under the terms of the Employment Agreement, if any, will be calculated and paid to you within thirty (30) days of the Termination Date. All such amounts paid to you will be subject to withholdings as required by applicable law.

Your participation in any of the Hospital's employee benefit plans will continue through the last day of the month in which the Termination Date occurs. If you are entitled and choose to elect COBRA continuation coverage, you will be responsible for payment of all COBRA premiums associated with such continuation coverage. "COBRA" means the Consolidated Omnibus Budget Reconciliation Act of 1985, as amended, through which certain qualified beneficiaries are provided continuation coverage in affected group health plans.

The Hospital will maintain your malpractice insurance in effect through the Termination Date. On the Termination Date, the malpractice policy will terminate and appropriate "Tail Coverage" will be issued to provide protection to you and the Hospital for any incidents that occurred while you provided services as an employee of and on behalf of the Hospital. The Hospital will arrange and pay for the "tail coverage" policy covering the period of your employment by the Hospital as provided in paragraph 5.1 of your employment agreement. You will be responsible for securing your own malpractice insurance following the Termination Date.

Please note that the malpractice insurance policy provided by the Hospital will not cover you for services you provide on behalf of a new employer or in the event that you open your own medical practice. Accordingly, if you begin employment with a new employer or choose to open your own practice prior to the Termination Date, you must notify the Hospital, as this may result in termination of the malpractice insurance provided by the Hospital, prior to the Termination Date.

In such event, the "tail coverage" required under paragraph 5.1 will commence at the time the malpractice insurance policy terminates. Please keep in mind that the provisions of paragraph 2.2 of your Employment Agreement remain in effect through the Termination Date.

The Hospital will make arrangements for continuity of care of patients from the date of this letter through the Termination Date. During this time, scheduled patients will be advised that you are on leave and given the option to see another physician in the Methodist Physician Group. After the Termination Date, patients will be notified that

you are no longer employed by the Hospital. Of course, at all times, patient choice of provider will be honored.

All of your patient records must be up to date and complete. If you need to arrange a time to complete all your notes and sign-offs, please contact Dawn Smith, Director of Medical Records, at 738-3441 (Southlake) or 881-2481 (Northlake) to schedule a time to do so within the next seven (7) days.

As you know, all patient records are the property of the Hospital. As such, they will be maintained by the Hospital through and following the Termination Date in accordance with Hospital policies and as required by applicable law. You will be provided with access to such records in accordance with the terms of paragraph 2.5 of your Employment Agreement. As always, patients request for copies and /or releases of records will be honored in compliance with applicable Federal and State laws, including without limitation HIPPA. Further, please note that the confidentiality obligations under Section 8 of your Employment Agreement remain in effect notwithstanding the termination of your employment.

Finally, you received a signing bonus at the commencement of your employment which is subject to repayment under the provisions of paragraph 7.3 of your Employment Agreement. The Hospital has determined that no repayment of the signing bonus is owed under paragraph 7.3
The letter was signed by/Matthew Doyle, Acting CEO

Fact Finding Conference
Respondents Verbal Position

Dr. Vincent Sevier is speaking: We brought her on board in August. She was the only female cardiologist. We have many females employed by Methodist. Nurse Practioners nurses I do believe. We thought she could bring in additional things to the group new things for the growth of the group. Her time here it was cares that came up some staff would bring things it's a part of see something say something. She was not retaliated against for brining things fourth. In the spring of 2020 Covid brought in state restrictions, changing relationships because of covid. Mid to late March we had to restructure because of gaps in revenue we had to make changes on physician's side. Her program was costly. We received something for reference for only community hospital nothing from Barns Jewish or Pinnacle to give her a negative reference we would not do.

**Respondent submitted Additional Information:**

| | |
|---|---|
| Attorney Appearance | Tab B-3 |
| Policy and Procedure | Tab B-5 |
| Termination Employment Agreement | Tab B-6 |
| Professional Services Employment Agreement | Tab B-7 |
| Duties of Physician | Tab B-8 |
| Relationship between the Parties | Tab B-9 |



# FAX COVER SHEET

**LAKE COUNTY**
8700 BROADWAY
MERRILLVILLE, IN 46410
P (219) 641.8700
F (219) 641.8710

**PORTER COUNTY**
6082 LUTE ROAD
PORTAGE, IN 46368
P (219) 762.9129
F (219) 762.2826

**HODGESDAVIS.COM**

DATE: May 17, 2021

NUMBER OF PAGES INCLUDING THIS PAGE: 2

TO: Gary Human Relations Commission
(219) 882-0373

FROM: Steven J. Scott

If you do not receive all of the pages or find that they are not legible, please call back as soon as possible (219-641-8700).

HODGES AND DAVIS, P.C. FAX NUMBER: (219-641-8710)

Confidentiality Notice

The documents accompanying this telecopy transmission contain confidential information. The information is intended only for the use of the individual(s) or entity named above. If you are not the intended recipient, you are notified that any disclosure, copying, distribution or the taking of any action in reliance on the contents of this telecopied information is not permissible. If you have received this telecopy in error, please immediately notify us by telephone at the number above to arrange for the return of the original documents. Thank you.



· HODGES ·
AND DAVIS P.C.
· · · · · · · · · · · · · ·
EST 1906

May 17, 2021

**VIA FACSIMILE AND FIRST CLASS MAIL**
Ms. Haneefah Khaaliq
Gary Human Relations Commission
455 Massachusetts Street
Gary, IN 46402

CARLE F HITES
R. LAWRENCE STEELE
GREGORY A. SOBKOWSKI
BONNIE C. COLEMAN
LAURA B. FROST
BENJAMIN T. BALLOU
STEVEN J. SCOTT
SHAWN D. COX
PHILIP E.D. HUNT
CARL J. HALL

OF COUNSEL:
CLYDE D. COMPTON
EDWARD J. HUSSEY

JASPER COUNTY OFFICE:
EDWARD P. DUMAS

LAKE COUNTY
8700 BROADWAY
MERRILLVILLE, IN 46410
P (219) 641.0700
F (219) 641.0710

PORTER COUNTY
P.O. BOX 470
PORTAGE, IN 46368
P (219) 762.0120

JASPER COUNTY
119 W. HARRISON STREET
RENSSELAER, IN 47978
P (219) 866.4158
F (219) 866.2274

HODGESDAVIS.COM

Re:    Charging Party: Jennifer Dochee, M.D.
       Respondent: The Methodist Hospitals, Inc.
       Case No. 470-2020-03359
       Our File No. 6367-2520-1

Dear Ms. Khaaliq:

This is in response to the Probable Cause finding that we recently received as counsel for Methodist Hospital in the above-referenced matter. Per said letter, which provided for conciliation efforts to resolve this matter, Methodist agrees to engage in conciliation efforts in an attempt to resolve this matter. Please confirm that you received this letter that Methodist agrees to engage in conciliation efforts. Thank you.

Very truly yours,

HODGES AND DAVIS, P.C.

By:    Steven J. Scott

SJS:sk:539978.1

Hello Attorney Brohman,

Nothing prior to June, and my access was restricted because they took my keys and key fob. I was given the office to as their employee.

Sent from my iPhone

On Jul 16, 2020, at 11:58 AM, Brohman, Michael <MBrohman@ralaw.com> wrote:

This was sent in June? Nothing more recent than that? Who is depriving you of access to your office? Was that an office that you were given solely in your capacity as an employee? Or are you entitled to use that office as a staff member?

**From:** Jennifer Dochee <jddochee@gmail.com>
**Sent:** Tuesday, July 14, 2020 5:18 PM
**To:** Brohman, Michael <MBrohman@ralaw.com>
**Subject:** Fwd: Hospital Restrictions

# EXTERNAL:

Sent from my iPhone

Begin forwarded message:

> **From:** Jennifer Dochee <jddochee@gmail.com>
> **Date:** June 15, 2020 at 2:59:36 PM CDT
> **To:** Michael Linton <mlinton@methodisthospitals.org>
> **Subject:** Fwd: Hospital Restrictions

Sent from my iPhone

Begin forwarded message:

> **From:** Vincent Sevier <VSEVIER@methodisthospitals.org>
> **Date:** June 15, 2020 at 2:49:03 PM CDT
> **To:** "jddochee@gmail.com" <jddochee@gmail.com>
> **Subject:** Hospital Restrictions

Dr. Dochee

6/7/2021                                    Gmail - Fwd: Hospital Restrictions

I was made aware that you participated in recent committee meetings of the medical staff and recently at the hospital. After discussions with leadership and legal just wanted to provide a reminder of the restrictions during this period of transition. The spirit of the letter you received is that you would not be on site either participating in patient care or exercising any privileges associated with medical staff membership as those are currently supported by your employment. At such time that this transition period ends you can begin to engage in your medical staff privileges and whatever rights those afford you by the medical staff. I hope there wasn't any confusion surrounding this and hopefully this helps to clear anything up. Feel free to reach out with any questions.

**Vincent L. Sevier, MD, MBA, FACEP**

Senior Vice President & Chief Quality Officer

Methodist Hospitals

Gary and Merrillville, IN

219.886.4349 (office)

vsevier@methodisthospitals.org

"Quality means doing it right when no one is looking." -**Henry Ford**

**\*\*\* Disclaimer Notice:  This e-mail, and any attachments, are the legitimate intellectual property of The Methodist Hospitals, Inc and contain proprietary information which is intended only for dissemination to its intended recipients. Further, this e-mail may also contain Protected Health Information and related materials whose usage & disclosure is further governed by HIPAA and other federal regulations.  If you are not the intended recipient, be advised that any unauthorized use, disclosure, copying,**

6/7/2024                                Gmail - Fwd: Hospital Restrictions

distribution, or the taking of any
action in reliance on the
information contained herein is
strictly prohibited.  If you have
received this e-mail and are not
the intended recipient, you are
instructed to notify The
Methodist Hospital's IT Security
Department by forwarding the
inappropriately received email to
TDIAMOND@methodisthospitals.
org.***

 Gmail

Witherspoon Legal <witherspoonlegal@gmail.com>

## Fwd: Chief Medical Office Appointment

1 message

**Jennifer Dochee** <jddochee@gmail.com>
To: Witherspoon Legal <witherspoonlegal@gmail.com>

Thu, Oct 29, 2020 at 11:37 AM

Sent from my iPhone

Begin forwarded message:

> **From:** Alma Cappadora <ACAPPADORA@methodisthospitals.org>
> **Date:** July 10, 2020 at 10:38:14 AM CDT
> **To:** Alma Cappadora <ACAPPADORA@methodisthospitals.org>
> **Subject: Chief Medical Office Appointment**

From: Matt Doyle, Interim President and CEO

Date: July 10, 2020

RE: CHIEF MEDICAL OFFICER APPOINTMENT

I am pleased to announce the appointment of Dr. Vincent Sevier as Senior Vice President and Chief Medical Officer.

Dr. Sevier received a medical degree from the University of Illinois College of Medicine and completed an Emergency Medicine Residency at the William Beaumont Hospital in Royal Oak, MI. He has specialized in Emergency Medicine, Healthcare Administration and Health Informatics. Additionally, Dr. Sevier received his MBA from the University of Tennessee, Knoxville, TN. Dr. Sevier has served the hospital system as the Chief Quality Officer for the past four years. In his role as CMO, Dr. Sevier will advise and lead physicians on staff in supporting the mission and goals of The Methodist Hospitals.

Dr. Sevier will continue to work with senior leadership to help define the business strategy for the Methodist Physician Group and will now pick up the responsibility of overseeing the cardiovascular service line. He will continue to ensure compliance with all aspects of quality and safety for the healthcare system. His role also includes overseeing the implementation of innovative clinical programs to advance quality improvement and new models of care for best practices in medicine.

Join me in wishing Dr. Sevier every success in his newly defined role.

*** Disclaimer Notice:  This e-mail, and any attachments, are the legitimate intellectual property of The Methodist Hospitals, Inc and contain proprietary information which is intended only for dissemination to its intended recipients.  Further, this e-mail may also contain Protected Health Information and related materials whose usage & disclosure is further governed by HIPAA and other federal regulations.  If you are not the intended recipient, be advised that any unauthorized use, disclosure, copying, distribution, or the taking of any action in reliance on the information contained herein is strictly prohibited.  If you have received this e-mail and are not the intended recipient, you are instructed to notify The Methodist Hospital's IT Security Department by forwarding the inappropriately received email to TDIAMOND@methodisthospitals.org.***

Gmail - Fwd: Text April 14

 Gmail

Witherspoon Legal <witherspoonlegal@gmail.com>

**Fwd: Text April 14**
1 message

**Jennifer Dochee** <dochee5@icloud.com>                                                    Thu, May 27, :
To: Witherspoon Legal <witherspoonlegal@gmail.com>

Sent from my iPhone

Begin forwarded message:

**From:** Jennifer Dochee <dochee5@icloud.com>
**Date:** November 16, 2020 at 8:21:29 AM CST
**To:** Loretta Houston <lhouston@gary.gov>
**Subject: Text April 14**

Tue, Apr 14, 4:44 PM

Dr. Dochee
I wanted to reach out and thought a text would be best. I know you have some questions concerning your transition. I would like to afford you an opportunity to have all those questions answered so you're getting clear information. We would like to offer a call with the CEO and I over the next couple of days. Let me know how we can be of assistance.

Sevier



Sent from my iPhone



**ROETZEL**
ROETZEL & ANDRESS, A LEGAL PROFESSIONAL ASSOCIATION

30 N. LaSalle Street, Suite 2800
Chicago, IL 60602
Direct Dial 312.582.1682
PHONE 312.580.1200 FAX 312.580.1201
mbrohman@ralaw.com

WWW.RALAW.COM

July 17, 2020

**VIA EMAIL & U.S. MAIL**

mdoyle@methodisthospitals.org
Matthew Doyle
Chief Executive Officer
Methodist Hospitals
c/o Northlake Campus
600 Grant Street
Gary, IN 46409

Falzeidan@methodisthospitals.org
Fadi Alzeidan, M.D.
President of the Medical Staff
Methodist Hospitals
c/o Northlake Campus
600 Grant Street
Gary, IN 46409

woniah@methodisthospitals.org
Winfred Oniah, M.D.
Chair, DSQC
Methodist Hospitals
c/o Northlake Campus
600 Grant Street
Gary, IN 46409

kvenkat@methodisthospitals.org
Kumar Venkat, M.D.
Chief, Division of Medicine
Methodist Hospitals
c/o Northlake Campus
600 Grant Street
Gary, IN 46409

Re: Dr. Jennifer Dochee

Dear Methodist Hospitals Administrators:

This office has been retained by Dr. Jennifer Dochee with respect to the improper and completely unauthorized action of the Methodist Hospitals ("Hospital"), acting through its Medical Staff Quality Committee ("MSQC"), in restricting the staff and clinical privileges that Dr. Dochee has with the Hospital and requiring her to submit to unlimited proctoring. These actions are outlined in a July 9, 2020 letter authored by Dr. Kumar Venkat, the Chief of the Hospital's Division of Medicine. In taking such action, the MSQC exceeded its authority and the Hospital/MSQC completely disregarded the substantive and procedural rights granted to Dr. Dochee under the Bylaws of the Hospital Medical Staff ("Bylaws") and the Hospital's Rules and Regulations ("Rules"). Moreover, the timing the action is suspect and suggests that the entire purpose of the action was simply to avoid the economic competition between Dr. Dochee, now an independent cardiologist with staff privileges, with the cardiologists employed by Dr. Dochee's former employer, The Methodist Hospitals, Inc. ("MHI"). In this regard, it is of no coincidence that the letter was sent at approximately the same time that Dr. Dochee was set to

Methodist Hospitals Administrators
July 17, 2020
Page 2

begin her independent practice after the July 12, 2020 effective date of the no-cause termination of Dr. Dochee's employment with MHI.

Among the many improper and unauthorized acts taken by the Hospital/MSQC are:

1.     Through the MSQC's letter, the Hospital/MSQC is taking away Dr. Dochee's unlimited Interventional Cardiology privileges, Cardiovascular Magnetic Resonance privileges, CT Coronary Angiography and Cardiac CT privileges, Abdominal Femoral Angiography with interpretation privileges, Peripheral Vascular Interpretation privileges, Balloon Stent Arthrectomy and Thrombectomy privileges, Carotid and Central Angiography (not for aneurysm or tumor) privileges, and arrhythmia interpretation, diagnoses and treatment privileges.  All of these privileges were granted to Dr. Dochee by the Hospital's Credentials Committee, which is the only Hospital Committee authorized to grant or deny practitioner requests for staff and clinical privileges.  Moreover, staff and clinical privileges may only be limited or taken away by the Hospital's Medical Council and Board of Directors, and only then after a practitioner has been afforded the due process, hearing and appeal rights set forth in the Bylaws and Rules.  Dr. Dochee was afforded none of these rights prior to the unauthorized and improper acts of the MSQC.

2.     Through the MSQC's letter, the Hospital/MSQC tried to couch its action as a Focused Professional Practice Evaluation ("FFPE") action.  However, FFPEs are meant to be short-term, educational actions designed to help improve a practitioner's skills.  They are not meant to be punitive actions that result in reports to the National Practitioner Data Bank ("NPBD").  Here, there can be no serious dispute that the Hospital/MSQC's action against Dr. Dochee is strictly punitive and, thus, not a permissible FFPE action.  As noted, through the unauthorized action, the Hospital/MSQC is removing clinical privileges that have been granted to Dr. Dochee.  Moreover, the Hospital/MSQC is requiring unlimited proctoring of Dr. Dochee's procedures.  Both of these acts of punishment imposed by the Hospital/MSQC are reportable to the NPBD.  Indeed, in its letter to Dr. Dochee, the MSQC even acknowledged that the proctoring aspect of the punishment will be reported to the NPBD.

3.     While trying to hide under the FFPE umbrella, the Hospital/MSQC failed to follow the FFPE requirements set forth in the Hospital's own Bylaws.  For instance, the Bylaws specifically provide that "when issues are identified, communication to the provider must be clear and specific regarding what is wrong with the performance and what improvements are expected."  The MSQC's letter to Dr. Dochee contained no such specificity.  All it referenced was some unidentified "case summary" which allegedly identified unspecified issues with Dr. Dochee's clinical judgment or decision-making.  No meetings were held between representatives of the MSQC and Dr. Dochee.

4.     Consistent with the informal, educational purpose of FFPEs, the Hospital Bylaws note that to resolve performance issues, there should be a documented discussion between the practitioner and the Division Chief, a letter to the provider noting areas of improvement or recommendations for training.  Dr. Dochee vehemently denies that the procedures she has performed require FFPE review.  However, to the extent they have required such review, neither the Division Chief nor any member of the MSQC have discussed those procedures with her,

2

Methodist Hospitals Administrators
July 17, 2020
Page 3

noted areas of needed improvement, or offered recommendations for training. Hence, again the Hospital/MSQC failed to follow its own Bylaws with respect to the punitive action taken against Dr. Dochee.

5.     Moreover, according to the FFPE section in the Hospital's Bylaws, external review is required when there are an insufficient number of non-conflicted specialists available to do an internal review of the practitioner's work. The MSQC's letter failed to identify the individuals who allegedly reviewed Dr. Dochee's work. However, on information and belief, those reviewers (likely including MHI employees Dr. Harish Shah and Dr. Andre Artis) were competitors of Dr. Dochee who had conflicts of interest. Since there is no reference to any external review of Dr. Dochee's work, any conclusions of the MSQC are a complete sham and must be disregarded. This would be true even if the FFPE of the MSQC were legitimate, which, as set forth in items 2, 3 and 4 above, it is not.

6.     As noted above, through the MSQC's letter, many of Dr. Dochee's unlimited clinical privileges have been removed and she has been required to submit to unlimited proctoring. However, the MSQC has no authority to impose such punishment against Dr. Dochee. Instead, such punishment clearly constitutes corrective action. Article VI of the Bylaws identify the procedures that the Hospital must follow and the rights that must be given to a practitioner when corrective action is at issue. None of these procedures were followed by the MSQC, nor was Dr. Dochee provided with any of her required rights. For instance:

a.     Pursuant to Section 2(A) of Article VI, when there is a complaint about the performance or competence of a practitioner, the practitioner involved must be provided with a copy of the Bylaws and a copy of the complaint. No one from the MSQC or any other branch of the Hospital has provided Dr. Dochee with a copy of any complaint regarding her performance or competence.

b.     Pursuant to Section 2(B) of Article VI, the Division Chief is required to appoint a qualified preceptor to do a detailed review of the practitioner's work and to submit a report of that review, or to have the Chair of the Medical Council appoint a peer review committee to do a focused review of the practitioner's work. By all accounts, the MSQC did not have a preceptor review Dr. Dochee's work, nor did it have the Chair of the Medical Council appoint a peer review committee.

c.     Pursuant to Section 2(C) of Article VI, if either the preceptor or the peer review committee initiates an investigation into the practitioner's work, the practitioner is to be "notified that an investigation is being conducted" and is to be "given an opportunity to provide information" pertaining to the investigation. In violation of the Bylaws, Dr. Dochee has never been notified of any investigation pertaining to the items raised in the MSQC's letter, nor was Dr. Dochee ever given any opportunity to provide information in response to that "investigation."

d.     Pursuant to Section 2(D) of Article VI, external review should be utilized to promote "impartiality in peer review." By all accounts, any complaints pertaining to Dr. Dochee's performance were likely provided by or reviewed by her direct competitors. Thus, to

Methodist Hospitals Administrators
July 17, 2020
Page 4

the extent any review needed to have been conducted of her procedures, an external reviewer should have been utilized. There is no indication in the MSQC's letter that external review was utilized.

     e.     Pursuant to Section 3 of Article VI, among many other things, it is the exclusive and specific function of the Hospital's Medical Council to recommend "reduction, modification, suspension or revocation of clinical privileges" or to impose "requirements of co-admissions, mandatory consultation, or monitoring." By all indications in the MSQC's letter, it was the MSQC, and not the Hospital's Medical Council, that took away Dr. Dochee's unlimited clinical privileges and is requiring her to have a proctor for an unlimited period of time. In doing so, the MSQC not only improperly performed the functions of the Medical Council, it directly violated Dr. Dochee's substantive and procedural rights.

     f.     Where, as here, Hospital action results in corrective action against a practitioner, Article VII provides the practitioner with hearing and appeal rights. Dr. Dochee has improperly been denied any hearing and appeal rights with respect to the Hospital's/MSQC's removal of clinical privileged and order for unlimited proctoring.

     As you are no doubt aware, the Bylaws require a practitioner to exhaust the remedies afforded by the Bylaws before resorting to legal action. Here, however, there are no remedies for Dr. Dochee to exhaust because the Hospital/MSQC utterly and completely disregarded its own Bylaws in taking the action outlined in the MSQC's July 9, 2020 letter. Accordingly, Dr. Dochee hereby demands that the Hospital/MSQC rescind and void the items set forth in that letter and immediately restore Dr. Dochee's full staff and clinical privileges, without restriction or limitation. If such action is not taken by the close of business on July 24, 2020, Dr. Dochee will have no choice but to initiate legal proceedings against the Hospital, the MSQC and all individuals who participated in the clear violation of Dr. Dochee's rights under the Bylaws and Rules. Of course, if she is required to initiate such proceedings, Dr. Dochee will seek all legal and equitable remedies available to her, including punitive damages and legal fees.

     If you have any questions about this matter, please do not hesitate to contact me.

     Very truly yours,

     ROETZEL & ANDRESS, LPA

     Michael B. Brohman

MBB
cc:     Jennifer Dochee, M.D. (via e-mail at jddochee@gmail.com)

4

May 30, 2021

To Whom It May Concern:

I would like to write a letter in support of Dr. Jennifer Duchee and provide some prospective of the psychological affects she endured while she was at Methodist Hospital. Dr. Duchee and I meet while we were in residency training in Detroit, MI. From the start, Dr. Duchee excelled in her training and was thorough with the patients she treated. She pursued further training in Cardiology and later completed an additional fellowship in Interventional Cardiology.

When Jennifer stated at Methodist Hospital, she was very excited to be working the Cardiology group and she was hoping to establish her own practice with the hospital. However, I began to hear from Dr. Duchee about unprofessional conduct of her colleagues and co-workers. Dr. Duchee shared with me the terrible things that were said about her and the actions that were carried out to hamper her ability to effectively treat her patients. As a Psychiatrist, I would like to share what I observed as it relates to Dr. Duchee mental health. Dr. Duchee went through a significant period where mood was depressed. She became more hyperviligent as it related to her interactions with her colleages and this transitioned to increased anxiety for her. Dr. Duchee lost weight due to her lost of appetite and depressed mood. She would often cry when talking to be about how she was made to feel whenever she met with Methodist Administration and Chief Attending staff.

When Dr. Duchee was released from her contract the week in which she was to close on her house, her mental health condition declined even further. Dr. Duchee is a person of faith and she has a strong network friends. These factors are what helped her to get back on her feet and began to heal. I don't know who any healthcare provider could ever be successful in such a toxic working environment. Although these events were traumatic and debilitating for Dr. Duchee, she has come out on the other side stronger. She will continue to be the outstanding Interventional Cardiologist, which was something Methodist Hospital could not take away from her.

Thank you,

Larry Tyron Gaines, MD
ABPN Board Certified Psychiatrist
Illinois Department of Corrections
Elgin Treatment Center
750 South State Street
Elgin, IL 60123
(847)608-3056



**MEDICAL COLLEGE OF WISCONSIN**

June 4, 2021

Division of Transplant Surgery

To whom it may concern:

I am writing this letter on behalf of my friend and colleague, Jennifer Dochee, M.D., in order to provide insight into who she is and what she has had to endure.

I first met Dr. Dochee in 2011 at the end of my third year of residency, we became instant friends. I am a transplant surgeon and intensivist and we supported each other throughout our residencies and fellowships. We celebrated our first jobs and supported each other while studying for boards. When Dr. Dochee got the job at Methodist Hospital she was so excited. She worked very hard and in the beginning, she just loved it. The experience began to change and she was no longer enjoying her time. She became extremely stressed and was very down. She was stating that it was unfair how they were treating her and that she felt powerless against it.

The day she was let go was the around the same time she had signed for her house. This totally took her by surprise. She was extremely worried about how she would pay for her home. Why was she let go without warning? She was so sad, stressed, and discouraged that she began to lose weight and fell ill because of it. There wasn't anything that I could say to bring any comfort to her during this time. She lost the house and was all the way down. It seemed the walls were closing in on her and there was no way out. No matter how she tried to fight the depression it continued to take a hold. The trauma of this situation can't be measured. Thank goodness, she is trying to piece her life back together.

As a close friend and confidant, I unfortunately had a front row seat to the abuse, frustration, stress, depression, and weight loss that Dr. Dochee underwent as a result of the occurrences at Methodist Hospital. I have prayed and cried with her throughout this tumultuous experience and I would not wish this on anyone. I hope this letter sheds some light on what Dr. Dochee experienced through my eyes. If there is any further information that I can provide in her support, please do not hesitate to get in touch with me.

Respectfully,

Terra Pearson, MD
Transplant Surgery and Intensivist
Medical College of Wisconsin
(414)805-6400 (w)

Center for Advanced Care
2nd Floor Transplant Center
9200 W. Wisconsin Avenue
Milwaukee, Wisconsin 53226
(414) 805-6400
FAX (414) 805-4343

BELOIT HEALTH SYSTEM, INC.

PHYSICIAN EMPLOYMENT AGREEMENT

**THIS AGREEMENT** is made effective this 11th day of January 2021, by and between **BELOIT MEMORIAL HOSPITAL, INC.,** which will be known as **BELOIT HEALTH SYSTEM, INC.,** a Wisconsin nonstock, not-for-profit corporation located at 1969 West Hart Road, Beloit, Wisconsin 53511 (the "**System**") and Jennifer Dochee, M.D., a Physician who is duly licensed to practice medicine in the State of Wisconsin ("**Physician**").

R E C I T A L S

**WHEREAS,** the System operates an acute care hospital, an outpatient campus and, effective January 1, 2010, multiple physician clinics in Beloit, Wisconsin and the surrounding areas; and

**WHEREAS,** the System operates the physician clinics as part of the System (the "**Clinic Division**"); and

**WHEREAS,** Physician practices in the Specialty noted in Exhibit A and is licensed to practice medicine in the state(s) noted in Exhibit A, and is to be employed with the System under the terms and conditions stated in this Agreement; and

**WHEREAS,** to assure that quality inpatient and outpatient physician services will be available in the System's service area, the System desires to engage Physician to provide physician services in the Specialty noted in Exhibit A ("**Physician Services**"); and

**WHEREAS,** the System and its medical staff have approved this employment relationship as being in the interest of the public as prescribed by Wisconsin Statutes § 448.08(5).

**NOW, THEREFORE,** in consideration of the mutual promises and covenants contained in this Agreement, the parties hereby agree as follows:

1.  **EMPLOYMENT**.

    1.1.  **Offer and Acceptance**.  The System hereby employs Physician for an initial term of two (2) years commencing on March 15th, 2021 ("**Commencement Date**") and ending on March 30th, 2023 ("**Initial Term**").  This Agreement shall continue until terminated as provided in Section 5.1.

    1.2.  **Physician's Duties**.  The System hereby hires Physician to provide Physician Services to patients of the System, and other duties as reasonably required by the System. Physician shall perform Clinic and Community Call in his or her specialty, according to a schedule(s) established by the System from time to time with input from physician leadership, it being understood and agreed that such coverage shall be shared by the physicians (including Physician) within the same specialty.  Physician shall perform Physician Services hereunder according to a schedule established by Clinic from time to time.  Physician shall not engage in any other medical related

activity without the System's prior written consent. Any fees or compensation for the performance of outside services shall accrue to the System and be subject to the terms of the physician compensation plan.

1.3.    **Standard of Performance**.  Physician shall exercise Physician's own professional judgment in the provision of Physician Services, and shall do all things necessary and/or reasonably proper to provide and maintain quality patient care and services, all within the limits of his or her training and experience and at a generally recognized professional level of quality.

1.4.    **Referrals.**  The System reserves the right to direct or restrict Physician's referrals for other health care services ("**Referrals**") to another provider, practitioner or supplier, for Referrals made while Physician is acting under the terms of this Agreement, except as expressly provided below.  Any such direction or restriction by the System may be set forth in written policies or written directives, or may be given orally by System management.  Any direction or restriction by the System will comply with all applicable Federal, State and local laws and regulations, as amended from time to time, including without limitation, the federal Stark Law. Physician shall comply with such policies or directives unless the patient expresses a different preference, the patient's insurer requires a different referral, or Physician determines that the referral, as directed or restricted by the System, is not in the patient's best medical interests. This subsection shall not apply to services provided by Physician outside the scope of this Agreement.

1.5.    **Non-Disclosure of Confidential Information, Patient Information and Records.**  Physician may not, directly or indirectly, on his or her own behalf or on behalf of any other person, firm or organization, use, divulge, or disclose to any other person or entity, any System Confidential Information (defined below) unless, through no act or omission of Physician, the information is in the public domain, Physician is required by law to so disclose, or Physician has the permission of the System to so disclose.  The term "**Confidential Information**" means System trade secrets as defined by Wisconsin law, all System proprietary information, and information which the System designates as confidential.  Physician recognizes that all patient information and records are the property of the System, and that during and after the term of his or her employment, Physician may not use or reproduce such information or records except for the purpose of fulfilling Physician's obligations under this Agreement, for use in defending Physician for an alleged act of malpractice or as otherwise directed by the System.  Physician does not have any right to such information or records or to copies thereof except as may be required or permitted by law or by contract.

2.    **COMPENSATION**.  Physician shall be paid under the System's Physician Compensation Plan, as stipulated in Exhibit B.

2.1.    **Withholding and Deductions**

2.1.1. **Withholding.** The System shall deduct and withhold from any and all compensation paid to Physician, under Section 2 of this Agreement, all necessary employment and income taxes and any other sums required to be withheld by law from Physician's compensation.

2.1.2. **Deductions.** Physician acknowledges and agrees that the compensation provided in Exhibit B for Physician Services hereunder anticipates completion of charge tickets and patient medical records ("Records") consistent with the System's Coding Policy. Accordingly, Physician voluntarily requests and authorizes the System to make deductions from his/her paycheck(s) consistent with and in the amount(s) set forth in the System's then current Coding Policy, as amended from time to time, arising out of his/her failure to complete his/her obligations under such policy. Deductions may begin on the paydate following execution of this Agreement. Physician may object to a deduction made pursuant to this section by presenting a written objection to System's Vice President of Human Resources within ten (10) calendar days of the paydate on which the deduction was made. Physician acknowledges and agrees that nothing in this Section 2.1.2 limits the System's ability to take disciplinary or other action, as provided in the Agreement or by System policy, including but not limited to, termination. Nothing in this section shall be construed to be a measure of damages or to be liquidated damages for any breach of the Agreement by the Physician.

2.2. **Fringe Benefits.** As additional compensation for providing Physician Services, the System shall provide Physician with the employee welfare and retirement benefits offered by the System from time to time. These benefits are subject to modification or termination, provided the changes are applicable to other similarly situated physician employees of the System.

2.3. **Professional Liability Coverage.** The System will pay: Physician's professional liability insurance premiums, with an insurance carrier selected by the System in its sole discretion; Physician's assessment for participation in the Wisconsin Injured Patients and Families Compensation Fund ("**PCF**"), if applicable to Physician; and "tail coverage" at the time of termination or expiration of this Agreement, as long as Physician has not had any corrective action taken by System against him/her within six (6) months of termination date. Upon termination or expiration of this Agreement there may be refunds of prepaid premiums or prepaid assessments from the System's malpractice carrier, or the PCF. Physician agrees that any such refunds are the property of the System. If the refund is issued to Physician or in Physician's name, Physician shall immediately notify the System of such fact, and shall immediately endorse, forward and otherwise pay such refunds to the System.

3.    **OBLIGATIONS OF THE PHYSICIAN**.

3.1.   **Licensure and Memberships**.

3.1.1.   **State Licensure**.  Physician shall, during the duration of this Agreement, be duly licensed by the state(s) noted on Exhibit A, to practice medicine without restriction.  Physician agrees that continued unrestricted licensure in such state(s) is a condition of employment, unless otherwise expressly agreed by the System.  Physician shall provide current proof of licensure upon the System's request.

3.1.2.   **Board Eligibility**.  Physician shall comply with the System's Medical Staff Bylaws requirements regarding board eligibility.

3.1.3.   **DEA Registration**.  Physician shall obtain and maintain registration with the Drug Enforcement Administration ("**DEA**"), if applicable, without any limitation on his or her authority to prescribe drugs under such registration.

3.1.4.   **Medical Staff Membership**.  Physician must apply for, obtain and maintain active medical staff membership at the System's acute care hospital and apply for, obtain and maintain clinical privileges at the System's acute care hospital as may be necessary for Physician's practice, as determined by the System.  Physician must also comply with all medical staff bylaws, rules, regulations and policies.

3.1.5.   **HMO/IPPO/IPA Memberships**.  Physician must apply for, and obtain and maintain, membership in such health maintenance organizations, preferred provider organizations, individual practice associations and other managed care arrangements which the System may from time to time designate.

3.1.6.   **Medicare and Medicaid Participation**.  Physician shall be and remain eligible for reimbursement from the Medicare/Medicaid programs and shall accept and treat Medicare and Medicaid patients, and shall immediately notify the System in the event he or she is, for any period of time, excluded from, or is in any way sanctioned By, either program.  Physician shall also notify the System within five (5) days of the receipt of an initial sanction notice, notice of proposed sanction or of the commencement of a formal investigation, or the filing of charges, by a Medicare quality improvement organization (including but not limited to MetaStar, Inc.), the Department of Health and Human Services, or any law enforcement agency or health regulatory agency of the United States, the State of Wisconsin or the State of Illinois.

3.2.   **Professional Liability Insurance**.  Physician will at all times during his or her employment with the System cooperate fully with the System in all respects so as to allow the System to maintain professional liability insurance covering the System and Physician, under insurance policies issued by an insurer selected by the System, in its sole discretion and at rates acceptable to the System. Physician also

shall cooperate fully so as to allow the System to maintain the System's and Physician's participation in any required state or federal insurance or liability coverage program. Physician shall notify the System immediately upon cancellation or limitation for any reason of the insurance required under this Section.

3.3. **Physician Conduct**. Physician shall at all times during the course of his or her employment by the System:

   3.3.1. Comply with all of the System's policies that are applicable to physician employees, including by way of example only, the System Corrective Action Policy;

   3.3.2. Comply with the System's Medical Staff Bylaws and Medical Staff Rules and Regulations;

   3.3.3. Comply with all of the directives and instructions of the System's Board of Directors and executive leadership; provided, however, that this provision shall not be construed as limiting Physician's reasonable exercise of his/her professional judgment as allowed in Sections 1.3 and 1.4;

   3.3.4. Comply with all applicable Occupational Safety and Health Administration ("**OSHA**") regulations and standards;

   3.3.5. Physician acknowledges that his or her conduct at all times impacts patients' confidence in, and the reputation of, Physician and the System and, therefore, Physician shall not engage in any Misconduct, without regard to whether such Misconduct relates to Physician's responsibilities hereunder. "Misconduct" is defined to include, by way of example and without limitation, conduct which is determined by the System to be disruptive of any System function or operation, conduct that diminishes the System's or Physician's reputation in the community or conduct which is offensive, abusive, disruptive or unprofessional.

3.4. **Records and Reports**. The Physician shall on a timely basis prepare and cause to be submitted to the System such records, reports and information as the System may reasonably require, including by way of example only, timely completion and submission of all medical records and other supporting information necessary for the System to properly bill for Physician Services and for the System to maintain compliance with all applicable billing and reimbursement laws, rules and regulations.

3.5. **Physician Cooperation.** Physician shall cooperate with the System's efforts to provide timely, high quality and cost effective services to patients of the System, including by way of example only, the System's efforts at cost control, efficient use of resources, development of quality standards, development of care protocols, enhancement and functioning of peer review systems, and other System initiatives.

4.    **BILLING AND COLLECTION; OTHER OBLIGATIONS OF THE SYSTEM.**  The System will provide all necessary billing and collection functions for all services furnished by Physician pursuant to this Agreement, and accordingly:

4.1.    All receivables, payments and collections generated or resulting from Physician Services are, and will remain, the sole and exclusive property of the System;

4.2.    Physician acknowledges the System's right and power to endorse, cash, deposit or withdraw any and all notes, checks, cash, drafts, money orders or other commercial paper of any kind whatsoever which are advanced in payment or received in collection or settlement of any and all receivables; and

4.3.    Physician agrees not to bill any Medicare beneficiary, the Medicare Carrier or any other insurer for Physician Services to the System (Part A services), Physician Services to individual patients (Part B services) or for any other services performed on behalf of the System.  Physician shall comply with this billing prohibition and the terms of 42 C.F.R. Part 415.

5.    **TERMINATION.**

5.1.    **Termination.**  This Agreement will terminate if any of the following events occurs:

5.1.1.    Either party may terminate this Agreement at any time by giving at least one hundred twenty (120) days prior written notice to the other party of its intention to terminate the Agreement.

5.1.2.    Upon the death or disability of Physician, subject to the System's duty under the law to reasonably accommodate.  The parties acknowledge that it would constitute undue hardship for the System to provide an accommodation that leaves Physician still unable to safely perform Physician's patient care responsibilities.

5.1.3.    By Physician upon the System's breach or violation of the terms of this Agreement, provided that the System has been given written notice specifying the nature of the breach or violation and a period of at least twenty-one (21) days in which to cure such breach or violation but fails to cure or take reasonable steps to cure such breach during the notice period. If the violation is of the nature that cannot be cured, the System shall not be entitled to an opportunity to cure the breach.

5.1.4.    By the System upon Physician's breach or violation of the terms of this Agreement, provided that Physician has been given written notice specifying the nature of the breach or violation and a period of at least twenty-one (21) days in which to cure such breach or violation but fails to cure such breach·during the notice period.  If the violation is of the nature that cannot be cured, Physician shall not be entitled to an opportunity to cure the breach.

5.1.5. Notwithstanding the above, the System may immediately terminate Physician's employment upon Physician's failure to satisfy the obligations set forth in Section 3 above or Physician's violation of Section 4.3 above.

5.2. **Effect of Termination**.

5.2.1. **Medical Staff Privileges**. Except as provided hereunder, the Medical Staff membership and clinical privileges of Physician shall, at the option of the System, terminate concurrently with the termination of this Agreement. In the event medical staff privileges are terminated pursuant to this paragraph, the System and Physician agree that such termination will be deemed to be Physician's voluntary resignation of his or her medical staff privileges. The System and Physician agree that (i) the System has no duty to provide notice, hearing or review in the event the System elects to terminate the Medical Staff membership of Physician upon termination of this Agreement unless a matter is then pending before the Medical Staff in which case the normal review process will be applied to that matter, (ii) Physician hereby waives such notice, hearing or review unless a matter is then pending before the Medical Staff in which case the normal review process will be applied to that matter, (iii) the System shall not be liable for any liability or loss incurred by Physician resulting from Physician's voluntary termination of his or her Medical Staff membership and clinical privileges under this Section, and (iv) the System shall only report termination of Physician medical staff privileges to the National Practitioner Data Bank if expressly required by law or regulation.

5.2.2. **Cooperation Regarding Termination**. Physician shall cooperate with all requests to effectuate Physician's termination of employment, including but not limited to completing all medical records and charts. Physician agrees that the System may seek a refund for fees, dues, assessments and insurance coverages that will extend beyond Physician's employment. Physician agrees to reimburse the System for a pro rata amount (based on the number of months of benefit that will extend beyond Physician's employment) unless the third parties to whom such payments were made agree to refund the System directly. Physician shall also return all of the System's property to the System; and execute at the System's request all documents required to notify third parties (including patients) of Physician's termination, to receive any refund to which the System may be entitled, and to terminate any memberships which the System has paid on Physician's behalf, including but not limited to medical staff, managed care and professional memberships/associations.

5.2.3 **Termination Damages Failure to Provide Notice.** It is a material breach for Physician to terminate this Agreement after the Initial Term without providing one hundred twenty (120) days' prior written notice as required in Section 5.1.1. In the event this happens, it would be difficult to determine the actual damages suffered by the System, including recruitment fees to

find a replacement for Physician and loss of business. Forty Thousand Dollars ($40,000.00) is a reasonable estimate of the damages that would accrue if such a breach occurred. This amount of liquidated damages is fair and reasonable and would not act as a penalty to Physician. Physician hereby consents to the System's withholding of such amount from the Physician's payroll checks, including the final payroll check, subject to any minimum compensation laws. If there still exists an amount due and owing, Physician shall pay such amounts to the System immediately upon termination. The amount due will accrue interest at 12% per year from the date of termination of this Agreement until the amount is paid to the System in full. Physician acknowledges payment of these damages shall not release Physician of his or her contractual obligations under this Agreement.

5.2.4   **Notice Period Compensation.**

a) If the Agreement is terminated for any reason, the physician's compensation during their termination notice period, if applicable, shall be calculated as follows: BHS shall calculate the Physician's Anticipated Productivity Compensation for the termination notice period, as measured in terms of Work Relative Value Units ("wRVUs") earned in the previous three calendar months preceding termination for professional services personally performed and applied to the current year's Earned Professional Compensation program. The Physician's anticipated productivity compensation (draw) for the termination period shall be calculated by multiplying his or her expected Anticipated Productivity Compensation by 50%. The Physician's final earned compensation calculation will occur three weeks after the final termination date and be paid out on the next regularly scheduled payroll.

b) If a physician is on a compensation guarantee, the guarantee will be eliminated and compensation will be calculated as noted above in section 5.2.4a

**RESTRICTIVE COVENANT.**

5.3.   **History of Covenants.** Physician and the System acknowledge and agree that the restrictive covenants and remedies for violation thereof contained in this Section: (i) were required by the System as a condition to entering into this Agreement; (ii) were negotiated at arms' length between parties of equal bargaining strength; and (iii) are designed to protect the System from unfair competition by Physician as described in more detail below.

5.4.   **Acknowledgments.** The System represents, and Physician accepts, that the System and its other physician and non-physician employees have expended substantial time and resources to develop the System and its patient base. Physician recognizes that the System has significant ongoing obligations which have been assumed based on the assumption that Physician will be providing Physician Services on the System's

behalf. Finally, Physician agrees that performing Physician's Services on behalf of the System generates sufficient income to the System for the System to pay Physician's salary, bonuses and fringe benefits, as well as help cover the System's overhead expenses as they relate to Physician. For these reasons, the parties agree that if Physician left the employment of the System and competed with the System, the System's obligations would continue and the loss of revenue that Physician was generating would not be available to the System for approximately 18 months for a number of reasons, e.g., recruitment of a new physician to replace Physician, the costs and lost revenue associated with training the new physician, the delay in collecting for the new physician's services and the loss of some of the System's patients to the competing Physician.

Therefore, it is understood and agreed as follows:

5.4.1. **Noncompetition**. During any term of this Agreement, and for a period equal to the length of Physician's employment or eighteen (18) months, whichever is shorter, following the termination of this Agreement for any reason ("**Period of Noncompetition**"), Physician shall not, except as otherwise provided herein, provide Physician Services within the geographic areas defined in Exhibit C.

5.4.2. **Nonsolicitation**. In addition to the above, during the Period of Noncompetition, Physician shall not, either directly or indirectly, on his or her behalf or on behalf of any other person, firm or organization (other than the System) solicit or attempt to entice away from the System (i) the services of any of its employees; or (ii) any patients for whom Physician has performed Physician Services within the immediately preceding twelve months.

5.4.3. **Restrictions are Reasonable**. Physician understands, acknowledges and agrees that the System's remedies provided herein, if the covenants contained in this Agreement are violated, are reasonable, necessary and appropriate to protect the System and its employees, and are not a penalty.

5.4.4. **Injunction**. In addition to all other rights and remedies available to the System arising from or in relation to this Agreement, the System shall be entitled to compel the specific performance of this covenant and all of its terms, and obtain an injunction to enforce the terms, provisions and covenants of this Agreement or to prevent their breach by Physician.

5.5. **Enforcement and Waiver** In the event that the System is required to commence litigation to enforce any provision of this Section 0, Physician shall pay the System all costs of enforcement, dispute resolution and collection, including without limitation, reasonable attorneys' fees, unless the System is unsuccessful in its efforts to enforce those provisions. If the System institutes any action or proceeding to enforce the provisions of this Section 0, Physician hereby waives all claims or defenses that the System has an adequate remedy at law, and such Physician shall not

urge in any such action or proceeding the claim or defense that such remedy at law exists.

6.    **MISCELLANEOUS.**

6.1.    **Assignment**.  Neither party may assign this Agreement or any rights hereunder without the prior written consent of the other, except that the System may assign this Agreement to a successor or subsidiary organization.

6.2.    **Amendment**.  No modification, amendment or addition to this Agreement will be valid or enforceable unless in writing and signed by both parties.

6.3.    **Responsibility of Parties.**  Except as set forth in this Agreement, each party is responsible for all acts and omissions of itself and its employees and neither party agrees to indemnify the other party for those acts or omissions.  However, this provision does not constitute a waiver by any party of any right to indemnification, contribution, subrogation, or other remedy available to that party at law or in equity.

6.4.    **Authority to Contract**.  The System has full power and authority to bind Physician to provide Physician Services under the terms of any contract or agreement in which the System's Physicians are expected to provide such services, including, but not limited to, managed care contracts, and to execute any documents related thereto in the name of Physician.

6.5.    **Binding and Entire Agreement**.  This Agreement is the entire agreement and understanding of the parties and is binding on all parties, their legal representatives, successors and assigns except as otherwise stated herein.

6.6.    **Notice**.  All notices, demands and other communications which may or are required to be given hereunder, must be in writing and must be given either by personal delivery or by registered or certified mail and will be deemed to have been given when personally delivered or when deposited in the mail, postage prepaid, addressed to the residence of Physician or his or her legal representative or to the business address of the System, as the case may be, or to such other addresses either party may designate by written notice to the other party.

6.7.    **Confidentiality**.  Physician and the System agree and covenant not to disclose to anyone the salary, benefits, terms and conditions of this Agreement, or any information relating to this Agreement, without the express written consent of the other party.  The foregoing shall not apply to (i) any disclosure made for tax purposes or as required to be made, or allowed, by law, or (ii) any disclosure to Physician's or the System's legal counsel, financial advisor, tax accountant or advisor, and spouse.

6.8.    **Governing Law**.  The laws of the State of Wisconsin shall govern this Agreement.

6.9.    **Agreement Subject to Law**.  If any provision of this Agreement is illegal, invalid or unenforceable under present or future laws effective during the term of this Agreement, that provision shall be fully severable and this Agreement shall be

construed and enforced as if the illegal, invalid, or unenforceable provision had never comprised a part of this Agreement. The remaining provisions of this Agreement shall remain in full force and effect and shall not be affected by the illegal, invalid, or unenforceable provision or by its severance. Furthermore, in lieu of such illegal, invalid or unenforceable provision, this Agreement shall be reformed to include as a part of this Agreement a provision as similar in terms to the illegal, invalid or unenforceable provision as may be possible and still be legal, valid or enforceable.

6.10.  **Waiver**. Failure to insist upon full performance of the obligation or failure to exercise rights under this Agreement shall not constitute a waiver as to future defaults or exercise of rights.

6.11.  **Headings**. The Section and other headings contained in this Agreement and in the exhibits to this Agreement are included for the purpose of convenient reference only and shall not restrict, amplify, modify or otherwise affect in any way the meaning or interpretation of this Agreement or the exhibits hereto.

**IN WITNESS WHEREOF**, the parties have executed this Agreement as of the date first above written.

PHYSICIAN:                          SYSTEM:

Jennifer Dochee, M.D.                Timothy M. McKevett, President & CEO

-11-

## EXHIBIT A

## PHYSICIAN SPECIFIC INFORMATION

1) Name:               Jennifer Dochee, M.D.

2) Specialty:          Interventionalist Cardiologist

3) Licensed in:        __X__ Wisconsin

                       __X__ Illinois

4) Work Level:         Full time unless otherwise noted here:

## EXHIBIT B

## PHYSICIAN COMPENSATION PLAN

If any aspect of Physician's compensation shall include a fixed or guaranteed amount, such amount and the applicable time period shall be as set forth below:

Commencing as of the 15th day of March 2021 and continuing through the 30th day of March 2023, physician's compensation will be the greater of Six hundred thousand dollars ($600,000.00) per year; or the amount payable in accordance with the terms and conditions of the then current Physician Compensation Plan. All compensation will be paid in accordance of the current payroll procedures.

-13-

**EXHIBIT B**

| COMPENSATION PLAN FOR EMPLOYED PHYSICIANS |
| :---: |
| **Beloit Health System, Inc.** |

Beloit Health System, Inc. (**"BHS"**) intends to compensate its employed physicians at levels that are consistent with reasonable, fair market compensation for similar physician services, and that permit BHS to recruit and retain qualified physicians as necessary to meet the healthcare needs of the communities it serves. BHS seeks to achieve this result through the adoption and implementation of this physician compensation plan (the **"Plan"**), substantially as described below.

The Plan is neither intended nor anticipated to cause physicians to be rewarded for reducing or limiting medically necessary care. Moreover, in all cases, the Plan is intended to be construed and administered in such a manner as is compliant with all applicable federal and state laws.

BHS's employed physicians shall be compensated at all times according to the Plan then in effect. The employment agreements of all employed physicians shall incorporate the Plan by reference, and shall permit amendments or modifications of the Plan from time to time without need for consent from each employed physician. All such amendments or modifications shall be made pursuant to established governance processes in effect at that time. This plan will be re-evaluated and possibly modified to address future changes in laws and regulations regarding health care payment policy, reimbursement and related matters, if and as enacted.

Any and all compensation amounts paid pursuant to the Plan shall be subject to BHS's standard withholdings for applicable taxes and benefit contributions.

The Plan will be administered by BHS's executive leadership, including in particular the senior executive of BHS's Beloit Clinic division.

**I.    Total Practice Compensation**

Each physician's **Total Practice Compensation** shall mean his or her Professional Compensation (see Part II), plus any Administrative Stipend (see Part III) and/or Supervisory Stipend (see Part IV). Physicians receiving income from outside sources shall be subject to the provisions set forth in Part V. All employed physicians shall be subject to the cap set forth in Part VI, as well as the Transition Year guaranteed floor described in Part VII.

**II.    Professional Compensation**

Physicians employed by BHS shall be compensated for their professional services (**"Professional Compensation"**) under either the formula described in Part II.A. below or the fixed salary approach (for new recruits) set forth in Part II.B. below.

A.    **Formula-Eligible Physicians.** All physicians other than those described in Part II.B. below shall be compensated for their professional services pursuant to the formula

-14-

described below (the **"Formula"**).  The Formula operates based on two components, Annual Base and Earned Compensation.  Certain modifications will be made in the case of Hospitalists and Reduced Producers, as described below.

1.    **Annual Base:**  Each physician shall be paid an Annual Base.  Each physician's initial Annual Base shall be established as of the commencement of his or her employment (the **"Start Date"**).

As of each subsequent January 1st throughout the term of a physician's employment, the physician's Annual Base shall be adjusted by BHS; *provided, however*, if a physician's Start Date falls on or after July 1st in a calendar year, BHS in its discretion may determine to defer adjusting the physician's Annual Base until the subsequent January 1st.  Unless otherwise determined by BHS, adjustments to Annual Base shall be calculated using the following method:

(a)    BHS shall calculate the physician's anticipated productivity for the upcoming year, as measured in terms of Work Relative Value Units (**"wRVUs"**), as set forth by the Centers for Medicare and Medicaid Services for the year corresponding to the year of the Survey Data referenced in Part II.A.2(a) below.  The physician's anticipated productivity shall be based on his or her wRVU production in the prior year for professional services personally performed (in the case of partial years, on an annualized basis), but taking into consideration particular facts and circumstances that may be relevant for the upcoming year.

(b)    BHS shall calculate the physician's expected performance-based compensation by multiplying the physician's anticipated productivity times the applicable Compensation per wRVU rates for the upcoming year, as described below.

(c)    The physician's Annual Base for the upcoming year shall be calculated by multiplying his or her expected performance-based compensation by 90%.

BHS reserves the right to deviate from the above process in circumstances where other considerations may dictate (including via mid-year adjustments when and as necessary, based on unanticipated changes in production levels).  Such considerations may include a physician's work ethic and effort, market changes unique to a particular specialty, assignment of wRVUs for physician-performed professional services in those rare circumstances when a CPT code has not yet been assigned or survey data does not otherwise reflect such service, practice location, significance to strategic plan objectives, recruitment or departure of other physicians in that specialty, practice revenues and expenses, compliance with law or regulation, etc.

2.    **Earned Compensation:**  For each year, a physician's Professional Compensation will vary from his or her Annual Base based on his or her actual productivity during such year, as measured in wRVUs for professional services personally performed.

(a)   *Production Formula.* The specific modification shall be calculated based on a formula that multiplies wRVUs credited to the physician times a predetermined value per wRVU (**"Compensation per wRVU"**). Compensation per wRVU shall be established in three tiers corresponding to increasing levels of productivity, on a specialty by specialty basis, as set forth in tables attached hereto for each specialty. *Example (Internal Medicine, applicable to 2010):*

| Tier Level | wRVUs | Compensation per wRVU |
|---|---|---|
| Tier 1 | First 3,700 | $44.00 |
| Tier 2 | Next 3,200 | $50.00 |
| Tier 3 | Above 6,900 | $59.00 |

To ensure that BHS continues to pay compensation consistent with reasonable, fair market levels, the Compensation per wRVU rates set forth above shall be re-determined annually by BHS based on external survey data, along with other relevant considerations. Such survey data may consist of, *e.g.*, salaries and production data for the Midwest geographic area as published by the Medical Group Management Association (**"MGMA"**) on a specialty-by-specialty basis, or survey data from one or more other comparable sources recognized within the industry (herein, **"Survey Data"**). The adjusted Compensation per wRVU rates shall take effect as of January 1st of each calendar year during the term of the physician's employment (without need for amendment or modification of such physician's written employment agreement).

(b)   *Quarterly Bonus Payments.* Earned Compensation shall be calculated at the end of each calendar quarter of the year, on a year-to-date basis. Specifically, at the end of each calendar quarter, BHS shall calculate the total number of wRVUs credited to the physician on a year-to-date basis. To the extent that [the number of wRVUs multiplied by the appropriate Compensation per wRVU rates] exceeds [the amount of the physician's Annual Base paid on a year-to-date basis, plus any payments made for prior quarters of such calendar year (as applicable)], BHS shall pay to the physician the excess amount determined by the formula (the **"Quarterly Bonus Payment"**). Quarterly Bonus Payments shall be paid no later than sixty (60) days after the close of each calendar quarter.

If a physician is in a material deficit position on a year-to-date basis and BHS reasonably foresees that the physician will be unable to substantially erase the deficit by year-end, BHS may in its sole discretion

adjust such physician's Annual Base Salary and/or offset such physician's payments of Annual Base Salary for the remainder of the year as necessary to erase the deficit. In all circumstances, BHS shall exercise its discretion in this regard with the primary objective of minimizing the prospect that an individual physician may later find himself or herself in a repayment or recoupment situation posing a material financial hardship.

(c)    *Year-End Reconciliation*. At the end of the calendar year (or, in the case of termination or expiration of a physician's employment mid-year, as of the date of such termination or expiration), BHS shall perform a final reconciliation, multiplying the actual number of wRVUs credited to the physician during the calendar year (or portion thereof, as applicable) times the applicable Compensation per wRVU for such calendar year (**"Total Earned Compensation"**).

    (i)    If Total Earned Compensation exceeds the physician's Annual Base paid during the calendar year (or portion thereof, as applicable), the difference shall be referred to as **"Annual Production Bonus."** BHS shall compare the physician's Annual Production Bonus for the year to the sum of the Quarterly Bonus Payments made to the physician during the year.

       If the Annual Production Bonus exceeds the sum of the Quarterly Bonus Payments, BHS shall pay to the physician the excess within sixty (60) days following the close of the calendar year (or following the date of termination or expiration of the physician's employment, as applicable).

       If the sum of the Quarterly Bonus Payments exceed the Annual Production Bonus, BHS shall recoup the excess amount through offsets to the physician's Annual Base for the subsequent year. In the case of reconciliations performed upon termination or expiration of a physician's employment, BHS may in BHS's sole discretion recoup the excess from the physician, including (without limitation) via offsets to the physician's then-remaining payments of compensation hereunder.

    (ii)    If the physician's Annual Base exceeds his or her Total Earned Compensation, BHS may in BHS's sole discretion recoup the excess through an offset to the physician's Annual Base for the subsequent year. In the case of reconciliations performed upon termination or expiration of a physician's employment, BHS may in BHS's sole discretion recoup the excess from the physician, including (without limitation) via offsets to the physician's then-remaining payments of compensation hereunder.

3.    **Reduced Producers:** BHS recognizes that some of its employed physicians face personal circumstances (*e.g.*, family commitments, a desire to wind down in anticipation of retirement, etc.) that may cause their production to consistently fall below full-time levels. BHS values such physicians' experience, dedication and skills and seeks to reasonably accommodate their personal circumstances so as to ensure the continued availability of their services for the benefit of the local community. To achieve this, BHS shall compensate such physicians generally pursuant to the above formula, with modifications intended to recognize that such arrangements present certain economic and logistical challenges for BHS.

Specifically, the compensation of Reduced Producers shall be determined by applying a reduced Compensation per wRVU rate calculated for the particular specialty area. In each case, such reduced Compensation per wRVU rate shall be established at 90% of the Tier 1 Compensation per wRVU rate for the specialty. Such reduced rate shall be applied for all wRVUs produced by such physician.

In the future, Reduced Producer status may be applied to any physician whose wRVU production for two consecutive calendar quarters falls below the 25th percentile production levels for the physician's specialty, as published in the most recent Survey Data. Alternatively, if mutually agreed by such physician and BHS executive leadership, such physician may defer Reduced Producer status by agreeing to collaborate with BHS executive leadership for two additional calendar quarters for the purpose of evaluating the cause of such physician's low production levels; such collaboration may entail a work schedule established by BHS executive leadership, as well as other measures intended to enhance the physician's production levels. Upon completion of this process, if the physician's production levels have not risen above the 25th percentile, BHS executive leadership may in its discretion determine whether to cause such physician to be classified as a Reduced Producer, taking into consideration all relevant facts and circumstances.

In any case where a physician moves into Reduced Producer status, the modified Compensation per wRVU rate associated with Reduced Producer status shall be applied on a prospective basis only, starting after (i) the two calendar quarters triggering the change in status, or (ii) if applicable, the two calendar quarters during which the physician has collaborated with BHS executive leadership in an effort to enhance his or her production levels, as described above.

Once designated as a Reduced Producer, a physician shall not become eligible for the standard tiered approach unless and until such physician's wRVU production for two consecutive calendar quarters exceeds the 25th percentile production levels, based on then-current Survey Data as set forth above. In such cases, the physician will become subject to the standard tiered approach on a prospective basis only, starting after the two calendar quarters triggering the change in status.

4.    **Hospitalists:** BHS recognizes the unique circumstances faced by physicians employed as hospitalists insofar as their workload is unpredictable and, in many

respects, subject to considerations largely outside their individual control or influence. For that reason, hospitalists shall be compensated pursuant to the tiered formula described above, subject to a minimum guaranteed annual base salary amount. The guaranteed annual base salary amount shall be payable without regard to an individual hospitalist's wRVU production levels. The amount of such guaranteed annual base salary shall be determined by BHS executive leadership based on prevailing market conditions, community need, and other relevant facts and circumstances.

**B.**    **New Recruits.**  It is anticipated that BHS will establish and continuously implement a robust physician recruitment program as necessary to achieve physician staffing levels contemplated by its employed physician recruitment plan. In connection with the same, BHS may pay physicians signing bonuses, relocation expenses or other types of recruitment incentives, if and to the extent permitted in BHS's employed physician recruitment plan or other physician recruitment policies and procedures then in effect.

Employed physicians newly recruited to BHS, and without a prior established practice in the community, obviously will require a reasonable period of time in order to build their practices to full-time volume. In order to attract such physicians and provide them with appropriate compensation protections for a time period sufficient to accommodate such practice-building efforts, BHS generally shall compensate its newly-recruited employed physicians on a fixed salary basis, with such amounts to be determined by BHS executive leadership based on prevailing market conditions, community need, and other relevant facts and circumstances.  Such arrangement shall continue for a predetermined time period (*e.g.*, 12 to 24 months, depending on specialty) and shall be the greater of the guaranteed quarterly fixed salary or, the amount calculated when multiplied by the applicable Compensation per wRVU rates for such specialty.

## III.    Administrative Stipend

In consideration for a physician's administrative services, BHS shall pay such physician a stipend in a fixed annual dollar amount. The payment of such amount shall be premised on the mutual agreement that such physician shall devote a predetermined number of hours per week to the rendering of such administrative services. The physician shall submit time records to BHS on a monthly basis certifying the number of hours spent providing such services in the previous month. Such documentation shall be sufficiently detailed to permit identification of the specific administrative services provided, the date on which such services were provided, and the number of hours involved.

Services as a member of the board, any board committees or the Physician Operations Committee are not compensable administrative services.

All administrative services arrangements, and corresponding stipends, shall be established by and maintained under the oversight of BHS executive leadership.

## IV.    Supervisory Stipend

If a physician supervises one (1) or more Nurse Practitioners (**"NPs"**) or Physician Assistants (**"PAs"**), the implications of such arrangement shall be as follows.

If the NP or PA does not separately bill for professional services, the supervising physician shall be charged the cost of such NP or PA's salary and benefits, with such amounts deducted from the physician's Total Practice Compensation.

If the NP or PA separately bills for professional services, the supervising physician shall be compensated at fair market value for his or her time and effort expended in such supervision. In such cases, BHS shall pay to the physician a predetermined fixed dollar stipend per year (prorated for any partial year). The supervising physician shall *not* be assigned or otherwise receive credit for the wRVUs produced by his or her supervised NP or PA; rather, such wRVU production shall be assigned to the NP or PA and considered in establishing the compensation of the latter.

All supervisory arrangements, and corresponding stipends, shall be established by and maintained under the oversight of BHS executive leadership.

## V.    Non-Practice Revenue

All payments not directly resulting from the provision of professional patient care services or from administrative or supervisory services on behalf of the Clinic (including, *e.g.*, deposition fees, expert witness fees, honoraria for speeches or papers, medical director fees, payments from pharmaceutical companies, part-time employment, self-employment and the like, referred to as **"Non-Practice Revenues"**), if and to the extent that such outside activities are expressly permitted pursuant to physician employment agreements, must flow through BHS. BHS shall pay such Non-Practice Revenues to the physicians earning such amounts only if and to the extent that such amounts, when added to a physician's Total Earned Compensation (as defined above), exceed such physician's Annual Base.

## VI.    Annual Cap on Compensation

BHS shall apply a cap to each physician's Total Practice Compensation (including Non-Practice Revenue, if any) at a level equal to one and one-half (1.5) times the ninetieth percentile (90th percentile) for the most recent Survey Data. If a physician's compensation hits or is reasonably anticipated to hit the cap, such physician's performance and compensation shall be subject to review by BHS executive leadership as necessary to confirm all of the following:

(i)     The accuracy and integrity of the physician's production data;

(ii)    That the physician's high production has not resulted in declines in clinical quality or patient satisfaction; and

(iii)   That the Total Practice Compensation to be paid pursuant to the Plan (as described above) continues to reflect reasonable, fair market levels based

on all the facts and circumstances (including, if determined to be necessary or appropriate, through consultation with an independent compensation consultant).

If BHS executive leadership successfully confirms all of (i) through (iii) above, the physician may be paid all amounts earned pursuant to the formula set forth in the Plan, including those amounts exceeding the cap.

\* \* \* \* \* \* \* \* \*

## EXHIBIT C

## NON-COMPETE TERRITORY RESTRICTIONS

**Pursuant to Section 5.4.1, Physician is prohibited from providing Physician Services in the geographic areas as set forth below during the Period of Noncompetition:**

The area that is defined as within 25 miles from any System facility where Physician has conducted at least 25% of his or her practice activities, as measured by patient encounters, within the 12 months immediately preceding the termination or expiration of this Agreement.

**PROMISSORY NOTE**

Amount: $25,000.00                                        Date: March 15, 2021

For value received, the undersigned, as maker, promises to pay to the order of Beloit Health System, Beloit, Wisconsin, the sum of $25,000.00 with interest thereon from this date until all amounts due hereunder are paid in full, at the mid-term applicable federal interest rate per annum, as published by the IRS for the month of the date of this Promissory Note, using the chart which states the applicable federal rates used for purposes of section 1274(d) of the Internal Revenue Code, payable in annual installments of principal and interest amortized over a five (5) year term, the first payment being due twelve (12) months following the date Maker commences employment with Beloit Health System and succeeding payments being due on the same day of each succeeding year thereafter until five (5) years from employment date, when the entire remaining balance, including principal and accrued interest, shall be immediately due and payable.

If Maker is providing medical services with Beloit Health System, when the first payment of this Note is due, then the payment to be made at such time, including all accrued interest thereon, shall not be made but instead shall be forgiven. Further, if Maker is providing medical services with Beloit Health System when the remaining payment(s) of this Note are due, the respective annual payment then called for, including all accrued interest thereon, shall not be made but instead be forgiven. If, Maker's employment with Beloit Health System terminates for any reason at any time prior to completion of five (5) full years of employment, all amounts remaining due on this Note as of the termination date will become due and payable immediately.

If Maker fails to commence employment with Beloit Health System, all amounts advanced to Maker, together with accrued interest, are immediately due and payable.

Maker promises to pay all costs of collection, including reasonable attorney fees, if this Note is not paid according to the terms hereof and the payments are not otherwise waived.

Proceeds of this Promissory Note will be paid to Maker when employment commences.


_____

Jennifer Dochee, MD

*Effective:  5/5/2008*
*Revised:   11/3/2008, 5/4/2009, 12/7/2009, 7/12/2010, 6/6/2011, 1/9/2012, 7/9/2012, 11/5/2012,*
*1/7/2013, 12/2/2013, 6/2/2014, 12/1/2014, 6/6/2016,10/3/2016,11/7/2016, 1/4/2017, 6/5/2017,*
*12/4/2017, 7/9/2018*

# BYLAWS
# OF THE MEDICAL STAFF
# OF THE METHODIST HOSPITALS, INC.

## PREAMBLE

The Medical Staff recognizes it is responsible for the quality of medical care in each hospital and must accept and discharge this responsibility subject to the ultimate authority of the Board of Directors of The Methodist Hospitals, Inc.

Therefore, in order to properly fulfill the requirements of the Medical Staff, the members of the Medical Staff organize themselves in conformity with these Bylaws.

## DEFINITIONS

A.    The term "Medical Staff of The Methodist Hospitals, Inc" or "Medical Staff" means the organization of all medical and osteopathic physicians holding valid Indiana licenses, duly licensed dentists, and podiatrists granted membership in the Medical Staff, which serves both hospitals of The Methodist Hospitals.

B.    The term "Governing Body" or "Board" means the Board of Directors of The Methodist Hospitals, Inc., which is individually responsible for the operation of hospital facilities in Gary and Merrillville.

C.    The term "Methodist Hospitals, Inc.", or "Hospital" shall mean the not-for-profit corporation which individually operates hospital facilities in Gary, Indiana (Northlake Campus) and Merrillville, Indiana (Southlake Campus).

D.    The term "In Good Standing" shall mean a member has met the attendance requirements of the bylaws and is not in arrears in dues payments, is currently not under suspension or serving with any limitation of clinical privileges or voting or other prerogatives imposed by operation of the bylaws, rules and regulations or policy of the medical staff.

E.    The term "Clinical privileges" or "Privileges" means the specifically delineated rights granted to a practitioner by the Board of Trustees, consistent with these Bylaws, to render professional diagnostic therapeutic, medical, dental, podiatric or surgical treatment in the hospital, and includes all reasonable and appropriate access to those hospital resources (including equipment, facilities and hospital personnel) which are necessary to effectively exercise those privileges.

*Effective: 5/5/2008*
*Revised: 11/3/2008, 5/4/2009, 12/7/2009, 7/12/2010, 6/6/2011, 1/9/2012, 7/9/2012, 11/5/2012, 1/7/2013, 12/2/2013, 6/2/2014, 12/1/2014, 6/6/2016,10/3/2016,11/7/2016, 1/4/2017, 6/5/2017, 12/4/2017, 7/9/2018*

F.      The term "Investigation" means a process specifically instigated by the Medical Council to determine the validity, if any, to a concern or complaint raised against a medical staff member or individual holding clinical privileges, and does not include activity of the Practitioner Impairment Committee.  (11/3/2008)

G.      The term "preceptor" means a medical staff member appointed by the Division Chief to provide assistance and direction to another Division member for a stated number of cases or days and to report to the Division Chief on the member's continued qualification for privileges.

H.      The term "monitor" means to observe and evaluate compliance with a therapeutic program or plan of correction imposed as part of corrective action under these Bylaws.

I.      The term "triad" means the President of the Medical Staff, the President of the Corporation and the Chief of the Division to which the subject member is assigned.

J.      The term "substantial evidence" means a preponderance of the evidence; that is, the evidence supporting the allegation, issue, recommendation or matter asserted outweighs the evidence offered against it, and demonstrates that the allegation, issue, recommendation or matter asserted is more probably true than not true.

## ARTICLE I
## MEDICAL STAFF MEMBERSHIP

**Section 1:     Nature of Membership**

No practitioner, including those in a medical administrative position by virtue of a contract or employment with the hospital, shall admit patients in the hospital unless he/she is a member of the Medical Staff or has been granted temporary privileges in accordance with the procedures set forth in these Bylaws. Membership in the Medical Staff shall confer only such clinical privileges and prerogatives as have been granted in accordance with these Bylaws.

Healthcare providers who are not members of the Medical/Allied Health Staff, and/or have no privileges at the Hospital may refer patients to the Hospital for outpatient therapy and/or the performance of outpatient diagnostic procedures if they hold an Indiana License and are not excluded from any federally funded governmental health care program, including but not limited to Medicare and Medicaid.

Since the Methodist Hospitals, Inc. is comprised of two hospital campuses (Northlake and Southlake); all Medical Staff members who admit patients must make arrangements for coverage of their patients at each hospital campus.

*Effective: 5/5/2008*
*Revised:  11/3/2008, 5/4/2009, 12/7/2009, 7/12/2010, 6/6/2011, 1/9/2012, 7/9/2012, 11/5/2012,*
*1/7/2013, 12/2/2013, 6/2/2014, 12/1/2014, 6/6/2016,10/3/2016,11/7/2016, 1/4/2017, 6/5/2017,*
*12/4/2017, 7/9/2018*

All medical staff members are entitled to communicate with the Board of Directors. The member(s) should discuss the concern with the President of the Medical Staff who will consult with the Chairman of the Board to ensure contact with the Board of Directors or an individual Board member.

**Section 2:    Qualifications for Membership**

A.    Only medical and osteopathic physicians, dentists and podiatrists licensed to practice in the State of Indiana who can document their background, experience, training, character, education, judgment, demonstrated competence, adherence to the ethics of their profession, adequate physical and mental health status, and ability to work with others with sufficient adequacy to assure the Medical Staff and the Governing Body that any patient treated by them in the Hospital will be given a high quality of medical care shall be eligible for membership on the Medical Staff.

B.    Acceptance of membership on the Medical Staff shall constitute the staff member's agreement to strictly abide by the Principles of Medical Ethics of the American Medical Association, the American Osteopathic Association, the Code of Ethics of the American Dental Association or by a similar statement of ethical conduct by other appropriate professional association, and by the Bylaws, Rules and Regulations, and Policies of the Medical Staff.

C.    The applicant for Medical Staff membership must be a graduate of an accredited medical, osteopathic, dental or podiatric school and as of 8/1/83, shall have completed formal training, approved residency appropriate to applicant's area of practice and/or have been in active practice for a period of not less than five (5) years.

An Emergency Medical Resident, in the final year of accredited residency training, may apply for membership to the Associate Staff, with restricted privileges, in the Ambulatory Care Section of the Division of Emergency/Ambulatory Care Services.

D.    All members shall comply with the financial responsibility requirements of the Indiana Medical Malpractice Act, and shall "qualify" pursuant to the provisions of the Indiana Medical Malpractice Act, as amended from time to time, unless their clinical activities are covered by the Federal Tort Claims Act.

E.    No person shall be entitled to Medical Staff membership solely because that person holds a certain degree, is licensed to practice in this or in any other state, is a member of any professional organization, is certified by any clinical board, or because such person had, or presently has, staff membership or privileges at another health care facility. Medical Staff membership or clinical privileges shall not be conditioned or determined on the basis of an individual's participation or non-participation in a particular medical group, IPA, PPO, PHO, hospital-sponsored foundation, or other organization or in contracts with a third party which contracts with this hospital.

*Effective: 5/5/2008*
*Revised:   11/3/2008, 5/4/2009, 12/7/2009, 7/12/2010, 6/6/2011, 1/9/2012, 7/9/2012, 11/5/2012,*
*1/7/2013, 12/2/2013, 6/2/2014, 12/1/2014, 6/6/2016,10/3/2016,11/7/2016, 1/4/2017, 6/5/2017,*
*12/4/2017, 7/9/2018*

F.    If requested by the Medical Council, the Chief of the Division, or the <u>Practitioner</u> Impairment Committee for the purpose of ascertaining health status, a Medical Staff member or privileges holder must provide the results of a medical or psychiatric evaluation made by two (2) physicians, one (1) selected by the physician and the other by the Medical Council.

G.    Medical staff membership and clinical privileges shall only be determined using criteria furthering the quality of health care, treatment and services provided at the Medical Center, consistent with these Bylaws. Economic credentialing shall not be implemented at Methodist Hospitals.

H.    Completion of History and Physical Examinations

A medical history and physical examination must be completed no more than 30 days before or 24 hours after admission or registration, but prior to surgery, an interventional diagnostic procedure, or a procedure requiring anesthesia services. The Medical history and physical examination must be completed and documented by a physician, or other qualified licensed individual in accordance with state law and hospital policy. An updated examination of the patient,  including any changes in the patient's condition, must be completed and documented within 24 hours after admission or registration, but prior to surgery, an interventional diagnostic procedure, or a procedure requiring anesthesia services, when the medical history and physical examination is completed with 30 days before admission or registration. The updated examination of the patient, including any changes in the patient's condition, must be completed and documented by a physician, or other qualified licensed individual in accordance with state law and hospital policy.

**Section 3:    Nondiscrimination**

No aspect of medical staff membership or particular clinical privileges shall be decided on the basis of sex, race, age, creed, color or national origin, handicap or other considerations not impacting the applicant's ability to discharge the privileges for which he/she has applied.

**Section 4: Harassment**

Harassment by a medical staff member against any individual (e.g., against another medical staff member, house staff, hospital employee, or patient on the basis of race, religion, color, national origin, ancestry, physical disability, mental disability, medical disability, marital status, sex or sexual orientation shall not be tolerated. "Sexual harassment" is unwelcome verbal or physical conduct of a sexual nature which may include verbal harassment (such as epithets, derogatory comments, or slurs), physical harassment (such as unwelcome touching, assault, or interference with movement or work) and visual harassment (such as the display of derogatory cartoons, drawings, or posters.)

*Effective:  5/5/2008*
*Revised:   11/3/2008, 5/4/2009, 12/7/2009, 7/12/2010, 6/6/2011, 1/9/2012, 7/9/2012, 11/5/2012,*
*1/7/2013, 12/2/2013, 6/2/2014, 12/1/2014, 6/6/2016,10/3/2016,11/7/2016, 1/4/2017, 6/5/2017,*
*12/4/2017, 7/9/2018*

Sexual harassment also includes unwelcome advances, requests for sexual favors, and any other verbal, visual, or physical conduct of a sexual nature when (1) submission to or rejection of this conduct by an individual is used as a factor in decisions affecting hiring, evaluation, retention, promotion, or other aspects of employment; or (2) this conduct substantially interferes with the individual's employment or creates an intimidating, hostile or offensive work environment. Sexual harassment also includes conduct which indicates that employment and/or employment benefits are conditioned upon acquiescence in sexual activities.

Section 5:  Terms of Appointment:

All initial appointments to any staff category, where clinical privileges are granted, will be for a provisional period of not less than one year, or more than two (2) years.  At the end of the first provisional year, if the practitioner's clinical activity is insufficient to complete the Focused Professional Performance  Evaluation (FPPE), an automatic one (1) year extension will be granted.  Practitioners may exercise clinical privileges within their specialty, which were granted by the Board of Directors.

During the provisional period, members may not serve as Chairman of a Committee, Medical Staff Officer or Division Chief.

## ARTICLE II
## CATEGORIES OF MEMBERSHIP

Every member's staff category shall be determined when membership is initially granted and again at membership renewal. No member may be assigned to more than one staff category.

**Section 1:    Active Medical Staff**

The Active Medical Staff shall consist of medical and osteopathic physicians, dentists and podiatrists who regularly admit to the hospital, or are otherwise regularly involved in at least five (5) patient contacts, annually, and who are capable of providing continuous care to their patients.

A patient contact is defined as an inpatient admission or consultation or follow-up, and evaluation and treatment of an emergency department patient, an inpatient or outpatient surgical procedure, or a diagnostic procedure interpretation at the Hospital.  Pursuant to individual request and presentation of sufficient documentation, the Medical Council reserves the right to establish certain additional patient care activities as meeting the patient contact requirement.

A.    Requirements for advancement to Active Staff category shall include but are not limited to:

    1.    Must complete two (2) years of service on the Associate Staff.

Effective: 5/5/2008
Revised: 11/3/2008, 5/4/2009, 12/7/2009, 7/12/2010, 6/6/2011, 1/9/2012, 7/9/2012, 11/5/2012,
1/7/2013, 12/2/2013, 6/2/2014, 12/1/2014, 6/6/2016,10/3/2016,11/7/2016, 1/4/2017, 6/5/2017,
12/4/2017, 7/9/2018

        2.      Shall establish a record indicating satisfactory competence.

        3.      Shall be encouraged to attend fifty percent (50%) of the Medical Staff and Division meetings.

B.     Responsibilities of members of the Active Medical Staff include, but are not limited to:

        1.      Shall be encouraged to attend no less than fifty percent (50%) of the Medical Staff and Clinical Division meetings. If sixty-five (65) or older, a member is excused from the responsibility of committees but is encouraged to attend Medical Staff and Clinical Division meetings.

        2.      Shall serve on at least one (1) committee if assigned by the President of the Medical Staff. Resignation from committee(s) will only be granted in exceptional circumstances and must be submitted in writing to the President of the Medical Staff and the Committee Chairman for consideration.

        3.    a.    Shall maintain responsibility for daily acute care hospital rounds and a current patient record including the initial history and physical, working diagnosis, objectives and plans for care and progress notes daily excluding sub-acute units, and other chronic care units. Any physician involved in the patient's care can fulfill the requirements for daily rounds and daily progress notes. Allied Health Staff affiliates are permitted to perform the history and physical as part of the supervising/delegating physician-employer privileges when the Medical Staff Rules and Regulations, state laws, regulatory, and professional practice acts allow. These must be countersigned.

                b.    Shall provide the Chief of Service with the name of an alternate with comparable privileges to manage patients when the medical staff member is out of town or not available to make hospital rounds. Members of the Divisions of Anesthesia, Emergency/Ambulatory Care, Pathology, and Radiology do not require Alternates.

                c.    Shall complete the medical record as provided in the Rules and Regulations.

        4.      Shall meet the requirement of continuing education as required in these Bylaws. This requirement may be satisfied by: attendance at Hospital educational programs; service as an instructor; faculty member; program participant at continuing education programs in member's field of interest. The member is responsible for the educational record in his/her file.

*Effective: 5/5/2008*
*Revised:   11/3/2008, 5/4/2009, 12/7/2009, 7/12/2010, 6/6/2011, 1/9/2012, 7/9/2012, 11/5/2012,*
*1/7/2013, 12/2/2013, 6/2/2014, 12/1/2014, 6/6/2016,10/3/2016,11/7/2016, 1/4/2017, 6/5/2017,*
*12/4/2017, 7/9/2018*

Hospital may document proof of attendance in a variety of ways, including the following:

-An attestation statement by the practitioner wherein he or she attests to participation in a CME program with proof of attendance available upon request.
-Obtaining a copy of all the program certificates that the practitioner has attended within a specified timeframe.
-Obtaining a copy of the log-information submitted with a license renewal when CMEs are required by the practitioner's state licensing body.

Physicians actively engaged in an accredited Fellowship Program may use the program to substitute for CME requirements until the program is complete.

Practitioners who do not meet the CME requirement at the time of reappointment will be given one additional year to comply.  At the end of that first year, if the CME deficiencies are not met, the practitioner will be given an additional 90 days to comply and a certified letter will be sent indicating that if not met within this time frame, they will be placed on involuntary leave of absence until the deficiency is cleared.

5.    May seek and hold elected offices of the Medical staff.

6.    Shall maintain active dues and assessment status.

7.    Shall be responsible for on call coverage as provided by medical staff policy unless over age sixty (60).

8.    Shall serve as a preceptor when requested.

9.    Shall maintain practice within the Hospital service area as it is defined by the Board of Directors.

10.   Shall comply with the financial responsibility requirements of the Indiana Medical Malpractice Act, and shall "qualify" pursuant to the provisions of the Indiana Medical Malpractice Act, as amended from time to time.

C.   Prerogatives of members of the Active Medical Staff include, but are not limited to:

1.    Attend and vote at meetings of the Medical Staff and of the Division and committees of which they are members.

2.    Vote in elections for Elected Officers and Division Chiefs.

*Effective: 5/5/2008*
*Revised:   11/3/2008, 5/4/2009, 12/7/2009, 7/12/2010, 6/6/2011, 1/9/2012, 7/9/2012, 11/5/2012,*
*1/7/2013, 12/2/2013, 6/2/2014, 12/1/2014, 6/6/2016,10/3/2016,11/7/2016, 1/4/2017, 6/5/2017,*
*12/4/2017, 7/9/2018*

3.      Be eligible to serve as medical staff officers.

**Section 2:      Associate Medical Staff**

A.      The Associate Medical Staff shall consist of newly appointed members of the Medical Staff.  The intent of the Associate classification is to provide a provisional period, of up to two one year terms, during which time the member will regularly admit patients to the Hospital, will demonstrate clinical performance and competence and will be properly oriented to the Hospital and Medical Staff.

Upon completion of this provisional period, the practitioner may be promoted to the Active Staff if the quality of his/her practices so warrants. If, for any reason, a practitioner is not promoted to the Active Staff, his/her membership automatically will expire after two (2) years from the date of his/her Associate Staff membership commenced.

Membership in the Associate Staff shall be made upon completion of an application for Medical Staff membership and delineation of privilege forms(s), favorable review by the Credentials and Professional Standards Committee and Medical Council and action by the Board of Directors.

B.      Associate Staff members:

1.      Shall provide the Division Chief with the names of an alternate with comparable privileges to manage patients when the medical staff member is out of town or not available to make hospital rounds.  Members of the Divisions of Anesthesia, Emergency/Ambulatory Care Pathology, and Radiology do not require Alternates.

2.      Shall maintain responsibility for daily acute care hospital rounds and a current patient medical record including the initial history and physical, working diagnosis, objectives and plans for care and progress notes daily excluding sub-acute units, and other chronic care units.  Any physician involved in the patient's care can fulfill the requirements for daily rounds and daily progress notes.

Allied Health Staff affiliates are permitted to perform the history and physical as part of the supervising/delegating physician-employer privileges when the Medical Staff Rules and Regulations, state laws, regulatory and professional practice acts allow.  These must be countersigned.

3.      Shall actively participate at least one (1) Medical Staff committee if assigned by the President of the Medical Staff.  Resignation from committee(s) will only be granted in exceptional circumstances and must be submitted in writing to the President of the Medical Staff and the Committee Chairman for consideration.

Effective: 5/5/2008
Revised: 11/3/2008, 5/4/2009, 12/7/2009, 7/12/2010, 6/6/2011, 1/9/2012, 7/9/2012, 11/5/2012, 1/7/2013, 12/2/2013, 6/2/2014, 12/1/2014, 6/6/2016,10/3/2016,11/7/2016, 1/4/2017, 6/5/2017, 12/4/2017, 7/9/2018

4.   Shall pay medical staff dues and assessments.

5.   Shall be responsible for on call coverage as provided by medical staff policy unless over age sixty (60).

6.   Shall be encouraged to maintain fifty percent (50%) attendance at Medical Staff and Division meetings. The Associate Staff member will have one (1) vote at such meetings.

7.   Not withstanding anything contained herein to the contrary, only second- year Associate Staff members are eligible to vote for Elected Officers and Division Chiefs.

8.   Shall meet the requirement of continuing education as required in these Bylaws. This requirement may be satisfied by attendance at Hospital educational programs; service as an instructor; faculty member, program participant at continuing education programs in member's field of interest. The member is responsible for the educational record in his/her file.

     Practitioners who do not meet the CME requirement at the time of reappointment will be given one additional year to comply. At the end of that first year, if the CME deficiencies are not met, the practitioner will be given an additional 90 days to comply and a certified letter will be sent indicating that if not met within this time frame, they will be placed on involuntary leave of absence until the deficiency is cleared.

9.   Shall cooperate with any preceptor assigned. The Division Chief will assign a preceptor from the Active Staff when the Division chief finds there may be a question or concern regarding performance of an Associate Medical Staff member. The preceptor will provide assistance and direction for a stated number of cases or days as needed for up to one year with the option of additional preceptoring if needed. Written reports will be required from preceptors at the conclusion of the preceptoring period and at any earlier determination by the preceptor or request of the Division Chief.

10.  At the end of one year, or sooner if he/she determines is appropriate, the Division Chief will assess the Performance Improvement report and any Preceptor report and if the report is satisfactory, may recommend Active Staff membership if appropriate or continuation to complete a two-year provisional membership without further preceptoring or, if the Medical Staff member requires further preceptoring, or the Division chief makes an adverse recommendation, a report with this recommendation will be made to the PIOC of the Division, with a copy

Effective: 5/5/2008
Revised: 11/3/2008, 5/4/2009, 12/7/2009, 7/12/2010, 6/6/2011, 1/9/2012, 7/9/2012, 11/5/2012,
1/7/2013, 12/2/2013, 6/2/2014, 12/1/2014, 6/6/2016,10/3/2016,11/7/2016, 1/4/2017, 6/5/2017,
12/4/2017, 7/9/2018

to the Credentials & Professional Standards Committee, requesting a more extensive peer evaluation or other action.

**Section 3:     Affiliate Staff**

A.     The affiliate medical staff shall consist of community and clinic based physicians who desire to be associated with, but who do not intend to admit or treat patients, at Methodist Hospitals.  The primary purpose of the Affiliate staff is to promote professional and educational opportunities, including continuing medical education endeavors, and to allow such individuals to refer patients to other members of the staff for admission, evaluation, and/or care and treatment.  Per individual practice preferences, follow-up responsibilities for unassigned patients may be expected.  Individuals requesting appointment to the Affiliate staff must meet the basic qualifications for Medical Staff membership as outlined in Article III: Membership Application Process, Section 4: Conditions and Duration of Membership of the Medical Staff Bylaws.

B.     Appointment as an Affiliate member is a courtesy only, which may be terminated by the Board of Directors upon recommendation of the Medical Council, without rights to the hearing or appeal procedures set forth herein.

C.     Affiliate staff may attend educational programs of the medical staff.  Affiliate staff may not be granted clinical privileges and do not have admitting privileges. A prior arrangement with a member of the active staff who agrees to provide in-hospital care to the affiliate staff members' patients must be maintained.

D.     Affiliate staff members may review their patient's medical records, consistent with any applicable HIPAA regulations.  Affiliate staff members may not write orders or make medical record entries or actively participate in the provision or management of care to patients.  They are not required to participate in the hospital on-call coverage rotation. Though not required to attend medical staff committee meetings, active participation is welcomed and encouraged.  Affiliate staff members are ineligible to vote or hold office.  Dues are required.  ( 12/4/2017)

**Section 4:     Courtesy Medical Staff**

The Courtesy Medical Staff shall consist of physicians, podiatrists, oral surgeons and dentists qualified for staff membership who admit or provide treatment or services to no more than twenty (20) patients annually at the Hospital.

Requirements for application/reappointment to Courtesy Staff category shall include but are not limited to:

*Effective:  5/5/2008*
*Revised:   11/3/2008, 5/4/2009, 12/7/2009, 7/12/2010, 6/6/2011, 1/9/2012, 7/9/2012, 11/5/2012,*
*1/7/2013, 12/2/2013, 6/2/2014, 12/1/2014, 6/6/2016,10/3/2016,11/7/2016, 1/4/2017, 6/5/2017,*
*12/4/2017, 7/9/2018*

    1)   Must have completed a minimum of five (5) years of service on the Associate Staff
        and/or Active Staff, provided that any practitioner who was a member of the Courtesy
        Staff on December 31, 2015 shall be exempt from this requirement; and;
    2)   Shall have established a record indicating satisfactory competence.

Practitioners shall provide evidence of compliance with the above requirements at the time of
submitting an application for initial appointment or reappointment to the Courtesy Staff
Category.

Courtesy Staff members shall have admitting privileges in accordance with documented training,
education and experience.   Medical staff members who admit, or are otherwise regularly
involved in fewer than five (5) patient contacts annually will be on Courtesy Staff, but will not
be granted independent admitting privileges, and will only be permitted to co-admit patients with
a physician, podiatrist, oral surgeon or dentist who has independent admitting privileges.

Courtesy Staff members shall be appointed to a specific Division but shall neither be eligible to
vote nor hold office or committee appointment in this Medical Staff organization.  They shall not
be required to attend division, general staff or committee meetings.

Courtesy Staff members are required to pay staff dues.

**Section 5:**     **Consulting Medical Staff**

A.     The Consulting Medical Staff shall consist of physicians who are either, members of a
       medical school faculty or practitioners that maintain a specialty practice not available
       locally by Active members on the Medical Staff.   A Consulting Staff member is
       required to either apply for Active Staff when his/her specialty is covered adequately by
       other Active members of the Staff as determined by the Medical Council or resign from
       the Medical Staff.

B.      Members of the Consulting Staff shall not be eligible to vote or hold office, but shall
       have voting rights in any committee to which they are appointed.  They shall be expected
       to perform consultations upon appropriate request.  They shall also be required to serve
       on Emergency Room Call for consultations and for those patients for which they serve as
       consultants. They shall not be required to attend division or general medical staff
       meetings, but shall attend meetings of committees to which they have been appointed.
       Consulting Staff members are required to pay dues.

C.     Consulting Staff members shall be eligible to request privileges see patients, prepare
       consultative evaluations and recommendations.

**Section 6:**     **Honorary Medical Staff**

*Effective:   5/5/2008*
*Revised:    11/3/2008, 5/4/2009, 12/7/2009, 7/12/2010, 6/6/2011, 1/9/2012, 7/9/2012, 11/5/2012,*
*1/7/2013, 12/2/2013, 6/2/2014, 12/1/2014, 6/6/2016,10/3/2016,11/7/2016, 1/4/2017, 6/5/2017,*
*12/4/2017, 7/9/2018*

A.    The Honorary Staff shall consist of physicians, dentists and podiatrists who are not active in the Hospital and are honored by membership in this category. They may be: Physicians, dentists and podiatrists who have retired from active Hospital service; Physicians, dentists and podiatrists of outstanding reputation ; Physicians, dentists and podiatrists who are in full-time practice as Medical or Clinical Directors of major industries in our area;. Honorary membership is initiated by invitation from the Medical Council subject to completion of the application process and approval by the Hospital board, which shall not be unreasonably withheld.    They shall have no clinical privileges.

**Section 7:    Adjunct Staff**

A.    The Adjunct Medical Staff consists of physicians, podiatrists, and dentists who have their primary practice at another hospital and who provide temporary coverage only for Active Staff members of this Medical Staff, from within his/her Division, with arrangements for coverage of sufficient privileges. This coverage shall be limited to temporary periods of absence of the Active Staff member.

B.    While providing coverage, Adjunct Staff shall maintain responsibility for daily acute care hospital rounds and a current patient record including the initial history and physical, working diagnosis, objectives and plans for care and progress notes daily excluding sub-acute units, and other chronic care units, and shall complete the medical record as provided in the Rules and Regulations.   Adjunct staff members may not admit, see consults or otherwise provide services, except when covering for the Active member. They shall pay Medical Staff dues.  They shall not be required to serve on medical staff committees nor be required to attend General Staff or Division meetings.  Members of the Adjunct Staff shall not be eligible to vote nor hold office.  They shall not be required to take Emergency Room Call.

**Section 8:    Ambulatory Staff Physician**

A.    The Ambulatory Staff Physician category is limited to Active Staff members in good standing at another hospital wishing to perform services to patients on an outpatient basis at The Methodist Hospitals. These physicians shall not do inpatient consultations. Ambulatory Staff applicants are subject to the membership application process established in these Bylaws; however, an interview with the Division Chief may be waived by the Division Chief.

B.    Ambulatory Staff Physicians' admitting privileges shall be limited to cases of complications during an outpatient procedure. Ambulatory Staff Physicians must request, qualify for and be granted privileges to provide such  direct patient care that is needed to attend their patients but  may request appropriate consultations for services outside their scope of practice as necessary. Ambulatory Staff Physicians shall not serve on committees nor serve on emergency room call rotation. They shall not be eligible to

*Effective: 5/5/2008*
*Revised:    11/3/2008, 5/4/2009, 12/7/2009, 7/12/2010, 6/6/2011, 1/9/2012, 7/9/2012, 11/5/2012,*
*1/7/2013, 12/2/2013, 6/2/2014, 12/1/2014, 6/6/2016,10/3/2016,11/7/2016, 1/4/2017, 6/5/2017,*
*12/4/2017, 7/9/2018*

vote or hold office.  They shall attend to their patients in the Emergency Room if complications arise from surgery.  They shall be subject to paying dues and assessments.

## ARTICLE III
## MEMBERSHIP APPLICATION PROCESS

**Section 1:    General Information**

No person including persons engaged by the hospital in administratively responsible positions shall exercise clinical privileges in the hospital unless and until he/she applies for and receives appointment to the Medical Staff or is granted temporary privileges as set forth in these Bylaws. By applying to the Medical Staff for membership or renewal of membership (or, in the case of members of the Honorary Staff, by accepting membership to that category), the applicant acknowledges responsibility to first review these Bylaws and agrees that throughout any period of membership to comply with the responsibilities of Medical Staff membership and with the Bylaws and Rules and Regulations of the Medical Staff as they may exist and as they may be modified from time to time.  Medical Staff membership shall confer on the member only such clinical privileges as have been granted in accordance with these Bylaws.

**Section 2:    Burden of Producing Information**

In connection with all applications for membership, renewal of membership, advancement or transfer, the applicant shall have the burden of producing information for an adequate evaluation of the applicant's qualifications and suitability for the clinical privileges and staff category requested, of resolving any reasonable doubts about these matters, and of satisfying requests for information.  The applicant's failure to sustain this burden shall be grounds for denial of the application.  This burden may include submission to a medical or psychiatric examination, at the applicant's expense, if deemed appropriate by the Medical Council, which may select the examining physician.

**Section 3:    Application Procedure**

Application for membership on the Staff shall be presented in writing on a form promulgated by the Medical Council, which shall state the qualifications and references of the Applicant and include the Applicant's agreement to be bound by the current Bylaws, Rules and Regulations and policies of the Medical Staff, and all pertinent Hospital policies and procedures as presented to the Medical Council for information purposes.   The application shall also set out the Applicant's specific request for Staff category and clinical privileges.

**Section 4:    Conditions and Duration of Membership**

A.     Medical Staff membership shall be granted by the Board of Directors for one year at a time for the first two years.  The first two years of membership on the Medical Staff are considered to be a provisional period.

*Effective: 5/5/2008*
*Revised:   11/3/2008, 5/4/2009, 12/7/2009, 7/12/2010, 6/6/2011, 1/9/2012, 7/9/2012, 11/5/2012,*
*1/7/2013, 12/2/2013, 6/2/2014, 12/1/2014, 6/6/2016,10/3/2016,11/7/2016, 1/4/2017, 6/5/2017,*
*12/4/2017, 7/9/2018*

At the end of the second year, each applicant will be evaluated for promotion for two years and after that time will be considered for membership renewal every two years. Each member of the Medical Staff shall be assigned to a Division.

B.    Proof of current Indiana State licensure, Indiana Registered DEA, State Narcotics (controlled substance) Registration (as applicable) and current medical malpractice coverage to meet the financial responsibility requirements of the Indiana Medical Malpractice Act are necessary for Medical Staff membership and membership renewal.

C.    The Medical Staff member agrees to provide such information as may be requested to demonstrate his/her physical and mental health status and to submit to any examination as requested.

D.    Honorary Staff membership shall be granted for an indefinite period at the discretion of the Board of Directors.

E.    All memberships in the Staff may be terminated as provided in these bylaws.

F.    For members who are board certified, a minimum of eighteen (18) continuing medical education credit hours in Category One (1) per year, thirty-six (36) per membership period, is required for membership on the Medical Staff. This requirement applies to all staff categories with the exception of the Honorary Staff.

For members who are not board certified, a minimum of thirty-six (36) continuing medical education credit hours in Category One (1) per year, or seventy-two (72) per reappointment period, is required for membership on the Medical Staff.

Physicians actively engaged in an accredited Fellowship Program may use the program to substitute for CME requirements until the program is complete.

G.    Members who have fulfilled the established requirements may request to move to another staff category. Members who have not met the established requirements may not request to move to another staff category until they have been compliant for one (1) year.

H.    Board Certification:

1.    Requirements:

a.    Initial medical staff membership applicants applying after December 31, 2008, shall be currently certified in their primary areas of practice at the Hospital by the appropriate specialty/subspecialty board of the American Board of Medical Specialties, the American Osteopathic Association, the American Board of Oral and Maxillofacial Surgery, or the American

Effective:  5/5/2008
Revised:    11/3/2008, 5/4/2009, 12/7/2009, 7/12/2010, 6/6/2011, 1/9/2012, 7/9/2012, 11/5/2012,
1/7/2013, 12/2/2013, 6/2/2014, 12/1/2014, 6/6/2016,10/3/2016,11/7/2016, 1/4/2017, 6/5/2017,
12/4/2017, 7/9/2018

Board of Podiatric Surgery, as applicable. Board certification from organizations outside the United States will be considered, however they must be recognized by the American Board of Medical Specialists, subject to the following:

    i.    Those applicants who are not yet board certified but who, at the time of application, have completed their residency or fellowship training within the last five years shall be eligible for Medical Staff membership, but can only retain membership by obtaining board certification in their primary area of practice within five (5) years from the date of completion of their residency or fellowship traning.

    ii.    Applicants who are not yet board certified but whose residency of fellowship training was completed more than five (5) years prior to the application date shall be eligible for Medical Staff membership, but can only retain membership by obtaining board certification in their primary area of practice within two (2) years of the date that the initial application for medical staff membership is approved.

An "initial application" for medical staff membership is any application other than a renewal application other than a renewal application governed by Section 6 of Article III of these Bylaws.

b.    Once board certified as specified in paragraph 1.a. above, the member must maintain current specialty or subspecialty board certification in at least one of their primary specialty/subspecialty areas according to the requirements of their particular specialty or subspecialty board as a condition of maintaining medical staff membership.

c.    If a medical staff member fails to comply with the board certification requirements applicable to initial medical staff membership in paragraph 1.a.1. above but such member has initiated and is active in the board certification process at the time that the applicable period specified in paragraph 1.a.1. expires, such member shall have a grace period of up to two (2) years to complete the process, provided that the member sits for the next available scheduled examination(s) offered by the applicable certification Board. Except as otherwise set forth in the proceeding sentence, any medical staff member who fails to comply with the board certification requirements applicable to initial medical staff membership applicants as set forth in paragraph 1.a. above shall be placed on immediate involuntary leave of absence for up to six (6) months, provided that when the member provides proof of compliance with paragraph 1.a. the involuntary leave of absence will be automatically rescinded. If the

*Effective:* 5/5/2008
*Revised:* 11/3/2008, 5/4/2009, 12/7/2009, 7/12/2010, 6/6/2011, 1/9/2012, 7/9/2012, 11/5/2012,
1/7/2013, 12/2/2013, 6/2/2014, 12/1/2014, 6/6/2016,10/3/2016,11/7/2016, 1/4/2017, 6/5/2017,
12/4/2017, 7/9/2018

member fails to demonstrate proof of compliance by the expiration of the six (6) month involuntary leave of absence period, then:

    i.    The member may request a voluntary leave of absence for an additional six (6) months, if practicing in the area, pursuant to the provisions of Article III, Section 8, part C of these Bylaws, or for up to an additional two (2) years, if not practicing in the area, pursuant to the provisions of Article III, Section 8, part A of these Bylaws.

    ii.    If the voluntary leave of absence is granted, reinstatement/return will be subject to: providing proof of compliance with paragraphs 1.a or 1.b above, as applicable; and compliance with Article III, Section 8, part I of these Bylaws. If the voluntary leave of absence is not granted, then the member's medical staff membership will be deemed terminated.

    iii.    If the member does not request a voluntary leave of absence, then his/her medical staff membership will be deemed to have been relinquished, without any right to hearing procedures.

    iv.    One who loses medical staff membership pursuant to the provisions of paragraph 1.c.iii above may reapply for medical staff membership only as a new applicant in compliance with the initial application procedures set forth in these bylaws and provided that he/she must present proof of board certification as specified in paragraph 1.a above at the time the application is submitted.

d.    Any medical staff member who fails to comply with the requirement to re-certify/maintain board certification as set forth in paragraph 1.b shall have a grace period of up to two (2) years from the time his/her board certification expires or otherwise terminates or is suspended, within which to become re-certified, without any adverse affect on his/her medical staff membership during such two (2) year period, subject to the following:

    i.    The member may apply for a waiver of compliance with the requirements of paragraph 1.b. pursuant to the provisions of paragraph 1.e. below.

    ii.    If the member fails to demonstrate proof of compliance by the expiration of the two (2) year grace period, and a waiver has not been obtained as provided in paragraph 1.e. below, then he/she shall be placed on immediate involuntary leave of absence for up to six (6) months; provided that, notwithstanding the foregoing,

*Effective: 5/5/2008*
*Revised:   11/3/2008, 5/4/2009, 12/7/2009, 7/12/2010, 6/6/2011, 1/9/2012, 7/9/2012, 11/5/2012,*
*1/7/2013, 12/2/2013, 6/2/2014, 12/1/2014, 6/6/2016,10/3/2016,11/7/2016, 1/4/2017, 6/5/2017,*
*12/4/2017, 7/9/2018*

when the member provides proof of compliance with paragraph 1.b., the involuntary leave of absence will be automatically rescinded.

iii.   If the member fails to demonstrate proof of compliance by the expiration of the six (6) month involuntary leave of absence period, and a waiver has not been obtained as provided in paragraph 1.e. below, then his/her medical staff membership will be deemed to have been relinquished, without any right to hearing procedures. For purposes of this paragraph 1.d.iii, a waiver must have been granted prior to the expiration of the six (6) month involuntary leave of absence period in order to avoid loss of medical staff membership hereunder; it is not sufficient that a waiver has been applied for and is pending.

iv.   One who loses medical staff membership pursuant to the provisions of paragraph 1.d.iii. above may reapply for medical staff membership only as a new applicant in compliance with the initial application procedures set forth in these bylaws and provided that he/she must present proof of board certification as specified in paragraph 1.a. above at the time the application is submitted.

e.   A member may apply in writing for a waiver of the requirement to maintain board certification, as specified in paragraph 1.b. above for good cause shown in accordance with the following procedures:

i.   The application shall be submitted to, and the determination to grant or deny the waiver shall be made by, a committee comprised of: The President of the Medical Staff or his/her designee; the Chairman of the Credentials & Professional Standards Committee or his/her designee; and the Chief of the Clinical Division to which the member belongs or her/his designee.

ii.   The committee may request such additional information or materials from the member, and may conduct such investigation, as it deems necessary or appropriate in order to made a decision on the request.

iii.   The committee shall make its determination within six (6) months of the date that the request for waiver was submitted, and shall give written notice of its decision to the requesting member, the Credentials and Professional Standards Committee and the Medical Council.

*Effective:  5/5/2008*
*Revised:    11/3/2008, 5/4/2009, 12/7/2009, 7/12/2010, 6/6/2011, 1/9/2012, 7/9/2012, 11/5/2012,*
*1/7/2013, 12/2/2013, 6/2/2014, 12/1/2014, 6/6/2016,10/3/2016,11/7/2016, 1/4/2017, 6/5/2017,*
*12/4/2017, 7/9/2018*

        iv.     The determination of whether to grant or deny a waiver shall be committed to the sole and absolute discretion of the committee and is not a matter of right to the requesting member.  Accordingly, the decision of the committee shall be deemed final and non-appealable.

2.    Exemptions

Any practitioner who was a member of the Medical Staff on December 31, 2008 shall be exempt from the board certification requirements in paragraphs 1.a. and 1.b. above.  Additionally, applicants who apply for medical staff membership after December 31, 2008, who graduated from an accredited medical, osteopathic, dental or podiatric school, prior to December 31, 2003, are exempt from the board certification requirements in paragraphs 1.a and 1.b above.  If any practitioner or applicant qualifying for either of the foregoing exemptions at any time has or obtains board certification in any specialty or subspecialty, such board certification shall be considered voluntary and he/she shall not be required to maintain such board certification as a condition of medical staff membership.

**Section 5:**    **Applications**

A.    Request for Applications
Applications may be released upon request in accordance with policies established for the release of Medical Staff Applications.

B.    Procedure - New Applicants
Each applicant will be provided with an application form(s), a copy of the Medical Staff Bylaws, the Medical Staff and Division Rules and Regulations, a copy of the Delineation of Privilege List for the Division and cover letter.

C.    Application:

1.    Return of an application to the Medical Staff with supporting materials, and the processing fee initiates the application process. The time period for processing an application is targeted to occur within 90 days after the application process is initiated, provided the verification documents have been received within sixty (60) days.

2.    The application will be reviewed by the Medical Staff Registrar who will follow up during the application process for application completeness.  The Medical Staff Registrar will conduct a primary source verification of Indiana State licensure, education (i.e. Medical School, Internship, Residency, Fellowship), Board Certification, National Practitioner Data Bank documentation, information

*Effective:  5/5/2008*
*Revised:    11/3/2008, 5/4/2009, 12/7/2009, 7/12/2010, 6/6/2011, 1/9/2012, 7/9/2012, 11/5/2012,*
*1/7/2013, 12/2/2013, 6/2/2014, 12/1/2014, 6/6/2016,10/3/2016,11/7/2016, 1/4/2017, 6/5/2017,*
*12/4/2017, 7/9/2018*

on current health status as relevant, results of criminal background check, documentation of immunization and testing (immunization record), tuberculosis (TB) skin test, or chest x-ray (must be current – cannot be more than one year old), and hospital affiliations/previous practice (as appropriate) to verify current competence. The Medical Staff Registrar shall also verify the information provided on the application regarding previously successful or currently pending challenges to any licensure or narcotics registration (state or Drug Enforcement Administration) or the voluntary relinquishment of such licensure or registrations, voluntary or involuntary termination of medical staff membership, at any hospital facility, voluntary or involuntary limitation, reduction, or loss of clinical privileges at another hospital, current exclusion from the federal Medicare or other federally funded health care program, and involvement in any professional liability actions under circumstances specified in the Medical Staff Bylaws, Rules and Regulations, and policies including final judgments or settlements in professional liability actions brought against the applicant.  Upon collection and verification of all required information, and receipt of recommendations from peers practicing in the same specialty, the Medical Staff Registrar shall classify the application as completed. If the applicant fails to complete the application within 90 days of its receipt by the Medical Staff Registrar, despite notice of areas of incompletion or unverifiable information, it shall be deemed to have been withdrawn, without prejudice, and the applicant shall not be entitled to hearing rights provided under these Bylaws.  The applicant may reapply when he/she can provide complete information.

By applying for membership in the Medical Staff, each Applicant:

a.    Agrees to be interviewed in regard to the application. (5/4/2009)
b.    Authorizes the Hospital and Medical Staff representatives to consult with members of medical staffs of other hospitals with which the Applicant has been associated and with others who may have information bearing on the applicant's competence, character and ethical qualifications.
c.    Consents to the inspection of all records and documents that may   be material to an evaluation of the applicant's professional and ethical qualifications and competence to carry out the clinical privileges requested for Staff membership.
d.    Agrees to provide such information as may be requested to  demonstrate physical and mental health status and to submit to any examination as requested.
e.    Releases from any liability all representatives of the Hospital and Medical Staff for their acts performed in good faith and without malice in connection with evaluating the Applicant's credentials.
f.    Releases from any liability all individuals and organizations who provide information to the Hospital in good faith and without malice concerning the Applicant's competence, ethics, character and other qualifications for

*Effective: 5/5/2008*
*Revised: 11/3/2008, 5/4/2009, 12/7/2009, 7/12/2010, 6/6/2011, 1/9/2012, 7/9/2012, 11/5/2012,*
*1/7/2013, 12/2/2013, 6/2/2014, 12/1/2014, 6/6/2016,10/3/2016,11/7/2016, 1/4/2017, 6/5/2017,*
*12/4/2017, 7/9/2018*

       Staff membership and clinical privileges including otherwise privileged or confidential information.

g.    Agrees to supply any other information deemed necessary for evaluation by the Credentials and Professional Standards Committee.

h.    Agrees to execute an ethical pledge which will include, but not be limited to, the following commitment:

    1.    Refrain from fee splitting or other inducements relating to patient referral.

    2.    Provide for continuous care of his/her patients.

    3.    Refrain from delegating the responsibility for diagnosis or care of hospitalized patients to a medical or dental practitioner who is not qualified to undertake this responsibility and who is not adequately supervised.

    4.    Seek consultation whenever necessary.

    5.    Refrain from substituting another professional without the patient's knowledge or consent, known as providing "ghost" surgical or medical services.

i.    Agrees to notify the Medical Staff Registrar of any changes in and otherwise update any information required by the application form throughout the application review process and subsequent term of membership, if granted.

D.    Results of Application

    1.    The Chief, the Vice Chief or their designee, of the Division in which the applicant seeks clinical privileges may, in his/her discretion, schedule the applicant for a personal interview, and shall provide the Credentials and Professional Standards Committee with specific written recommendations for denying some or all of the application for privileges, or for granting and delineating the Practitioner's clinical privileges. When the Division Chief, Vice Chief or their designee's report is completed, the applicant will be scheduled to attend the Credentials and Professional Standards Committee meeting for an interview. In appropriate circumstances, if the application is complete, with no concerns, the Credentials and Professional Standards Committee can approve the waiver of the applicant's Credentials and Professional Standards meeting personal interview.

        Within a month of receiving the completed application, the Credentials and Professional Standards Committee shall recommend to the Medical Council that the Applicant be accepted for membership with privileges as recommended, rejected for membership and privileges, or that the application be deferred for further consideration. Exceptions to the DEA requirement may be considered upon special request by the Division Chief to the Credentials & Professional Standards Committee, Medical Council, and the Board of Directors.

Effective: 5/5/2008
Revised:   11/3/2008, 5/4/2009, 12/7/2009, 7/12/2010, 6/6/2011, 1/9/2012, 7/9/2012, 11/5/2012,
1/7/2013, 12/2/2013, 6/2/2014, 12/1/2014, 6/6/2016,10/3/2016,11/7/2016, 1/4/2017, 6/5/2017,
12/4/2017, 7/9/2018

2.      At its next regular meeting after receipt of the report and recommendation of the Credentials and Professional Standards Committee, the Medical Council shall recommend to the Board of Directors that the Applicant be accepted, deferred or rejected. A recommendation to accept must specify the clinical privileges to be granted which may be qualified by probationary conditions relating to such clinical privileges. If the recommendation is to deny the application, the applicant shall be provided written notice consistent with the hearing and appeals provisions of these bylaws.

3.      The Board of Directors shall either accept the favorable recommendation of the Medical Council, refer it back for further consideration stating the reasons for such action, or if the recommendation is not supported by substantial evidence, shall deny the application. If the Board denies the application, the applicant shall be provided written notice consistent with the hearing and appeals provisions of these bylaws.

4.      When final action has been taken by the Board of Directors, the Hospital shall notify the membership applicant as soon as possible, but without exception within fourteen (14) days.

**Section 6:       Membership Renewal Application Procedure**

Membership automatically expires at the end of two years unless a shorter term is stipulated. Membership can only be renewed pursuant to the following application procedure.

A.      Application Procedure

1.      At least five (5) months in advance prior to the expiration of each Medical Staffs membership, the following is to occur:

a.      The Medical Staff Registry Office shall send to Medical Staff members the following documents for completion:
   1.      Request for renewal of membership form as promulgated by the Medical Council,
   2.      Copy of current Delineation of Privileges and blank Delineation of Privileges.
   3.      Release of Liability Form.
   4.      Request for Additional Privileges form.

b.      The Medical Staff Registrar shall request Medical Staff members to submit documentation of the following:

   1.      Current medical license.

*Effective: 5/5/2008*
*Revised:   11/3/2008, 5/4/2009, 12/7/2009, 7/12/2010, 6/6/2011, 1/9/2012, 7/9/2012, 11/5/2012,*
*1/7/2013, 12/2/2013, 6/2/2014, 12/1/2014, 6/6/2016,10/3/2016,11/7/2016, 1/4/2017, 6/5/2017,*
*12/4/2017, 7/9/2018*

    2.    Current Indiana Narcotics Renewal (CSR).

    3.    Current Federal DEA number (if applicable)

    4.    Current exclusion, if any, from the federal Medicare or other federally funded health care program,

    5.    Official documentation as follows:  For physicians who are board certified, a minimum of eighteen (18) continuing medical education (CME) hours per year, thirty-six (36) per  membership period is required for membership on the Medical Staff, including CME hours in the Medical Staff member's specialty.

            For physicians who are not board certified, a minimum of   thirty-six (36) continuing medical education credit hours in Category One (1) per membership period, is required for physicians' membership on the Medical Staff.

            Physician actively engaged in an accredited Fellowship Program may use the program to substitute for CME requirements until the program is complete.

    6.    CPR/BLS certification (exemption: teleradiology and Pathology)

2.    Within thirty (30) days of receipt the Medical Staff Registrar shall review all returned forms and verify that all information has been included.  The reappraisal includes information concerning the individual's current licensure, health status, professional performance, peer evaluation, judgment, and clinical/technical skills as indicated by the results of quality assurance activities, medical staff dues, continuing medical education, and other reasonable indicators of continuing qualifications.

3.    A summary of clinical activity on each member applying for renewal of membership  will be provided to include discharges, mortalities, surgical procedures, ancillary procedures, outpatient/inpatient, and consultations (performed and requested).

B.    Effects of Application

    1.    The Credentials and Professional Standards Committee shall review all pertinent information available on each and transmit its recommendation to the Medical Council.

    2.    The Credentials and Professional Standards Committee shall take into consideration the required bi-annual appraisal from the Chiefs of the respective Clinical Divisions together with statistical data supplied by the Hospital. The Chiefs shall to make a specific recommendation on clinical privileges and membership renewal

*Effective: 5/5/2008*
*Revised:    11/3/2008, 5/4/2009, 12/7/2009, 7/12/2010, 6/6/2011, 1/9/2012, 7/9/2012, 11/5/2012,*
*1/7/2013, 12/2/2013, 6/2/2014, 12/1/2014, 6/6/2016,10/3/2016,11/7/2016, 1/4/2017, 6/5/2017,*
*12/4/2017, 7/9/2018*

C.    Standards and Procedure for Review

    1.    Each recommendation concerning the renewal of a Medical Staff membership and the clinical privileges to be granted upon membership renewal shall be based upon such Member's professional competence and clinical judgment in the treatment of patients, ethics, conduct as may affect patient care, participation at Medical Staff meetings and staff affairs, compliance with the Medical Staff Bylaws and Rules and Regulations, appropriate use of the Hospital's facilities for patients.

    Each member shall provide information regarding previously successful or currently pending challenge to any licensure or narcotics registration (state or Drug Enforcement Administration) or the voluntary relinquishment of such licensure or registrations, voluntary or involuntary termination of medical staff membership, voluntary or involuntary limitation, reduction, or loss of clinical privileges at another hospital, and final judgments or settlements in professional liability actions brought against the applicant. Any applicant not holding or voluntarily or involuntarily relinquishing an Indiana state professional license, DEA or state narcotics (controlled substance) registration (if applicable) shall be ineligible for Medical Staff membership renewal.

    2.    The bi-annual review shall take into consideration the Member's health. Specifically, the member must submit a statement that no health problems exist that could affect his or her ability to perform the privileges requested. Further, a confirmation of health status from the Chief of Service in which the member has had privileges must be submitted.

D.    Adverse Recommendations

    1.    Where membership renewal or a change in clinical privileges is not recommended, the reason for such recommendations shall be stated and documented.

    2.    The affected member shall be notified in writing by the Chairman of the Credentials and Professional Standards Committee of the adverse recommendation, and the member shall be given an opportunity to appear before said Committee to challenge the recommendation.

    3.    Prosecution of such a challenge must be initiated by the affected member within thirty (30) days of notice of the adverse recommendation, or the right to challenge shall be waived.

    4.    The Medical Council shall make written recommendations to the

Effective: 5/5/2008
Revised:    11/3/2008, 5/4/2009, 12/7/2009, 7/12/2010, 6/6/2011, 1/9/2012, 7/9/2012, 11/5/2012,
1/7/2013, 12/2/2013, 6/2/2014, 12/1/2014, 6/6/2016,10/3/2016,11/7/2016, 1/4/2017, 6/5/2017,
12/4/2017, 7/9/2018

Board of Directors, through the President of the Medical Staff or President-Elect of the Medical Staff, concerning the membership renewal , non-renewal and/or clinical privileges of each practitioner scheduled for periodic appraisal. The length of membership renewal  cannot exceed two (2) years. When membership renewal is not recommended or there is a recommended reduction in clinical privileges, the reasons for such recommendations shall be stated and documented and the procedure provided in Article Seven VII of these Bylaws shall be followed.

5.  The Board may accept the recommendation of the Medical Council or may refer the matter back to the Medical Council for further consideration, stating the purpose for such referral and setting a reasonable time limit for making a subsequent recommendation.  The following procedures shall apply with respect to action on the application:

   a.  If the Medical Council issues a favorable recommendation, the board shall affirm the recommendation if it is supported by substantial evidence, as the final action on the application.

   b.  If the tentative final action of the Board is unfavorable, the administrator shall give the member written notice of the tentative adverse recommendation and the member shall be entitled to the procedural rights set forth in Article VII. If the member waives procedural rights, the Board's decision shall be the final action.

   c.  In the event the recommendation of the Medical Council, or any significant part of it, is unfavorable to the member and the member waives procedural rights, the Medical Council's recommendations shall be forwarded to the Board for final action, which shall affirm the Medical Council's recommendation if it is supported by substantial evidence.

   d.  If the member requests a hearing following the adverse Medical Council recommendation pursuant or an adverse Board tentative final action, the Board shall take final action only after the member has exhausted all procedural rights as established by these Bylaws.  After exhaustion of the procedural rights, the Board shall make a final decision and shall affirm the decision of the  ad hoc hearing committee if it is supported by substantial evidence, following a fair procedure.  The board's decision shall be in writing and shall specify the reasons for the action taken.

## Section 7:    Expedited Applications

A completed application, with no concerns, for membership or membership renewal can be expedited if it documents each of these criteria:

Effective:  5/5/2008
Revised:   11/3/2008, 5/4/2009, 12/7/2009, 7/12/2010, 6/6/2011, 1/9/2012, 7/9/2012, 11/5/2012,
1/7/2013, 12/2/2013, 6/2/2014, 12/1/2014, 6/6/2016,10/3/2016,11/7/2016, 1/4/2017, 6/5/2017,
12/4/2017, 7/9/2018

No current or previously successful challenges to any professional licensure or registration;

No current exclusion from Medicare or Medicaid;

No involuntary termination of medical staff membership at any other organization;

No involuntary limitation, reduction, denial, or loss of clinical privileges to date;

No excessive number or unusual pattern of professional liability actions resulting in final judgment against the applicant.

Verify that there are no involuntary termination, limitation, reduction , denial, or loss of privileges at other institutions.

Such applications shall be reviewed by the relevant Division and section chair(s); if approved, by the Credentials and Professional Standards Committee Chair; if approved, by the Medical Council, in lieu of the application process described in these bylaws.  If any of these medical staff authorities makes any adverse recommendation, the application shall no longer be eligible for expedition, and shall revert to the regular application process. An expedited application may be acted upon by a committee appointed by the Board of Directors, if permitted by Methodist Hospital Board of Directors bylaws or policy.

**Section 8:    Leave of Absence**

A.    Any member of the staff may request, in writing, a leave of absence not to exceed two (2) years if he/she will not be engaged in the practice of medicine in Lake and Porter Counties and not have need for Hospital facilities during this period. An extension may be granted by the Board upon written request. Upon returning to the practice of medicine locally, he/she may apply for membership renewal at his/she former rank if staff dues during the leave of absence have been maintained.

B.    This request must be submitted in writing to the Chief of the staff member's Division. The reason for the request must be included.  The member should include information regarding coverage for patient care. The Chief shall acknowledge receipt of the request by signing the written request prior to forwarding it to the Credentials and Professional Standards Committee.

C.    Any member of the staff practicing in Lake and Porter Counties may request, in writing, a leave of absence not to exceed six months, which is nonrenewable.

D.    Any member of the Medical Staff may request, in writing, a leave of absence not to exceed two (2) years if the staff member is contractually obligated to refrain from practicing medicine in Lake or Porter County under the terms of a restricted covenant.

E.    Physicians on Active status participating in full-time post-graduate training programs must have the approval of the Division Chief prior to beginning the program if the member wishes to maintain medical staff membership.  Approval for a training program

*Effective: 5/5/2008*
*Revised:   11/3/2008, 5/4/2009, 12/7/2009, 7/12/2010, 6/6/2011, 1/9/2012, 7/9/2012, 11/5/2012,*
*1/7/2013, 12/2/2013, 6/2/2014, 12/1/2014, 6/6/2016,10/3/2016,11/7/2016, 1/4/2017, 6/5/2017,*
*12/4/2017, 7/9/2018*

that requires the physician to be away for one (1) month or more includes the requirement that the physician be placed on a leave of absence for that period of time.

F.    Except for unanticipated medical leave of absence, no leave of absence status shall be granted unless the member's medical records are in order and Quality Assurance issues, if any, are resolved.  If a member has outstanding medical records when requesting leave of absence, the member has thirty (30) days to complete them.

G.    No Leave of Absence status will be granted unless Medical Staff dues are current.

H.    The Credentials and Professional Standards Committee must make a recommendation to the Medical Council, the Medical Council to the Board of Directors and the Board of Directors must approve the request for leave of absence.

I.    Requirements to be met for return from leave of absence include the following:
      a.    Prior to returning from Leave of Absence Status, a member must provide documentation of CME hours.  The Credentials and Professional Standards Committee has the authority to waive the requirement in extenuating circumstances.  A letter requesting return to former rank should be submitted to the Division Chief of the Staff member.  The return must be approved by the Credentials and Professional Standards Committee.  Reactivation of membership and clinical privileges previously held shall be granted, but may be granted subject to monitoring and/or preceptoring as determined by the Division Chief.
      b.    Medical Staff dues, Indiana State licensure, registrations and proof of malpractice insurance must be current. Insurance coverage shall meet the requirements of the Indiana Medical Malpractice Act.
      c.    The Division Chief must make a recommendation to the Credentials Committee regarding status and extent of privileges.
      d.    The Credentials and Professional Standards Committee must make a recommendation to the Medical Council; the Council to the Board of Directors; and the Board of Directors must approve the return to former rank.

J.    Physicians who do not provide proof of compliance with the Indiana Medical Malpractice Act will be placed on an immediate involuntary leave of absence for a six-month period. When the physician provides proof of compliance with the Act, the leave of absence will automatically be rescinded.  If the physician does not meet the requirements by the end of the six-month period, membership will be deemed to have been relinquished, without any right to hearing procedures.

K.    Military leave of Absence – Requests for leave of absence to fulfill military service obligations shall be granted upon notice and review by the Credentials and Professionals Standards Committee, Medical Council and Board of Directors.  Reactivation of membership and clinical privileges previously held shall be granted, but may be granted subject to monitoring and/or preceptoring as determined by the Division Chief.  During

*Effective:  5/5/2008*
*Revised:   11/3/2008, 5/4/2009, 12/7/2009, 7/12/2010, 6/6/2011, 1/9/2012, 7/9/2012, 11/5/2012,*
*1/7/2013, 12/2/2013, 6/2/2014, 12/1/2014, 6/6/2016,10/3/2016,11/7/2016, 1/4/2017, 6/5/2017,*
*12/4/2017, 7/9/2018*

military leave of absence, the member is not required to pay dues or any medical staff assessment.

L.  Medical leave of absence-Requests for leave of absence for medical reasons, as documented by the member's physician, shall be granted upon notice and review by the Credentials and Professionals Standards Committee, Medical Council and Board of Directors, and may be granted retroactively, if the member's condition made a timely request unfeasible. Reactivation of membership and clinical privileges previously held shall be granted, but may be granted subject to monitoring and/or preceptoring as determined by the Division Chief.

M.  Charity leave of absence-Requests for leave of absence for medical missions, or to assist as part of a disaster team or other charitable service reasons, documented where feasible by the charitable sponsor organization, shall be granted upon notice and review by the Credentials and Professionals Standards Committee, Medical Council and Board of Directors, and may be granted retroactively, if the disaster or other condition made a timely request unfeasible. Reactivation of membership and clinical privileges previously held shall be granted, but may be granted subject to monitoring and/or preceptoring as determined by the Division Chief. During charity leave of absence, the member is not required to pay dues or any medical staff assessment.

N.  The leave of absence shall not exceed the member's present term of membership. Members are not entitled to more than one leave of absence during a two-year membership term unless approved by the Medical Council.  Abuse of the privilege to obtain leave of absence, as determined by the Medical Council, can be grounds for denial of renewal of membership.  However, requests for leave of absence to fulfill military service obligations or to obtain treatment for a medical or behavioral condition or disability shall not be denied or result in denial of renewal of membership if the applicant otherwise qualifies for membership and there are no other adverse recommendations affecting consideration of renewal of membership.

O.  Those applicants or members subject to compliance with the board certification requirements in paragraphs 1.a. and/or 1.b. of Article III, Section 8, part H. of these Bylaws, as applicable, will be placed on involuntary leave of absence as required pursuant to the provisions of paragraphs 1.c. or 1.d. of Article III. Section 8: part H. of these Bylaws, as applicable.

**Section 9:    Medical Staff Voting**

Medical Staff in the Active and Associate II Staff categories are eligible to vote at meetings, for elected officers and Division Chiefs.

*Effective:  5/5/2008*
*Revised:   11/3/2008, 5/4/2009, 12/7/2009, 7/12/2010, 6/6/2011, 1/9/2012, 7/9/2012, 11/5/2012,*
*1/7/2013, 12/2/2013, 6/2/2014, 12/1/2014, 6/6/2016,10/3/2016,11/7/2016, 1/4/2017, 6/5/2017,*
*12/4/2017, 7/9/2018*

# ARTICLE IV
# CLINICAL PRIVILEGES

## Section 1:    Exercise of Privileges

Except as otherwise provided in these Bylaws, a practitioner at this hospital shall be entitled to exercise only those privileges specifically requested and granted. Said privileges and services must be within the scope of any license, training, education, board certification, certificate or other legal credential authorizing practice in state and consistent with any restrictions thereon, and shall be subject to the Rules and Regulations of the Division and Rules and Regulations of the Medical Staff.   Upon consideration of the recommendation of the Medical Council, medical staff privileges may be granted, continued, modified or terminated by the Board for reasons related to quality of patient care, compliance with applicable laws  and other provisions of the Medical Staff Bylaws, or practitioner competence and fitness, only upon following the procedures outlined in these Bylaws.

## Section 2:    Delineation of Privileges in General

A.    Requests

Each application for membership and renewal of membership in the Medical Staff must contain a request for the specific clinical privileges desired by the applicant.  A request for a modification of clinical privileges may be made at any time, but such requests must be supported by documentation of training and/or experience supportive of the request.

B.    Basis for Privileges Determination

Requests for clinical privileges shall be evaluated on the basis of the practitioner education, training, experience, demonstrated professional competence and judgment, clinical performance, and the documented results of patient care and other quality review that the Medical Staff deem appropriate. Credentialing criteria, as established by the Medical Staff, are used in the privileging process.  Pertinent information concerning clinical performance obtained from other sources, especially other institutions and health care settings where a member exercises clinical privileges shall also be considered.

## Section 3:    Temporary Privileges

Any temporary privileges must be granted by the Hospital President or designee(s) upon recommendation by the President of the Medical Staff or designee(s) and the Credentials and Professional Standards Committee Chairperson.  The Division Chief or designee(s) acts in the absence of the President of the Medical Staff or Credentials and Professional Standards Committee Chairman.   Such temporary privileges shall be for a period of sixty (60) days. Temporary privileges can be renewed for an additional sixty (60) days for a pending application as allowed by the Medical Staff for fulfilling an important patient care need

*Effective: 5/5/2008*
*Revised: 11/3/2008, 5/4/2009, 12/7/2009, 7/12/2010, 6/6/2011, 1/9/2012, 7/9/2012, 11/5/2012, 1/7/2013, 12/2/2013, 6/2/2014, 12/1/2014, 6/6/2016,10/3/2016,11/7/2016, 1/4/2017, 6/5/2017, 12/4/2017, 7/9/2018*

Temporary privileges may be granted under the following two circumstances, if the application is complete, with no concerns:

1.    To fulfill an important patient care need, including, but are not limited to, covering for a member who is unable to perform duties or is otherwise on a leave of absence, or providing services that no current member can. The Division Chief will make a determination based on patient care need. The Chairman of the Credentials and Professional Standards Committee must agree in order to process temporary privileges.

      Prior to the granting of temporary privileges requested, the following credentials must be verified with the primary source

      a.    Indiana Medical License
      b.    Drug Enforcement Administration and Controlled Substance Registration (if applicable)
      c.    Medical Malpractice Insurance including participation in the Indiana Patient Compensation Fund
      d.    Board Certification and/or documentation of operative or medical experience
      e.    BLS/ACLS/ATLS/PALS certification if not Board Certified (Emergency/Ambulatory Care only)
      f.    National Practitioner Data Bank Response
      g.    Two professional references including a statement of the applicants ability to perform the privileges requested
      h.    Personal interview with Division Chief, Vice Chief or their designee.
      i.    Privilege list
      j.    Criminal Background Check
      k.    Documentation of Immunity and Testing (Immunization Records)
      l.    Tuberculosis (TB) skin test, or chest x-ray (must be current – cannot be more than one year old)

2.    When an applicant with a complete application with no concerns, is approved by the Credentials and Professional Standards Committee or its Adhoc Committee is awaiting review and the approval of the Medical Council and Board of Directors.

      Prior to the granting of temporary privileges, verification of items listed in Medical Staff Rules and Regulations: Section L: Applicants – Medical Staff. In addition, because the application must be complete, with no concerns the following items cannot be present:

      a.    Current or previously successful challenge to licensure or registration
      b.    Involuntary termination of medical staff membership at another organization
      c.    Involuntary limitation, reduction, denial, or loss of clinical privileges.
      d.    Final judgment adverse to the applicant in a professional, liability action.

*Effective: 5/5/2008*
*Revised:  11/3/2008, 5/4/2009, 12/7/2009, 7/12/2010, 6/6/2011, 1/9/2012, 7/9/2012, 11/5/2012,*
*1/7/2013, 12/2/2013, 6/2/2014, 12/1/2014, 6/6/2016,10/3/2016,11/7/2016, 1/4/2017, 6/5/2017,*
*12/4/2017, 7/9/2018*

Malpractice insurance verification including compliance with the financial responsibility requirements of the Indiana Medical Malpractice Act, also must be obtained, excluding federal tort claims.

In the exercise of such privileges, he/she shall be under the supervision of the Chief of the respective Division or his designated representative.  Special requirements will be specified by the Hospital at the time temporary privileges are granted.

## Section 4:    Emergency Privileges

In case of an emergency, any medical staff member with clinical privileges shall be expected to do everything possible within the scope of the member's license. to save the life of the patient including the calling of such consultation as may be quickly available. For the purpose of this section, an emergency is defined as a condition wherein the life or ultimate welfare of the patient is in immediate danger and any delay in administering treatment would add to the danger. This provision is intended to waive service or Staff status restriction which normally could prohibit the necessary emergency care.  Any and all implementation of emergency privileges shall be subsequently reviewed by the Medical Staff Performance Improvement Committee.

## Section 5:    Disaster Privileges

Disaster privileges may be granted when the hospital's disaster management plan has been activated, and the organization is unable to handle the immediate patient needs.

The President of the Medical Staff, the Vice President of Medical Affairs, or the  President of the Corporation, or their designees, may, on a case by case basis, grant disaster privileges upon presentation of a valid photo identification issued by a state or federal agency and  any of the following:

-A current Hospital picture identification with professional designation
-A current license to practice or primary-source verification of license by the medical staff office, and a valid picture identification issued by a state, federal or regulatory agency
-Identification establishing that the individual is a member of a Disaster Medical Assistance Team (DMAT) The Medical Reserve Corps (MRC), the Emergency System for Advance Registration of Volunteer Health Professionals (ESAAE-VHP), or other recognized state or federal response organization or group.

-Identification granted by a federal, state or municipal entity establishing that the individual has been granted authority to render patient care, treatment, and services in disaster circumstances
-Presentation by current hospital staff or medical staff member(s) with personal knowledge regarding the practitioner's identity and ability to provide services during a disaster may attest to the identity of the individual.

*Effective: 5/5/2008*
*Revised:    11/3/2008, 5/4/2009, 12/7/2009, 7/12/2010, 6/6/2011, 1/9/2012, 7/9/2012, 11/5/2012,*
*1/7/2013, 12/2/2013, 6/2/2014, 12/1/2014, 6/6/2016,10/3/2016,11/7/2016, 1/4/2017, 6/5/2017,*
*12/4/2017, 7/9/2018*

Verification of the credentials of individuals with disaster privileges is a high priority. Verification shall be initiated as soon as the immediate situation is under control, and except in extraordinary circumstances (e.g. no means of communication or a lack of resources), will be completed within 72 hours from the time the practitioner presents to the organization. The time the privileges were granted will be documented, and the President of the Medical Staff, the Vice President of Medical Affairs, or the President of the Corporation, or their designee will make a decision within 72 hours regarding whether to continue the privileges and shall follow the procedures established in these Bylaws for granting temporary privileges to meet an important care need.

Those holding temporary disaster privileges, shall be assigned to work in areas appropriate to their specialty based upon the needs of the Hospital and shall be assigned to work under the direct supervision of a current medical staff member within the same specialty.

Disaster privileges may be withdrawn at any time by the individuals listed above. Refusal or withdrawal of such privileges does not give the right to the hearing and appeal process under these bylaws unless the refusal or withdrawal results in a report to any state or national agency.

**Section 6:**    **Visiting Professor/Expert Surgeon**

A Visiting Professor/Expert Surgeon who renders direct patient care must meet the requirements for Temporary Privileges as outlined in these Bylaws. In cases where the Visiting Professor/Expert Surgeon practices outside the State of Indiana, it will be necessary for the physician to obtain a temporary license for the State of Indiana and malpractice insurance coverage that meets the requirements of the Indiana Patient Compensation Act.

**Section 7:**    **Telemedicine**

Licensed independent practitioners at a distant site may only apply for those privileges for services which the distant site medical staff and the Medical Council has recommended be made available by telemedicine to patients at the Hospital.

Those privileges can be granted upon favorable recommendation of the Medical Council and approved by the Board only if:

1.    the distant site is currently federally accredited, the practitioner is privileged there to provide the same services provided at the Hospital and the medical staff accesses the results of peer review of the practitioner's privileges at the distant site; or

*Effective: 5/5/2008*
*Revised:  11/3/2008, 5/4/2009, 12/7/2009, 7/12/2010, 6/6/2011, 1/9/2012, 11/5/2012,*
*1/7/2013, 12/2/2013, 6/2/2014, 12/1/2014, 6/6/2016,10/3/2016,11/7/2016, 1/4/2017, 6/5/2017,*
*12/4/2017, 7/9/2018*

2.      using credentialing information from the distant site, which is currently federally accredited, the practitioner is credentialed and meets the requirements for the privileges, and the application is complete with no concerns, or

3.      the practitioner is a Medical Staff member who qualified for the privileges at the Hospital.

**Section 8:  Locum Tenens:**

A physician serving as a locum tenens for an Active staff member of the medical staff, to fill a vacancy under special situations (for example: illness, death, termination, or vacation) , may apply for locum tenens privileges.  These locum tenens privileges will be granted by the Division Chief, the President of the Medical Staff and the President of the Corporation (CEO).

Allied Health Practitioners may serve as locum tenens to fill a vacancy under special situations (for example: illness, death, termination, or vacation).  These locum tenens privileges will be granted by the Division Chief, the President of the Medical Staff and the President of the Corporation (CEO), and the applicant must meet the requirements as outlined in Article XI: Allied Health Professionals (AHP's).

 Locum Tenens privileges may be granted for one (1) initial period of ninety (90) days.  Locum Tenens privileges may be renewed without recredentialing for one (1) additional ninety (90) day renewal period, provided such renewal period commences within twelve (12) months of the granting (i.e., commencement date) of initial locum tenens privileges.  The total period of locum tenens privileges, cumulative of the initial grant and a renewal grant, may not exceed one hundred eighty (180) days; practitioners that wish to continue practicing after this time period has been utilized must apply for staff membership and privileges.

Locum Tenens credentialing requires completion of an application with the processing fee, privilege form, and specific verification of credentialing process required elements (licensure(s), National Practitioner Data Bank sanction check, Medicare sanction check, health status/professional reference, criminal background check, professional liability insurance coverage, and education verification).  Hospital affiliations within the last two (2) years must also be verified.

A concurrent focused review will be performed after thirty (30) days with results reported to the Credentials and Professional Standards Committee.

Locum Tenens will not pay medical staff dues.

A practitioner may not reapply for locum tenens privileges for a period of one (1) year after the expiration of the initial period of locum tenens privileges, if not renewed, or one (1) year after the expiration of the renewal period, as applicable.

*Effective: 5/5/2008*
*Revised: 11/3/2008, 5/4/2009, 12/7/2009, 7/12/2010, 6/6/2011, 1/9/2012, 7/9/2012, 11/5/2012,*
*1/7/2013, 12/2/2013, 6/2/2014, 12/1/2014, 6/6/2016,10/3/2016,11/7/2016, 1/4/2017, 6/5/2017,*
*12/4/2017, 7/9/2018*

## Section 9: Focused Professional Practice Evaluation

Focused Professional Practice Evaluation (FPPE) shall mean the process by which Methodist Hospital evaluates the privilege-specific competence of practitioners who do not have documented evidence of competently performing the requested privilege in the hospital. It shall also mean the process by which Methodist evaluates a practitioner whose current ability to provide safe high quality care has been called into question through the OPPE process. This policy applies to any Methodist physician, dentist (including oral surgeon), podiatrist or allied health staff member.

Patient encounter shall mean an admission, consult, or any inpatient/outpatient procedures performed at Methodist by the practitioner.

A.   The division chief shall be responsible for initiating the process. The triggers and criteria for conducting a FPPE include:

New Privilege Requests – New privileges granted to members of the medical staff.

New Applicant – When a physician is appointed to the Medical Staff, the privileges are considered provisional for an established period of time according to the Medical Staff Bylaws. During this provisional period, this review will be completed to confirm competence in the clinical privileges requested.

Sentinel Event – An unexpected occurrence involving death or serious physical or psychological injury or the risk thereof, including variation for which a recurrence would carry a risk of serious adverse outcome.

Near Miss – Any process variation which did not affect the outcome, but for which a recurrence carries a significant chance of a serious adverse outcome.

Serious Event – An event, occurrence or situation involving the clinical care of a patient that results in death or compromises patient safety and results in an unanticipated injury requiring the delivery of additional health care services.

Triggers may be a single incident or evidence of a clinical practice trend. Examples of performance triggers include: number of adverse events; number peer review events with adverse determination; infection rates higher than most practitioners; low volume admissions/procedures over an extended period of time; increased length of stay (LOS); increased number of return to surgery; frequent/repeat readmission for same issue; patterns of unnecessary diagnostic testing/treatments; failure of follow approved clinical practice guidelines, patient, family or staff complaints.

*Effective:  5/5/2008*
*Revised:   11/3/2008, 5/4/2009, 12/7/2009, 7/12/2010, 6/6/2011, 1/9/2012, 7/9/2012, 11/5/2012,*
*1/7/2013, 12/2/2013, 6/2/2014, 12/1/2014, 6/6/2016,10/3/2016,11/7/2016, 1/4/2017, 6/5/2017,*
*12/4/2017, 7/9/2018*

B.     Methods to be utilized are:

        1.     Chart review.
        2.     Direct observation.
        3.     Monitoring of diagnostic and treatment patterns.
        4.     Proctoring.
        5.     Discussion with members of the medical staff or other(s) as deemed
           necessary by the department chairperson.

C.     The FPPE will consist of a minimum of five (5) patient encounters reviewed by peers
       after three (3) months of their appointment date or the granting of a new privilege. If after
       three months the number of patient encounters has not been achieved, the department
       chairperson may extend the evaluation period for an additional three (3) months. Any
       extension must be approved by the Credentials and Professional Standards Committee.

D.     If a practitioner has not performed a sufficient number of procedures so that
       comfortable with granting full, unrestricted privileges, it may require a certain number of
       procedures to be granted under proctorship.  If the provider's performance is not
       consistent with what the medical staff feels is high-quality care, criteria for focused
       monitoring for that specific practitioner may include 100% monitoring of all cases.

E.     The circumstance under which an external review is required is when there are
       insufficient numbers of non-conflicted  specialists to do an internal review or by
       recommendation of  the Peer Review Committee.

F.     Examples of measures to be taken to resolve performance  issues include a documented
       discussion between the  practitioner and the Division Chief, a letter to the provider
       noting areas in need of improvement, recommendations for training, focused monitoring,
       and subsequent correction  action.

G.     When issues are identified, communication to the provider must be clear and specific
       regarding what is wrong with the performance and what improvements are expected.
       Examples include – the specific area in which the practitioner's performance is
       unsatisfactory and specific examples of the deficiencies, what improvements are expected
       and the specific period of time the practitioner is being given to demonstrate acceptable
       performance, what assistance is available to help the practitioner improve performance,
       and a statement indicating that if performance does not improve to a minimally
       acceptable level, further action may be taken.

H.     Measures employed in resolving performance issues are measured and consistently
       implemented and may include: necessary education; proctoring/assisting for defined
       privilege; counseling; physician/practitioner assistance programs; suspension of specific
       privileges; revocation of specific privileges.

*Effective: 5/5/2008*
*Revised:    11/3/2008, 5/4/2009, 12/7/2009, 7/12/2010, 6/6/2011, 1/9/2012, 7/9/2012, 11/5/2012,*
*1/7/2013, 12/2/2013, 6/2/2014, 12/1/2014, 6/6/2016,10/3/2016,11/7/2016, 1/4/2017, 6/5/2017,*
*12/4/2017, 7/9/2018*

The improvement plan must be documented and include the requirements, who is accountable, and how the improvement will be measured and documented.

I.     The outcomes of FPPE shall be documented and reported on a regular basis, as determined by the specific Divisions, to the following: The Credentials and Professional Standards Committee; the Medical Council and the Board of Directors.

## Section 10: Ongoing Professional Practice Evaluation

The ongoing professional practice evaluation (OPPE) requires that the medical staff conduct an ongoing evaluation of each practitioner's professional performance. This process allows any potential problems with a practitioner's performance or trends that impact quality of care and patient safety to be identified and resolved in a timely manner. The OPPE also fosters an efficient, evidence-based privilege renewal process. The information resulting from the ongoing professional practice evaluation is used to determine whether to continue, limit, or revoke any existing privilege(s).

Ongoing professional practice evaluation (OPPE) is defined as the routine measurement and evaluation of current competency for current medical staff members.

A.     The respective Division Chief(s) are responsible to coordinate the Ongoing Professional Practice Evaluation (OPPE) review. The OPPE will be performed on all practitioners at a minimum of every six months.

B.     The type of information and the process for evaluation of each practitioner's ongoing professional practice will be approved annually by the Divisions through the Medical Council.

Physicians will have ongoing division specialty specific feedback in the following areas:

1.     *Common Indicators:*
       a.     Unapproved Abbreviations
       b.     Illegible Orders
       c.     Rounding Failures
       d.     H&P not Dictated/Written Within 24 Hours

2.     *Division Specific Indicators:*
       a.     Division Chief will annually select the criteria used specific to their area.

C.     The evaluation may be obtained through, but is not limited to, the following:

       •Concurrent and/or targeted medical record review of extrapolated data within a minimum of six months.
       •Direct observation

*Effective:  5/5/2008*
*Revised:   11/3/2008, 5/4/2009, 12/7/2009, 7/12/2010, 6/6/2011, 1/9/2012, 7/9/2012, 11/5/2012,*
*1/7/2013, 12/2/2013, 6/2/2014, 12/1/2014, 6/6/2016,10/3/2016,11/7/2016, 1/4/2017, 6/5/2017,*
*12/4/2017, 7/9/2018*

• Monitoring/proctoring
• Division Chief will have discussion with other practitioner's involved in the care of specific patients
• Data collected and assessed through quality improvement indicators and triggers
• Sentinel event data
• Any applicable peer review data.

D.    Ongoing data review and findings about practitioner practice and performance will be evaluated by the Division Chiefs and Medical Council every six months and will be utilized to access the quality of care of each practitioner.

E.    Results of monitored indicators are reported to the practitioner's clinical Division Chief at minimum, every six (6) months.

F.    Unusual patterns, trends, outliers or issues are to be brought to the Division Chief immediately for review, corrective action and/or additional monitoring, as necessary. Trends will be reported to Division Chief for further action and possible referral to Medical Council.

G.    Practitioners who do not admit/utilize the hospital with adequate frequency for assessment or are in a specialty that does not provide inpatient hospital care shall be responsible for providing alternative information for review that will allow an informed decision regarding professional practice evaluation, every six (6) months at a minimum.

H.    All profiles will be reviewed by the respective Division Chief and filed in the quality file.

## ARTICLE V
## EXCLUSIVE CONTRACTING

**Section 1:    Member Requirement**

A member or applicant who is or will be providing services at the hospital pursuant to a contract, exclusive or otherwise, with the hospital must satisfy the same medical staff membership qualifications, must be processed for membership, membership renewal and clinical privileges in the same manner, and must fulfill all of the obligations of the appropriate membership category as any other applicant or medical staff member.

**Section 2:    Applications for Exclusively Contracted Privileges**

*Effective: 5/5/2008*
*Revised:    11/3/2008, 5/4/2009, 12/7/2009, 7/12/2010, 6/6/2011, 1/9/2012, 7/9/2012, 11/5/2012,*
*1/7/2013, 12/2/2013, 6/2/2014, 12/1/2014, 6/6/2016,10/3/2016,11/7/2016, 1/4/2017, 6/5/2017,*
*12/4/2017, 7/9/2018*

Applications for membership or for clinical privileges which directly utilize those hospital resources and services subject to exclusive contracts will not be accepted for processing while a contract is in effect, unless new providers are being sought.

**Section 3:     Quality Review of Exclusive Contract Proposals**

Privileges can be denied, reduced or terminated as a result of the initiation of an exclusive contract, or transfer of an existing exclusive contract for professional services, provided that prior to the implementation of such contract, the proposal shall be submitted to the Medical Council which shall deliver to the Board its written evaluation of the effect that the contract's limitations on privileges may have on the quality of care, treatment and services.   The Board shall consider the written evaluation of the Medical Staff in making its determination concerning the proposed contract.  If the Medical Council fails to provide a written evaluation within thirty (30) days thereof, sixty (60) days if this request is made during a month when the Medical Council does not meet (August or December) then the Board shall assume that the Medical Council recommends such arrangement.

**Section 4:     Hearing and Appeal Rights**

Medical Staff members negatively affected by an exclusive arrangement will no longer be allowed to provide exclusive services but retain medical staff membership and therefore hearing and appeal rights.

**ARTICLE VI**
**CORRECTIVE ACTIONS**

**Section 1:     Practitioner Conduct**

Practitioners' conduct advocating for patients or providing input that is meant to improve care  is appropriate and not actionable under these bylaws.  Practitioners' conduct is actionable under these bylaws if it disrupts or could disrupt the delivery of quality care , and can reasonably be considered harassment as defined by these bylaws and/or verbal, visual or physical abuse, directed against another medical staff member, house staff, hospital employee, contractor or volunteer, or patient.   Retaliation against complainants or those implementing this process, failure or refusal to cooperate with this process, even if the underlying accusation is found to be untrue, and abuse of the complaint process by members to harass other members are subject to corrective action under these bylaws.

Abuse of the complaint process by non-Hospital employees, board members or contractors is subject to discipline under Hospital administrative policies.

**Section 2:     Initiating Corrective Action**

*Effective: 5/5/2008*
*Revised: 11/3/2008, 5/4/2009, 12/7/2009, 7/12/2010, 6/6/2011, 1/9/2012, 7/9/2012, 11/5/2012,*
*1/7/2013, 12/2/2013, 6/2/2014, 12/1/2014, 6/6/2016,10/3/2016,11/7/2016, 1/4/2017, 6/5/2017,*
*12/4/2017, 7/9/2018*

A.  Any person may provide information confidentially to the medical staff about the improper conduct, performance, or competence of its members. Information provided to hospital administrative or medical staff members shall be directed to the President of the Corporation or designee. the relevant Division Chief and/or President of the Medical Staff and/or to the Medical Council Chair or their designees. Information provided to Division Chief or the Medical Council chair or President of the Medical Staff or designees. directly or indirectly, shall be reviewed as soon as possible by him/her or designee. The Division Chief or the Medical Council Chair or President of the Medical Staff, or designee, shall make an initial determination of authenticity and severity, and act accordingly. In all cases, the member involved shall be provided with a copy of these bylaws and a copy of the complaint.

B.  The Division Chief or the Medical Council Chair or President of the Medical Staff can choose from among the following options:

1.  The Division Chief or the Medical Council Chair or President of the Medical Staff, shall refer to the Practitioner Impairment Committee any member whose behavior suggests that he or she may be suffering from mental or physical ailments, substance abuse or emotional problems.

2.  The Division Chief may assign a qualified preceptor from among the Division membership, or the Chair or President of the Medical Staff may appoint a qualified preceptor from among the Medical Staff membership, . The preceptor will provide assistance and direction as needed for up to a year, if needed, as determined by the Division Chief. The preceptor is obligated to report in writing any significant patient safety or professional competence or conduct issues to the Division Chief at the conclusion of the preceptoring period and at any earlier determination by the preceptor or request of the Division Chief. At the end of the preceptoring period, the Division Chief will assess the Preceptor report. If the Medical Staff member requires further preceptoring, a report with this determination will be made to the PIOC of the Division, with a copy to the Credentials & Professional Standards Committee, requesting a more extensive peer evaluation preceptors will be ad-hoc members of the Leadership Performance Improvement Council. Preceptors shall be indemnified as such by the Hospital. The preceptee shall make compensation to Medical Staff Services for preceptor services.

3.  Initiate focused review. Upon request of the Division Chief or President of the Medical Staff, or on his/her own volition, the Medical Council Chair shall appoint a special committee of impartial medical staff members whose professional credentials establish their competence to analyze the grounds for the request and the performance of the practitioner. The panel shall conduct the review as peers following the time frames set for that focused review by the Medical Council Chair. Focused review may result in recommendations for changes to improve

Effective:  5/5/2008
Revised:   11/3/2008, 5/4/2009, 12/7/2009, 7/12/2010, 6/6/2011, 1/9/2012, 7/9/2012, 11/5/2012,
1/7/2013, 12/2/2013, 6/2/2014, 12/1/2014, 6/6/2016,10/3/2016,11/7/2016, 1/4/2017, 6/5/2017,
12/4/2017, 7/9/2018

the member's performance; recommendations for system, protocol or policy changes; a request for investigation or corrective action; or other action.

When reliable information indicates a member may have exhibited acts, demeanor, or conduct reasonably likely to be (1) detrimental to patient safety or to the delivery of quality patient care within the hospital; (2) unethical; (3) contrary to the medical staff bylaws and rules and regulations; (4) below applicable professional standards; or (5) violations of state or federal laws (such as HIPAA or EMTALA), request the Medical Council initiate an investigation or action against such member.

C.    Initiating Investigation

The Medical Council shall direct an investigation to be undertaken upon its own initiative or upon the request of the Division Chief or President of the Medical Staff. The Medical Council may conduct the investigation itself, or may assign the task to an appropriate medical staff officer, medical staff department, or standing or ad hoc medical staff committee. If the investigation is delegated to an officer of committee other than the Medical Council, such officer or committee shall proceed with the investigation in a prompt manner and shall forward a written report of the investigation to the Medical Council in a timely manner.  The report may include recommendations for appropriate corrective action. The member shall be notified that an investigation is being conducted and shall be given an opportunity to provide information in a manner and upon such terms as the investigating body deems appropriate.  The individual or body investigating the matter may, but is not obligated to, conduct interviews with persons involved; however, such interview shall not constitute a "hearing" as that term is used in Article VII, nor shall the procedural rules with respect to hearings or appeals apply.  Despite the status of any investigation, at all times the member subject to investigation remains subject to whatever action may be taken in accordance with these Bylaws as warranted by the circumstances, including without limitation summary suspension, termination of the investigative process, or other action.

D.    External Review

External Peer review will take place at any time during the focus review or corrective action initiation or investigation process, if deemed appropriate by the Division Chief or the Medical Council Chair or President of the Medical Staff, under the following circumstances;

    a.    Ambiguity when dealing with vague or conflicting recommendations from committee review(s) where conclusions from this review could directly impact an individual's membership or privileges.

    b.    Lack of internal expertise when no one on the medical staff has adequate expertise in the clinical procedure or area under review.

*Effective: 5/5/2008*
*Revised: 11/3/2008, 5/4/2009, 12/7/2009, 7/12/2010, 6/6/2011, 1/9/2012, 7/9/2012, 11/5/2012,*
*1/7/2013, 12/2/2013, 6/2/2014, 12/1/2014, 6/6/2016,10/3/2016,11/7/2016, 1/4/2017, 6/5/2017,*
*12/4/2017, 7/9/2018*

    c.     When the medical staff needs an expert witness for a fair hearing, for evaluation of a credential file or for assistance in developing a benchmark for quality monitoring.

    d.     To promote impartiality in peer review

The Medical Executive Council or Board may require external peer review in any circumstances deemed appropriate by either of these bodies. No practitioner can require the hospital or medical staff to obtain external peer review if it is not deemed appropriate.

**Section 3:**    **Medical Council Action**

As soon as practicable after the conclusion of the investigation, the Medical Council shall take action which may include, without limitation:

A.    determining no corrective action should be taken and, if the Medical Council determines there was no credible evidence for the complaint in the first instance, removing any adverse information from the member's file; or, if no corrective action is taken, retaining a confidential memorandum summarizing the disposition of the complaint in the member's credentials file up to the subject's next reappointment or up to one year, whichever is longer, and then expunged, if no related action is taken or pending.

B.    deferring action for a reasonable time where circumstances warrant;

C.    issuing letters of admonition, censure, reprimand, or warning, although nothing herein shall be deemed to preclude department heads from issuing informal written or oral warnings outside of the mechanism for corrective action. In the event such letters are issued, the affected member may make a written response which shall be placed in the member's file;

D.    recommending the imposition of terms of probation or special limitation upon continued medical staff membership or exercise of clinical privileges, including, without limitation, requirements for co-admissions, mandatory consultation, or monitoring;

E.    recommending reduction, modification, suspension or revocation of clinical privileges;

F.    recommending reductions of membership status or limitation of any prerogatives directly related to the member's delivery of patient care;

G.    recommending suspension, revocation or probation of medical staff membership;

H.    taking other actions appropriate under the circumstances.

Effective: 5/5/2008
Revised: 11/3/2008, 5/4/2009, 12/7/2009, 7/12/2010, 6/6/2011, 1/9/2012, 7/9/2012, 11/5/2012,
1/7/2013, 12/2/2013, 6/2/2014, 12/1/2014, 6/6/2016,10/3/2016,11/7/2016, 1/4/2017, 6/5/2017,
12/4/2017, 7/9/2018

**Section 4:**      **Subsequent Action**

A.      If corrective action is recommended by the Medical Council, that recommendation shall be transmitted to the board and to the member pursuant to the notice requirements of the hearing procedures set forth in these bylaws.

B.      So long as the recommendation is supported by substantial evidence the recommendation of the Medical Council shall be adopted by the board as final action unless the member requests a hearing, in which case the final decision shall be determined pursuant to the hearing procedures set forth in these bylaws.

**Section 5:**      **Summary Restriction or Suspension**

 A.      Criteria for Initiation

Whenever a member's conduct appears to require that immediate action be taken to prevent imminent danger to the health of any person the following three authorities may initiate immediate action by meeting in person or by telephone with each other:

1.      The President of the Medical Staff or in his/her absence, the President-Elect of the Medical Staff or their designee;
2.      The Chief of the Division, or in his/her absence, the Vice-Chief of the Division or their designee;
3.      The President of the Corporation of his/her designee.

Such summary suspension decision will need the vote of two (2) out of three (3) members. If they cannot agree unanimously, then the President-elect will be invited to participate and vote. If the President-Elect is not available or is already in the panel, then the Chairman of the Medical Council will be invited and they must concur to summarily restrict or suspend the medical staff membership and/or clinical privileges of such member. Unless otherwise stated, such summary restriction or suspension shall become effective immediately upon imposition, and the member shall immediately, and the President of the Medical Staff and Medical Council shall promptly be given notice pursuant to the requirements of the hearing procedures set forth in these bylaws. The summary restriction or suspension may be limited in duration and shall remain in effect for the period stated or, if none, until resolved as set forth herein. The summary suspension or restriction shall not be considered to be a final action until adopted as such by the board of trustees following exhaustion of hearing and appeal rights. Unless otherwise indicated by the terms of the summary restriction or suspension, the member's patients shall be promptly assigned to another member by the department chairman or by the chief of staff, considering where feasible, the wishes of the patient in the choice of a substitute member.

*Effective: 5/5/2008*
*Revised: 11/3/2008, 5/4/2009, 12/7/2009, 7/12/2010, 6/6/2011, 1/9/2012, 7/9/2012, 11/5/2012,*
*1/7/2013, 12/2/2013, 6/2/2014, 12/1/2014, 6/6/2016,10/3/2016,11/7/2016, 1/4/2017, 6/5/2017,*
*12/4/2017, 7/9/2018*

B.    Medical Council Action

Within ten (10) working days after such summary restriction or suspension of all privileges has been imposed, a meeting of the Medical Council shall be convened to review and consider the action. If the summary action involved restrictions of some specific privileges, only those matters will be considered.   Upon request, the member may attend and make a statement concerning the issues under investigation, on such terms and conditions as the Medical Council may impose, although in no event shall any meeting of the Medical Council, with or without the member, constitute a "hearing", nor shall any procedural rules apply.  The Medical Council may modify, continue, or terminate the summary restriction or suspension, but in any event it shall furnish the member with notice of its decision.

C.    Procedural Rights

Unless the Medical Council promptly terminates the summary restriction or suspension, the member shall be entitled to the procedural rights afforded by these bylaws

**Section 6:     Automatic Suspension or Limitation**

In the following instances, the member's privileges or membership may be suspended, limited or revoked as described, which action shall be final without a right to a hearing or further review, except where a bona fide dispute exists as to whether the circumstances have occurred. If such a dispute exists, the member must request a meeting with the chief of staff or designee to discuss the matter as soon as possible.  The President of the Medical Staff may terminate the suspension or limitation, refer the matter to the Medical Council or another appropriate medical staff committee, or allow the termination or suspension to stand. The application for renewal of staff privileges may not be considered for a member who is under suspension.

A.    Licensure

1.    Revocation and Suspension:  Whenever a member's license or other legal credential authorizing practice in this state is revoked or suspended, medical staff membership and clinical privileges shall be automatically revoked as of the date such action becomes effective.

2.    Restriction:  Whenever a member's license or other legal credential authorizing practice in this state is limited or restricted by the applicable licensing or certifying authority, any clinical privileges which the member has been granted at the hospital which are within the scope of said limitation or restriction shall be automatically limited or restricted in a similar manner, as of the date such action becomes effective and throughout its term.

3.    Probation:  Whenever a member is placed on probation by the applicable licensing or certifying authority, his or her membership status and clinical

Effective: 5/5/2008
Revised: 11/3/2008, 5/4/2009, 12/7/2009, 7/12/2010, 6/6/2011, 1/9/2012, 7/9/2012, 11/5/2012, 1/7/2013, 12/2/2013, 6/2/2014, 12/1/2014, 6/6/2016,10/3/2016,11/7/2016, 1/4/2017, 6/5/2017, 12/4/2017, 7/9/2018

privileges shall automatically become subject to the same terms and conditions of the probation as of the date such action becomes effective and throughout its term.

4. If at any time a member is excluded from the federal Medicare or other federally funded health care programs, then the member's medical staff membership and clinical privileges shall be automatically suspended as of that date. A member whose membership and privileges are relinquished due to Medicare exclusion may reapply for medical staff membership after the exclusion period has ended.

B. Controlled Substances

1. Whenever a member's DEA certificate is revoked, limited, or suspended, the member shall automatically and correspondingly be divested of the right to prescribe medications covered by the certificate, as of the date such action becomes effective and throughout its term.

2. Whenever a member's DEA certificate is subject to probation, the member's right to prescribe such medications shall automatically become subject to the same terms of the probation, as of the date such action becomes effective and throughout its term.

C. Medical Records

Members of the medical staff are required to complete medical records as stated in the rules and regulations. A limited suspension, in the form of withdrawal of admitting and other related privileges until medical records are completed, shall be imposed automatically after notice of delinquency for failure to complete medical records within such period. For the purposes of this Section, "related privileges" means any voluntary on-call service for the emergency room, scheduling surgery, assisting in surgery, consulting on hospital cases, and providing professional services within the hospital for future patients. Bona fide vacation or illness that are communicated in advance, may constitute an excuse subject to approval by the Medical Council. Members whose privileges have been suspended for delinquent records may admit patients only in life-threatening situations. The suspension shall continue until lifted by the chief of staff or his or her designee.

D. Professional Liability Insurance

Failure to maintain professional liability insurance as the bylaws require shall be grounds for automatic suspension of a member's clinical privileges, and if within 90 days after written warnings of the delinquency the member does not provide evidence of required professional liability insurance, the member's membership shall be automatically terminated.

Effective:  5/5/2008
Revised:    11/3/2008, 5/4/2009, 12/7/2009, 7/12/2010, 6/6/2011, 1/9/2012, 7/9/2012, 11/5/2012,
1/7/2013, 12/2/2013, 6/2/2014, 12/1/2014, 6/6/2016,10/3/2016,11/7/2016, 1/4/2017, 6/5/2017,
12/4/2017, 7/9/2018

E.    Other Non-Compliance

Failure of a member to pay dues, without good cause to meet special appearance requirements of these bylaws, or a significant misrepresentation or misstatement in or omission from the application for initial or renewed membership, intentional or inadvertent shall result in automatic suspension of membership and privileges.  Failure of a member to disclose any of the actions that trigger automatic suspension shall trigger automatic suspension.

F.    A practitioner whose membership and/or privileges has been automatically suspended shall not be entitled to procedural rights afforded under these Bylaws. The practitioner may be called to attend a Medical Council meeting to discuss the facts surrounding the automatic suspension, but has no right to demand such a meeting, nor may an attorney or other representative accompany the member if called.

**Section 7:    Medical Council Deliberation**

Within ten (10) working days, after automatic suspension is imposed or warranted under these bylaws, the Medical Council shall convene to review and consider the facts, and may recommend such further corrective action as it may deem appropriate.

**ARTICLE VII**
**HEARINGS, APPELLATE REVIEW AND APPEALS**

**Section 1:    General Provisions**

A.    Application of Article

For purposes of this Article, the term "member" may include "applicant," as it may be applicable under the circumstances, unless otherwise stated.

B.    Exhaustion of Remedies

If adverse action is taken or recommended, the member must exhaust the remedies afforded by these bylaws before resorting to legal action.

C.    Final Action

Recommended adverse actions shall become final only after the hearing and appellate rights set forth in these bylaws have either been exhausted or waived, and only upon being adopted as final actions by the Board.

*Effective:  5/5/2008*
*Revised:   11/3/2008, 5/4/2009, 12/7/2009, 7/12/2010, 6/6/2011, 1/9/2012, 7/9/2012, 11/5/2012,*
*1/7/2013, 12/2/2013, 6/2/2014, 12/1/2014, 6/6/2016,10/3/2016,11/7/2016, 1/4/2017, 6/5/2017,*
*12/4/2017, 7/9/2018*

D.   Participation of Counsel

Other than at the hearing and appeal, and any related conferences in which the subject is included, the member may not be accompanied by his or her legal counsel or any other representative at any peer review meeting.

**Section 2:    Hearings and Appellate Reviews**

A.   Right to Hearing

1.   Except as otherwise provided in these Bylaws,  when any member receives a notice of a recommendation of the Medical Council that, if ratified by decision of the Corporation's Board of Directors, will result in termination of Medical Staff membership or exercise of clinical privileges, in whole or in part, the member shall be entitled to a hearing before an ad hoc Hearing Committee of the Medical Staff.

2.   When any member receives notice of a decision by the Medical Council that will affect status as a member of the Medical Staff or exercise of clinical privileges and such decision is contrary to the recommendation by the ad hoc Hearing Committee, the member shall be entitled to an appellate review by a committee appointed by the Corporation's Board of Directors before the Board makes a final decision on the matter.

B.   Request for Hearing

1.   The Medical Council shall be responsible for giving prompt written notice of an adverse recommendation or decision to the affected member who is entitled to a hearing or to an appellate review. The notice shall inform the member:
   a.   Of the recommendation or action, and the reasons for it;
   b.   That the member has a right to a hearing, and thirty (30) days after receiving the notice within which to submit a request for a hearing to the President of the Corporation, either in person or by certified or registered mail.
   c.   Of the rights related to the hearing available to the member pursuant to these Bylaws.

2.   Notice to the member shall be by certified or registered mail or personal service, and the date of receipt of notice shall be the date signed for on the return receipt, if delivered by certified or registered mail, or the date actually served by personal service.

Effective: 5/5/2008
Revised: 11/3/2008, 5/4/2009, 12/7/2009, 7/12/2010, 6/6/2011, 1/9/2012, 7/9/2012, 11/5/2012,
1/7/2013, 12/2/2013, 6/2/2014, 12/1/2014, 6/6/2016,10/3/2016,11/7/2016, 1/4/2017, 6/5/2017,
12/4/2017, 7/9/2018

    3.    The member must initiate a request for hearing within thirty (30) days of notification of an adverse recommendation.

    4.    The failure of a member to request a hearing to which he/she is entitled by these Bylaws within the time and in the manner herein provided shall be deemed a waiver of his/her right to such hearing and to any further appellate review to which the member might otherwise have been entitled on the matter.

C.    Notice of Hearing

    1.    Once a hearing is requested, the Chairman of the ad hoc Hearing Committee shall schedule and arrange for such a hearing to occur no sooner than thirty (30) days nor later than sixty (60) days after receipt of the request for hearing. The Chairman shall notify the parties of the time, place and date so scheduled.

    2.    The notice of hearing shall state, in concise language, the acts or omissions with which the physician is charged, a list of specific or representative charts being questioned and/or the reasons or subject matter that was considered in making the adverse recommendation or decision, and a list of the witnesses (if any) expected to testify at the hearing.

D.    Composition of Ad Hoc Hearing Committee

    1.    On behalf of the Hospital, the President of the Medical Staff will recommend that an ad hoc Hearing Committee be appointed. The President of the Medical Staff, along with the President-Elect and the Immediate Past President will select no less than five members of the medical staff to serve on the Ad Hoc Hearing Committee. The hearing shall be conducted by an ad hoc committee of not less than five (5) members of the Medical Staff who are not members of the Medical Council or Credentials Committee. One (1) of the members to be appointed shall be designated as Chairman. The members of the Medical Staff appointed to the ad hoc committee, cannot be in direct economic competition with the member, and are neither favorably or unfavorably disposed toward the member. This shall be certified by the appointed members, in writing, and made a part of the record of the Hearing. Direct economic competition is determined by considering factors such as the practice area in which the ad hoc hearing committee members are credentialed and the geographic service area from which they draw patients; among other factors. Any potential conflict should be disclosed by members upon being requested to serve on the ad hoc committee or any time thereafter upon realization of a potential conflict.

E.    Conduct of Hearing

    1.    There shall be at least a majority of the members of the ad hoc Hearing Committee present when the hearing takes place and no member may vote by proxy.

*Effective:* 5/5/2008
*Revised:* 11/3/2008, 5/4/2009, 12/7/2009, 7/12/2010, 6/6/2011, 1/9/2012, 7/9/2012, 11/5/2012,
1/7/2013, 12/2/2013, 6/2/2014, 12/1/2014, 6/6/2016,10/3/2016,11/7/2016, 1/4/2017, 6/5/2017,
12/4/2017, 7/9/2018

2.  The personal presence of the member for whom the hearing has been scheduled shall be required. A member who fails, without good cause, to appear and proceed at such hearing shall be deemed to have waived his/her rights and to have accepted the adverse recommendation or decision involved, and the same shall thereupon become and remain in effect as if the member failed to timely request a hearing.

3.  Postponement of hearings set forth in these Bylaws shall be made only with the approval of the ad hoc Hearing Committee and member.

4.  In addition to a chairman of the ad hoc Hearing Committee, the Medical Council may request that a hearing officer be appointed, due to the complexity of the matter or for other reasons. The Medical Council shall submit such request to the President of the Corporation, who shall appointed a hearing officer subject to the mutual approval of the Medical Council and the Board of Directors. The hearing officer shall be an attorney at law qualified to preside over an administrative hearing such as this, but attorneys from a firm regularly utilized by the hospital, the medical staff or the involved medical staff member, for legal advice regarding their affairs and activities shall not be eligible to serve as hearing officer. The hearing officer shall gain no indirect financial benefit from the outcome other than compensation for his/her services as hearing officer, and must not act as a prosecuting officer or as an advocate. The hearing officer shall advise the chairman of the Ad Hoc Hearing Committee and, shall endeavor to assure that all participants in the hearing have a reasonable opportunity to be heard and to present relevant oral and documentary evidence in an efficient and 0expeditious manner. The hearing officer shall advise the Ad Hoc Hearing Committee to determine the proper order of or procedure for presenting evidence and argument during the hearing and shall advise the Ad Hoc Hearing Committee to make all rulings on questions which pertain to matters of law, procedure or the admissibility of evidence. If requested by the Ad Hoc Hearing committee, the hearing officer may participate in the deliberations of such committee and be a legal advisor to it, but the hearing officer shall not be entitled to vote.

5.  The affected member, and either the Medical Council of the Medical Staff or the Corporation's Board of Directors, whichever generated the adverse action, may be represented at any phase of the hearing procedure by an Attorney at Law or by another person of the party's choice.

6.  Both parties shall have the right to submit a written statement at the close of the hearing. Within seven (7) days after final adjournment of the hearing, the ad hoc Hearing Committee shall make a written report and recommendation, stating the reasons therefore, and shall forward the same together with the hearing record and all other documentation to the Board.

*Effective: 5/5/2008*
*Revised:  11/3/2008, 5/4/2009, 12/7/2009, 7/12/2010, 6/6/2011, 1/9/2012, 7/9/2012, 11/5/2012,*
*1/7/2013, 12/2/2013, 6/2/2014, 12/1/2014, 6/6/2016,10/3/2016,11/7/2016, 1/4/2017, 6/5/2017,*
*12/4/2017, 7/9/2018*

The report may recommend confirmation rejection or modification of the original adverse recommendation of the Medical Council.

7.   The ad hoc Hearing Committee shall make a record of said hearing by a court reporter and cause a transcript of said proceeding to be prepared.   The member may obtain a transcript through the court reporter and will be responsible for any associated charges.

8.   Each party shall have the following rights in the hearing:

   a.   To call and examine witnesses who will testify under oath;
   b.   To introduce exhibits and documentary evidence:
   c.   To cross-examine any witness on any matter relevant to the case and to rebut any evidence.

9.   The ad-hoc Hearing Committee may question the witnesses and call additional witnesses as they deem appropriate.

10.  Counsel for the Hospital or the Medical Council, whichever is bringing the adverse action, will open with evidence in support of the it's position.

11.  This is an administrative hearing and strict rules of evidence are generally not applicable  Any relevant evidence shall be admissible, if it is the sort of evidence on which responsible persons are accustomed to rely in the conduct of serious affairs.

12.  Each party is entitled to submit a memorandum of points and authorities to the ad hoc Hearing Committee.

13.  The hearing shall be closed to the public.  All documents and testimony shall be maintained in strict confidence by all participants, and witnesses, consistent with the state peer review protection statue.

14.  The Chairman of the ad hoc Hearing Committee may adjourn the hearing and reconvene it at the convenience of the participants without special notice after consultation with the majority of the members.  Upon conclusion of the presentation of oral and documentary evidence by each party, the hearing shall end.  The ad hoc Hearing Committee shall thereafter, outside the presence of all persons (except the hearing officer if one is appointed, and upon the request of the Ad Hoc Hearing Committee), conduct its deliberations and render its determination and recommendation.

F.   Decisions of the Ad Hoc Hearing Committee

Effective: 5/5/2008
Revised: 11/3/2008, 5/4/2009, 12/7/2009, 7/12/2010, 6/6/2011, 1/9/2012, 7/9/2012, 11/5/2012,
1/7/2013, 12/2/2013, 6/2/2014, 12/1/2014, 6/6/2016,10/3/2016,11/7/2016, 1/4/2017, 6/5/2017,
12/4/2017, 7/9/2018

Within seven (7) days after final adjournment of the hearing, the ad hoc hearing committee makes a written report of its recommendations and the reasons for them, with specific reference to the hearing record and other documentation considered, and forwards the report along with the record and other documentation to the Medical Staff President to immediately forward to the President of the Corporation, Medical Council, the Board of Directors and to the member by special notice.

**Section 3:      Appeals to the Corporation's Board of Directors**

A.   Within seven (7) days after receipt of a notice of the ad hoc Hearing Committee's decision, either the member or the party recommending adverse action may appeal the decision. The request must be delivered to the President of the Corporation in person or by certified or registered mail and may include a request for a copy of the ad hoc hearing committee report and record and all other material, favorable or unfavorable, if not previously forwarded, that was considered in taking the adverse recommendation or action.

B.   If such an appellate review is not requested within seven (7) days, the parties shall be deemed to have waived the right to the same, and to have accepted such adverse recommendation or decision, and the same shall become effective upon ratification by the full Board of Directors.

C.   After receipt of such notice of request for appellate review, the Corporation's Board of Directors shall schedule a date for such review and shall, through the President of the Corporation, by written notice, notify the parties of the same. The date of the appellate review shall be scheduled as soon as the arrangements for it may reasonably be made but not more than thirty (30) days from the date of receipt of the request for appeal., provided, however, that appellate review for a member who is under a suspension then in effect shall be held as soon as the arrangements for it may be reasonably made, but not later than twenty-one (21) from the date of receipt of the request for appeal. The time may be extended by the appellate review body for good cause and if a request is made as soon as is reasonably practical.

D.   The appellate review shall be conducted by a duly appointed Appellate Review Committee of the Corporation's Board of Directors of not less than three (3) members. The Chairman of the Corporation's Board of Directors shall select the members of the Appellate Review Committee. No members may participate in or act on the appeal if they are in direct economic competition with the appellant or appointee or otherwise are favorably or unfavorably disposed towards the individual or personally benefit from the outcome.

E.   The parties shall have access to the report and record (and transcription, if any) of the ad hoc Hearing Committee and all other material, favorable or unfavorable, that was

*Effective: 5/5/2008*
*Revised: 11/3/2008, 5/4/2009, 12/7/2009, 7/12/2010, 6/6/2011, 1/9/2012, 7/9/2012, 11/5/2012,*
*1/7/2013, 12/2/2013, 6/2/2014, 12/1/2014, 6/6/2016,10/3/2016,11/7/2016, 1/4/2017, 6/5/2017,*
*12/4/2017, 7/9/2018*

considered in making the decision. The parties may submit a written statement on their behalf in which those to the Appellate Review Committee of the Board of Directors through the President of the Corporation at least five (5) days prior to the date of such appellate review. The written statements may cover any matters raised at any step in the hearing process. The President of the Corporation shall provide a copy of the statements to the opposing parties at least three (3) days prior to the scheduled date of the appellate review.

F.    The Appellate Review Committee shall act as an Appellate Body. The role of the Appellate Review Committee is to determine whether proper procedure and due process were followed.  It shall review the record created in the proceedings and shall consider the written statements submitted for the purpose of determining whether the adverse recommendation or decision against the affected physician was justified and was not arbitrary or capricious. The chairman of the appellate review body is the presiding officer, who shall determine the order of procedure during the review, make all required rulings and maintain decorum.  The Appellate Review Committee shall allow the parties or their representatives to personally appear and make oral statements in favor of their positions.  Any party or representative appearing is required to answer questions put by any member of the Appellate Review Committee.

G.    New or additional matters not raised during the original hearing or in the ad hoc Hearing Committee report, nor otherwise reflected in the record, shall only be introduced at the Appellate Review under unusual circumstances, and the Appellate Review Committee shall, in its sole discretion, determine whether new matters shall be accepted.

H.    The Appellate Review Committee shall, within five (5) days after the adjourned ate of the appellate review, either make a written report recommending that the Corporation's Board of Directors affirm or reject the  recommendation.  The Appellate Review Committee may also remand the matter back to the ad hoc Hearing Committee for further information which stays the appellate process until the information is submitted.  As the Medical Council is a party to the appeal, any remand of the ad hoc Hearing Committee decision should be to the ad hoc Hearing Committee, not the Medical Council, for clarification or additional information.  The Appellate Review Committee may remand to the ad hoc Hearing Committee only once. Upon receipt of the information (or lack of response if no information is provided) the Appellate Review Committee shall make a report to the Corporation's Board of Directors as described above.

I.    When this section is applicable, the appellate review shall not be deemed to be concluded until all of the procedural steps provided have been completed or waived.

J.    Upon receipt of the recommendation of the Appellate Review Committee, at the next regularly scheduled Board Meeting following the conclusion of the appellate review, but no later than thirty (30) days thereafter, the Board of Directors, at a meeting of the Board, shall make its final decision in the matter and shall send notice thereof to the Medical

*Effective: 5/5/2008*
*Revised:    11/3/2008, 5/4/2009, 12/7/2009, 7/12/2010, 6/6/2011, 1/9/2012, 7/9/2012, 11/5/2012,*
*1/7/2013, 12/2/2013, 6/2/2014, 12/1/2014, 6/6/2016,10/3/2016,11/7/2016, 1/4/2017, 6/5/2017,*
*12/4/2017, 7/9/2018*

Council, the President of the Corporation, and to the affected member. The full Board shall either approve or reject the recommendation of the Appellate Review Committee. The full Board and its appellate review committee (if appointed) shall not hear the merits of the case. They shall decide if appropriate procedures were followed in the hearing. The decision of the Board shall be final and binding.

K.  Not withstanding any other provision of these Bylaws, no one shall entitled to more than one (1) hearing and one (1) appellate review on any matter pertaining to the termination of membership and/or privileges.

## ARTICLE VIII
## MEDICAL STAFF ORGANIZATION

**Section 1:     General Medical Staff Meetings**

A.  Annual Meeting: The annual meeting of the Medical Staff shall be the last meeting before the end of the calendar year.

At this meeting, the retiring Officers, Council Chairman and Chiefs of Service must submit annual reports.

Medical Staff Officers for the ensuing year shall be elected by secret ballot.

Nominees shall be elected upon receiving a majority of the valid votes cast. In the case of a tie, there will be a coin toss to determine the winner. The President of the Medical Staff will perform the coin toss immediately, and the coin toss will be witnessed by the two nominees ;who are the subjects of the tie vote.
The term of all elective offices will be from January 1st through December 31st.

B.  Regular Meetings: The regular meetings of the Medical Staff shall be held at least twice during the year.

C.  Special Meetings: Special meetings of the Medical Staff may be called by the President of the Medical Staff, President of the Corporation, Board, and Medical Council or at the written request of fifteen (15) members of the Active Medical Staff.

Notice of such meetings shall be in writing to all members of the Staff at least three (3) days prior to the proposed meeting or by email if an effective email distribution system is in place or telephone at least one (1) day prior to the meeting. Such notice shall contain the agenda, and only these items may be discussed at the special meeting.

D.  Attendance at Meetings: All members of the Active and Associate Staffs are encouraged to attend Division or Department Meetings as well as regular meetings of the General Medical Staff and any Special meetings called by the Medical Council or President of the

*Effective: 5/5/2008*
*Revised:   11/3/2008, 5/4/2009, 12/7/2009, 7/12/2010, 6/6/2011, 1/9/2012, 7/9/2012, 11/5/2012,*
*1/7/2013, 12/2/2013, 6/2/2014, 12/1/2014, 6/6/2016,10/3/2016,11/7/2016, 1/4/2017, 6/5/2017,*
*12/4/2017, 7/9/2018*

Medical Staff . Absence from more than one-half (1/2) of these meetings will cause that member to be warned to improve attendance. The Credentials and Professional Standards Committee shall have the right to excuse a member from these attendance requirements for a specific period for good cause.

E.     Quorum: Ten percent (10%) of the total membership of the Active and Associate II Medical Staff shall constitute a quorum.  Actions may be taken at a Medical Staff meeting once a quorum has been established, even if a quorum is not maintained for the remainder of the meeting.

F.     Agenda: The agenda and order of business for General Medical Staff meetings is  listed in the Medical Staff Policies and Procedures Manual.

G.     Electronic and Telephonic Means: Notice, attendance, actions including voting and participation may be accomplished by email or other electronic and/or telephonic means where permitted by the chair of the medical staff meeting on either an individual or group basis.

## Section 2:     Elected Officers of the Medical Staff

A.     The Officers of the Medical Staff shall be the President-Elect, President, Immediate Past-President, Secretary,  Treasurer and Delegates-At Large.

The President-Elect shall automatically succeed the position of the President upon completion of his/her tenure as President-Elect. Medical Staff officers are elected from among the Active Staff in good standing and are accountable to the Medical Staff.

Medical Staff Officers must:

1.  Be active staff member in good standing;
2.  Have served on medical staff committees; and
3.  Be board certified or possess comparable competence; to an individual with board certification. Comparable competence is defined as at least five years of active staff membership, with evaluation under the medical staff's quality assessment process showing quality patient care.

B.     Presidential Officers and Duties

1.     President: The President shall be elected for a two (2) year term.  The President shall call and preside at all meetings of the General Medical Staff and shall be an ex-officio member of all committees. He/she shall perform such other duties as shall from time to time be required by the Medical Staff. The President, or designee, shall serve on committees of the Governing Body.

*Effective: 5/5/2008*
*Revised:    11/3/2008, 5/4/2009, 12/7/2009, 7/12/2010, 6/6/2011, 1/9/2012, 7/9/2012, 11/5/2012,*
*1/7/2013, 12/2/2013, 6/2/2014, 12/1/2014, 6/6/2016,10/3/2016,11/7/2016, 1/4/2017, 6/5/2017,*
*12/4/2017, 7/9/2018*

The President of the Medical Staff is expected to provide a monthly report to the Board outlining those Medical Staff activities intended to evaluate and improve the quality of care practiced in the Hospital as well as deficiencies identified and corrective actions taken. In addition, the President of the Medical Staff shall summarize pertinent findings, actions, recommendations and programs of the various Medical Staff committees and Clinical Divisions. The President shall report to the Medical Council and Medical Staff at each meeting the activities of the Board and administration affecting professional practice and patient care at the hospital.

In the event of the temporary absence or unavailability of the President, the President-Elect shall assume the duties of the President for that period of time. In the event of the death, resignation or removal of the President: the President-Elect shall succeed to and assume the office of the President for the remainder of the unexpired term. Further, in the case of resignation or removal, the resigning or removed President shall forfeit any right to serve in the capacity of Immediate Past President, to which position he/she would otherwise have succeeded at the conclusion of his/her unexpired term as President, and the then-sitting Immediate Past President shall serve an additional two-year term as Immediate Past President (fulfilling the term forfeited by the resigning or removed President).

The President of the Medical Staff shall also make all Medical Staff committee appointments that will take effect as of January 1 of the second year of the President's two-year term. The appointments shall be made at the end of the first year of the President's two-year term, in time for Medical Council approval at its November meeting, taking every effort to assign all members to a committee and to limit assignment to one (1) committee per member. Chairmen and Vice-Chairmen shall be appointed when a term has expired or when the position is otherwise vacated.

2.  President-Elect: The President-Elect shall be elected for a <u>two (2) year term</u> prior to taking office as President of the Medical Staff. In the event of death or resignation or removal of the President, the President-Elect shall assume the office of President. In the absence of the President, the President-Elect shall assume all the duties and have the authority and responsibilities of the President.

    The President-Elect of the Medical Staff shall also make all Medical Staff Committee appointments that will take effect as of January 1 of the first year during which he/she shall assume the office of the President (i.e., January 1 of the year after his/her two-year term as President-Elect has ended). The appointments shall be made at the end of the second year of the President-Elect's two-year term, in time for Medical Council approval at its November meeting, taking every effort to assign all members to a committee and to limit assignment to one (1)

*Effective: 5/5/2008*
*Revised: 11/3/2008, 5/4/2009, 12/7/2009, 7/12/2010, 6/6/2011, 1/9/2012, 7/9/2012, 11/5/2012, 1/7/2013, 12/2/2013, 6/2/2014, 12/1/2014, 6/6/2016,10/3/2016,11/7/2016, 1/4/2017, 6/5/2017, 12/4/2017, 7/9/2018*

committee per member. Chairmen and Vice-Chairmen shall be appointed when a term has expired or when the position is otherwise vacated.

In the event that the position of President-Elect of the Medical Staff should be vacated in the middle of the term:

a)      if the reason for the vacation is his/her death, resignation, removal from staff, or incapacity to serve, a new election shall be held by the Medical Staff to select his/her replacement (per existing Article VIII, Section 2(B)@2) of the Bylaws); and

b)      if the reason for the vacation is due to assumption of the duties of President upon the death, resignation or removal of the President, the Medical Council will appoint and approve a replacement President-Elect from within the Medical Council membership, who shall serve for the remainder of the President-Elect's unexpired term of office and until a new President-Elect is elected at the next regular election held by the Medical Staff.

3.      Past-President: The immediate Past-President shall serve as a member of the Medical Council and ex-officio on all committees of the Medical Staff. In addition, he/she shall serve as Chairman of the Bylaws Committee. In case the President and President-Elect are absent or unable to perform their duties, he/she shall serve as President Pro-Tempore of the Medical Staff.   The Immediate Past-President, shall serve a two (2) year term. Notwithstanding the foregoing, in the event of the death, resignation or removal of the President, the Immediate Past President shall serve an additional two-year term as Immediate Past President at the conclusion of his/her own term (fulfilling the term vacated or forfeited by the deceased, resigning, or removed President.

4.      Secretary: The Secretary of the Medical Staff shall be responsible for approving and authorizing the distribution of Minutes of all meetings of the Medical Staff, calling meetings on the order of the President and performing such other duties as may be assigned from time to time including the responsibility for conducting the balloting for all elected Medical Staff officers. In the event of the death or removal or resignation of the Secretary, the President of the Medical Staff shall appoint a successor to the unexpired term of office. The Secretary will be elected annually, for a two (2) year term, at the annual Medical Staff meeting.

5.      Treasurer: The Treasurer of the Medical Staff shall be Chairman of the Budget Committee of the Medical Staff. He/she shall be responsible for the disbursement of Medical Staff funds and an accounting of all such funds. He/she shall further perform such other duties as shall be assigned from time to time by the President of the Medical Staff. In the event of death or resignation or removal of the Treasurer, the President of the Medical Staff shall appoint a successor to the

*Effective:  5/5/2008*
*Revised:   11/3/2008, 5/4/2009, 12/7/2009, 7/12/2010, 6/6/2011, 1/9/2012, 7/9/2012, 11/5/2012,*
*1/7/2013, 12/2/2013, 6/2/2014, 12/1/2014, 6/6/2016,10/3/2016,11/7/2016, 1/4/2017, 6/5/2017,*
*12/4/2017, 7/9/2018*

unexpired term of office. The Treasurer will be elected annually, for a two (2) year term, at the annual Medical Staff meeting.

6.      Delegate-At-Large: There shall be one (1) Delegate for each fifty (50) members of the Active Staff, adding an additional member at large when Active Staff membership exceeds a fifty member unit by twenty-six members, elected from the Active Staff as voting members-at-large of the Medical Council. These terms are for three (3) years, on a staggered basis, and are elected at the annual meeting of the Medical Staff.

In the event of the death, removal, or resignation of the Delegate-at-Large, a temporary appointment will be made by the President of the Medical Staff until the Nominating Committee can make its recommendation at the next General Staff meeting following the vacancy.

Prior to the next General Staff meeting, the President of the Medical Staff will notify staff members of the Nominating Committee's proposed slate.

At the General Staff meeting following the vacancy, the Nominating Committee will make its report, and an election will be held to fill this vacancy according to procedures outlined in these Bylaws.

**Section 3:**    **Director of Medical Education**

Director of Medical Education: The Director of Medical Education shall be appointed by the President of the Corporation and shall be responsible for directing the clinical education programs of all Divisions and General Staff, the recruitment of students for the medical education programs, post-graduate education programs of the Medical Staff and coordination of medical research programs.

He/she must be a member of the Medical Staff of The Methodist Hospitals, Inc. and will serve ex-officio as a member of the Medical Education Committee.

**Section 4:**    **Liaison with the Hospital Board of Directors**

The President of the Medical Staff and the immediate Past President shall serve as ex-officio voting members of the Hospital Board.  The President-Elect of the Medical Staff and the second Immediate Past President shall serve as designated non-voting members of the Hospital Board. The President of the medical staff is expected to provide the Board with a report at its regular meetings and report pertinent Board actions to the Medical Staff.

**Section 5:**    **Removal of Officers**

*Effective: 5/5/2008*
*Revised: 11/3/2008, 5/4/2009, 12/7/2009, 7/12/2010, 6/6/2011, 1/9/2012, 7/9/2012, 11/5/2012,*
*1/7/2013, 12/2/2013, 6/2/2014, 12/1/2014, 6/6/2016,10/3/2016,11/7/2016, 1/4/2017, 6/5/2017,*
*12/4/2017, 7/9/2018*

The removal of an elected officer of the Medical Staff may be recommended, in writing, by the Medical Council or by petition, in writing, of a least fifteen (15) members on the Active Staff to be submitted to the Medical Council for review and recommendation. The Officer under consideration shall have the opportunity to present his or her case to the Medical Council. The recommendation shall include evidence of failure to perform satisfactorily and, if approved by the Medical Council, will be effective immediately and not subject to appeals.

Criteria for the removal of an elected Medical Staff Officer may include the following:

1. Failure to maintain Active Staff status in good standing.
2. Any other matter, which materially interferes with the effective performance of the Officer's duties.
3. Involuntary termination of staff privileges.

A report of the removal and replacement of an officer shall be made and approved at the next regular staff meeting.

**Section 6:      Vice President of Medical Affairs**

The Hospital may appoint a Vice President of Medical Affairs or other administrative officer to act as a liaison between the Medical Staff and Hospital Administration. Such Vice President of Medical Affairs or other administrative officer shall be a MD/DO, hold a valid Indiana License, and have such duties on behalf of the Hospital as designated by the Hospital from time to time, provided, however, that in the exercise of such duties he/she shall be bound by the Corporate Bylaws of The Methodist Hospitals, Inc. and the Medical Staff Bylaws. The Vice President of Medical Affairs cannot be an active member of the Medical Staff.

**Section 7:      Conflicts of Interest**

Officers, Division Chiefs, Department Chairs, and all medical staff members are obliged to represent the interests of the medical staff in upholding the quality of care provided at the Hospital. To meet this obligation to the Medical Staff and to enable discerning decision-making, all medical staff members must disclose potential conflicts of interest as relevant to the position held and the circumstances.

Members shall not use or disclose any information obtained as a result of his/her medical staff leadership position for any purpose other than the furtherance of quality medical care.

All disclosure involving Medical Staff where he or she may be in violation of the bylaws or hospital policies shall make full disclosure in writing of the details of the situation to request an exception.

A:      Who Discloses:
        Disclosure is required by all medical staff members, at the time of reappointment. In

Effective:  5/5/2008
Revised:   11/3/2008, 5/4/2009, 12/7/2009, 7/12/2010, 6/6/2011, 1/9/2012, 7/9/2012, 11/5/2012,
1/7/2013, 12/2/2013, 6/2/2014, 12/1/2014, 6/6/2016,10/3/2016,11/7/2016, 1/4/2017, 6/5/2017,
12/4/2017, 7/9/2018

addition, during the course of the year when an issue arises to which a conflict of interest may be relevant, all parties shall disclose the conflict prior to participating in consideration of that issue.

B.    What is Disclosed:  The following is meant to be a guide and may not be all inclusive).

    1.    Competitive or personal relationships, activities, or interests that may inappropriately influence a member's decisions or actions;

    2.    Grants or other financial, academic or professional relationships involving research relating to decisions under review;

    3.    Ownership held by a member or his/her immediate family in the Hospital  or the system of which the Hospital is a part or affiliated;

    4.    Ownership held by a member of his/her immediate family in any other health related business or entity:

    5.    Ownership of material financial interests in any company that furnishes goods or services to the hospital or is seeking to provide goods or services to the hospital;

    6.    That he/she currently receives or imminently or potentially shall receive personal compensation from the Hospital under the terms of a contract or employment;

    7.    Ownership in or directorship or other leadership or employment by a managed care company that contracts with or could contract with the Hospital;

    8.    Gifts including goods, services, or honoraria from the Hospital or any company or person who contracts with or otherwise sells to the Hospital.

C:    Disposition of Conflicts:

    1.    A member shall recluse himself/herself if the member reasonably believes that his/her ability to render a fair and independent decision may be affected by a conflict of interest,

    2.    If a majority of voting members of the committee or in the staff meeting vote that the member should be excused from discussion or vote due to conflict of interest, the chair shall excuse the member.

    3.    If a member discloses a potential conflict of interest and requests a vote regarding excusing the member, the member shall leave the room while the issue is being discussed and voted upon.

    4.    The minutes of the meeting shall include the names of those excused for conflicts and the nature of the conflicts involved.

    5.    No member may exercise any leadership role unless and until the member completes the Conflict of Interest disclosure form that is consistent with these Bylaws.

    6.    If a conflict of interest exception if granted a justification will be written explaining the full details of the exception and the basis for approval including any conditions placed on the approval.

    7.    All exceptions are documented and maintained by the Corporate Compliance

*Effective:  5/5/2008*
*Revised:    11/3/2008, 5/4/2009, 12/7/2009, 7/12/2010, 6/6/2011, 1/9/2012, 7/9/2012, 11/5/2012,*
*1/7/2013, 12/2/2013, 6/2/2014, 12/1/2014, 6/6/2016,10/3/2016,11/7/2016, 1/4/2017, 6/5/2017,*
*12/4/2017, 7/9/2018*

Officer and available to the public by request.

8.    If it is determined that a conflict exists and no exception should be granted, that determination is final.  An investigation is then completed to determine if there has been any violation of policy and an agreement to an appropriate resolution is determined in accordance with the Medical Staff Bylaws.

## ARTICLE IX
## CLINICAL ORGANIZATION OF THE MEDICAL STAFF

**Section 1:    Clinical Divisions**

A.    The Clinical Divisions of the Medical Staff shall be as follows:

> Division of Family Medicine
> Division of Medicine
> Division of Obstetrics and Gynecology
> Division of Pediatrics
> Division of Surgery
> Division of Anesthesia
> Division of Emergency and Ambulatory Care
> Division of Pathology; Nuclear Medicine - Wet Lab
> Division of Radiology; Nuclear Medicine - Imaging
> Division of Physical Medicine and Rehabilitation

B.    Divisions of Medical Staff are determined and established upon recommendation of the Medical Council, a majority vote of the Medical Staff and Board approval.

C.    Each Division may establish Departments and Clinics within their organization, for specialties that are in the field of interest of the Division, subject to the approval of the Medical Council.

D.    Each Division shall be organized as a separate part of the Medical Staff and shall have a Chief and Vice-Chief who shall be responsible for the overall supervision of the clinical work within the division.

E.    In the case of members with privileges that derive from another Division, the altering or removal of such privileges is the responsibility of the Chief of the Division from which the privileges originated.

**Section 2:    Election or Appointment of Chiefs of Clinical Divisions**

Effective:  5/5/2008
Revised:   11/3/2008, 5/4/2009, 12/7/2009, 7/12/2010, 6/6/2011, 1/9/2012, 7/9/2012, 11/5/2012,
1/7/2013, 12/2/2013, 6/2/2014, 12/1/2014, 6/6/2016,10/3/2016,11/7/2016, 1/4/2017, 6/5/2017,
12/4/2017, 7/9/2018

A.    1.    The Chief of each Division is certified by an appropriate specialty board, or affirmatively establishes comparable competence, through the credentialing process as follows:  Applies to those appointed/re-appointed as of 1/1/2003.

Division Chiefs must:

   a.    be members in good standing with no disciplinary action

   b.    have served on medical staff committees; and

   c.    be board-certified or possess comparable competence to an individual with board certification.  Comparable competence is defined as at least five years of active staff membership, with evaluation under the medical staff's quality assessment process showing quality patient care.

2.    Election to the position of Chief of Family Medicine, Medicine, Obstetrics and Gynecology, Pediatrics, and Surgery Divisions shall be for a term of two (2) years contingent upon maintaining Active status in good standing on the Medical Staff. A Chief shall be permitted to succeed himself/herself for two (2) terms. Re-nomination is required for re-election. He/she is then ineligible for a fourth consecutive term.

3.    At the completion of the second year of the Chief's service, a Division election shall be held. A list of those members of a Division that are eligible for Chief shall be submitted in a mailed ballot to all Active Staff members.  This ballot  shall be mailedby August 15th.  The tabulation shall be made by the President of the Staff, or designate.

The Division member with the top votes will be the elected Division Chief and the results will be announced to the Medical Council and the Board of Directors by the President of the Corporation and the President of the Medical Staff.

4.    The performance of every Chief of Service of Family Medicine, Medicine, Obstetrics and Gynecology, Pediatrics, and Surgery shall be reviewed annually by the President of the Medical Staff and Medical Council during the two (2) year term of office.

B.    1.    The Chiefs of Pathology, Physical Medicine and Rehabilitation, Radiology, Emergency and Ambulatory Care and Anesthesiology shall be recommended by the President of the Corporation, approved by the Medical Council and appointed by the Board of Directors. Their term of office shall be outlined in contracts with the Hospital.

*Effective: 5/5/2008*
*Revised: 11/3/2008, 5/4/2009, 12/7/2009, 7/12/2010, 6/6/2011, 1/9/2012, 7/9/2012, 11/5/2012,*
*1/7/2013, 12/2/2013, 6/2/2014, 12/1/2014, 6/6/2016,10/3/2016,11/7/2016, 1/4/2017, 6/5/2017,*
*12/4/2017, 7/9/2018*

      2.     The performance of every Chief of Pathology, Physical Medicine and Rehabilitation, Radiology, Emergency and Ambulatory Care and Anesthesiology shall be reviewed annually by the Medical Council and Board of Directors. His/her appointment as Chief shall be continued unless proper notice of an adverse recommendations given to the incumbent.

C.    1.     Every Division of the Medical Staff shall have a Vice-Chief ,who shall be recommended by the Division Chief, in consultation with the President of the Corporation, and President of the Medical Staff, subject to the approval of Medical Council. The term of office shall be concurrent with the Chief of Service. In the Divisions of Family Medicine, Medicine, Obstetrics and Gynecology, Pediatrics, and Surgery, the Vice-Chief may be re-appointed for one (1) additional consecutive term of office.

      2.     The Vice-Chief is expected to be present for and assume the full responsibilities of the Chief of each Division whenever the Chief has resigned or is otherwise not available. Responsibilities include, but are not limited to, timely evaluation of members of the Division and attendance at meetings. The Vice-Chief shall be allowed a vote when serving in the place of the Chief at various meetings.

D.    The Division of Surgery shall have Subspecialty Chiefs, who shall be recommended by the Surgery Division Chief, in consultation with the Vice Chief and President of the Medical Staff, subject to the approval of Medical Council. The Subspecialty Chief's term of office shall be concurrent with that of the Chief and may be renewed by the same recommendation and approval process for one (1) additional consecutive term of office.

E.    Hospital shall provide clerical support for the Division and, where appropriate, shall assign a member of the Administrative Staff to the Division.

## Section 3:    Functions of the Division Chief

The Division Chief is accountable to the Medical Council. The Chief shall:

A.    Be accountable for all professional and administrative activities within the Division.

B.    Be a member of the Medical Council giving guidance on the overall medical policies of the Hospital and making specific recommendations and suggestions regarding his/her own Division in order to assure quality patient care.

C.    Maintain continuing review of the professional performance of all practitioners with clinical privileges in his/her Division. Such review shall be discussed with each member, individually, prior to submitting a report to the Medical Council.

D.    Provide for the initial phase of patient care review required by these Bylaws.

Effective:  5/5/2008
Revised:   11/3/2008, 5/4/2009, 12/7/2009, 7/12/2010, 6/6/2011, 1/9/2012, 7/9/2012, 11/5/2012,
1/7/2013, 12/2/2013, 6/2/2014, 12/1/2014, 6/6/2016,10/3/2016,11/7/2016, 1/4/2017, 6/5/2017,
12/4/2017, 7/9/2018

The Division Chief will assign a preceptor from the Active Staff when there is a question or concern regarding performance of a Medical Staff member.

E.  Be responsible for enforcement of the Medical Staff Bylaws and Rules and Regulations within the Division.

F.  Be responsible for implementation, within the Division, of actions taken by the Medical Council of the Medical Staff.

G.  Transmit to the Medical Council the Division's recommendations concerning the Staff membership and classification, and the delineation of clinical privileges for all practitioners of the Division.

H.  Be responsible, in cooperation with the Director of Medical Education, for the teaching, education and research programs of the Division.

I.  Participate in every phase of administration of the Division through cooperation with the Nursing Service and the Hospital Administration in matters affecting patient care.

J.  Assist in the preparation of such annual reports, including budgetary planning, pertaining to the Division as may be required by the Medical Council, the President of the Corporation or the Governing Body.

K.  Establish regular liaison with the Clinical Supervisor for the respective clinical service in Nursing, the Vice-Chief and the assigned Administrative Officer, if any.

L.  The Division Chief shall annually be responsible for updating the physician alternate list for members of his/her Division. Members of the Divisions of Anesthesia, Emergency/Ambulatory Care, Pathology, and Radiology do not require Alternates.

M.  Conduct Division meetings no less than two (2) times annually, half (1/2) of which may be subspecialty meetings.

N.  Assure that the Vice-Chief is adequately prepared to assume the Chief's full responsibilities and available whenever the Chief will not be available. When both the Chief and Vice-Chief will not be available, the Chief will appoint a Division member, preferably a former Division Chief, to assume full responsibilities and be available.

O.  Recommend to the Medical Council for its adoption the clinical criteria for privileges within the Division.

P.  Require a member of the Department to submit to a medical or psychiatric evaluation for the purpose of ascertaining health status.

*Effective: 5/5/2008*
*Revised:  11/3/2008, 5/4/2009, 12/7/2009, 7/12/2010, 6/6/2011, 1/9/2012, 7/9/2012, 11/5/2012,*
*1/7/2013, 12/2/2013, 6/2/2014, 12/1/2014, 6/6/2016,10/3/2016,11/7/2016, 1/4/2017, 6/5/2017,*
*12/4/2017, 7/9/2018*

**Section 4:      Divisions of the Medical Staff**

A.      The Divisions of Family Medicine, Medicine, Pediatrics, Obstetrics and Gynecology, and Surgery may establish departments and clinics that are specialties within the field of interest of the Division. The Division will be responsible for the clinical work of all subordinate departments and clinics.

B.      The authority to establish and terminate departments and clinics within a Division shall be vested in the recommendation of the appropriate Division Chief and approval by the Medical Council.

C.      Each department may have a Chairman. He/she shall be appointed by the Division Chief. The term of office shall be concurrent with the Chief of the Division.  In the case of Chairmen who have contractual agreements with the Hospital, the President of the Corporation, together with the Chief of the Division, the Medical Council and the Board, shall approve the appointment.

D.      Written records must be kept and reports made of Division meetings by the Division Chief to the next meeting of the Medical Council.

E.      Each Department shall meet separately or jointly with other Departments or Divisions of this Hospital no less than two (2)  times per year. A record of proceedings of these meetings shall be kept including any conclusion or recommendations resulting from discussion of patients evaluated and treated in the Hospital. This record shall be made by a secretary appointed from the membership of the Division or Department by the Division Chief or Chairman. The Hospital shall provide clerical and administrative support.

F.      The Division meetings shall consist of a clinical review of deaths in the past month and a discussion of Hospital cases of a puzzling or complicated nature based upon the medical records of patients.

A Hospital pathologist and radiologist shall attend all Division meetings of a clinical nature.  A Hospital anesthesiologist shall attend all Surgery and Obstetrics/Gynecology Division meetings of a clinical nature.  The order of business of regular Division meetings is listed in the Medical Staff Policies and Procedures Manual.

**Section 5:      Removal, Resignation or Absence of a Division Chief, Vice Chief, a Subspecialty Chief or Chairman of a Department**

The removal of the Division Chief , the Vice Chief,  a Subspecialty Chief or Chairman of a Department may be initiated by the President of the Medical Staff, in writing, to the Medical Council or by petition of at least 2/3 of the Division.  The Officer under consideration shall have

*Effective: 5/5/2008*
*Revised:    11/3/2008, 5/4/2009, 12/7/2009, 7/12/2010, 6/6/2011, 1/9/2012, 7/9/2012, 11/5/2012,*
*1/7/2013, 12/2/2013, 6/2/2014, 12/1/2014, 6/6/2016,10/3/2016,11/7/2016, 1/4/2017, 6/5/2017,*
*12/4/2017, 7/9/2018*

the opportunity to present his or her case to the Medical Council.  The recommendation shall include evidence of failure to perform satisfactorily and, if approved by the Medical Council, will be effective immediately and not subject to appeals.

Criteria for the removal of a Chief or Chairman may include the following:

1. Failure to maintain Active Staff status in good standing.
2. Any other matter, which materially interferes with the effective performance of the Officer's duties.
3. Involuntary termination of staff privileges.

A Division Chief , the Vice Chief,  a Subspecialty Chief or Chairman of a Department may resign effective immediately or upon a date specified, by writing , or verbally stating, the intent to resign to a Medical Staff Officer or Division or Department official.   Any verbal resignation shall be immediately documented by the Officer or Official receiving the resignation, with a copy to the resigning Chief or Chairman.

When an office is so vacated, or if an office is vacated because a Chief, Vice Chief, Subspecialty Chief, or Chairman of Department takes a Leave of Absence, it shall be filled by presidential appointment for the duration of the term. Appointments are subject to confirmation by the Medical Council.

**Section 6:    Joint Meetings with Other Hospitals**

When appropriate, Division and/or Department meetings may be held jointly with the comparable service in another hospital. In such cases, minutes of these meetings must be taken in such form that the record of each Hospital's activities is kept with the regular minute book for the respective Division or Department.

**Section 7:    Immunity - Professionals and Peer Review Committees**

From time to time, the Divisions and Departments described in Article Ten (X) are engaged in evaluating the qualifications of professional health care providers or evaluating patient care rendered by professional healthcare providers or evaluating the merits of complaints against a professional health care provider including a determination or recommendation concerning such complaints. Whenever any Division or Department is so engaged, it shall be deemed to be a Peer Review Committee as defined in I.C.§34-30-15-1 et. sec., and the Division or Department shall be entitled to all the privileges, immunities and rights provided by or through such Act entitled "Immunity: Professionals and Peer Review Committees" as presently constituted or as the same may be amended, revised, supplemented and/or repealed from time to time.

## ARTICLE X
## COMMITTEES OF THE MEDICAL STAFF

*Effective: 5/5/2008*
*Revised:   11/3/2008, 5/4/2009, 12/7/2009, 7/12/2010, 6/6/2011, 1/9/2012, 7/9/2012, 11/5/2012,*
*1/7/2013, 12/2/2013, 6/2/2014, 12/1/2014, 6/6/2016,10/3/2016,11/7/2016, 1/4/2017, 6/5/2017,*
*12/4/2017, 7/9/2018*

**Section 1:     Committee Policies**

A.    Special committees may be appointed by the President of the Medical Staff from time to time as may be required to properly carry out the responsibilities of the Medical Council or the committees responsible to it. Such committees shall confine their interest to the purposes for which they are appointed and shall report their findings to the Medical Council or the appropriate committee. They shall not have any authority to act unless such is specifically granted by the motion establishing the committee. All special committees that are appointed shall have a statement of purpose and committee description prepared.

B.    The President of the Corporation, or his/her designee, may attend all meetings of the Medical Staff, its Divisions, Departments, Committees and the Medical Council.

C.    The Chairman of a committee may be removed upon recommendation of the President of the Medical Staff to the Medical Council. The recommendation shall include evidence of failure to perform satisfactorily and, if approved by the Medical Council will be effective immediately and not subject to appeals.

When an office is so vacated, it shall be filled by presidential appointment for the duration of the term. Appointments are subject to confirmation by the Medical Council. When members appointed to Committees of the Medical Staff fail to participate satisfactorily in the work of the committees to which they are appointed, their committee appointment may be terminated by action of the President of the Medical Staff or the Medical Council. The President of the Medical Staff shall then appoint a replacement to complete the un-expired term of the member who is dropped.

When a member's committee membership is terminated, the member shall be advised that a new appointment may follow. In the event that a second committee appointment is terminated for unsatisfactory committee service, the member's status shall be reviewed by the President of the Medical Staff. The President of the Medical Staff is expected to recommend appropriate action to the Medical Council.

Resignation from committee(s) will only be granted in exceptional circumstances and must be submitted in writing to the President of the Medical Staff and the Committee Chairman for consideration.

D.    Authority - Each Committee of the Medical Staff, when conducting business in accordance with these Bylaws, shall be deemed to have the authority to act on matters which fall within the Committee's jurisdiction and after the Committee has satisfied itself that sufficient foundation exists for the action. Whenever a question exists, a proposed action may, and should, be referred to the Medical Council. Actions taken on a Committee's individual authority are subject to review and modification or rejection by the Medical Council.

*Effective:  5/5/2008*
*Revised:   11/3/2008, 5/4/2009, 12/7/2009, 7/12/2010, 6/6/2011, 1/9/2012, 7/9/2012, 11/5/2012,*
*1/7/2013, 12/2/2013, 6/2/2014, 12/1/2014, 6/6/2016,10/3/2016,11/7/2016, 1/4/2017, 6/5/2017,*
*12/4/2017, 7/9/2018*

E.   Each Committee is required to keep minutes which accurately reflect the substance of meetings.

F.   A quorum for each Committee of the Medical Staff shall be 10% of its members. Any action of a Committee requires a majority vote by the members present.

## Section 2:    Medical Council

A.   The Medical Council shall be the Governing Body of the Medical Staff. As such, the Medical Council shall be concerned with the clinical quality of care, the scope of services and the various standards of the accrediting bodies, State Board of Health and other governmental agencies and liability insurance carriers. To assist the Medical Staff in fulfilling its duties, hospital management or the Board shall inform the Medical Council of any hospital activities, decisions, plans or proposals that affect or may affect the medical staff organization and its function, as soon as practical, giving due regard to confidentiality and proprietary concerns and conflict of interest issues.

B.   The Medical Council shall consist of all elected officers of the Medical Staff the Immediate Past-President, and the second Immediate Past President  (6), Chiefs of the Clinical Divisions (11), Committee Chairmen (4), the Medical Director of the Hospitalist Group (shall serve as a non-voting member) and one (1) Medical Staff Member-at-Large for up to every fifty (50) Active Staff members adding an additional member at large when active membership exceeds a 50-member unit by 26 members.

Medical Staff member(s) serving in an administrative capacity (excluding Division Chiefs or Medical Directors) shall not be eligible to be members of the Medical Council. The Hospital President shall be a non-voting ex-officio member.

The Council shall meet no less than ten (10) times annually and shall maintain a permanent record of its proceedings and actions. Such minutes shall be reported to the Governing Body of the Hospital in the President's report.

C.   The President of the Medical Staff shall serve as the Chairman of Medical Council, and the President-Elect shall serve as Vice Chairman of Medical Council.

D.   Duties of the Medical Council shall include, but not be limited to, the following:

1.   To represent and to act on behalf of the Medical Staff subject to such limitations as may be imposed by these Bylaws.

2.   To coordinate the activities and general policies of the various Divisions.

3.   To receive and act upon committee reports.

Effective: 5/5/2008
Revised:   11/3/2008, 5/4/2009, 12/7/2009, 7/12/2010, 6/6/2011, 1/9/2012, 7/9/2012, 11/5/2012,
1/7/2013, 12/2/2013, 6/2/2014, 12/1/2014, 6/6/2016,10/3/2016,11/7/2016, 1/4/2017, 6/5/2017,
12/4/2017, 7/9/2018

4.    To implement policies of the Medical Staff not otherwise the responsibility of the Division.

5.    To recommend action, as required by these Bylaws or as other wise requested, to the President of the Corporation on matters of a medico-administrative nature.

6.    To make recommendations on Hospital management matters to the Governing Body as required by these Bylaws or as otherwise requested.

7.    To fulfill the Medical Staff's accountability to the Governing Body for the medical care rendered to patients in the Hospital.

8.    To ensure that the Medical Staff is kept abreast of the accreditation program and informed of the accreditation status of the Hospital.

9.    To provide for the preparation of all medical staff meeting programs, either directly or through delegation, to a program committee or other suitable agent.

10.    To determine the clinical privileges available and applicable to each Division and its members within the Division.

11.    To make recommendations for Staff membership, assignments to Divisions and delineation of clinical privileges, after reviewing the credentials of each applicant, together with the recommendations of the Division Chiefs and Credentials and Professional Standards Committee.

12.    To review periodically all information available regarding the performance and clinical competence of Staff members and other practitioners with clinical privileges.

13.    To take all reasonable steps to promote professionally ethical conduct and competent clinical performance on the part of all members of the Medical Staff including the initiation of and/or participation in Medical Staff corrective or review measures when warranted.

14.    To define, on a continuing basis, the circumstances warranting further intensive review of a member or other practitioner's services provided under privileges held and establish the parameters for participation of the subject under review in the focused review process.

15.    To report at each General Staff meeting.

*Effective: 5/5/2008*
*Revised: 11/3/2008, 5/4/2009, 12/7/2009, 7/12/2010, 6/6/2011, 1/9/2012, 7/9/2012, 11/5/2012,*
*1/7/2013, 12/2/2013, 6/2/2014, 12/1/2014, 6/6/2016,10/3/2016,11/7/2016, 1/4/2017, 6/5/2017,*
*12/4/2017, 7/9/2018*

16.    The Medical Council may create such ad hoc committees as may be necessary from time to time to carry out special functions. These committees shall be investigative, advisory and recommending bodies to the Medical Council.

**Section 3:      Credentials and Professional Standards Committee**

A.    The purpose of this Committee shall be the evaluation of all applicants for membership and to make recommendations in conformity with the Bylaws. They shall also be expected:

1.    To evaluate any breach of ethical, moral or professional conduct that may be reported.

2.    To review records that are referred by the Medical Council and to arrive at a decision regarding the performance of the Staff member and to report, in writing, these cases with a recommendation.

3.    To review all information regarding the competence of Staff members and to make recommendations for the granting of privileges and membership.

4.    To review quarterly one-eighth (1/8) of the entire staff. The Associate Staff shall be reviewed on an annual basis.

B.    The Chairman and Vice-Chairman of the Credentials and Professional Standards Committee shall be appointed annually by the President of the Medical Staff from the members of the Committee who have served at least one (1) year or former Medical Staff Presidents, former Division Chiefs, or former Medical Council Chairmen.  Appointments are subject to confirmation by the Medical Council.

C.    There shall be seven (7) additional members of the Committee appointed by the President of the Medical Staff from the members of the Active Staff with a minimum of five (5) years on the Active Staff. These members should be appointed so as to represent the major clinical services. The members of the Committee shall be appointed for three (3) year terms, on a staggered basis, and may be re-appointed.  In the event that the appointed chairperson of the committee is an individual who is not already on the committee, the membership of the committee may be expanded to a maximum of fifteen (15).

Clinical Division Chiefs who are not members of the Credentials Committee by virtue of the established appointment process shall be ex-officio members of this Committee, without vote.

*Effective: 5/5/2008*
*Revised: 11/3/2008, 5/4/2009, 12/7/2009, 7/12/2010, 6/6/2011, 1/9/2012, 7/9/2012, 11/5/2012,*
*1/7/2013, 12/2/2013, 6/2/2014, 12/1/2014, 6/6/2016,10/3/2016,11/7/2016, 1/4/2017, 6/5/2017,*
*12/4/2017, 7/9/2018*

D.    Meetings shall be held on call of the Chairman of the Credentials and Professional Standards Committee. A written record of Committee proceedings shall be prepared, reported and submitted to the Medical Council.

E.    Whenever the credentialing, privileging and evaluation of an advanced practice nurse is before the Committee, the Chief Nursing Officer or designee will be included as s standing committee member with voting privilege as to such advanced practice nurses.

**Section 4: Practitioner Impairment Committee**

A.    The Practitioner Impairment Committee is appointed by the President of the Medical Staff. Impairment at The Methodist Hospitals, Inc. is defined as: "potential inability of a practitioner member to practice medicine with reasonable skill and safety due to physical or mental disabilities, including deterioration through the aging process, or loss of motor skills, or abuse of drugs, or alcohol, of sufficient degree to diminish a person's ability to deliver competent patient care".

B.    The President of the Medical Staff shall appoint seven (7) members from the Active Staff, including a chairman. Except for initial appointments, each member shall serve a term of 3 years, and the terms shall be staggered as deemed appropriate by the Medical Council to achieve continuity. To the extent feasible, members of this committee shall not serve as active participants on any Medical Staff or Hospital peer review or quality management, assessment and improvement committees while serving on this committee.

C.    To assist impaired members and thereby further the quality and safety of patient care, the Practitioner Impairment Committee may receive reports related to the health, well-being, or perceived impairment of individual practitioners and, as it deems appropriate, shall evaluate the veracity of such reports, gather additional data and make recommendations regarding such reports. The Committee shall also facilitate self-referral by practitioners seeking assistance with known or suspected physical, mental or emotional impairment. The Committee may refer the member to appropriate sources of treatment and assistance. With respect to matters involving individual practitioners, the Committee shall, as may seem appropriate, provide advice, counseling, or monitoring, or coordinate services with outside treatment and assistance sources. Such activities shall be confidential; however, in the event information received by the Committee clearly demonstrates that the health or known impairment of a practitioner poses an unreasonable risk of harm to hospitalized patients, or that the member is refusing to obtain assistance or failing to comply with treatment or assistance plans, that information may be referred for corrective action. The Committee shall also consider general matters related to the health and well-being of the medical staff and hospital staff, and, with the approval of the Medical Council, develop educational programs on recognizing behavioral problems, illness and impairment in healthcare professionals. The Committee may also develop recommendations for the Medical Council regarding assisting practitioners with their health-related problems. When a practitioner does not or is not willing to follow recommendations made by

Effective:  5/5/2008
Revised:   11/3/2008, 5/4/2009, 12/7/2009, 7/12/2010, 6/6/2011, 1/9/2012, 7/9/2012, 11/5/2012,
1/7/2013, 12/2/2013, 6/2/2014, 12/1/2014, 6/6/2016,10/3/2016,11/7/2016, 1/4/2017, 6/5/2017,
12/4/2017, 7/9/2018

consultants/committees for rehabilitation a decision will be made by the Medical Council. This committee serves as a "sounding board" to the Division Chiefs. It may provide advice and guidance, especially when a Division Chief is faced with difficult impairment problems. (11/3/2008)

**Section 5:     Leadership Performance Improvement Council:**

A.     The function of the Leadership Performance Improvement Council is to:

1.     Lead and evaluate organizational performance
2.     Recommend corporate priorities
3.     To observe the progress of corporate priorities
4.     Evaluate the outcomes of action based committee
5.     Evaluate the outcomes of benchmark studies
6.     Review and evaluate utilization issues
7.     Provide over-site function for compliance with regulations (utilization review) and standards
8.     Approve special teams and expected outcomes
9.     Recommends and approves policy changes affecting performance improvement issues
10.    Approve the Organizational Performance Plan and Utilization Management Plan.

B.     Voting members include:  Vice Presidents of the Methodist Hospitals, Chief PA advisor, PIOC chairs, and Medical staff representation from Radiology, Anesthesiology, Pathology and Emergency Services.  Hospital representatives from Patient, Infection Control, Diagnostic & Therapeutics Environment of Care, Division Chiefs and Medical Staff President are ex-officio members with voting privileges.  The committee is co-chaired by a medical staff representative, appointed by the President of the Medical Staff, and the Director of Quality Services.

C.     Council meetings will be held at least ten (10) times annually.  The council shall record the proceedings and submit minutes, with appropriate recommendations, to the Medical Council.

**Subsection 1: Performance Improvement Outcome Committees**

A.     Purpose:  The Medical Staff subscribes to the principles of performance improvement as outlined in the Organizational Performance Plan.   The following multidisciplinary performance improvement committees meet a minimum of three (3) times a year:  Acute Care/Pediatrics, Operative and Trauma Services, Obstetrics/Gynecology, Osteopathic Methods and Concepts Committee and Cardiovascular and Leadership PIC Peer Review/Transfusion/Medical Records Committee.  Refer to the Performance Improvement Plan for further details.

*Effective: 5/5/2008*
*Revised:   11/3/2008, 5/4/2009, 12/7/2009, 7/12/2010, 6/6/2011, 1/9/2012, 7/9/2012, 11/5/2012,*
*1/7/2013, 12/2/2013, 6/2/2014, 12/1/2014, 6/6/2016,10/3/2016,11/7/2016, 1/4/2017, 6/5/2017,*
*12/4/2017, 7/9/2018*

**Subsection 2: Tumor Conference and Cancer Committee**

A.    Purpose:  The purpose of this subcommittee shall be to evaluate the quality of care of patients with cancer; evaluate the effectiveness of cancer control efforts and cancer diagnosis, management and follow-up services provided under the auspices of The Methodist Hospitals; oversee the Cancer Registry activities, be accountable for all cancer patient care evaluation studies, and act as advisors to Registry staff; ensure that consultative services from all major disciplines are available to all cancer patients; organize, publicize, conduct and evaluate regular educational and consultative cancer conferences; institute and review cancer patient evaluation studies, including survival, and comparison data as available, and make recommendations based on the studies; ensure that cancer rehabilitation services are provided and used in the improvement of patient outcomes.

B.    Membership:  The Chairman and Vice-Chairman shall be appointed annually by the President of the Medical Staff from those practitioners who have served at least one (1) year as members of the Committee. They may be re-appointed.

Other additional members shall be appointed by the President of the Medical Staff from the Active Staff for two (2) year terms of office on a staggered basis.

Cancer Committee
Chairman - Oncologist
Vice Chairman – Oncologist

Members:
1 - Division of Family Medicine
1 - Division of Medicine
1 - Division of Obstetrics/Gynecology
1 - Division of Pathology
1 - Division of Radiology
1 - Division of Surgery
1 - Any Division
1 - Administrative Liaison
1 - Chief, Division of Medicine (Ex-officio)
1 - Chief, Division of Surgery (Ex-officio)
1 – Quality Improvement Representative

Hospital administration will appoint the following members to participate on this committee:  a representative from Nursing, Social Service, and Religion; the Administrator of the Cancer Center and the Tumor Registrar shall be included as ex-officio voting members.

*Effective: 5/5/2008*
*Revised:    11/3/2008, 5/4/2009, 12/7/2009, 7/12/2010, 6/6/2011, 1/9/2012, 7/9/2012, 11/5/2012,*
*1/7/2013, 12/2/2013, 6/2/2014, 12/1/2014, 6/6/2016,10/3/2016,11/7/2016, 1/4/2017, 6/5/2017,*
*12/4/2017, 7/9/2018*

C.    Meetings shall be held on the call of the Chairman for the Tumor Conference and a
minimum of quarterly (four times a year) for the Cancer Committee. The Cancer
Committee shall report to the Leadership Performance Improvement Council.
Informational reports shall be forwarded to the Medical Education, Research and Library
Committee.

**Subsection 3: Medical Records Committee**

A.    Purpose / Function:

1.  Establish standards for format and content and monitor the quality of medical records,
    with responsibility for maintenance of record quality resting with the medical staff
    leadership and hospital leadership.  Examples of actions include developing and
    monitoring a standard list of approved abbreviations and reviewing records for
    compliance; reviewing for timeliness and accuracy of documentation in accordance
    with bylaws/rules & regulations and departmental policy and developing action plans
    for improvement for areas out of compliance.
2.  Provide advice and support to the Medical Record Department in determining
    systems and procedures which will best enable it to meet the needs of the institution.
3.  Quarterly reviews the results of multidisciplinary evaluation of a sampling of medical
    records to assure quality, clinical pertinence and timely completion.
4.  Facilitates the approval of forms for inclusion in the patient's medical record.
5.  Review the delinquent record report by physician and determine what actions are to
    be taken to repeat offenders
6.  Responsible for the incomplete chart retirement process.

B.    Membership:

The Medical Record Committee Co-Chair and members of at least four clinical Divisions
other than the Division of the Chairman will be appointed by the President of the Medical
Staff on an annual basis to serve on this Committee. The Committee is Co-Chaired by the
Director of Medical Records and will include members represented from the following:
Medical Affairs Administration, Quality Improvement, Nursing, Pharmacy, Physical
Therapy, Respiratory Therapy, Dietary and other areas responsible for documentation in
the patient's medical record.

All members are voting members.

C.    Frequency:

Meetings will be held quarterly or at least four (4) times annually.  The committee shall
record the proceedings and submit minutes, with appropriate recommendations, to the
Leadership – Performance Improvement Council.   The minutes shall be reported the

*Effective: 5/5/2008*
*Revised:  11/3/2008, 5/4/2009, 12/7/2009, 7/12/2010, 6/6/2011, 1/9/2012, 7/9/2012, 11/5/2012,*
*1/7/2013, 12/2/2013, 6/2/2014, 12/1/2014, 6/6/2016,10/3/2016,11/7/2016, 1/4/2017, 6/5/2017,*
*12/4/2017, 7/9/2018*

Division Chiefs and Medical Council.  The Medical Record Committee reports to the Leadership – Performance Improvement Council.

**Section 6:      Pharmacy and Therapeutics  (P&T) Committee**

A.     The purpose of this committee is to provide for adequate scope and quality of pharmacy and therapeutic services in the Hospital.

B.     The Committee shall consist of.  eight members to be appointed annually by the President of the Medical Staff, to include representation from the Divisions of Anesthesia, Family Medicine, Medicine, Obstetrics/Gynecology, Pathology, Pediatrics, Radiology and Surgery.  The President of the Medical Staff shall appoint as Chairman a Medical Staff member with experience or at least an interest in Infection Control, and a Vice Chairman from among the eight voting members.

Division Chief or designee will be consulted by Pharmacy for any changes/additions/deletions to the Formulary that affect their specific Division.  After review, a recommendation form will be completed, signed by the physician who reviewed it, and will then be presented to the P&T Committee for review and approval. The Division Chief/designee will be invited to attend the P&T Committee meetings.

The Institutional Review Board  Chairman shall serve as ex-officio voting members of this committee.

In addition, as non-voting members, the Committee includes the representation from Infection Control, Administration, Patient Care Services, Microbiology, and Pharmacy Respiratory and Medical Nutrition.   Representation from Environmental Services, Central Service, Laundry, Food Services, Engineering, Maintenance, and the Operative Suite, may be involved on consultative basis.  The Committee may include, when necessary, the Chief of Respiratory Therapy and/or the Medical Director, the Chief of Pharmacy and the Central Service Manager.  Appointments are subject to Medical Council approval.

C.     Meetings of the Committee shall be held at least ten (10) times annually. The Committee shall record the proceedings and submit minutes, with appropriate recommendations, to the Medical Council.

D.     Specific responsibilities of the Committee include, but are not limited to, the following:

1.     To receive and act on reports from the Institutional Review Board and other committees established from time to time relative to pharmacy and therapeutic activities.

*Effective:  5/5/2008*
*Revised:   11/3/2008, 5/4/2009, 12/7/2009, 7/12/2010, 6/6/2011, 1/9/2012, 7/9/2012, 11/5/2012,*
*1/7/2013, 12/2/2013, 6/2/2014, 12/1/2014, 6/6/2016,10/3/2016,11/7/2016, 1/4/2017, 6/5/2017,*
*12/4/2017, 7/9/2018*

2.      To advise the Hospital on services or programs that should be added, expanded or removed.~~.~~

3.      To assess the technical quality of pharmacy and therapeutic services performed by the Hospital. This responsibility shall include periodic review of policies and procedure, periodic audit of records and techniques, provision for medical administration consultation to directors and ongoing review of specific services and procedures offered.

4.      To recommend medical equipment needs.

5.      To develop and survey drug utilization policies and practices and formulate policies regarding drug inventory and floor stock, unit-dose system, Hospital formulary service, intravenous mixture and administration.

6.      To assume the above responsibilities with respect to the following departments of the Hospital: Radiology, Pathology, Physical Medicine and Rehabilitation, Physical Therapy, Occupational Therapy, Speech and Hearing, Nursing, Nuclear Medicine, Pharmacy, Health Education, Medical Nutrition, Electrodiagnostics, Electrocardiography, Respiratory Therapy, Central Service and other diagnostic or therapeutic departments/services that may properly be the concern in the care of patients.

7.      To oversee the functions of the Infection Control Committee and to promote a safe environment with respect to communicable diseases.

8.      To review utilization of all drugs and drug reactidons on an annual basis and to create and maintain a Hospital Formulary.

**Subsection 1: Radiation Safety Committee**

A.      The Radiation Safety Committee shall be a subcommittee of and report to the Diagnostic and Therapeutics Committee.  The purpose of the Radiation Safety Committee is to assure the safe and effective use of ionizing radiation in diagnostic and therapeutic procedures.

The Committee will be concerned with:
1.      Various sources of ionizing radiation.
2.      Applicable standards, codes, regulations and control.
3.      The internal Hospital practices for procurement, storage, transportation, handling and clinical use of ionizing radiation agents.
4.      The maintenance of a current policy and procedure manual governing the use of ionizing radiation in the Hospital.

*Effective: 5/5/2008*
*Revised: 11/3/2008, 5/4/2009, 12/7/2009, 7/12/2010, 6/6/2011, 1/9/2012, 7/9/2012, 11/5/2012,*
*1/7/2013, 12/2/2013, 6/2/2014, 12/1/2014, 6/6/2016,10/3/2016,11/7/2016, 1/4/2017, 6/5/2017,*
*12/4/2017, 7/9/2018*

B.    The Committee shall be composed of no less than eight (8) members including appropriate representatives from Nuclear Medicine, Radiology, Radiation Therapy and other clinical departments as well as representatives from Inpatient Care Services and Administration. The Radiation Safety Officer must be a member of the Committee. Representatives shall be named annually by the President of the Medical Staff subject to approval by the Board. Each member shall have one (1) vote. The Committee may be enlarged upon recommendation of the Committee to the Performance Improvement Committee.

C.    The Committee shall meet no less than four (4) times annually. The meetings are to be planned, called and chaired by a Chairman elected by the Committee from among its members. The Chairman shall designate the Radiation Safety Officer.

It is recommended that the Chairman of the Committee be a physician experienced in the handling of radiation sources, the measurement of radioactivity and in radioisotope dosage for various diseases. The Chairman's term shall be one (1) year, however, the Chairman may be re-elected without restrictions.

A written record of each meeting shall be prepared and submitted to the Diagnostic and Therapeutics Committee together with the recommendations and actions taken.

D.    Specific responsibilities of the Committee include, but are not limited to, the following:

1.    Coordinate and supervise the use of ionizing radiation sources within the institution.

2.    Review and grant permission for, or disapprove the use of, ionizing radiation sources for experimental or non-routine uses within the institution from the standpoint of radiation health and safety of patients or working personnel or other factors which the Committee may wish to establish for the medical use of these radiation sources. Committee authorization approves only the radiation aspects of a program. Authorization by other bodies at the Hospital may also be required.

3.    Prescribe special conditions that will be required for the proposed use of ionizing radiation sources such as a minimal level of training and experience.

4.    Receive and review records and reports from the Radiation Safety Officer or any other individuals that may be delegated responsibility for the health physics practice in the institution.

5.    Recommend remedial actions against radiation hazards or infractions and suspend any use which the Committee considers unsafe or unwise.

Effective: 5/5/2008
Revised:  11/3/2008, 5/4/2009, 12/7/2009, 7/12/2010, 6/6/2011, 1/9/2012, 7/9/2012, 11/5/2012,
1/7/2013, 12/2/2013, 6/2/2014, 12/1/2014, 6/6/2016,10/3/2016,11/7/2016, 1/4/2017, 6/5/2017,
12/4/2017, 7/9/2018

6.    Formulate the review training programs and educational series for the safe use of ionizing radiation sources.

7.    Maintain a record of actions taken by the Committee.

8.    Inform the appropriate authorities of any changes in the Committee membership as they arise.

E.    Administrative procedures include, but are not limited to, the following:

1.    Hold four (4) meetings annually to review the safety aspects of the current program and to consider special cases or problems. Special sessions may be called by the Chairman as required.

2.    Establish record keeping procedures for the Committee meetings including actions, recommendations and decisions.

3.    Initiate a program for the preparation and assembly of information relating to the radiation safety of the Hospital.  These may consist of periodic records of seminars to be decided upon by the Committee.

4.    Delegate responsibility to a specific individual, namely, the Radiation Safety Officer (RSO), for the conduct of the routine day-to-day radiation safety program which will include the necessary surveys and the maintenance of certain records. The activities of the RSO will be reviewed periodically by the Committee.

5.    Maintain written records of receipts, transfers and disposal of all ionizing radiation sources in the Hospital.

6.    Provide for initiating actions as necessary to assure radiation safety and compliance with the provisions of Nuclear Regulatory Commission and the Indiana State Board of Health Radiation Protection Regulations and the Radiation Safety Policies/Procedures for the Hospital, and the current Radiation Control Manual of the Hospital.

7.    Review all new or modified uses of ionizing radiation materials.

8.    The Radiation Safety Officer will review all Policies and Procedures related to Radiation Safety annually.

**Subsection 2: Institutional Review Board**  (11/2005) (6/5/2017)

A.    The Institutional Review Board (IRB) shall be a subcommittee of and report to the Diagnostic and Therapeutics Committee.

*Effective:* 5/5/2008
*Revised:* 11/3/2008, 5/4/2009, 12/7/2009, 7/12/2010, 6/6/2011, 1/9/2012, 7/9/2012, 11/5/2012, 1/7/2013, 12/2/2013, 6/2/2014, 12/1/2014, 6/6/2016,10/3/2016,11/7/2016, 1/4/2017, 6/5/2017, 12/4/2017, 7/9/2018

The purpose the IRB is to develop and maintain protocols for the protection of human subjects as required by federal regulations and to review research projects and activities that involve human subjects.

The Chairman of the IRB shall be an ex-officio, non-voting member of the Diagnostics and Therapeutics and shall be appointed by the President of the Medical Staff for a two (2) year term.

B.  The duties of the IRB shall include, but not be limited to, the following:

   1.  Determine for each activity as planned and conducted whether the human subjects will be placed at risk and, of the risk involved, whether:

      a.  The risks to the subject(s) are so outweighed by the benefits to the subject(s) and the importance of the knowledge to be gained as to not warrant a decision to allow the subject to accept the risk.
      b.  The rights and welfare of the subject(s) are adequately protected.

   2.  Develop a legally effective Informed Consent Form, and see that it is properly utilized.

   3.  Provide reviews to be conducted with objectivity and in a manner to ensure the exercise of independent judgment of the members. Members will be excluded from review of projects or activities in which they have an active role or conflict of interest.

   4.  Encourage continuing constructive communication between the members and the Principal Investigator as a means of safeguarding the rights and welfare of the subjects.

C.  The IRB shall have the authority to require the Principal Investigator to have available the facilities and professional attention required for subjects who may suffer physical, psychological or other injury as a result of participation in an activity.

D.  The IRB will maintain appropriate and informative records of the Institutional Review Board's review of its applications and activities, of documentation of Informed Consent and of other documentation that may pertain to the selection, participation and protection of subjects and to the review of circumstances that adversely affect the right or welfare of individual subjects.

E.  The President-Elect of the Medical Staff shall appoint the following voting members to the IRB: two (2) representatives from the Division of Medicine; one (1) representative from the Division of Family Medicine; one (1) representative from the Division of

*Effective: 5/5/2008*
*Revised: 11/3/2008, 5/4/2009, 12/7/2009, 7/12/2010, 6/6/2011, 1/9/2012, 7/9/2012, 11/5/2012,*
*1/7/2013, 12/2/2013, 6/2/2014, 12/1/2014, 6/6/2016,10/3/2016,11/7/2016, 1/4/2017, 6/5/2017,*
*12/4/2017, 7/9/2018*

Surgery; and such other representatives of other Clinical Divisions, if any, as the President of the Medical Staff shall deem appropriate. Each representative appointed to the Board shall serve as voting members for a two year term.    *(7/9/2012)*

F.    Hospital administration will recommend the following who shall also be voting members:

      1.    Hospital Pharmacist.
      2.    Representative of Inpatient Care Services.
      3.    Hospital Risk Manager.
      4.    Hospital Attorney.
      5.    A representative of the community who is not otherwise affiliated with the Hospital, and who is not part of the immediate family of a person who is affiliated with the Hospital.

G.    The IRB shall be sufficiently qualified through the experience and expertise of its members, and the diversity of the members, including consideration of race, gender and cultural backgrounds and sensitivity to such issues as community attitudes, to promote respect for its advice and counsel in safeguarding the rights and welfare of human subjects.

Every nondiscriminatory effort will be made to insure that the IRB does not consist entirely of men or entirely of women so long as no selection is made to the IRB on the basis of gender. The IRB may not consist of entirely of members of one profession.

H.    Alternates will be appointed for the following members and will have votes when attending as alternates: Hospital Attorney, Hospital Pharmacist, and Community Representative. Alternates are invited and encouraged to attend all meetings of the Committee.

I.    The IRB shall meet as frequently as is necessary to fulfill its responsibility but no less than quarterly.

J.    In compliance with the Federal Regulations, this IRB must have a quorum of over fifty percent (50%) of the voting members present, including at least one member whose primary concerns are in non-scientific areas, in order to conduct business.

K.    The IRB may in its discretion invite individuals with competence in special areas to assist in the review of issues which require expertise beyond or in addition to that available on the IRB. These individuals may not vote with the IRB.

**Subsection 3: Infection Control Committee**

*Effective: 5/5/2008*
*Revised: 11/3/2008, 5/4/2009, 12/7/2009, 7/12/2010, 6/6/2011, 1/9/2012, 7/9/2012, 11/5/2012,*
*1/7/2013, 12/2/2013, 6/2/2014, 12/1/2014, 6/6/2016,10/3/2016,11/7/2016, 1/4/2017, 6/5/2017,*
*12/4/2017, 7/9/2018*

A.   The Infection Control Committee shall report to the Diagnostic and Therapeutics
     Committee.   The purpose of this Committee is to assure that patients and others are
     afforded a safe environment with respect to communicable diseases.

B.   The Chairman and Vice-Chairman, preferably with background or interest in
     epidemiology, shall be appointed annually by the President of the Medical Staff subject
     to confirmation by the Medical Council.  The Infection Control Committee shall consist
     of a minimum of six (6) members to include an infectious disease physician whose
     primary practice is at the Northlake Campus, an infectious disease physician whose
     primary practice is at the Southlake Campus, a physician from the Division of Pediatrics,
     a physician from the Division of Surgery, a physician from the Division of Pathology,
     and a physician from the clifnicalwith a specialty in pulmonology.

C.   The Infection Control Nurse shall assist the Committee Chairman in the preparation of
     the agenda, reports, minutes and implementation of actions taken.

D.   Meetings of the Committee shall be held no less than ten (10) times
     annually. Written record of the Committee's findings and actions shall be submitted to the
     Diagnostic and Therapeutics Committee via the Chairman of the Infection Control
     Committee.

E.   The Infection Control Committee shall be responsible for the surveillance of inadvertent
     Hospital infection potentials, of a preventative and corrective program designed to mini-
     mize infection hazards and the supervision of the infection control in all phases of the
     Hospital's activities including:

     1.   Operating rooms, delivery rooms, recovery rooms and special care units.
     2.   Sterilization procedures by heat, chemicals or otherwise.
     3.   Isolation procedures.
     4.   Prevention of cross-infection by anesthesia apparatus or inhalation therapy
          equipment.
     5.   Testing of Hospital personnel for carrier status.
     6.   Disposal of infectious material.
     7.   Other situations as requested by the Medical Council.
     8.   Decisions on appropriate corrective actions including educational
          programs, changes in policy and procedure.

**Section 7:    Medical Education, Research and Library Committee**

A.   The Medical Education, Research and Library Committee is intended to determine
     medical education priorities, develop, implement and coordinate appropriate medical
     education programs and to provide for research activities of the Medical Staff.

*Effective: 5/5/2008*
*Revised:   11/3/2008, 5/4/2009, 12/7/2009, 7/12/2010, 6/6/2011, 1/9/2012, 7/9/2012, 11/5/2012,*
*1/7/2013, 12/2/2013, 6/2/2014, 12/1/2014, 6/6/2016,10/3/2016,11/7/2016, 1/4/2017, 6/5/2017,*
*12/4/2017, 7/9/2018*

B.    The Committee shall consist of the Chairman and Vice-Chairman appointed annually by the Medical Staff President.  A minimum of five (5) other Medical Staff members to include representatives from the Cancer Committee, Leadership Performance Improvement Council and the Director of the Family Practice Residency Program. (5/4/2009)

All Medical Staff appointments are for three-year terms on a staggered basis.  A representative of Administration and the Administrative Liaison also will serve on this committee.  Such appointments are subject to Medical Council approval.

C.    The Medical Education, Research and Library Committee shall meet no less than six (6) times annually and shall prepare a written record of Committee meetings for submission to the Medical Council.

D.    The responsibilities of the Medical Education, Research and Library Committee and Director of Medical Education shall include but are not limited to:

1.    Obtain appropriate accreditation for all medical education programs.
2.    Recommend assignments for the Medical Staff faculty.
3.    Approve the curriculum for each program and selection standards for students as presented by the appropriate program director.
4.    Be responsible for the instruction in all programs sponsored by the Medical Staff.

E.    The function of the Library is a part of this committee.

**Section 8:    Utilization Management Committee**

A.    Methodist Hospital's Board of Directors has the ultimate responsibility of utilization review.  Oversight and monitoring of compliance with the utilization plan is delegated to the Utilization Management (UM) Committee. Monitoring and oversight is also provided through the Medical Council who acts upon received reports, studies and recommendations from the UM committee.

B.    Written Utilization Management Plan

The committee shall formulate a written utilization management plan for the hospital.  Such plan must be in effect at all times.

C.    The committee shall be composed of seven (7) or more members with chairperson and vice chairperson appointed annually by the President of the Medical Staff.  Appointments will be made for two years on a staggered basis and are subject to Medical Council approval.

*Effective:* 5/5/2008
*Revised:* 11/3/2008, 5/4/2009, 12/7/2009, 7/12/2010, 6/6/2011, 1/9/2012, 7/9/2012, 11/5/2012,
1/7/2013, 12/2/2013, 6/2/2014, 12/1/2014, 6/6/2016,10/3/2016,11/7/2016, 1/4/2017, 6/5/2017,
12/4/2017, 7/9/2018

D.    Meeting sessions shall be no less than quarterly, but in sufficient frequency to satisfy the requirements of the committee in a timely basis.

E.    Goals and Responsibilities of the Committee (included, but not limited to)

1.    Evaluating the efficient utilization of beds and services through medical necessity; pre-admission, In-Patient admission, and concurrent review. The appropriate use of diagnostic and therapeutic services and the Length of Stay (LOS).

2.    Assuring that the medical records substantiates clear documentation of the quality and utilization of services needed for the management and progress of each patient.

3.    Assuring initial and concurrent reviews are conducted and documented in a proper and timely manner as specified by designated payor guidelines using nationally recognized current medical necessity criteria.

4.    To assure cooperation and support from external review organizations in measuring the utilization and quality of services established by medical staff standards.

5.    Assuring medical staff and the interdisciplinary team receives timely updates on patient benefits for follow-up services as specified by the designated payor's guidelines.

6.    Assuring the physicians and interdisciplinary team receives timely updates on payment denials as specified by the designated payor's guidelines.

F.    Confidentiality of Records

All medical information and/or records incident to utilization review shall be considered confidential. HIPAA guidelines, state specific regulations, organizational policies govern release of said information. Identities of individuals are kept confidential in all UR records and reports.

**Section 9:    Committees of the General Medical Staff**

**Subsection 1: Nominating Committee**

The Nominating Committee shall consist of the Immediate Past-President as Chairman plus the second Past-President, and the third Past-President. The President-Elect shall serve as an ex-officio member without vote. The Committee shall offer two (2) or more nominees for each office at the July meeting of the Medical Staff and/or the information will be distributed via a Special Medical Staff Memo.

Effective: 5/5/2008
Revised:   11/3/2008, 5/4/2009, 12/7/2009, 7/12/2010, 6/6/2011, 1/9/2012, 7/9/2012, 11/5/2012,
1/7/2013, 12/2/2013, 6/2/2014, 12/1/2014, 6/6/2016,10/3/2016,11/7/2016, 1/4/2017, 6/5/2017,
12/4/2017, 7/9/2018

Nominations may also be made by petition signed by at least twenty-five (25) members of the Active Staff and filed with the Secretary of the Medical Staff at least five (5) days prior to the annual meeting.

## Subsection 2: Bylaws Committee

The Bylaws Committee shall consist of the Immediate Past-President as Chairman plus the second Past-President and third Past -President.  In addition, the President of the Medical Staff may appoint up to five (5) Active Medical Staff members who have served on the Active Staff for a minimum of five (5) years.

The Committee must conduct an annual review of the Bylaws. The review will seek to maintain compliance with approved recommendations, to prepare amendments necessary to correct identified deficiencies and to maintain efficiency, high quality and currently accepted standards for Medical Staff affairs.

Meetings shall be held no less than twice annually. A record shall be made and filed with the Medical Council. The record must reflect that an annual review of the Bylaws has been conducted together with a statement of the findings. The Committee must submit proposed Bylaws revisions to the Medical Council and then to the General Staff for Adoption.

## Subsection 3: Budget Committee

The purpose of this committee shall be the recommendation of an annual budget of the Medical Staff to the Medical Council and the amount of annual dues to be assessed each member. The budget, upon adoption by the Medical Council and the General Medical Staff, shall be an authorization from the Treasurer of the Medical Staff to approve payment of bills as incurred. Whenever the dues recommendation for the next budget period exceeds the dues assessment of the current year, a simple majority vote of the general Medical Staff in attendance is required to authorize the increased dues assessment.

The fiscal agent for the Medical Staff shall be the Hospital.

The Chairman of the Budget Committee shall be the Treasurer of the Medical Staff whose term of office shall be for one (1) year. Two (2) additional members shall be appointed by the President of the Medical Staff from the Active Staff. Their term of office shall be for three (3) years on a staggered basis, and they may be re-appointed.

Meetings shall be held upon call of the Chairman of the Budget Committee.

*Effective: 5/5/2008*
*Revised:  11/3/2008, 5/4/2009, 12/7/2009, 7/12/2010, 6/6/2011, 1/9/2012, 7/9/2012, 11/5/2012,*
*1/7/2013, 12/2/2013, 6/2/2014, 12/1/2014, 6/6/2016,10/3/2016,11/7/2016, 1/4/2017, 6/5/2017,*
*12/4/2017, 7/9/2018*

**Section 10:    Immunity - Professionals and Peer Review Committees**

Among the responsibilities imposed upon the Committees described in these Medical Staff Bylaws as well as upon the Medical Council itself are the responsibilities of evaluating the qualifications of professional health care providers or merits of complaints against a professional health care provider including a determination of recommendation concerning such complaints.

Whenever the Medical Council or any of its Committees, a majority of whose members are professional health care providers, is so engaged, the Medical Council or such Committee shall be deemed to be a Peer Review Committee as defined in I.C.§34-30-15-1 et. sec., and the Medical Council or any of its Committees shall be entitled to all of the privileges, immunities and rights provided by or through such Act entitled "Immunity - Professionals and Peer Review Committees" as presently constituted or as the same may be amended, revised, supplemented and/or repealed from time to time.

**Section 11:    Electronic and Telephonic Means**

Notice, attendance, actions including voting, and participation may be accomplished by email or other electronic and/or telephonic means where permitted by the chair of the committee on either an individual or group basis.

## ARTICLE XI
## ALLIED HEALTH PROFESSIONALS (AHP'S)

**Section 1:    Definitions**

A.    An "Allied Health Professional" ("AHP") is a licensed professional who is not eligible for membership on the Medical Staff but who is qualified by academic and clinical training and experience to render patient care services in accordance with specific privileges granted pursuant to these bylaws.  Allied Health  Professionals include licensed professionals in the following disciplines:

1.    Advance Practice Nurse ("APN") as defined under Indiana law [under 848 IAC 4-1-3 (b), this currently includes Nurse Practitioners, Certified Nurse Midwives, and Clinical Nurse Specialists];
2.    Physician Assistant ("PA");
3.    Clinical Psychologist; and
4.    Certified Registered Nurse Anesthetist ("CRNA").

B.    A "Collaborative Agreement" is:

1.    In the case of an AHP who is an APN, the written practice agreement meeting the requirements of 848 IAC 5-1-1(a)(7); or

Effective: 5/5/2008
Revised: 11/3/2008, 5/4/2009, 12/7/2009, 7/12/2010, 6/6/2011, 1/9/2012, 7/9/2012, 11/5/2012,
1/7/2013, 12/2/2013, 6/2/2014, 12/1/2014, 6/6/2016,10/3/2016,11/7/2016, 1/4/2017, 6/5/2017,
12/4/2017, 7/9/2018

    2.    In the case of an AHP who is a PA, the written supervisory agreement meeting the requirements of I.C. § 25-27.5-5-2(f) and as filed with and approved by the Indiana State Medical Licensing Board pursuant to I.C. § 25-27.5-5-2(g).

C.    A "Collaborative Physician" is any physician with whom an AHP has a written Collaborative Agreement on file, which may include the Sponsor and one or more other physicians.

D.    A "Sponsor" is a medical or osteopathic physician, dentist or podiatrist who:

    1.    Is a member of the Medical Staff in good standing;
    2.    Must either:
        a.  be the employer of the AHP;
        b.  have a written independent contractor agreement with the AHP pursuant to which such AHP provides services on behalf of the Sponsor; or
        c.  be a physician employee of the Hospital, if the AHP is a Hospital employee; and;
    3.    Agrees in writing, on such form as shall be prescribed by the Medical Council and the Hospital Board, to sponsor the AHP's application for privileges and to accept the responsibilities of the Sponsor as set forth in these Bylaws.

In the case of an AHP who is a PA, the Sponsor must also be such PA's supervising physician registered with the Stat e of Indiana pursuant to I.C. § 25-27.5-6-4(a)(2) and 848 IAC 2.2-2-2(a).

E.    The "Sponsor Agreement" is the form prescribed by the Medical Council, as referenced in Section 1(D )(3) of this Article XI, by which the Sponsor agrees in writing to assume the responsibilities of a Sponsor as specified in these Bylaws.

**Section 2:**    **Scope of Practice of Allied Health Professionals**

A.    Privileges.

    1.    Subject to the limitations set forth in this Section 2 of Article XI of these Bylaws, an AHP shall be entitled to exercise only those privileges specifically requested and granted. Such privileges must be within the scope of such AHP's license, training, education, certification or other legal credentialing authorizing the AHP to practice in the State of Indiana and consistent with any restrictions thereon. The initial application for appointment and any application for reappointment submitted by the AHP shall include an outline of the privileges requested.

    2.    The AHP's practice within any Division is subject to the rules and regulations of that division and to the authority of the Chief of the Division, as well as the Rules and Regulations of the Medical Staff and applicable provisions of these Bylaws.

*Effective: 5/5/2008*
*Revised:  11/3/2008, 5/4/2009, 12/7/2009, 7/12/2010, 6/6/2011, 1/9/2012, 7/9/2012, 11/5/2012, 1/7/2013, 12/2/2013, 6/2/2014, 12/1/2014, 6/6/2016,10/3/2016,11/7/2016, 1/4/2017, 6/5/2017, 12/4/2017, 7/9/2018*

The quality and efficiency of the care provided by AHPs within any such Division shall be monitored and reviewed as part of the regular Medical Staff mechanism.

B.    Limitations.

1.    Except for Clinical Psychologists, as a condition of appointment or reappointment and the grant and continued effectiveness of privileges:

a.    All AHPs must have a Sponsor who maintains Medical Staff membership in good standing.  By submitting his/her application, such AHP acknowledges that his/her appointment as an AHP shall remain in effect only if the Sponsor maintains medical staff membership in good standing.

b.    All AHPs must submit with the application for appointment or reappointment a signed Sponsor Agreement.

c.    In addition to the Sponsor Agreement, all AHPs who are APNs or PAs shall submit with the application and maintain on file a copy of his/her current Collaborative Agreement(s) with the Sponsor and any other physician(s) he/she will be assisting.  It is acknowledged that an AHP may have more than one Collaborative Agreement on file.

2.    AHPs may not:

a.    become members of the Medical Staff or vote on Medical Staff affairs;
b.    admit patients independently;
c.    discharge patients independently;
d.    be or serve "on call" independently; or
e.    independently conduct daily rounds with respect to any patient of a Sponsor or Collaborative Physician.

3.    AHPs who are APNs or PAs may perform the medical history and physical examination within the scope of the supervision of a medical or osteopathic physician and provided that it is countersigned by such physician.

4.    Pursuant to I.C. § 25-23-1-30, AHPs who are CRNAs may administer anesthesia under the direction and in the immediate presence of a physician, provided that such physician need not be the Sponsor.

C.    Prerogatives.  AHPs may:

1.    attend educational meetings of the hospitals or Medical Staff when appropriate to their disciplines;

Effective: 5/5/2008
Revised:   11/3/2008, 5/4/2009, 12/7/2009, 7/12/2010, 6/6/2011, 1/9/2012, 7/9/2012, 11/5/2012,
1/7/2013, 12/2/2013, 6/2/2014, 12/1/2014, 6/6/2016,10/3/2016,11/7/2016, 1/4/2017, 6/5/2017,
12/4/2017, 7/9/2018

2.    exercise such other prerogatives as the Medical Council may accord to AHPs.

**Section 3:    Responsibilities of AHP and Sponsor**

A.    Responsibilities of the AHP.  The AHP shall:

1.    Provide an ongoing demonstration of competence and compliance with the requirements of the Medical Staff Bylaws and Rules and Regulations, Committee actions and Governing Body actions.

2.    Maintain notes/records within the limits of their privileges or as specifically directed by the Collaborating Physician.  Such documentation shall be completed in a timely fashion, consistent with medical record documentation requirements.

3.    Pay applicable dues attendant to his/her AHP appointment.  Dues are due on January 15 of each calendar year, and after that date, three (3) reminder letters will be sent.  If dues are not paid by May 1, the AHP will be suspended.

4.    Maintain malpractice insurance coverage as necessary to maintain "qualified healthcare provider" status pursuant to the Indiana Medical Malpractice Act.

5.    Comply with all continuing education requirements applicable to his/her licensure and certification.

B.    Responsibilities of the Sponsor.  The Sponsor shall:

1.    Maintain his/her Medical Staff membership in good standing at all times.

2.    Sign a written Sponsor Agreement agreeing to assume the responsibilities of Sponsor to the AHP as set forth herein.

3.    Be accountable for the quality and extent of the Affiliate's performance.

4.    Review all patient encounters of the AHP within twenty-four (24) hours.  Such review shall be documented in the medical chart.  This responsibility may be delegated to a physician designee or may be performed by a Collaborative Physician or his/her physician designee, with respect to such Collaborative Physician's patients.

5.    Countersign and retain responsibility for the medical history and physical examination delegated to an AHP with history and physical privileges.  This responsibility may be delegated to a physician designee or may be performed by a

*Effective:* 5/5/2008
*Revised:* 11/3/2008, 5/4/2009, 12/7/2009, 7/12/2010, 6/6/2011, 1/9/2012, 7/9/2012, 11/5/2012, 1/7/2013, 12/2/2013, 6/2/2014, 12/1/2014, 6/6/2016,10/3/2016,11/7/2016, 1/4/2017, 6/5/2017, 12/4/2017, 7/9/2018

Collaborative Physician or his/her physician designee, with respect to such Collaborative Physician's patients.

**Section 4:    Appointment.**

A.    Initial Appointment

    1.    Application:

        a.    An application for clinical privileges must be submitted by the AHP on the form promulgated by the Medical Council, which shall state the qualifications and references of the Applicant and include the Applicant's agreement to be bound by the current Bylaws, Rules and Regulations and policies of the Medical Staff, and all pertinent Hospital policies and procedures as presented to the Medical Council for information purposes.

        b.    The AHP must submit the signed Sponsor Agreement, if required, together with a copy of the written Collaborative Agreement(s), if required, at the time that the application is submitted.

        c.    The application, with all required accompanying materials and the signed Release of Liability form must be completed and returned to the Medical Staff Office. If all required application materials are not received within sixty (60) days of the date the application form is initially submitted, the application will be considered to have been voluntarily withdrawn.

        d.    The completed application, accompanied by a complete list of the clinical privileges the AHP requests, must be submitted to the Medical Staff Office accompanied by payment of the non-refundable processing fee. The Medical Council annually determines the non-refundable processing fee for AHPs.

    2.    Qualifications and Burden of Proof:

        a.    The AHP has the burden of producing adequate information for a proper evaluation of the AHP's experience, training and certification, current competence, ability to work cooperatively with others and health status, and of resolving any doubts about these or any of the qualifications required for the requested specified services.

        b.    The AHP has the burden of satisfying any reasonable requests for information or clarification made by appropriate Medical Staff or Board authorities, including without limitation requests from the Medical Staff Office, the Credentials and Professional Standards Committee, the Medical Council or the Board of Directors. If the AHP fails to respond to any request for

*Effective:* 5/5/2008
*Revised:*    11/3/2008, 5/4/2009, 12/7/2009, 7/12/2010, 6/6/2011, 1/9/2012, 7/9/2012, 11/5/2012,
1/7/2013, 12/2/2013, 6/2/2014, 12/1/2014, 6/6/2016,10/3/2016,11/7/2016, 1/4/2017, 6/5/2017,
12/4/2017, 7/9/2018

additional information or clarification from any authority by the specified
deadline, the application will be considered to have been voluntarily
withdrawn.

c.  The AHP agrees to provide such information as may be requested to
demonstrate his/her physical and mental health status and to submit to
appropriate examinations as requested.

3.  Verification of Information and Evaluation of Completed Credential File:

a.  Verification of the references, licensure, registration, certification, education,
training, affiliations and other qualification evidence provided will be
completed by the Medical Staff Office.  The Medical Staff Office will refer
the completed credential file to the appropriate Division Chief for initial
evaluation.

b.  The completed credential file will be reviewed by the appropriate Division
Chief or his/her designee, to evaluate evidence of the applicant's training,
education, experience and demonstrated ability and to make a
recommendation to the Credentials and Professional Standards Committee.

c.  The Chief Nursing Officer or designee will be scheduled to meet with new
AHP applicants who are advance practice nurses related to the credentialing,
privileging and evaluation of such advanced practice nurses.

d.  If, at any time during the review process, there are questions regarding the
application, the AHP will be asked to clarify or provide additional information
before a recommendation is made to the Credentials and Professional
Standards Committee.  The request will be in writing and will include a
specified date for submitting the additional information or clarification
requested.

4.  Credentials and Professional Standards Committee Evaluation:

a.  The Credentials and Professional Standards Committee shall review the
application and supporting documents, including the recommendations from
the Division Chief of the appropriate division, to make a determination of the
applicant's competence and recommendation for privileges.

b.  If the conclusion of the Credentials and Professional Standards Committee is
contrary to that of the Division Chief, the application may be deferred at the
sole discretion of the Credentials and Professional Standards Committee
pending further clarification and/or the provision of additional information by
the AHP.  If additional information or clarification is requested, the request

Effective: 5/5/2008
Revised: 11/3/2008, 5/4/2009, 12/7/2009, 7/12/2010, 6/6/2011, 1/9/2012, 7/9/2012, 11/5/2012,
1/7/2013, 12/2/2013, 6/2/2014, 12/1/2014, 6/6/2016,10/3/2016,11/7/2016, 1/4/2017, 6/5/2017,
12/4/2017, 7/9/2018

will be in writing and will include a specified date for submitting the additional information or clarification requested.

    c. The Credentials and Professional Standards Committee will make a recommendation to the Medical Council that the applicant be accepted for appointment with privileges as recommended, rejected for appointment and privileges, or that the application be deferred for further consideration.

5. Medical Council Evaluation:

    a. The Medical Council shall review the recommendations from the Division Chief, the Credentials & Professional Standards Committee and any other relevant information available. The Medical Council shall recommend to the Board of Directors that the Applicant be accepted, deferred or rejected.

    b. Acceptance: If the Medical Council recommends that the applicant be accepted, the recommendation shall be forwarded to the Board of Directors for review and approval.

    c. Deferral: If the Medical Council requires further information or clarification, it may defer its recommendation pending receipt of such information or clarification. In such event, the Medical Staff Office will notify the AHP and, when applicable, the Sponsor, of the deferral. If the AHP is to provide the additional information, the notice must so state and must include a request for the specific data/explanation and the deadline for response. Failure to respond in a satisfactory manner within the specified time frame will be construed as a voluntary withdrawal of the application.

    d. Adverse Recommendation: If the Medical Council recommends that the applicant be rejected for appointment and privileges, the adverse Medical Council recommendation is forwarded to the Vice President of Medical Affairs who shall promptly inform the AHP and the sponsor, in writing, of the recommendation and the reasons for the recommendation.

    e. The AHP has ten (10) days from the receipt of the notice of an adverse recommendation to request a hearing on the recommendation. This request must be in writing and delivered personally or by certified mail to the Medical Staff Office. Failure to respond in a timely and appropriate manner is deemed a waiver of any opportunity to appeal and the Board of Directors shall take final action on the recommendation of the Medical Council.

B. Reappointment Procedures:

Effective: 5/5/2008
Revised:   11/3/2008, 5/4/2009, 12/7/2009, 7/12/2010, 6/6/2011, 1/9/2012, 7/9/2012, 11/5/2012,
1/7/2013, 12/2/2013, 6/2/2014, 12/1/2014, 6/6/2016,10/3/2016,11/7/2016, 1/4/2017, 6/5/2017,
12/4/2017, 7/9/2018

1.    The first two years as an AHP are considered to be a provisional period.  At the end of the first year, each applicant will be evaluated for renewal for an additional year.  At the end of the second year, each applicant will be evaluated for renewal for two years, and after that time, will be considered for renewal every two years.

2.    Reappointment will be based upon information that will include consideration of professional performance, judgment, skills and knowledge; the individual's current licensure, physical and mental health status; continuing education; the timeliness, accuracy, clarity and legibility of entries in medical records; working relations with medical colleagues and others in the Hospital; peer review information applicable to his/her performance; verification of Collaborative Agreement(s), and other reasonable indications of continuing qualifications.

3.    Issues regarding clinical competence, scope of practice, and clinical privileges must be forwarded to the appropriate peer review committee for review.

4.    The reappointment application will be reviewed by the Medical Staff Office for completeness and forwarded to the respective Division Chief.  The approval process will follow the same approval process as an initial application.

C.    **Temporary Privileges**.

1.    Temporary privileges for AHPs will be considered in the rare case of an urgent patient care need that mandates an immediate authorization to practice.  In addition, the credentialing application must be complete, with no concerns, with all documentation received and verified.  A written request from the AHP must be made to the Credentials and Professional Standards Committee that explains in detail the reason for the request.  If it is demonstrated that there is an urgent patient care need that would not otherwise be fulfilled, temporary privileges must be granted by the Hospital President or designee(s) upon recommendation by the President of the Medical staff or designee(s) and the Credentials and Professional Standards Committee Chairperson.  The Division Chief or designee(s) acts in the absence of the President of the Medical Staff or Credentials and Professional Standards Committee Chairman.  If all concur in their recommendations, the President of the Hospital will send a letter to the AHP confirming that temporary privileges have been granted.

2.    Temporary privileges may also be granted to an AHP applicant with a complete application with no concerns, approved by the Credentials & Professional Standards Committee or its Ad hoc Committee who is awaiting review and approval of the Medical Council and Board of Directors, with the following elements:

*Effective:  5/5/2008*
*Revised:   11/3/2008, 5/4/2009, 12/7/2009, 7/12/2010, 6/6/2011, 1/9/2012, 7/9/2012, 11/5/2012,*
*1/7/2013, 12/2/2013, 6/2/2014, 12/1/2014, 6/6/2016,10/3/2016,11/7/2016, 1/4/2017, 6/5/2017,*
*12/4/2017, 7/9/2018*

        a.   relevant training or experience
        b.   current competence/
        c.   ability to perform the clinical privileges requested
        d.   other criteria required by the  medical staff bylaws
        e.   query and evaluation of National Practitioner Data
             challenge to licensure or registration,
        g.   absence of involuntary termination of medical staff
             membership at any hospital or other entity,
        h.   absence of any involuntary limitation, reduction, denial or loss of clinical privileges.

3.     Prior to granting of temporary privileges, primary source verification of the following must be obtained:

-Certification and Indiana License
-Drug Enforcement Administration and Controlled Substance Registration (if applicable)
- Medical Malpractice Insurance including participation in the Indiana Patient Compensation Fund
- National Practitioner Data Bank Response
- Two professional references including a statement of the applicant's ability to perform the privileges requested
- Interview with Division Chief
- Requested privileges list
- Criminal background check
- Documentation of immunity and testing (Immunization Records)

4.     Temporary privileges may be granted an AHP for no more than 120 days.

**Section 5:**    **Disciplinary Procedures**

A.    Grounds for Initiating:  The grounds for initiating routine, summary or automatic restriction, suspension or termination of an AHP's appointment and/or clinical privileges are the same as provided in the Medical Staff Bylaws for instituting such action against a Medical Staff member or a practitioner with clinical privileges as applicable.

B.    Procedures:  The procedures for initiating and taking action relative to the routine, summary or automatic restriction, suspension or termination of an AHP's appointment and/or clinical privileges are the same as provided in the Medical Staff Bylaws with regard to such actions against a Medical Staff member a practitioner with clinical privileges, as applicable.

Effective:  5/5/2008
Revised:   11/3/2008, 5/4/2009, 12/7/2009, 7/12/2010, 6/6/2011, 1/9/2012, 7/9/2012, 11/5/2012,
1/7/2013, 12/2/2013, 6/2/2014, 12/1/2014, 6/6/2016,10/3/2016,11/7/2016, 1/4/2017, 6/5/2017,
12/4/2017, 7/9/2018

C.   If the AHP's affiliation is terminated, the AHPs clinical privileges shall be automatically terminated.  A process of evaluation of the circumstances will take place to assess whether or not the AHP will be re-evaluated.

D.   The AHP and the Sponsor, if applicable, are responsible to notify the Medical Staff Office of any change in the AHP's practice and provide documentation indicating details of the change.

E.   When disciplinary action is proposed or has been taken against an AHP, the VPMA promptly notifies the AHP and the Sponsor, if applicable, by special notice of the action and the rights available under these Bylaws.

F.   Any appeal of a disciplinary action taken by the AHP shall be governed by the appeal procedures outlined in Section 6 of this Article XI, below.

**Section 6:    Hearing and Appeals Process.**

A.   Right to Fair Hearing and Appeals.  Any AHP holding current clinical privileges  is entitled to a fair hearing and appeals process in the event of the denial, suspension, restriction or termination of such privileges.

B.   AHP Ad Hoc Review Committee.  In the event that the privileges of an AHP are  denied, suspended, restricted or terminated, the AHP, within ten (10) days of the   receipt        of notice of such action, may request an interview before an AHP Ad Hoc Review Committee composed of:

   1.    at least two (2) members of the Medical Staff, one of whom must be in the same area of clinical practice as the Sponsor, if the AHP has a Sponsor, or if there is no Sponsor, then in the same clinical division as the AHP; and
   2.    a representative of the AHP category in the same clinical division involved, if available.

   The Vice President of Medical Affairs shall designate one of the appointees as Chairman. This AHP Ad Hoc Review Committee shall convene as soon as is  reasonably possible. A notice of the AHP Ad Hoc Review Committee meeting   will be sent to the AHP and the Sponsor, if applicable, by the Vice President of  Medical Affairs. The AHP and the Sponsor, if applicable, shall be required to   personally appear before the review committee, and shall present an oral or written statement in support of the AHP and respond to any questions from committee members. Failure of the AHP and the Sponsor to appear in person or to proceed in this manner is deemed a waiver and will be construed as a voluntary withdrawal of the appeal.  The review committee's recommendation will be submitted to the Board of Directors for final action.

*Effective: 5/5/2008*
*Revised:   11/3/2008, 5/4/2009, 12/7/2009, 7/12/2010, 6/6/2011, 1/9/2012, 7/9/2012, 11/5/2012,*
*1/7/2013, 12/2/2013, 6/2/2014, 12/1/2014, 6/6/2016,10/3/2016,11/7/2016, 1/4/2017, 6/5/2017,*
*12/4/2017, 7/9/2018*

C.    Appeals of the Actions of the AHP Ad Hoc Committee.  The AHP or the Medical Council may file an appeal of the AHP Ad Hoc Review Committee's action before the Board of Directors prior to its final action on the matter. The Board shall accept written memoranda of appeal up to a week prior to the meeting at which the appeal will be determined, and may permit oral presentation by the parties or their representatives at that meeting.  The Board of Directors shall adopt the AHP Ad Hoc Review Committee decision, so long as it is reasonable,   appropriate under the circumstances and supported by substantial evidence.  The final decision by the Board of Directors shall become effective upon the date of its adoption.

D.    Notice of Decision:  The Vice President of Medical Affairs shall promptly given   notice of the final decision to the AHP, to the Sponsor, if applicable, and to the President of the Medical staff.  If the AHP is a hospital employee, notice will be given to the Human Resources Department.

## ARTICLE XII
## CONFIDENTIALITY, RELEASE OF INFORMATION AND INDEMNIFICATION

**Section 1:    Authorization for Release of Information**

By applying for or exercising clinical privileges within this hospital, an applicant:

A.    Authorizes the hospital and its authorized representatives to consult with the management and members of the medical staffs of other hospitals, healthcare facilities or institutions with which the applicant has been associated, and with others who may have information bearing on his professional qualifications, credentials, clinical competence, clinical privileges requested or presently granted, character, mental or emotional stability, physical condition, ethics, behavior or any other matter as well as to inspect all records and documents that may be material to such questions.

B.    Grants immunity to any and all hospitals, healthcare facilities, individuals, institutions, organizations and their authorized representatives who in good faith supply oral or written information, records, or documents to the hospital in response to an inquiry emanating from this hospital or its authorized representatives.

C.    Releases from any and all civil liability all authorized representatives of the hospital, or any third party, for statements made, materials provided or acts performed in good faith in evaluating the applicant for any of the purposes or reasons set forth above.

**Section 2:    Confidentiality of Information**

A.    General

*Effective: 5/5/2008*
*Revised:  11/3/2008, 5/4/2009, 12/7/2009, 7/12/2010, 6/6/2011, 1/9/2012, 7/9/2012, 11/5/2012,*
*1/7/2013, 12/2/2013, 6/2/2014, 12/1/2014, 6/6/2016,10/3/2016,11/7/2016, 1/4/2017, 6/5/2017,*
*12/4/2017, 7/9/2018*

Medical Staff, clinical service, division, or committee Minutes, files, and records, including information regarding any member or applicant to this Medical Staff, shall, to the fullest extent permitted by law, be confidential. Dissemination of such information and records shall only be made where expressly required by law, pursuant to officially adopted policies of the Medical Staff, or, where no officially adopted policy exists, only the express approval of the Medical Council or its designee. Members shall have access to information in their own files.

B.    Breach of Confidentiality

Inasmuch as effective peer review and consideration of the qualifications of Medical Staff members and applicants to perform specific procedures must be based on free and candid discussions, any breach of confidentiality of the discussions or deliberations of medical staff departments, divisions, or committees, except in conjunction with other hospital, professional societies, or licensing authorities is outside appropriate standards of conduct for this Medical Staff and will be deemed disruptive to the operations of the hospital, subject to the Hearing procedures in Article VII: Changes of Status or Privileges.

If it is determined that such a breach has occurred, the Medical Council may undertake such corrective action as it deems appropriate.

C.    Releases

Each applicant or member shall, upon request of the Medical Staff or hospital, execute general and specific releases in accordance with the express provisions and general intent, of this Article. Execution of such releases shall not be deemed a prerequisite to the effectiveness of this Article.

**Section 3:    Indemnification**

The Hospital shall defend (or cover the costs incurred for defense by), and cover settlements, judgments and damages amounts on behalf of any member of the Medical Staff serving on or assisting any Hospital or Medical Staff committee, or assisting in peer review or quality management activities involving care provided at the Hospital, involved in claims arising out of such activities, so long as the member of the Medical Staff acted in good faith.

## ARTICLE XIII
## MEDICAL STAFF RULES AND REGULATIONS AND POLICY

A.    The Medical Staff or Medical Council shall adopt such Rules and Regulations as may be necessary for the proper conduct of its work. Such Rules and Regulations shall be a part of these Bylaws except that they may be amended at any regular meeting without previous notice by a two-thirds (2/3) vote of the members present entitled to vote thereon.

*Effective:   5/5/2008*
*Revised:     11/3/2008, 5/4/2009, 12/7/2009, 7/12/2010, 6/6/2011, 1/9/2012, 7/9/2012, 11/5/2012,*
*1/7/2013, 12/2/2013, 6/2/2014, 12/1/2014, 6/6/2016,10/3/2016,11/7/2016, 1/4/2017, 6/5/2017,*
*12/4/2017, 7/9/2018*

Such amendments shall become effective when recommended and approved by the Medical Council and approved by the Board of Directors.

Each Division may make such Rules and Regulations, in addition to those that apply to the entire Medical Staff, as it deems necessary and desirable for the function of the Division subject to approval by the Medical Council.

B.      The Medical Council shall review, develop and adopt policies, which will be binding upon the Medical Staff and its members and those otherwise holding clinical privileges. Such policies must be consistent with the Medical Staff Bylaws and Rules and Regulations.  Only policies adopted by Medical Council are binding upon the Medical Staff and its members.  Amendments to Medical Staff policies are to be distributed in writing in a timely and effective manner to Medical Staff members and those otherwise holding clinical privileges.

Any Active Staff member may raise a challenge to any policy established by the Medical Council. In the event that a rule, regulation or policy is thought to be inappropriate, any practitioner may submit a petition signed by 5 % of the Active Staff members. When such a petition has been received by the Medical Council, the Chair will use his/her discretion in addressing the matter by, at a minimum, providing the petitioners with information clarifying the intent of such rule, regulation or policy, or other response as deemed applicable to the issue in question. After clarification is provided and if a majority of the petitioners request,  the matter may be brought to the agenda of a general or special medical staff meeting by petition signed by 10% of the Active Staff members and maybe confirmed, rejected or amended by a majority of voting members.

## ARTICLE XIV
## AMENDMENTS

Recommendations for amendments to the Medical Staff Bylaws must be submitted to the Bylaws Committee for review.  The Bylaws may then be amended as follows:

A.      Amendments proposed to comply with the requirements of a regulatory or accrediting agency (e.g. Joint Commission on the Accreditation of Healthcare Organizations, Indiana State Board of Health, etc.) may be presented at Medical Council with final vote to be taken at the next Medical Staff meeting. Which may be a special meeting called for the purpose of amending the bylaws.   The notice of proposed amendments shall publish the text of such proposed amendments or indicate where a copy of the text may be examined and reviewed.

*Effective: 5/5/2008*
*Revised:    11/3/2008, 5/4/2009, 12/7/2009, 7/12/2010, 6/6/2011, 1/9/2012, 7/9/2012, 11/5/2012,*
*1/7/2013, 12/2/2013, 6/2/2014, 12/1/2014, 6/6/2016,10/3/2016,11/7/2016, 1/4/2017, 6/5/2017,*
*12/4/2017, 7/9/2018*

B.  All other proposed amendments shall be acted on after thirty (30) days' notice, by mail or electronically of the proposed bylaws changes to the Medical Staff. Action on the proposed amendments shall be taken at the next regular Medical Staff meeting or at a special meeting called for the purpose of amending the bylaws    Amendments shall require a two-thirds (2/3) majority of those voting members present for adoption. Amendments must be forwarded to the Board of Directors for approval prior to becoming effective.

C.  The Medical Council shall have the power to adopt such bylaws, rules and regulations and medical staff policy amendments as are, in its judgment, technical modifications or clarifications, reorganization or renumbering, or necessary because of punctuation, spelling, or other errors of grammar or expression or inaccurate cross-references. After adoption by the Medical Council, such bylaws, rules and regulations and medical staff policy amendments shall be communicated in writing to the medical staff and the Board, and they shall be effective immediately and shall be permanent if not disapproved by the Medical Staff at a regular or special meeting or Board within ninety (90) days after adoption by the Medical Council.

## ARTICLE XV
## PARLIAMENTARY AUTHORITY

The Medical Staff shall be governed by the latest edition of Robert's Rules of Order when not contrary to these Bylaws or Rules and Regulations.

## ARTICLE XVI
## ADOPTION AND AFFILIATION

These Bylaws and appended Rules and Regulations, having been duly adopted at a meeting of the Active Medical Staff, shall replace any previous Bylaws and Rules and Regulations and shall become effective when approved by the Board of Directors of the Hospital. They shall, when adopted and approved, be equally binding on the Medical Staff, the Hospital, and their successors in interest.

The Hospital's affiliation with other hospitals, health care systems or similar entities shall not in and of itself affect these Medical Staff Bylaws.

*Effective: 5/5/2008*
*Revised:   11/3/2008, 5/4/2009, 12/7/2009, 7/12/2010, 6/6/2011, 1/9/2012, 7/9/2012, 11/5/2012,*
*1/7/2013, 12/2/2013, 6/2/2014, 12/1/2014, 6/6/2016,10/3/2016,11/7/2016, 1/4/2017, 6/5/2017,*
*12/4/2017, 7/9/2018*


Effective this _____ day of _____, _____


_____
Secretary, Medical Staff of
The Methodist Hospitals, Inc.

*Effective:  5/5/2008*
*Revised:   11/3/2008, 5/4/2009, 12/7/2009, 7/12/2010, 6/6/2011, 1/9/2012, 7/9/2012, 11/5/2012,*
*1/7/2013, 12/2/2013, 6/2/2014, 12/1/2014,  6/6/2016,10/3/2016,11/7/2016, 1/4/2017, 6/5/2017,*
*12/4/2017, 7/9/2018*

# A

accrediting, 90
Active Medical Staff, 4
Ad Hoc Hearing Committee
    Decisions, 45
Adjunct Staff, 10
ADOPTION (Article XVII), 91
Advance Practice Nurse ("APN"), 78
Adverse Recommendations, 21
agenda, 48, 49, 74
Allied Health Professional" ("AHP"), 78
Allied Health Staff affiliates, 5, 7
alternate list, 58
alternates, 5, 7, 58
Ambulatory Staff Physician, 10
amendments, 77, 89, 90
AMENDMENTS (Article XV), 90
Annual General Staff Meeting, 48
annual reports, 48, 57
annual review, 77
Appealable Terminations, 42
appeals, 52, 59, 60
Appeals to the Corporation's Board of Directors, 46
appellate review, 42, 43, 46, 47, 48
Appellate Review, 46, 47
Appellate Review Committee, 46, 47
applicant for Medical Staff membership, 3
application, 7, 11, 16, 17, 18, 25
Application for membership, 11
Application of Article, 41
Application Procedure, 19
Applications, 16
Appointment Procedure, 11
APPOINTMENTS AND REAPPOINTMENTS, 11
arrangements for coverage, 2, 10
Associate Medical Staff, 4
attendance, 1, 5, 6, 8, 20, 48, 49, 56, 77, 78
Attendance, 48
Authorization for Release of Information, 87
Automatic Suspension or Limitation, 39
automatic termination, 7

# B

ballot process, 48, 56
board certification, 25
Board Certification, 16, 26
board certified, 12, 19
Breach of Confidentiality, 88
Budget Committee, 77
Burden of Producing Information, 11
Bylaws Committee, 76

# C

Cancer Registry, 66
Cardiovascular and Leadership PIC Peer
    Review/Transfusion/Medical Records Committee, 66
CATEGORIES OF MEMBERSHIP, 4
Challenge
    currently pending, 16
    successful, 16
Charity leave of absence, 24
clerical support, 57
Clinical Divisions, 54
CLINICAL ORGANIZATION OF THE MEDICAL STAFF, 54
Clinical privileges, 1
CLINICAL PRIVILEGES, 25
Collaborative Agreement, 78, 80, 82, 84
committee, 5, 8, 9, 22, 35, 36, 39, 42, 43, 44, 45, 46, 47,
    54, 60, 61, 62, 64, 65, 67, 68, 71, 74, 75, 77, 78, 88, 89
Committee authority, 61
Committee Policies, 60
Committees, 60, 75, 76, 77
    Budget, 77
    Bylaws, 76
    Credentials and Professional Standards, 63
    Diagnostice and Therapeutics, 68
    Formulary/Drug Utilization, 73
    Human Subjects, 71
    Impaired Physician, 64
    Infection Control, 73
    Nominating, 76
    Peer Review, 77
    Radiation Safety, 69
    Tumor Conference and Cancer, 66, 67
Committees of the General Medical Staff, 75, 76
COMMITTEES OF THE MEDICAL STAFF, 60
communicable diseases, 69, 73
Composition of Hearing Committee, 43
Conditions and Duration of Appointments, 11
Conduct of Hearing, 43
CONFIDENTIALITY AND RELEASE OF INFORMATION, 87
Confidentiality of Information, 88
conflict of interest, 72
Conflicts of Interest, 53
consultation, 17, 20, 27, 56, 69
Consulting Medical Staff, 9
continuing education, 6, 12, 19
continuing medical education, 20
continuing medical education credit hours, 12, 19
contract, 2
contractual agreements, 58
controlled substance, 12, 20
Controlled Substances, 40
corrective action, 2, 36, 37, 38, 41, 65, 88
Courtesy Medical Staff, 9

*Effective:  5/5/2008*
*Revised:   11/3/2008, 5/4/2009, 12/7/2009, 7/12/2010, 6/6/2011, 1/9/2012, 7/9/2012, 11/5/2012,*
*1/7/2013, 12/2/2013, 6/2/2014, 12/1/2014, 6/6/2016,10/3/2016,11/7/2016, 1/4/2017, 6/5/2017,*
*12/4/2017, 7/9/2018*

covenant, 23
coverage, 5, 10, 12, 24, 28
credentialing criteria, 26
Credentials and Professional Standards Committee, 63
Criminal Background Check, 27
criminal background check,, 16

D

daily acute care hospital rounds, 5, 7, 10
DEA, 12, 19, 20
DEA registration, 3
Decisions of the Ad Hoc Hearing Committee, 45
DEFINITIONS, 1
Delegate-At-Large, 51
Delineation of Privileges in General, 25
denial of the application, 11
denying some or all of the application for privileges, 18
Departments of the Medical Staff, 58
Diagnostic and Therapeutics Committee, 68
direct economic competition, 43
Director of Medical Education, 52, 57, 75
Disaster privileges, 27
disruptive behavior, 52, 59
documentation of Immunity and Testing (Immunization Records), 27
documentation of immunization and testing (immunization record, 16
Drug Enforcement Administration, 16, 20
Drug Enforcement Administration and Controlled Substance Registration, 26
dues, 6, 8, 9, 10, 11, 20, 23, 24, 77

E

economic competition, 43
Economic credentialing, 4
educational record, 6, 8
Elected Officers of the Medical Staff, 49
Election or Appointment of Chiefs of Clinical Divisions, 55
electronic and/or telephonic means, 49
eligible for membership, 3
Emergency Medical Resident, 3
Emergency Privileges, 27
Emergency Room Call, 9, 10
ethical conduct, 3, 63
ethical pledge, 17
excluded from the federal Medicare or other federally funded health care programs, 40
exclusion from the federal Medicare or other federally funded health care program, 16
Exclusive Contract, 34
exclusive contracts, 34
Exercise of Privileges, 25
Exhaustion of Remedies, 41
Expedited Applications, 22

External Review, 36

F

Federal Tort Claims Act, 3
Fellowship Program, 6, 12, 19
Final Action, 41
final judgments, 16, 20
financial responsibility requirements, 3, 6, 12
Focused Professional Practice Evaluation (FPPE), 30
focused review, 35, 63
Formulary/Drug Utilization Committee, 73
from committee, 5, 8, 61
Functions of the Chief of Service, 57

G

General Medical Staff Meetings, 48
ghost" surgical or medical services, 17
Governing Body, 1

H

Harassment, 4
Hearing and Appeal Rights, 34
Hearing Committee, 42, 43, 44, 45, 46, 47
Hearings and Appellate Reviews, 42
HEARINGS, APPELLATE REVIEW AND APPEALS, 41
history and physical, 5, 7, 10
Honorary Medical Staff, 10
Honorary Staff membership, 12
Hospital policies and procedures, 11
Hospital service area, 6
Human Subjects Committee, 71
Human Subjects Review Committee, 68, 71

I

immediate Past-President, 51
Immediate Past-President, 49
Immunity - Professionals and Peer Review Committees, 77, 78
Immunity: Professionals and Peer Review Committees, 60
impaired physician, 64
Impaired Physician Committee, 64
important patient care need, 26
In Good Standing, 1
Indiana Medical License, 26
Indiana Medical Malpractice Act, 3, 6, 12, 24, 27
Indiana Patient Compensation Act, 28
Indiana Patient Compensation Fund, 26
Indiana State licensure, 12, 16, 24
Infection Control Committee, 73
Initiating Corrective Action, 35
Initiating Investigation, 36

Effective: 5/5/2008
Revised: 11/3/2008, 5/4/2009, 12/7/2009, 7/12/2010, 6/6/2011, 1/9/2012, 7/9/2012, 11/5/2012,
1/7/2013, 12/2/2013, 6/2/2014, 12/1/2014, 6/6/2016,10/3/2016,11/7/2016, 1/4/2017, 6/5/2017,
12/4/2017, 7/9/2018

inpatient, 10, 20
involuntary leave of absence, 24
Involuntary limitation, 27

J

Joint Meetings with Other Hospitals, 59

L

leave of absence, 22, 23
Leave of Absence, 22, 23, 59
length of reappointment, 21
Liaison with the Hospital Board of Directors, 52
licensed, 3
licensure, 12, 16, 20, 24
locum tenens, 29, 30

M

malice, 17
Medical Committees Committees
    Medical Education, Research and Library, 74
Medical Council, 61
Medical Council Deliberation, 41
Medical Education, Research and Library Committee, 74
Medical leave of absence, 24
medical license, 19
Medical Malpractice Insurance, 26
Medical Staff Impairment Committee, 2, 3, 35, 64
MEDICAL STAFF MEMBERSHIP, 2
Medical Staff of The Methodist Hospitals, Inc, 1, 52
MEDICAL STAFF ORGANIZATION, 48
Medical Staff Policies and Procedures Manual, 49, 59
MEMBERSHIP APPLICATION PROCESS, 11
Military leave of Absence, 24
minimum requirement, 6, 8
monitor, 2

N

National Practitioner Data Bank, 16
Nature of Membership, 2
Near Miss, 30
New Applicants, 16
Nominating Committee, 76
Non appealable terminations, 42
Nondiscrimination, 4
non-voting, 67, 71
Notice of Hearing, 43
Nuclear Regulatory Commission, 71

O

on call, 8, 64

on call coverage, 6
ongoing professional practice evaluation (OPPE), 32
Operative and Trauma Services, 66
Osteopathic Methods and Concepts Committee, 66
osteopathic physicians, 3, 4
Other Non-Compliance, 41

P

PARLIAMENTARY AUTHORITY, 90
Participation of Counsel, 42
patient care review, 57
peer evaluation, 9, 20
performance improvement, 65
Performance Improvement, 8, 65, 67, 70
Performance Improvement Council, 35, 65, 74
Performance Improvement Outcomes Committees, 65
physical and mental health status, 3, 12, 17
post-graduate training, 23
Practitioner Conduct, 34
PREAMBLE, 1
preceptor, 2, 6, 8, 35, 57
President, 5, 8, 21, 26, 46, 47, 48, 49, 50, 51, 52, 56, 57, 58,
    59, 60, 61, 62, 63, 64, 66, 69, 71, 72, 73, 74, 76, 77
President-Elect, 21, 49, 50, 51, 52
Presidential Officers and Duties, 49
primary source, 16, 26
primary source verification, 16
Principal Investigator, 72
Principles of Medical Ethics, 3
Privileges, 1, 19, 25, 26, 27, 28, 34, 88
Probation, 39
Procedural Rights, 39
processing fee, 16
Professional Liability Insurance, 40
proof of compliance, 24
provisional, 7, 11
provisional period, 11
psychiatric examination, 11

Q

Qualifications for Membership, 3
qualified preceptor, 35
quality assurance, 20
quorum, 61, 73
Quorum, 48

R

Radiation Safety Committee, 69
ratification, 46
reappointment, 11, 20, 21, 25, 63
Reappointment Procedure, 19
reappraisal, 19

*Effective: 5/5/2008*
*Revised: 11/3/2008, 5/4/2009, 12/7/2009, 7/12/2010, 6/6/2011, 1/9/2012, 7/9/2012, 11/5/2012,*
*1/7/2013, 12/2/2013, 6/2/2014, 12/1/2014, 6/6/2016,10/3/2016,11/7/2016, 1/4/2017, 6/5/2017,*
*12/4/2017, 7/9/2018*

Regular Meetings, 48
Releases from any liability, 17
Removal of Division Chief/Department Chairman, 59
Removal of Officers, 52
Request for Applications, 16
Request for Hearing, 42
Requirements for advancement, 5
Resignation, 5, 8, 61
Restriction, 38, 39
results of a medical or psychiatric evaluation, 4
Results of Application, 18
Revocation and Suspension, 39
Right to Hearing, 42
Robert's Rules of Order, 90
RULES AND REGULATIONS
    Article XIV, 89

### S

Secretary, 49, 51, 76, 91
Sentinel Event, 30
Serious Event, 30
settlements, 16, 20
Sexual harassment, 4
sixty (60, 6, 8, 16, 26, 43
sixty-five (65), 5
Special committees, 60
Special Meetings, 48
specialty board, 55
Standards and Procedure for Review, 20
State of Indiana, 3, 28
Substantial Evidence, 2
Summary Restriction or Suspension, 38
summary suspension, 36, 38
supervising/delegating physician-employer, 5, 7

### T

Telemedicine, 29
temporary privileges, 2, 11, 26, 27
Temporary Privileges, 26
term of office, 51, 56, 57, 58, 77
terminated, 12, 60, 61
termination, 16, 20, 42, 43, 47, 48
transfer, 11
Treasurer, 49, 51, 77
triad, 2
Triad, 44
Triggers, 30
tuberculosis (TB) skin test, 16
Tumor Conference and Cancer Committee, 66, 67

### U

Utilization Management Committee, 75

### V

valid Indiana licenses, 1
Vice President of Medical Affairs, 52, 53
Vice-Chief, 55, 56, 58
Visiting Professor/Expert Surgeon, 28
vote, 5, 7, 8, 9, 10, 11, 43, 55, 56, 61, 64, 69, 77, 89, 90
voting, 51, 52, 67, 68, 71, 72, 73, 74

### W

working diagnosis, 5, 7, 10




JEROME A. PRINCE
Mayor

## CITY OF GARY
### HUMAN RELATIONS COMMISSION
455 Massachusetts Street
Gary, Indiana 46402-2500
(219) 883-4151 / (219) 881-5225 / Fax: (219) 882-0373

HANEEFAH KHAALIQ
Executive Director

# FAX REPLY MEMO

**To:** Steven Scott      **From:** L Houston

**Fax:** (219) 641-8710      **Pages:** (2)

**Phone:**      **Date:** 11/6/2020

**Re:**      **Cc:**

☐ URGENT      ☐ FOR REVIEW      ☐ PLEASE REPLY      ☐ FOR YOUR RECORDS

**COMMENTS:**

Faxed Amended Charge —

Talked to Dr. Duda on 1/24/2021

going to get Right to Sue –

Dr Anken called to apologize –